James E. Cecchi
Caroline F. Bartlett
Zachary S. Bower
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Interim Class Counsel*

Dennis G. Pantazis
Craig L. Lowell
Dennis G. Pantazis, Jr.
WIGGINS CHILDS
PANTAZIS FISHER GOLDFARB LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
 (205) 314-0500

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No.  13-7585(JBS-JS) |
| | **AMENDEDCONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs Douglas Aronson, Denise Aronson, Norma D. Thiel, Nicholas W. Farrell, Gustavo Galvan, Cahokia School District, Kenny King and the Alliance Youth Sports Association (collectively referred to as "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, by way of Second Amended Consolidated Class Action Complaint against Defendants Riddell, Inc., All American Sports Corporation d/b/a Riddell/All American, Riddell Sports Group, Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corporation, and RBG Holdings Corporation (collectively "Defendants"), and allege as follows, all on information and belief, except where specifically so identified as being on personal knowledge, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery:

## I.  **INTRODUCTION**

1.      Over the past fifteen years the public has become increasingly aware of the long term neurologic risks associated with repeated concussive injuries sustained playing recreational and professional sports.  The public's awareness and legitimate fear of concussion injury has manifested itself in positive and negative ways.  On the positive side, the NFL, recognizing its role in the many serious neurologic issues affecting its retired players, reached a landmark settlement with its players which will entitle those who have experienced neurologic injuries to recover from an uncapped settlement fund that could reach $1 billion.  The NCAA has reached a similar resolution with its collegiate athletes.

2.      Riddell, the world's largest manufacturer of football helmets, was also keenly aware of the developing concern by the public as to the safety of youth and high school football.  Riddell's reaction, however, was not entirely benign.  It realized that consumers of helmets would necessarily pay more for a helmet that purportedly provided greater protection from concussions.

3.      To exploit this natural human instinct, Riddell devised a marketing strategy that claimed that Riddell's helmets contained "Concussion Reduction Technology" and, in some specific cases, could reduce the risk of concussion by 31%.  The veracity of these claims – disseminated to parents, youth football leagues and coaches – is the core of this case.

4.      Plaintiffs allege that Riddell's assertions of "Concussion Reduction Technology" ("CRT") are misleading and false.  At the time it told the public that its helmets were more protective, Riddell was well aware of serious limitations in the underlying data allegedly supporting Riddell's claims including the fact that most of the helmets claimed to better protect youth players were never subject to clinical studies of any type.  Notwithstanding this fact, of

which Riddell was well aware, Riddell continued to market its helmets as containing Concussion Reduction Technology that could provide those who purchased its football helmets with reduced incidences of concussions.  This lawsuit seeks redress for this the economic harm caused by this false and deceptive marketing effort.

5.      Defendants design, manufacture and market football helmets. Defendants have released a number of football helmets since 2002 which they claim have "Concussion Reduction Technology."  These helmets include, amongst others, the Revolution, Revolution Speed and Riddell 360.

6.      Defendants marketed the Riddell Football Helmets as having "Concussion Reduction Technology" in order to convey to consumers that these football helmets can reduce the incidence of concussion when compared to other modern football helmets available for sale from other manufacturers.

7.      In reality, Defendants' promises are false or deceptive because their Riddell Football Helmets do not provide the promised "Concussion Reduction Technology" or result in decreasing the incidence of concussions for corresponding concussion reduction results.  In fact, objective and reliable research, which was not funded by Defendants, has shown that claims of concussion reduction related to football helmets are not valid and are instead simply a marketing tool.

8.      This research shows, for example, that concussion rates remained the same regardless of the type of football helmet used and, in fact, concussion rates among football players have increased since 2002 despite Riddell's huge successes selling helmets allegedly containing Concussion Reduction Technology.

9.     In the face of this reality, Defendants nevertheless charged a price premium for their Football Helmets in an effort to profit from the increased awareness and concern among consumers over the frequency and effects of concussions.  According to Riddell and a Federal Court, this price premium was $50 per helmet.

10.     Plaintiffs bring this lawsuit as a result of these false and deceptive claims of concussion reduction because the Football Helmets Plaintiffs purchased were not worth what they paid for them.  Moreover, the phrase "Concussion Reduction Technology" is in and of itself, a statement that is false, deceptive, misleading, and/or likely to mislead consumers, as it did for each of the named plaintiffs in this case.  Every time that Defendant used this phrase on their website, in their sales materials, in their sales and marketing presentations, on their packaging, and in their advertisements or promotions, they misled the American consumer.  At no time during the Class Period did Riddell possess legitimate proof demonstrating that its helmets reduced concussions.  In fact, during the entire Class Period, Riddell was well aware of the severe limitations of the sole alleged scientific basis for its concussion claims, a single study performed by the University of Pittsburgh Medical Center ("UPMC").  In fact, Riddell concealed from the Class these limitations and ignored direct instructions from the researchers at UPMC as to why the claims made by Riddell were not accurate based on the UPMC study.

11.     Plaintiffs file this complaint because Defendant's helmets do not actually have "Concussion Reduction Technology" and thus, their helmets are no more effective at reducing concussions than any other helmets on the market.[1]

---

[1] Specifically, these other helmets include the following Adult models: Riddell VSR-4; Xenith X2, X1, and Epic; Schutt ION 4D, Schutt DCT and VTD, Air XP, Air XP Pro VTD, and DNA Pro; Rawlings Quantum Plus, Impulse, and Tachyon.  The other helmets also include the following Youth models: Xenith X2E; Schutt Recruit, XP, XP Hybrid, and Vengeance.  Moreover, most consumers, including all of the named Plaintiffs, compared premium priced

4

## II.   JURISDICTION AND VENUE

12.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are more than one hundred Class members, and minimal diversity exists because at least one of the Plaintiffs and numerous members of the Class are citizens of different states than Defendants.

13.   This Court has personal jurisdiction over the action because Defendants each conduct substantial business activities in New Jersey through the promotion, distribution and sale of the Football Helmets at issue, and have had substantial and continuous contacts with New Jersey.

14.   Similarly, venue is proper in this District under 28 U.S.C. §1391(a)(2) because a significant part of the events that gave rise to the claim occurred in this District. Some of the Plaintiffs purchased the Football Helmets in this District and therefore sustained their injuries in this District and Defendants routinely advertise and sell their Football Helmets in this District. This Court accordingly has jurisdiction over this action and venue is proper in this District.

## III.   THE PARTIES

15.   Plaintiffs Douglas and Denise Aronson reside in Wayne, New Jersey.

16.   Plaintiff Norma D. Thiel is a citizen of New Jersey and resides in Camden County, New Jersey.

17.   Plaintiff Nicholas W. Farrell is a citizen of Florida and resides in Marion County, Florida.

---

Riddell Revolution models to less expensive Schutt models, as well as older Riddell models like the VSR-4.

18.     Plaintiff Gustavo Galvan is a citizen of California and resides in Los Angeles County, California.

19.     Plaintiff Kenny King is a citizen of Arizona residing in Maricopa County, Arizona.

20.     Plaintiff the Alliance Youth Sports Association, Inc., is a not for profit company located in Maricopa Count, Arizona.

21.     Plaintiff Cahokia School District is a citizen of St. Clair County, Illinois.  Cohokia School District asserts claims solely on theories of equitable relief, including unjust enrichment, and for declaratory relief.

22.     Defendant Riddell, Inc. is an Illinois corporation whose principal place of business is in Illinois.  Riddell, Inc. is engaged in the business of designing, manufacturing, selling, and/or distributing football equipment, including Revolution brand helmets.  This Defendant ships its products, including Revolution brand helmets, to direct purchasers and distributors in New Jersey and throughout the United States, sells its products in retail stores in New Jersey and throughout the United States, and/or advertises its products in New Jersey and throughout the United States.  Riddell, Inc. operates as a subsidiary of Riddell Sports Group, Inc.

23.     Defendant All American Sports Corporation, doing business as Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling, and/or distributing football equipment, including Revolution brand helmets.  This Defendant ships its products, including Revolution brand helmets, to direct purchasers and distributors in New Jersey and throughout the United States, sells its products in retail stores in New Jersey and throughout the United States, and/or advertises its products in New Jersey and throughout the United States.

24.     Defendant Riddell Sports Group, Inc. is a Delaware Corporation with its principal place of business in Irving, Texas.  This Defendant ships its products, including Revolution brand helmets, to direct purchasers and distributors in New Jersey and throughout the United States, sells its products in retail stores in New Jersey and nationwide, and/or advertises its products in New Jersey and throughout the United States.

25.     Defendant Easton Bell Sports, Inc. through its subsidiary Riddell Sports Group, Inc., manufactures, markets, advertises, and/or sells their Riddell Football Helmets throughout the United States.

26.     Defendant Easton-Bell Sports LLC is the parent corporation of Easton-Bell Sports, Inc., and is a Delaware corporation with its principal place of business in New York, New York.

27.     Defendant EB Sports Corporation is a Delaware corporation with its principal place of business in Van Nuys, California.

28.     Defendant RBG Holdings Corporation is a Delaware corporation with its principal place of business in Van Nuys, California.  It operates as a holding company, which through its subsidiaries designs, develops and markets sports equipment, including the Revolution brand helmets.

29.     Defendants are owned by the private equity firm Fenway Partners, Inc.

30.     Each Defendant was involved in some manner in the creation and dissemination of the misleading marketing campaign regarding the Football Helmets and/or was involved in or profited from the sales of such helmets.  Further, a duty to disclose arises in four relevant circumstances: (1) when the facts at issue involve an issue of safety; (2) when the Defendant has superior or exclusive knowledge of material facts not known to the Plaintiffs; (3) when the

Defendants actively conceals a material fact from the Plaintiffs; and (4) when the Defendants make partial representations but also suppresses other material facts.  Each Defendant either alone or in combination made partial representations or concealed material facts within their possession concerning the actual safety of the Football Helmets and their alleged ability to reduce the incidence of concussion to any degree as compared to other helmets.

31.     At all times mentioned herein, each and every Defendant was an agent, representative, affiliate, or employee of each and every other Defendant, and in doing the things alleged in the Causes of Action stated herein, each and every Defendant was acting within the course and scope of such agency, representation, affiliation, or employment and was acting with the consent, permission and authorization of the other Defendants.  During the relevant time period, Defendants misrepresented to the Class the material facts at issue herein, and/or failed to disclose to the Class the scope and nature of the illegal business practices as detailed herein, thus engaging in a conspiracy that resulted in injury in fact to members of the Class, which conspiracy is still on-going.  All actions of each Defendant were ratified and approved by the other Defendants or their respective directors, officers and/or managing agents, as appropriate for the particular time period alleged herein.

## IV.     BACKGROUND FACTUAL ALLEGATIONS

### A.     WHAT IS A CONCUSSION?

32.     A concussion is an injury to the brain that results in temporary loss of normal brain function.

33.     The milder indications of a concussion include headache, lack of concentration, problems with memory and judgment, sensitivity to light, lack of coordination and difficulty

with balance. The more significant effects can include Chronic Traumatic Encephalopathy ("CTE") and Second Impact Syndrome.

34.     CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain, which eventually leads to dementia and other neurological disorders. Second Impact Syndrome is a condition in which the brain swells rapidly after the injured person suffers a second concussion before being able to properly heal from the first, causing substantial injury or death.

35.     The brain has three main parts – the cerebrum controls higher mental functions, such as thought, memory and language; the cerebellum controls balance and coordination; and the brainstem controls bodily function such as breathing, heart rate and blood pressure.

36.     A number of structures surround the brain to keep it safe.  It is encased in the skull to protect it from outside sources, it has supporting tissues to help stabilize it, and it is covered on all sides by three membranes and a layer of fluid.  For this reason, it is often said that the brain "floats" inside the skull.

37.     As a result, injuries to the brain occur when the head suddenly stops moving, but the brain, which was traveling at the same speed as the head, continues to move and strikes the inside of the skull, transferring part of the force to the brain.   This occurs most commonly when a blow is given to the head, and can also occur when the head is forced to accelerate or decelerate rapidly.

38.     Because the brain is soft, when the brain strikes the inside of the skull, it briefly deforms, leading to a concussion.

39.     A common analogy of how to visualize a concussion is to consider an eggshell and a yolk.  The brain is the yolk, nestled in its shell and further protected by the egg white.

When the yolk moves quickly and violently, it smashes into the rigid shell – the same as with the brain inside the skull.

40.     Accordingly, while the shell can be protected with a device that might prevent it from cracking, this device cannot prevent the yolk inside the shell from being shaken and twisted.

41.     A concussion is not a structural injury to the brain, but is rather a functional injury.  As a result, concussions don't typically show up on MRI or CT scans.

42.     The brain has to be in perfect balance or equilibrium in order to function at its fullest potential.  A concussion results in a disequilibrium, or shift in metabolic need of the brain, which then results in impaired brain function, and causes a variety of immediate symptoms including nausea, blurred vision, amnesia, dizziness and other longer term effects such as permanent brain injury.

43.     According to the CDC, up to 3.8 million people suffer concussions each year, the majority of which occur during competitive or recreational sports.

44.     With respect to concussions in youths, the CDC estimates that more than 170,000 emergency visits in children 18 or younger were attributable to traumatic brain injuries.[2]

**B.     INCREASED PUBLIC AWARNESS OF CONCUSSIONS**

45.     Concussions, and their debilitating effects, continue to receive increasing attention.  Indeed, according to The New York Times, emergency room visits by children and adolescents for brain injuries jumped more than 60% from 2001 to 2009.[3]  The CDC attributes

---

[2] Centers for Disease Control. Nonfatal traumatic brain injuries related to sports and recreation activities among persons ≤ 19 years - United States, 2001-2009. MMWR 2011;60:1337-1342.

[3]     http://www.nytimes.com/2011/10/07/sports/report-shows-rise-in-er-visits-for-concussions-among-young.html?_r=0.

this increase in visits to "the growing awareness among parents and coaches, and the public as a whole, about the need for individuals with a suspected T.B.I. to be seen by a health care professional."

46.     One significant reason for this increased awareness of concussions is due to the publicity and media attention on concussions in professional sports, such as the NFL and NHL, and the long-term catastrophic effects of repetitive concussive injuries.

47.     Alongside this increased awareness of concussions, and their long-term effects, has been an increased emphasis on properly recognizing and diagnosing concussions through education and training.   Indeed, the CDC and other health organizations have dedicated websites and other sources of information focused solely on increasing awareness of concussions and their symptoms.  Professional sports leagues and other media and entertainment outlets have followed suit.

## C.     PROFITING FROM CONCUSSION FEARS – THE UPMC CONCUSSION STUDY

48.     In order to take advantage of the increased public awareness of concussions and their potentially devastating impacts, manufacturers and retailers of sports equipment have sought to profit through the production, marketing and sales of equipment that they claim can reduce the frequency and/or severity of concussions.  Yet, despite the marketing hype as to how "modern" helmets reduce the incidence and severity of concussions, the rate of concussions amongst youth and high school football players continues to rise.  In fact, since 2002 (the year of

the release of the Riddell Revolution helmet), concussions amongst youth and high school players has risen considerably.[4]

49.    As part of their effort to capture the largest share of the helmet market, defendants decided to conduct what would appear to be a scientific test regarding the purported concussion protective benefits of the Revolution helmet. But, the study, as will be detailed, was flawed both in its design and in its implementation. Moreover, it was infected with potential bias and conflicts of interest such that its results were and are fundamentally unreliable. Defendants knew these flaws but still utilized the purported results of the study to flood the market with false and misleading claims about how the Revolution brand helmets reduced concussions and were superior to comparable helmets from other manufacturers. Indeed, Riddell even ignored direct limitations explained to Riddell by the principal researchers as to why Riddell's claims regarding the study were inaccurate. The details of the study, and its limitations, are as follows.

50.    Commencing in 2002, the University of Pittsburgh Medical Center ("UPMC") conducted a study to compare the concussion rates and recovery times for athletes wearing *new* Riddell Revolution helmets compared to athletes wearing what was referred to as *traditional* helmets. The "traditional" helmets were not new although Riddell claimed that they were reconditioned. However, reconditioning rarely involves replacing the foam padding on the inside of the helmet, a critical part of the helmet that wares out over time.

51.    Riddell provided a grant to pay the salary for two leading authors of the study. A third author, Thad Ide, is a Riddell employee. In addition to being employed by Riddell, Mr. Ide is the owner of at least two patents which cover aspects of the design of the Revolution Helmet.

---

[4] http://ojs.sagepub.com/content/1/7/2325967113517860.full *last accessed* March 5, 2015. *See Also* http://ojs.sagepub.com/content/1/7/2325967113517860/F1.expansion.html *last accessed* March 5, 2015.

Although Riddell has repeatedly emphasized that certain design aspects of the helmet are "patented", none of the patent claims, nor the specifications, state specifically that the helmets described and claimed in the patents reduce the incidence of concussion or prevent concussions.

52.    Riddell's payment of the salaries of Collins and Lovell is a significant potential conflict of interest that was subsequently raised by many commentators regarding the study.  Of equal or greater concern is the fact that Riddell directly employed the third researcher – Thad Ide, the owner of the patents covering the Revolution helmet.  Ide, as owner of at least two patents covering the helmet, had a direct financial stake in the positive outcome of the study.  In subsequent advertisements trumpeting the purported success of the study, Riddell failed to disclose to consumers the significant potential conflicts of interest raised by these facts.  To the contrary, Riddell concealed these facts as well as other significant limitations in the studies design and outcome.

53.    By way of example, three of the study's authors are co-owners of ImPACT, a company that manufactures and distributes computerized neurocognitive testing software. However, upon information and belief, the software can only be utilized in ways *approved and sanctioned* by Riddell.  In fact, in 2003, ImPACT and Riddell agreed that ImPACT "would not be selling at any places in conflict with Riddell" and that "any ImPACT sale which is completed through a Riddell initiated contact, Riddell will be paid on."  The authors used ImPACT concussion management software for the study but, given Riddell's direct financial stake in the success of ImPACT, there is a serious question as to whether this software is effective and useful in a study of this nature.

13

54.     Indeed, the author's themselves excluded about 15% of the collected data because of an undefined "data collection error".   The details of these exclusions have never been made public.

55.     Beyond the financial conflicts of the study, the study was designed in a way to reach a pre-determined conclusion, *i.e.*, that the Revolution helmet was superior at reducing concussions.   Specifically, the "Research Proposal" for the study included "Directional Hypotheses."   A directional hypothesis is one that suggests that a relationship between two variables should go one way or the other.   The directional hypotheses provided in the research proposal included that: (1) "Athletes wearing the Revolution will exhibit significantly fewer incidences of cerebral concussion compared to the [traditional helmet] group"; (2) "Athletes wearing the Revolution will exhibit fewer and shorter-duration-on-field markers of concussion severity as compared to control subjects"; and (3) "Post-concussion neurocognitive dysfunction and post-concussive symptoms will resolve earlier in athletes wearing the Revolution helmet relative to athletes not wearing this helmet."

56.     In subsequent advertisements for the Revolution line helmets, Riddell did not disclose that the study design included a directional hypotheses, nor did it disclose Riddell's direct financial underwriting of the study.

57.     The study was a "prospective cohort study," not a random study, that focused on a subset of high school players in the Pennsylvania Interscholastic Athletic Association.   From 2002 to 2004, the study tracked approximately 2,000 high school football players, with slightly more than half wearing Riddell's Revolution helmets and slightly fewer wearing "traditional" helmets.

58.     The Revolution helmets supplied in 2002 to study participants were new, but the same helmets were reused in the following years.  The traditional helmets were drawn from the schools' inventories and were not new.  Traditional and Revolution helmets that were not new were refurbished and recertified each year by a member of the National Athletic Equipment Reconditioners Association using standards established by the National Operating Committee on Standards for Athletic Equipment.  However, recertifying a helmet rarely if ever involves replacing the padding on the inside of the helmet.  According to experts, this fact alone invalidated any useful data that emanated from the study since padding inside a helmet necessarily degrades over time.

59.     The study participants were also not randomly assigned helmets.  The lack of random assignment represents a significant limitation in the study design that limits the use of the study data.  As a result of the lack of random assignment, the study participants who wore the new Revolution helmets were significantly older than the study participants wearing the traditional helmets.  Research suggests that younger brains are more easily concussed and recover more slowly than older brains.  Again, these significant limitations were not disclosed by Riddell in its advertising material.

60.     The manner in which the data was collected and analyzed also raised serious questions about Riddell's use of the Concussion Study to market the Revolution Helmets.  First, the data was not separated by position, *i.e.*, skill player position versus lineman.  This is important because of the nature of impacts sustained by skill players versus lineman.  In addition, the Revolution helmet has a large, standoff shell, more likely to be worn by a lineman than a skill position player.  As such, by failing to separate out the data by position, the studies

15

design biased directly in favor of (as it was supposed to) the Revolution helmet.  Riddell's subsequent advertisements did not disclose this bias inherent in the study design.

61.     Based upon publicly available information, it is also likely that the data itself was "mined" to come to the pre-determined conclusion suggested by the directional hypotheses.  By way of example, in a 2002 Pilot Data and Report, the authors found that athletes wearing the Revolution helmet and athletes wearing the traditional helmets during the 2002 season had nearly identical concussion rates.

62.     The data gathered in 2003 showed that the difference in the rate of concussion between the groups of athletes wearing the Revolution helmet and the athletes wearing the traditional helmets was not statistically significant, although the difference "approached" statistical significance.

63.     In 2004, an internal study stated that the total number of participants over the three years was 2,207, with 1,173 fitted with the Revolution helmet and 1,034 equipped with traditional helmets.   The internal report showed that 5.29% of the athletes wearing the Revolution helmet had diagnoses of cerebral concussions, while 7.16% of the athletes wearing traditional helmets sustained concussions.  According to the authors, the difference between the groups "approached but did not reach statistical significance."

64.     The final three-year study considered only 2,141 of the 2,207 participants, with 1,173 fitted with the Revolution and 968 fitted with traditional helmets.  It is not clear why 66 participants wearing a traditional helmet were eliminated, or whether these participants had low concussion rates or not.

65.     Using these numbers, as opposed to the complete numbers, the concussion rates were 5.3% and 7.6%, respectively, which the authors of the study described as a "statistically

significant difference." According to two of the studies' authors, the results "demonstrated <u>a</u> <u>trend</u> toward a lowered incidence of concussion" but the "limited size sample precludes a more conclusive statement of findings at this time."  This is a critical and dispositive limitation that Riddell ignored and/or concealed when marketing the Revolution line helmets.

66.    Indeed, Riddell ignored other warnings by UPMC about exploiting the data in scientifically inappropriate ways.  According to one of the studies author's, Riddell exaggerated the results of the study and was notified by UPMC "that this data should not be use[d] as a marketing ploy or marketing tactic from a scientific paper that was not for those purposes."

67.    UPMC attempted to reign in Riddell's public statements in other unsuccessful ways.  For example, a press release drafted by Riddell stated that "Research Shows Riddell Revolution Football Helmet Provides Better Protection Against Concussions."  UPMC deleted this statement and specifically wrote "can't say it provides better protection."  Riddell ignored UPMC's unequivocal statements on the most critical aspect of the study and, instead, continued to make the exact claim UPMC said they could not.

68.    UPMC also objected to other ways Riddell characterized the data.  An absolute risk is a risk of developing a condition and/or disease over time.  A relative risk is used to compare a risk in two different sets of people.  UPMC attempted to have Riddell be specific when quoting the data, and insisted that it utilize "absolute" risk, a more accurate reflection of the risk level.  According to UPMC, the data showed only a 2.3% absolute risk reduction – which is obviously far less eye catching than the number Riddell chose to use, *i.e.*, 31% reduction without any explanation that this was a relative risk number.

69.    In subsequent advertisements, Riddell did not, in any way, disclose the warnings about the study given to it by the two non-Riddell employee authors.  Nor did Riddell disclose

that a statistical difference was only arrived at by analyzing an incomplete set of the data population, or that the data was not position specific.

70.     The study was submitted for publication in <u>Neurosurgery</u>, a journal in the field of neurology.  Prior to publication, the submitted article underwent a peer review process, during which it received several criticisms.  As already noted, there were many criticisms.  One reviewer observed that "[c]ynics might say that [the three years that were used in the study] was needed to enroll enough subjects so that the results would attain statistical significance."  Another reviewer was "not convinced that significant differences in 'technology' exists between the Revolution and traditional helmet models."

71.     Yet another reviewer noted that "[t]he study has several limitations in its design which may influence the results," including the fact that "[h]elmet selection was neither randomized or controlled," and that "[y]ounger patients tended to use the older helmet type, and that group may be more susceptible to concussions."  The same reviewer also pointed out that "each of the authors has a business relationship with either" ImPACT or Riddell, which the reviewer said created a "substantial conflict of interest."

72.     A separate reviewer criticized the difference in the age of the helmets used, noting that "it is well recognized that a new football helmet has a lower [severity index] rating than an older helmet.  That is why helmets are recertified after a period of years.  We know the Riddell helmets in this study are new but we have no mention of the other helmets.  This invalidates any comparison."

**D.    RIDDELL MAKES A VARIETY OF CLAIMS TO PROMOTE THEIR CORE MESSAGE OF CONCUSSION REDUCTION TECHNOLOGY**

73.    Riddell's Concussion Reduction claims are based solely on the results of the UPMC study.  Riddell has no other tests, clinical or otherwise, that support the Concussion Reduction claims made to the public about the Revolution line helmets.

74.    Numerous advertisements include the following phrase or language similar to it: "Research shows a 31% reduction in concussions in players wearing Riddell Revolution Helmets."  Although the study tested *only* the Revolution helmet, Riddell used the phrase in many advertisements for other helmets in the Revolution "family," including the "IQ," "IQ HITS," "Youth," "Speed" and "Speed Youth" helmets.

75.    Riddell's claims regarding the youth helmets are particularly egregious since the youth helmets were not part of the study in any way.  Notwithstanding this fact, Riddell still marketed the youth helmets as if some study showed that they actually reduced incidences of concussion amongst youth football players.

76.    Some advertisements included a more complete phrase, to the effect that "research has shown that players wearing the Riddell Revolution football helmet are 31% less likely to suffer a concussion than players wearing traditional football helmets."  Some added that the study showed a reduced risk of concussion "up to 41%" and others added that the 41% rate was only for players who had not previously suffered a concussion.  Most of the advertisements also included a reference to the <u>Neurosurgery</u> article.

77.    In a March 16, 2009 press release, Riddell made the following statement:

> The name Riddell is synonymous with football protection.  Riddell football helmets and shoulder pads are the equipment that players at the highest levels demand by name.  The Riddell Revolution helmet is the standard against which all football helmets are measured-shown in published research to reduce the risk of concussion by nearly a third.

19

> The Revolution Speed football helmet-Riddell's latest breakthrough innovation-is a combination of protection, comfort, and style that is taking the football world by storm.  Riddell's proud history has been built on their passionate quest for the next improvement in athlete protection and their drive to advance the state-of-the-art in athletic equipment.  Visit www.riddell.com for more information.

78.    Riddell also sent out a letter stating that "[g]round-breaking research shows that athletes who wear Riddell Revolution Youth helmets were 31% less likely to suffer a concussion than athletes who wore traditional football helmets" and citing the article.   Again, the Concussion Study did not test the youth helmet, only the Revolution helmet.

79.    In promotional videos touting the technology and safety of their Riddell Football Helmets, Defendants routinely point to specific designs and technological advances that they claim make their helmets safer.  By way of example and not limitation, in a four and a half minute video still available on their websites, Defendants explain in detail the technological and design advances that enable their Riddell Football Helmets to reduce concussions.  Indeed, in this video, Defendants state that "on-file reconstructive studies on concussive events showed that many of the players were being struck to the side of the head and the face so we developed our patented side impact protection . . . to better handle those blows to the side of the head and the face."



80.     Defendants further tout their Riddell Football Helmets and market their purported increased safety at marketing events they label as "Protection Tour[s]… a program that delivers expert-driven health and safety education to youth football players, parents and coaches nationwide."  According to Riddell President Dan Arment, "[o]ur expertise in football headgear and protective equipment positions us well to deliver valuable information to youth football players, their parents and coaches about equipment care and fitting at the Protection Tour,"

81.     Commensurate with these concussion reduction promises are price premiums that Defendants charge for their Riddell Football Helmets.  Indeed, while less expensive comparable products are readily available, the Riddell Football Helmets are sold at a higher price based on promises of increased safety and reduced concussions.  The price premium is $50 per helmet. Defendants support this extra cost by pointing to the "technology" of the Riddell Football Helmets and to the results of the Concussion Study.

82.     Defendants target their concussion reduction marketing to youth football leagues and high school teams.

83.     Defendants likewise advertise extensively on social media and elsewhere on the Internet, routinely making the same concussion reduction claims, such as this advertisement on their Facebook page:



84.      As further evidence of this marketing scheme, Defendants routinely place advertisements in youth focused media, and advertise at youth focused events such as NFL Play

60 Youth Football Clinics.  This conduct is particularly egregious since, as noted, the UPMC study did not test a single youth helmet.

85.    In sum, Defendants marketed, advertised, sold, and disseminated their Football Helmets as having technology that can reduce the frequency of concussions.  Defendants, through their website, direct sales force, product packaging, promotional advertisements and marketing, and retailers using information provided by Defendants, utilize the following representations, *inter alia*, to market their Riddell Football Helmets.  The following  are examples of the types of claims made by Defendants regarding the Riddell Football Helmets' ability to reduce the incidence of concussions when compared to other football helmets on the market:

a.   "Riddell's exclusive Concussion Reduction Technology ***protects young athletes against concussions*** and impact."[5]

b.   "The most advanced piece of ***modern concussion prevention*** in the game today!"[6]

c.   "Safer, more protective, and advanced frontal helmet protection ***designed to reduce concussions***.[7]"

d.   "***Riddell CRT (Concussion Reduction Technology) to keep young players safe on the field***."[8]

e.   "Riddell's Concussion Reduction Technology ***provides increased protection against concussions*** and impact."[9]

---

[5] http://sportsapparelrankings.weebly.com/football-helmets.html

[6] http://www.made-in-china.com/products-search/hot-china-products/Riddell_360_Football_Helmet_Facemask.html

[7] http://www.sportsunlimitedinc.com/riddell-360-youth-football-helmet-with-360-2bd-lw-facemask.html

[8] http://www.amazon.co.uk/RIDDELL-Youth-Revolution-Football-Helmet/dp/B0055QC7ZA

[9] http://jimfischersporting.weebly.com/football.html

     f.     The helmet's ***Revolution Concussion Reduction Technology*** uses three principal design elements – an offset shell, mandible extensions and energy managing S-Pads – to provide superior protection for players on the field.[10]

86.     Making such "concussion reduction" claims has been hugely rewarding to Defendants as their Riddell Football Helmets are some of the best-selling football helmets in the United States.  Despite Defendants' representations, there is no material difference in the Riddell Football Helmets and the other football helmets available to consumers in regard to concussion reduction.

## E.    THE FTC INVESTIGATION

87.     The Federal Trade Commission ("FTC") investigated whether Riddell was falsely representing that its Revolution Football Helmets could reduce concussions and the risk of concussions by 31%.

88.     The FTC investigation focused on the flaws in the UPMC study, and the FTC determined that the limitations of the study were sufficiently serious to preclude the conclusion made by Riddell that the design of the Revolution Helmets was responsible for any purported difference in the concussion rates experienced.

89.     The FTC further noted that the study did not even include elementary and middle school players.

90.     Instead of contesting the FTC's findings or its criticisms of the study's methodologies and unreliability, Defendants instead chose to wholly abandon making the specific 31% claim.

91.     Amazingly, Defendants continued to ubiquitously make the broader "concussion reduction technology" claim, the only basis for which was the same flawed study.   Such

---

[10] http://news.riddell.com/info/releases/riddells-latest-innovation-in-protection-the-riddell-revolution-speed-helmet-gains-momentum-at-top-division-i-football-programs

continued promises to consumers that their Revolution Helmets had "concussion reduction technology" is illustrative of Defendants drive for profits at the expense of consumers.

### IV. DEFENDANTS' CLAIMS OF "CONCUSSION REDUCTION TECHNOLOGY" ARE FALSE OR DECEPTIVE

92.     According to several studies, and the majority of independent experts, Defendants' claims that their Football Helmets have "concussion reduction technology" are false and misleading.

93.     In fact, in the largest prospective study in the United States conducted by independent researchers, it was found that the Riddell Revolution Helmets did not reduce a player's incidence of concussion when compared to other modern helmets such as those manufactured by Schutt and Xenith.

94.     The study was conducted by the University of Wisconsin and published in the American Journal of Sports Medicine on July 24, 2014, The study compared the incidence of concussion for high school players in Wisconsin in the years 2012 and 2013.  The players wore Riddell helmets and helmets manufactured by Schutt and Xenith.  By far the most common helmet utilized in the study was the Riddell Revolution and Riddell Revolution Speed.  Unlike the UPMC study, the Wisconsin Study was not funded by Defendants and, equally important, the two comparative groups wore comparable modern helmets.

95.     The Wisconsin Study was more robust than the UPMC and followed 2081 players for two years.  In fact, the Wisconsin Study is the largest prospective study to have reported the brand of helmets worn by High School football players in the United States.  The Study concluded that there was no difference in the rate of concussion for players wearing Riddell helmets as opposed to helmets manufactured by Schutt or Xenith.

96.     The researchers noted that "[d]espite what manufacturers might claim, newer and more expensive equipment may not reduce concussion risk . . .  [s]o is it worth the significant extra cost to families and schools?"[11]

97.     Defendants are also aware that their Riddell Football Helmets cannot actually reduce the frequency of concussions and that their claims of "concussion reduction technology" are therefore false or misleading.  For example, court documents made public during a Colorado lawsuit revealed that Biokinetics, a Canadian-based biomechanics firm hired by the NFL, sent Riddell a report in 2000 showing that no football helmet, no matter how revolutionary, could prevent concussions.

98.     Accordingly, despite having made specific representations on an issue relating to user and child safety, and thus having a duty to disclose the material limitations of such claims, Defendants failed to disclose what they knew for certain - that significant evidence establishes that their Riddell Football Helmets provide no material difference in concussion reduction. Coupled with their affirmative statements to the contrary, Defendants' failure to disclose to consumers that there is no material difference in concussion reduction of their helmets would, and did, mislead reasonable purchasers of such helmets into paying a premium price for such helmets.

99.     In addition, at no time did Defendants disclose to consumers in their advertisements the significant structural limitations of the UPMC concussion study, nor the conflicts of interest of the study's authors.

---

[11]Timothy A. McGuine, et al., *Protective Equipment and Player Characteristics Associated With the Incidence of Sport-Related Concussion in High School Football Players: A Multifactorial Prospective Study*, 42 Am. J. Sports Med., 2470-2478 (2014).
.

100.    Plaintiffs and the members of the Class paid price premiums for the Riddell Football Helmets.  In fact, Defendants have acknowledged that they could charge a $50 price premium per helmet (when compared to other available helmets on the market) by making the "concussion reduction technology" claim.   Further, a Federal Judge has determined that Riddell was able to charge a $50 price premium for the Revolution Helmets, noting that Riddell itself attributed the price premium to the concussion reduction technology claims.[12]   Therefore, Plaintiffs and the members of the Class were harmed, and suffered an ascertainable loss, by virtue of their payments of a price premium for these purportedly concussion reduction Riddell Football Helmets.

101.    Alternatively, some members of the Class, including the Aronsons, suffered damages in the full amount of the price paid for the Riddell Football Helmets because they had access to other football helmets without cost, and the only reason for the purchase of the Riddell Football Helmet was the "concussion reduction technology" claim. Therefore, damages to these Plaintiffs are equal to the entire cost of the Football Helmet.

102.    Because Defendants' uniform claims regarding "concussion reduction technology" were widely included and disseminated in advertisements, marketing, and sales presentations, and went to a material characteristic, benefit and use of their Football Helmets – that of user safety – a reasonable consumer would likely be misled into believing that the Revolution helmet will reduce the frequency of concussions.

103.    Accordingly, Plaintiffs assert their class allegations pursuant to Fed. R. Civ. P. 23 against Defendants, and seek claims for violations of the consumer protection laws, unjust

---

[12] "The launch of the Revolution allowed Riddell to get a $50 premium for the new helmet, which Riddell attributes to the 'technology' of the helmet and the concussion study". *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 980 (2010).

enrichment, and declaratory relief, and seek monetary, declaratory and injunctive relief for similarly situated purchasers of Defendants' Riddell Football Helmets.

## VI.   PLAINTIFF SPECIFIC FACTUAL ALLEGATIONS

### a.   *Plaintiffs Douglas and Denise Aronson*

104.   Plaintiffs Douglas and Denise Aronson purchased a Revolution Speed Football Helmet for use by their son in or around August of 2011 for his personal use as a member of his high school football team.  Both the Aronsons and their son had been exposed to Defendants' claims that their Riddell Football Helmets had "concussion reduction technology" prior to making their purchase.  Moreover, as a former professional football player, it was particularly important to Doug Aronson to insure that he purchased the most protective helmet available.

105.   Specifically, prior to entering high school, a representative offering Riddell Football Helmets for sale appeared at a boy's club football practice and conveyed to the players, parents and coaches that the Riddell Football Helmets he was offering for sale was the best helmet for preventing concussions because it had concussion reduction technology.   The representative did not disclose any of the true facts regarding the Concussion Study set forth above.  The representative also did not disclose that the Revolution Speed Helmet was not even a part of the Concussion Study and that no clinical study showed that the Speed helmet was better or more protective than less expensive alternative helmets available to the Aronsons.

106.   Later, in 2011, after learning that his high school team was not providing a Riddell Football Helmet with what they understood to have concussion reduction technology, the Aronson's son asked them to purchase a Riddell Football Helmet with concussion reduction technology.  As a result, Denise Aronson went online to Riddell's website.  While on the Riddell website and prior to making this purchase, Denise Aronson viewed Riddell's claim that its

Riddell Football Helmets had concussion reduction technology.  Accordingly on more than one occasion, the Aronsons were exposed to Defendants' claim that their Riddell Football Helmets had "concussion reduction technology" that would make them better at preventing concussions that other helmets that were available to them.  Based on this belief, the Aronsons purchased a Riddell Revolution Speed Football Helmet directly from Riddell.

107.   The online price of the Riddell Football Helmet was at least $50 more than other comparable football helmets on the market, such as Schutt helmets, available to the Aronsons. While the Aronsons recall that their total bill for the purchase of the Riddell Helmet was approximately $300, their purchase included other items, such as a face mask, so they do not presently recall the exact price paid for the Riddell Helmet itself.  As this purchase was directly from Defendants, the exact price paid by the Aronsons is known to Defendants as are all the details of the Aronsons' purchase.  As a result, and because the Riddell Football Helmet they purchased does not actually provide greater protection against concussions, Plaintiffs Douglas and Denise Aronson have suffered economic harm by virtue of the price premium charged for the Riddell Football Helmet.

108.   Alternatively, the Aronsons suffered damages in the full amount paid for the Riddell Football Helmet because their son's high school had already provided another football helmet for free.  Accordingly, the amount they spent purchasing the Riddell Football Helmet represents the total amount of their damages because the Aronsons received nothing from their purchase of the Riddell Football Helmet because it was no better at preventing concussions than the football helmet that was being provided by their son's high school team and this was ***the only reason*** they purchased it.  In other words, the Aronsons were no better off having paid for and

received a Riddell Football Helmet than they would have been had their son simply used the helmet provided to them for free by his high school team.

### b.    *Plaintiff Norma D. Thiel*

109.    Plaintiff Norma D. Thiel is a citizen of New Jersey and resides in Camden County, New Jersey.  Ms. Thiel bought a Riddell 360 helmet for her son.  He was involved in a car accident at a young age, and suffered a concussion, so the concussion reduction technology was critically important to her.  She saw Riddell You-tube videos advertising the Riddell 360, and how its technology could better protect the head from concussions than other models on the market.  While Ms. Thiel considered other helmets, the claims made by Riddell concerning concussion reduction technology were dispositive.  Ms. Thiel purchased the Riddell Revolution 360 directly from Riddell's website for $389.98 on April 24, 2013, because she relied upon Riddell's advertising materials, that stated it would provide better protection from concussions than other helmets on the market.

### c.    *Plaintiff Nicholas W. Farrell*

110.    Plaintiff Nicholas W. Farrell is a citizen of Florida and resides in Marion County, Florida.  Plaintiff Farrell was exposed to Concussion Reduction Technology claims, as well as the 31% reduction claim, which were important to him because he had already had a concussion before.  He saw these ads on the internet and in magazines.  Relying upon Riddell's concussion reduction claims, he purchased the helmet for $250.00 in September of 2010 because he thought Riddell's claims meant the Revolution was better at reducing concussions than other helmets on the market which he considered.  He purchased the helmet through a magazine, although he is unsure of exactly which one.

### d.    *Plaintiff Gustavo Galvan*

111.    Plaintiff Gustavo Galvan is a citizen of California and resides in Los Angeles County, California.  Mr. Galvan purchased a Riddell Revolution Helmet in June of 2011 for over $200.00.  While shopping for the helmet, he performed internet research on football helmets from a variety of manufacturers and noticed that the Riddell website "news" section claimed that the helmet reduced concussions by 31%.  He also noted that the packaging of the helmets showed "Concussion Reduction Technology" and that the helmets were "great for youth and junior high players".  Mr. Galvan relied upon these statements claiming superior concussion reduction technology, and purchased a Riddell Revolution helmet from Dick's Sporting Goods at 2753 East Eastland Center Drive, West Covina, CA 91791.

### e.    *Plaintiff Cahokia School District*

112.    Plaintiff Cahokia School District purchased multiple Riddell Football Helmets since 2011.  Cohokia School District is pursuing only declaratory judgment and unjust enrichment claims at this time.  Cohokia School District purchased numerous Riddell Football Helmets at a price premium of $50 per helmet but, since the helmets do not perform better than other comparable helmets at reducing concussions, Riddell has been unjustly enriched.

113.    Plaintiff Cahokia School District was exposed to the false and deceptive claims regarding the ability of the Football Helmets to reduce concussions as detailed herein as detailed herein, paid a price premium for these Riddell Football Helmets and suffered economic harm because the Football Helmets it purchased do not provide greater protection against concussions.

### f.    *Plaintiffs Kenny King and the Alliance Youth Sports Association*

114.    Plaintiff Kenny King is the Executive President of the Alliance Youth Sports Association.  Plaintiff the Alliance Youth Sport Association is an entity that runs a pee wee

football league.   Mr. King regularly purchases helmets on behalf of the Alliance Youth Sport Association.   In February of 2010, Mr. King met with Taylor Hanahana, a Riddell sales representative at the Glazier Clinic in Las Vegas, NV.  Riddell's sales representative represented that the Revolution helmets offered superior concussion reduction technology.  The Sales Representative followed up with Mr. King and met with him at Mr. King's office, and further compared the concussion reduction properties of the Revolution, to Schutt models.  Mr. King also reviewed concussion reduction statements in the Riddell 2010 sales catalog.  Mr. King then relied upon Riddell's statements and began purchasing Riddell Revolution Youth helmets for the Alliance Youth Sport Association in July of 2010, which purchases continues at least through March of 2013, because he thought they offered better concussion protection than less expensive Schutt models.

115.    Accordingly, each Plaintiff was exposed to one or more claims by Defendants that their Riddell Football Helmets have concussion reduction technology.

116.    The deception cause by this claim was the belief by all consumers that persons wearing Riddell Football Helmets were less likely to get a concussion than those persons wearing other helmets that were then available for purchase by consumers.

### VII.    CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The proposed Class is defined as follows: All purchasers of Riddell Football Helmets promoted as containing concussion reduction technology within the United States from the beginning of the applicable statutes of limitation period through the present.

31

118.    The Plaintiffs who purchased their Riddell Helmets online directly from Defendants assert a Class defined as: All purchasers from Defendants' websites of Riddell Football Helmets promoted as containing concussion reduction technology within the United States from the beginning of the applicable statutes of limitation period through the present.

119.    Plaintiffs reserve the right to amend their class definition.

120.    Excluded from the Class are Defendants, their parent, subsidiaries and affiliates, their directors and officers and members of their immediate families.  Also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

121.    This action is maintainable as a class action. The Class is so numerous and geographically dispersed that joinder of all Class members is impracticable, and the resolution of their claims as a Class will provide substantial benefits to both the parties and the Court.

122.    A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this class action. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it unfeasible or impossible for members of the Class to individually seek redress for the wrongful conduct alleged.

123.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

124.    Rule 23(a)(2) and Rule 23(b)(3) are both satisfied because there are questions of law and fact common to the Class and that  predominate over questions affecting any individual Class member.  The common questions include*, inter alia*, the following:

a.    whether Defendants' Football Helmets can actually prevent or reduce the occurrence of concussions as compared to other football helmets available for purchase by consumers;

b.    whether Defendants concealed the ineffectiveness of Football Helmets in preventing or reducing concussions;

c.    whether Defendants engaged in unfair, false, misleading, or deceptive acts or practices regarding in the marketing and sale of their Football Helmets;

d.    whether Defendants were unjustly enriched by their claims of concussion reduction;

e.    whether the Class is entitled to declaratory, injunctive and other equitable relief, including restitution and disgorgement, and if so, the nature of such relief; and

f.    whether the Class is entitled to compensatory damages, and if so, the amount of such damages.

125.    Plaintiffs' claims and the claims of members of the Class all derive from a common core of operative facts.  Further, irrespective of the individual circumstances of any Class member, liability in this matter will rise and fall with a relatively few core issues related to Defendants' statements regarding the effectiveness of their Football Helmets at preventing or reducing concussions.

126.    The Class may be properly maintained under Rule 23(b)(2).  Defendants have acted or refused to act, with respect to some or all issues presented in this Complaint, on

grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

127.    Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs have the same interest as all members of the Class in that the nature and character of the challenged conduct is the same.

128.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs purchased Football Helmets and paid a price premium for the products because of Defendants' false claims of concussion reduction or omission of material facts to the contrary. Plaintiffs' interests are entirely consistent with, and not antagonistic to, those of the other members of the Class.

129.    Plaintiffs have retained adequate counsel experienced in the prosecution of consumer and class action litigation who meet the criteria of Rule 23(g).

## VIII.   ASCERTAINABLE LOSS

130.    By reason of the above-described conduct, Defendants caused actual harm, injury-in-fact, and loss of money to Plaintiffs and the Class. Plaintiffs and the Class were injured in the following ways:

        a.      Plaintiffs and members of the Class paid price premiums of at least $50 per helmet for Defendants' Football Helmets for the purpose of preventing or reducing concussions based on Defendants' misrepresentations regarding the Riddell Football Helmets' having concussion reduction technology;

        b.      Alternatively, some members of the Class suffered full damages of the total amount paid for the Riddell Football Helmets because they already had access to another football helmet without charge, and purchased the Riddell

34

Football Helmet only because of the concussion reduction technology promises made by Defendants;

c.     If Defendants' Riddell Football Helmets actually included technology that was capable of reducing the likelihood of concussions compared to other helmets as represented, Plaintiffs would not have suffered the economic loss described herein;

d.     Plaintiffs and the Class have been deprived of the benefits of their Riddell Football Helmets promoted by Defendants, requiring restitution; and

e.     Plaintiffs and the Class have been deprived of the benefit of their bargains and suffered other damages by purchasing Riddell Football Helmets, which could not lessen the likelihood of concussions as represented.

## IX.     CAUSES OF ACTION

### COUNT I
**Violation Of New Jersey's Consumer Fraud Act, N.J.S.A. §58:8-1, *et seq.***
**(Brought by Plaintiffs Aronson and Thiel,**
**Individually and on Behalf of the New Jersey Subclass)**

131.     Plaintiffs repeat the allegations contained in the above paragraphs, as if fully set forth herein.

132.     Plaintiffs from New Jersey bring this claim individually and on behalf of the other members of a New Jersey Subclass.

133.     Defendants misrepresented that the Riddell Football Helmets would provide certain concussion reduction and prevention benefits including, but not limited to Defendants' representations that the Riddell Football Helmets delivered a 31% reduction in the risk of concussions and provided superior anti-concussion support from its concussion reduction technology including padding and side impact protection or provided the other promised

35

concussion reduction and prevention benefits as described herein or omitted material facts to the contrary.

134.    Defendants' affirmative misrepresentations constitute an unconscionable commercial practice, deception, fraud, false promise and/or misrepresentation as to the nature of the goods, in violation of the NJCFA.

135.    Defendants' knowing and intentional omissions as described herein constitute a violation of the NJCFA.

136.    Plaintiffs from New Jersey and the other New Jersey Subclass members suffered an ascertainable loss caused by exposure to Defendants' misrepresentations and omissions and paid a price premium due to the misleading and false advertising and deceptive promises of concussion reduction and prevention benefits of the Riddell Football Helmets, when, in fact, those qualities did not exist.

137.    Simply put, Plaintiffs from New Jersey and the other New Jersey Subclass members paid for the advertised benefits of the Football Helmets and did not get what they paid for.

## COUNT II
### Violation Of The Florida Deceptive And Unfair Trade Practices Act (FDUTPA), Sections 501.201, *Et Seq*., Florida Statutes (2005) (Brought by Plaintiff Nicholas Farrell, Individually and on Behalf of the Florida Subclass)

138.    Plaintiffs incorporate by reference the above as though fully set forth herein.

139.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. ("FDUTPA").  The stated purpose of the Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

36

140.     Plaintiffs from Florida and the Florida Subclass are consumers as defined by Fla. Stat. §501.203 and have standing to pursue this claim because they were exposed to Defendants' representations regarding concussion reduction, purchased the subject Riddell Football Helmets, have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above.

141.     The helmets in question are goods within the meaning of the Act, and Defendants are engaged in commerce with the meaning of the FDUTPA.

142.     Fla. Stat. §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

143.     Defendants' conduct alleged herein violates the legislatively declared policies in the FDUTPA because Defendants misled Florida Subclass members into believing that the Football Helmets would reduce the chances of concussion compared to other less expensive helmets when, in fact, there was no material difference in concussion protection among traditional football helmets. Defendants concealed this material fact by failing to include it on their helmet's packaging or related marketing materials.

144.     Defendants' concealed other material facts relating to the helmets including, but not limited to, the serious flaws and limitations of the Concussion Study as set forth above.

145.     As a result of Defendants' "unfair" or "deceptive" conduct, Plaintiffs from Florida were exposed to the Defendants' unfair and deceptive practices, and members of the Florida Subclass spent money on the premium-priced Riddell Football Helmets that they would not otherwise have acquired at the prices that they did and did not receive a helmet that possessed

the increased concussion protection Defendants represented or omitted material facts to the contrary.

146.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein that offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

147.    Plaintiffs from Florida and the Florida Subclass have been aggrieved by Defendants' unfair and deceptive practices because they purchased the offending helmet described herein at premium prices over comparable helmets from competing manufacturers. The premium was at least, according to Riddell, $50 per helmet.

148.    The damages Plaintiffs from Florida and the Florida Subclass suffered were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants as more fully described herein.

149.    Pursuant to Fla. Stat. §§501.211(2) and 501.2105, Plaintiffs from Florida and the Florida Subclass seek damages, attorneys' fees and costs of prosecuting this action.

150.    Pursuant to Fla. Stat. §501.211(1), Plaintiffs from Florida and the Florida Subclass seek a declaratory judgment and court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

### COUNT III
**VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *et seq.* –**
**"Unfair" Business Acts and Practices**
**(Brought by Plaintiff Gustavo Galvan, Individually and on Behalf of the California Subclass)**

151.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

152.    Plaintiffs from California have standing to pursue this claim on behalf of all affected persons who reside in California  as such Plaintiffs have suffered injury in fact and has lost money or property as a result of Defendants' actions, as set forth above.

153.    Defendants' actions as alleged in this Complaint constitute "unfair" business practices within the meaning of California Business and Professions Code § 17200, *et seq.* ("UCL").

154.    Defendants' business practices, as alleged herein, are "unfair" because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to their customers. Additionally, Defendants' conduct is "unfair" because Defendants' conduct violated the legislatively declared policies not to engage in such practices based on California's False Advertising Law (Bus. & Prof. Code § 17500, *et seq.*) and the Consumers Legal Remedies Act (Civ. Code § 1750, *et seq.*).

155.    Defendants misled consumers into believing that their Riddell Football Helmets reduced concussions when, in fact, there was no material difference in concussion protection between the Riddell Football Helmets and other lower-priced helmets sold by competing manufacturers.  Defendants concealed this material fact from consumers.  Defendants also concealed from plaintiffs that the sole basis for Riddell's Concussion Reduction Claims was the UPMC study.  Hanover, as set forth above, the study was seriously flawed and did not support the claims made by Riddell.

156.    As a result of Defendants' "unfair" conduct, Plaintiffs from California and members of the California Subclass were exposed to the unfair conduct and spent money on premium-priced Riddell Football Helmets that they would not otherwise have spent at the levels that they did and did not receive the increased concussion protection promised by Defendants.

157.    Defendants' unfair business practices alleged herein constitute a continuing course of unfair competition because Defendants market and sell their Riddell Football Helmets in a manner that offends public policy and/or in a fashion that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to their customers.

158.    Plaintiffs from California and the California Subclass seek an order for injunctive and equitable relief, including requiring Defendants to make full restitution and disgorgement of all monies they have wrongfully obtained from Plaintiffs from California and the California Subclass, along with all other relief permitted under Bus. & Prof. Code § 17200, *et seq.*

**COUNT IV**
**Violation of Cal. Bus. & Prof. Code § 17200, *et seq.* –**
**"Deceptive" Acts and Practices**
**(Brought by Plaintiff Gustavo Galvan,**
**Individually and on Behalf of the California Subclass)**

159.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

160.    Plaintiffs from California have standing to pursue this claim as such Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' actions, as set forth above.

161.    Defendants' actions as alleged in this Complaint constitute "deceptive" or "fraudulent" business practices within the meaning of California Business and Professions Code § 17200, *et seq.*, although no intent is alleged or required to establish Defendants' violation of this prong of the UCL.

162.    Defendants' business practices, as alleged herein, are "deceptive" or "fraudulent" because they are likely to deceive consumers, including Plaintiffs and members of the California Subclass.

163.    Defendants made material misrepresentations as stated above, failed to disclose all material information to purchasers of their Riddell Football Helmets concerning the lack of concussion protection offered by the Riddell Football Helmets as compared to less expensive helmets even though, based on the safety-related impacts of such claims and the products at issue they had a duty to do so, and affirmatively concealed the fact that there is no material difference between Riddell Football Helmets and other lower-priced helmets in terms of concussion protection or reduction.   Defendants also concealed, *inter alia*, the significant and fatal material limitations of the Concussion Study as set forth above.

164.    As a result of Defendants' "deceptive" or "fraudulent" conduct, Plaintiffs from California and members of the California Subclass were exposed to the Defendants' deceptive and fraudulent conduct, and spent money on premium-priced Riddell Football Helmets that they would not otherwise have spent at the levels that they did and did not receive the increased concussion protection represented by Defendants.

165.    Defendants' business practices alleged herein constitute a continuing course of unfair competition since Defendants market and sell their Riddell Football Helmets in a manner that was and remains likely to deceive California Subclass members.

166.    Plaintiffs from California and the California Subclass  seek an order for injunctive and equitable relief, including requiring Defendants to make full restitution and disgorgement of all monies they have wrongfully obtained from Plaintiffs from California and the California Subclass, along with all other relief permitted under Bus. & Prof. Code § 17200, *et seq.*

718f25294915a51f

**COUNT V**
**Violation of Cal. Bus. & Prof. Code § 17200,** *et seq.*
**"Unlawful" Business Practices**
**(Brought by Plaintiff Gustavo Galvan,**
**Individually and on Behalf of the California Subclass)**

167.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

168.    Plaintiffs from California have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above.

169.    Defendants' actions as alleged in this Complaint constitute an "unlawful" business practice within the meaning of California Business and Professions Code § 17200, *et seq.*, because Defendants' actions violated, *inter alia*, California Business and Professions Code § 17500, *et seq.*, which proscribes misleading advertising, and because they violated Civil Code § 1750, *et seq.*, the Consumers Legal Remedies Act, as alleged in this Complaint and the prior substantiation rules of the Federal Trade Commission.

170.    As a result of Defendants' "unlawful" conduct, Plaintiffs from California and members of the California Subclass were exposed to the unlawful conduct and spent money on premium-priced Riddell Football Helmets that they would not otherwise have spent at the levels that they did and did not receive the increased concussion protection or reduction represented by Defendants.

171.    Defendants' business practices alleged herein constitute a continuing course of unfair competition since Defendants market and sell their products in a manner that was and remains likely to be unlawful.

172.    Plaintiffs from California and the California Subclass seek an order for injunctive and equitable relief, including requiring Defendants to make full restitution and disgorgement of all monies they have wrongfully obtained from Plaintiffs from California and the California Subclass, along with all other relief permitted under Bus. & Prof. Code § 17200, *et seq.*

**COUNT VI**
**Violation of Cal. Bus. & Prof. Code § 17500, *et seq.* –**
**Misleading Advertising**
**(Brought by Plaintiff Gustavo Galvan,**
**Individually and on Behalf of the California Subclass)**

173.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

174.    Plaintiffs from California have standing to pursue this claim as such Plaintiffs have suffered injury in fact and has lost money or property as a result of Defendants' actions as set forth above.

175.    Defendants engaged in the advertising and marketing alleged herein to the public and offered for sale Riddell Football Helmets in California with the intent to directly or indirectly induce the sale of their Riddell Football Helmets to purchasers of such helmets in California, or such advertisements originated in California and were intended to be conveyed to persons outside California.

176.    Defendants' advertising and marketing representations regarding the superior concussion protection of their Riddell Football Helmets were false, misleading, and deceptive as set forth in detail above. Defendants also concealed material information from the consuming public as set forth above that they were obligated to disclose about the actual level of concussion protection or reduction of their Riddell Football Helmets as compared to less expensive helmets in their product packaging and other advertising and marketing materials.

43

177.    Defendants' misrepresentations and omissions of material fact alleged herein deceived, or have the tendency and likelihood to deceive, the general public regarding the benefits and characteristics contained in the Riddell Football Helmets.

178.    Defendants' misrepresentations and omissions of material fact as alleged herein were the type of factual statements  that are objectively material, in that a reasonable person would attach importance to them, and were intended by Defendants to induce such persons to act on such information in making their purchase decisions.

179.    At the time they made the misrepresentations and omissions alleged herein, Defendants reasonably should have known that such statements were untrue or misleading and thus in violation of Bus. & Prof. Code § 17500, *et seq.*

180.    Defendants' business practices alleged herein constitute a continuing course of unfair competition since Defendants market and sell their products in a manner that was and remains likely to deceive California Subclass members.

181.    As a result, Plaintiffs from California and the California Subclass seek injunctive and equitable relief, including full restitution and disgorgement, and all other relief permitted under Bus. & Prof. Code § 17500, *et seq.*

### COUNT VII
**Violation of Cal. Civ. Code § 1750, *et seq.* –**
**Consumers Legal Remedies Act**
**(Brought by Plaintiff Gustavo Galvan,**
**Individually and on Behalf of the California Subclass)**

182.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

183.    Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

184.    Plaintiffs from California and members of the California Subclass who purchased the Riddell Football Helmets primarily for personal, family or household purposes are "consumers" as defined in Cal. Civ. Code § 1761(d).

185.    The Riddell Football Helmets that Plaintiffs from California and the California Subclass purchased from Defendants are "goods" within the meaning of Cal. Civ. Code § 1761(a).

186.    The purchases by Plaintiffs from California and members of the California Subclass as set forth above of the goods sold by Defendants, alleged herein, constitute "transactions" within the meaning of Cal Civ. Code § 1761(e).

187.    In connection with their sale of the goods in question, Defendants violated the CLRA by:

a.    Misrepresenting to Plaintiffs from California and members of the California Subclass that Defendants' Riddell Football Helmets offered more concussion protection when compared to traditional helmets, when they in fact do not, in violation of Cal Civ. Code §§ 1770(a)(5), (7), (14), and (16);

b.    Misrepresenting to Plaintiffs from California and members of the California Subclass that Defendants' Riddell Football Helmets had characteristics, uses and benefits they did not have, in violation of Cal. Civ. Code § 1770(a)(5);

c.    Representing to Plaintiffs of California and members of the California Subclass that Defendants' Riddell Football Helmets were of a particular standard, quality, or grade, when they were of another, in violation of Cal. Civ. Code § 1770(a)(7);

d.    Misrepresenting that their transactions with Plaintiffs from California and members of the California Subclass conferred benefits and rights on Plaintiffs from California

45

and the California Subclass, and obligations on Defendants, which were not, in fact, conferred or which were prohibited by law, in violation of Cal. Civ. Code § 1770(a)(14); and

     e.    Misrepresenting to Plaintiffs from California and members of the California Subclass that the subject of a transaction has been supplied in accordance with a previous representation when it had not, in violation of Cal. Civ. Code § 1770(a)(16).

     188.    In addition, under California law, Defendants had a duty to disclose to Plaintiffs from California and California Subclass members the true amount of concussion protection offered by their Riddell Football Helmets (which was none or significantly less than represented), as such material facts related to issues of safety; Defendants had superior, if not exclusive, knowledge of this information at the time of sale as compared to Plaintiffs from California and California Subclass members; Defendants actively concealed from Plaintiffs from California and California Subclass members the true amount of concussion protection offered by their Riddell Football Helmets, which was material to customers; and Defendants made partial representations to Plaintiffs from California and the California Subclass that did not fully disclose the lack of additional concussion protection offered by their Riddell Football Helmets as compared to less expensive helmets. Defendants thus also violated the CLRA by concealing material information from Plaintiffs from California and California Subclass members regarding the lack of additional concussion protection offered by the Riddell Football Helmets.

     189.    Defendants' misrepresentations and omissions of material fact as alleged herein were material in that a reasonable person would attach importance to the information and Defendants intended consumers to act upon the information in making purchase decisions.

190.    Defendants' misrepresentations and omissions of material fact were likely to mislead consumers. Plaintiffs from California and California Subclass members were exposed to these misrepresentations and omissions, and reasonably acted in response to Defendants' material representations and omissions of fact that Defendants' Riddell Football Helmets offered more protection against concussions than other helmets as shown by their purchasing such helmets at a premium price, and suffered damage as a result thereof.

191.    Plaintiffs from California, on behalf of themselves and the California Subclass, demand judgment against Defendants under the CLRA for injunctive relief and restitution to Plaintiffs and the California Subclass, as well as an award of attorneys' fees and costs.

192.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs have previously served Defendants with notice of their alleged violations of the CLRA by certified mail return receipt requested. As Defendants failed to provide appropriate relief for their violation of the CLRA as requested in that letter, Plaintiffs from California also seek actual, compensatory, special and exemplary damages under the CLRA.

### COUNT VIII
**Misrepresentation in Violation of the Arizona
Consumer Fraud Act § 44-1522 *et seq*.
(Brought by Plaintiffs Kenny King and the Alliance Youth Sports Association,
Individually and on Behalf of the Arizona Subclass)**

193.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

194.    Plaintiffs from Arizona have standing to pursue this claim because such Plaintiffs suffered a distinct and palpable injury and have lost money or property as a result of Defendants' actions as set forth above.

195.    Defendants' Riddell Football Helmets are "merchandise" as defined in §44-1521(5).

196.    Defendants engaged in deception, false pretense, false promise, and/or misrepresentation by making the false and/or misleading representations to consumers about the effectiveness and appropriateness of the Riddell Football Helmets, as described above in violation of the Arizona Consumer Fraud Act §44-1522 et seq.

197.    Defendants made these misrepresentations in connection with the sale and advertisement of merchandise as stated in §44-1522(A).

198.    Defendants uniformly marketed and advertised the Riddell Football Helmets as being more effective at preventing concussions, and being especially appropriate for youth players, but the Riddell Football Helmets offers no additional concussion prevention compared to other helmets and was never even tested for youth players.

199.    Defendants made statements and representations of material facts regarding the effectiveness of their Riddell Football Helmets' ability to reduce concussions and appropriateness for particular players with the intent that consumers rely on these misrepresentations in deciding to purchase and use these helmets and omitted material facts to the contrary.

200.    Defendants' representations about the Riddell Football Helmets' quality, effectiveness, and use standards are material because a reasonable person, as well as Plaintiffs from Arizona and Arizona Subclass members would deem such information about concussion prevention important to their purchasing decisions or conduct regarding the purchase and use of a football helmet.

201.    As a result, Plaintiffs from Arizona and members of the Arizona Subclass were exposed to the Defendants' statements, misrepresentations, and omissions of material fact and purchased the Riddell Football Helmets and paid a premium price for the Riddell Football Helmets over comparable helmets.

202.    Defendants' practice of misleading consumers about the effectiveness of their Riddell Football Helmets to prevent an injury to the head/brain, and profiting from this deception was done with reckless or conscious disregard to the rights of Plaintiffs from Arizona and members of the Arizona Subclass and was outrageous due to Defendants' evil motive or reckless indifference to the rights of Plaintiffs from Arizona and members of the Arizona Subclass, and merits the imposition of punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others from wrongful conduct in the future.

203.    As a result of defendants conduct, Plaintiffs from Arizona and Arizona Subclass members suffered damage and seek actual damages, attorney fees, costs and expenses of suit, punitive damages and any further relief this court deems just and proper.

## COUNT IX
### Omission In Violation Of The Arizona
### Consumer Fraud Act § 44-1522 *et seq.*
### (Brought by Plaintiff Kenny King and the Alliance Youth Sports Association,
### Individually and on Behalf of the Arizona Subclass)

204.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

205.    Plaintiffs from Arizona have standing to pursue this claim because Plaintiffs from Arizona suffered a distinct and palpable injury and have lost money or property as a result of Defendants' actions as set forth above.

206.    Defendants' Riddell Football Helmets are "merchandise" as defined in §44-1521(5).

207.    Defendants engaged in deception, a deceptive or unfair act or practice, and/or concealment, suppression, or omission by concealing the effectiveness and appropriateness of the Riddell Football Helmets from consumers, as described above, in violation of the Arizona Consumer Fraud Act §44-1522 *et seq*.

208.    Defendants' omissions were in connection with the sale and advertisement of merchandise as stated in §44-1522(A).

209.    Defendants failed to disclose all material information to purchasers of their Riddell Football Helmets concerning the lack of amount of concussion protection offered by the Riddell Football Helmets and affirmatively concealed the fact that there is no material difference between Riddell Football Helmets and other lower-priced helmets.

210.    Defendants actively marketed and sold the Riddell Football Helmets' effectiveness at being better at preventing concussions despite evidence from a study they commissioned stating otherwise.

211.    Defendant failed to disclose all material information regarding the Riddell Football Helmets' effectiveness at preventing concussions with the intent that consumers rely on this concealment and continue purchasing and paying a premium price for the Riddell Football Helmets.

212.    As a result of Defendants' omissions and concealment, Plaintiffs from Arizona and members of the Arizona Subclass were exposed to said omissions and purchased the Riddell Football Helmets and paid a premium price for the Riddell Football Helmets over comparable helmets.

213.    Defendants' practice of concealing material information about the effectiveness of their Riddell Football Helmets to prevent an injury to the head/brain, and profiting from this deception  was done with reckless or conscious disregard to the rights of Plaintiffs from Arizona and members of the Arizona Subclass and was outrageous due to Defendants' evil motive or reckless indifference to the rights of  Plaintiffs from Arizona and members of the Arizona Subclass, and merits the imposition of punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others from wrongful conduct in the future.

214.    As a result of defendants conduct, Plaintiffs from Arizona and Arizona Subclass members suffered damage and seek actual damages, attorney fees, costs and expenses of suit, punitive damages and any further relief this court deems just and proper.

**COUNT X**
**Unjust Enrichment**
**(Applicable to All Classes)**

215.    Plaintiffs incorporate the allegations set forth in the above paragraphs as if fully set forth herein.

216.    Plaintiffs bring this claim individually, as well as on behalf of the members of the nationwide Class, and respectively on behalf of the New Jersey, Illinois, California, Florida and Arizona Subclasses against Defendants.

217.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the other Class and Subclass members' purchases of the Football Helmets, which retention under these circumstances is unjust and inequitable because Defendants misrepresented and omitted material facts relating to the efficacy of the Football Helmets, which caused injuries to Plaintiffs and the other Class and Subclass members because either they paid

a price premium due to the deceptive advertising and false promises of anti-concussion and concussion reduction efficacy.

218.    Plaintiffs and the other Class and Subclass members conferred a benefit on Defendants by purchasing one or more of the Football Helmets.

219.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class and Subclass members' purchases of the Football Helmets, which retention under these circumstances is unjust and inequitable because Defendants misrepresented and omitted material facts relating to the efficacy of the Football Helmets, which caused injuries to Plaintiffs and Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of anti-concussion and concussion reduction efficacy.

220.    Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and the other Class and Subclass members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the other Class and Subclass members for their unjust enrichment, as ordered by the Court.

## COUNT XI
### Assumpsit And Quasi-Contract
### (Applicable to All Classes)

221.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

222.    By virtue of the purchase and sale of the Revolution helmets, Defendants entered into a series of implied-at-law contracts that resulted in money being had and received by Defendants, either directly or indirectly, at the expense of Plaintiffs and Class members under agreements in assumpsit and quasi-contract.  Plaintiffs and other Class members conferred a benefit upon Defendants by purchasing one of the Revolution helmets. Defendants had

knowledge of the general receipt of such benefits, which Defendants received, accepted and retained.  For the reasons set forth above, Plaintiffs and the Class show just grounds for recovering money to pay for benefits Defendants received from them, and have a right to restitution at law through an action derived from the common-law writ of assumpsit by implying a contract at law, or a quasi-contract as an alternative to a claim for breach of contract.

223.   Defendants, having received such benefits, are required to make restitution as the circumstances here are such that, as between the two, it is unjust for Defendants to retain such monies based on the illegal conduct described above. Such money or property belongs in good conscience to the Plaintiffs and the Class members and can be traced to funds or property in Defendants' possession. Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the conduct challenged in this Complaint.

224.   An entity who has been unjustly enriched at the expense of another is required to make restitution to the other. Under common law principles recognized in claims of common counts, assumpsit, and quasi-contract, under the circumstances alleged herein it would be inequitable for Defendants to retain such benefits without paying restitution or damages therefor. Defendants should not be permitted to retain the benefits conferred via payments by Plaintiffs and Class members, and other remedies and claims may not permit them to obtain such relief, leaving them without an adequate remedy at law.

225.   Plaintiffs and Class members seek, *inter alia*, damages and restitutionary disgorgement of all profits resulting from such payments. Based on the facts and circumstances set forth above, in order to prevent unjust enrichment and to prevent Defendants from taking advantage of its own wrongdoing, Plaintiffs and the Class are further entitled to the

establishment of a constructive trust of all monies charged and collected or retained by Defendants from which Plaintiffs and Class members may seek equitable and legal restitution.

**COUNT XII**
**Declaratory Relief**
**(Applicable to All Classes)**

226.    Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

227.    There currently exists between the parties an actual and on-going controversy regarding the respective rights and liabilities of the parties regarding, *inter alia*, the need for Defendants to accurately disclose or correct disclosure of the actual lack of additional concussion protection offered by the Riddell Football Helmets in question as detailed above and/or the need of Defendants to restore some or all amounts that should not have been paid by Class members based on these misrepresentations and omissions of material facts, as alleged in detail above.

228.    Plaintiffs, members of the Class and the general public may be without adequate remedy at law, rendering declaratory relief appropriate in that:

f.    Damages may not adequately compensate the Class members for the injuries suffered, nor may other claims permit such relief;

g.    The relief sought herein in terms of ceasing such practices, providing full and complete corrective disclosure and/or declaring there is an obligation of Defendants to pay such monies to Class members may not be fully accomplished by awarding damages; and

h.    If the conduct complained of is not enjoined, harm will result to Class members because Defendants' wrongful conduct is continuing, claims are unresolved, persons (primarily

minors) are wearing helmets that do not provide the promised protection, and persons are entitled to the direct monies taken from them.

229.    Class members may suffer irreparable harm if a determination of the parties' rights and obligations is not ordered.

230.    Accordingly, Plaintiffs request the Court issue an order granting the following declaratory relief:

i.    That a judicial determination and declaration be made of the rights of Class members and the corresponding responsibilities of Defendants;

j.    That Defendants be ordered to provide notice in clear and conspicuous language to Class members and the public of the actual lack of additional concussion protection or reduction the Revolution helmet provides as compared to other helmets; and/or

k.    An order declaring Defendants are obligated to pay restitution to all members of the Class as appropriate and/or otherwise pay over all funds Defendants wrongfully acquired either directly or indirectly by which Defendants were unjustly enriched.

WHEREFORE, Plaintiffs pray for relief as follows as applicable to the above causes of action:

a.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be certified as class representatives and Plaintiffs' counsel be appointed as counsel for the Class;

b.    That the unlawful conduct alleged herein be declared to be illegal and in violation of the state and common law claims alleged herein;

c.      That Plaintiffs and members of the Class recover damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and members of the Class;

d.      That Defendants be enjoined from engaging in the same or similar practices alleged herein;

e.      That Plaintiffs and members of the Class receive restitution and disgorgement of all Defendants' ill-gotten gains or excessive monies paid;

f.      That Plaintiffs and members of the Class receive pre-judgment and post-judgment interest as allowed by law;

g.      That Plaintiffs and members of the Class recover their costs of the suit, and attorneys' fees as allowed by law; and

h.      All other relief allowed by law and equity.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
*Interim Class Counsel*


By:      /s/ *James E. Cecchi*
         JAMES E. CECCHI

         Dated: March 5, 2015

Dennis G. Pantazis
Craig L. Lowell
Dennis G. Pantazis, Jr.
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury on all issues so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
*Interim Class Counsel*


By:    /s/ *James E. Cecchi*
       JAMES E. CECCHI

       Dated: March 5, 2015



Dennis G. Pantazis
Craig L. Lowell
Dennis G. Pantazis, Jr.
WIGGINS CHILDS
PANTAZIS FISHER GOLDFARB LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

*Interim Class Counsel*

*Additional counsel for Plaintiffs*:

Robert M. Foote, Esq.
Kathleen C. Chavez, Esq.
FOOTE, MIELKE, CHAVEZ, & O'NEIL LLC
10 West State Street, Suite 200
Geneva, Illinois 60134
(630) 232-7450

Joe R. Whatley Jr.
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, New York 10036
 (212) 447-7060

Alan M. Mansfield
WHATLEY KALLAS, LLP
10200 Willow Creek Road, Suite 160
San Diego, California 92131
 (619) 308-5034

Stephen A. Corr
STARK & STARK, P.C.
777 Township Line Road, Suite 120
Yardley, Pennsylvania 19067
 (267) 907-9600

E. Clayton Lowe, Jr.
THE LOWE LAW FIRM, LLC
301 19th Street North, Ste. 525
Birmingham, Alabama 35203
 (205) 314-0607

Joshua R. Gale
WIGGINS CHILDS
PANTAZIS FISHER GOLDFARB LLC
101 N. Woodland Blvd., Ste. 600
DeLand, Florida  32720
386-675-6946

Richard Burke
Jamie Weiss
Quantum Legal LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
847-433-4500

Thomas R. Ysursa
BECKER, PAULSON, HOERNER
& THOMPSON, P.C.
5111 West Main Street
Belleville, Illinois 62226
 (618) 235-0020