IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

IN RE RIDDELL CONCUSSION
REDUCTION LITIGATION

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 13-7585 (JBS/JS)

**OPINION**

---

APPEARANCES:

James E. Cecchi, Esq.
Caroline F. Bartlett, Esq.
CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
     -and-
Stephen A. Corr, Esq.
STARK & STARK
777 Township Line Road
Suite 120
Yardley, PA 19067
     Attorneys for Plaintiffs Norma D. Thiel, Nicholas W.
     Farrell, Cahokia School District, Gustavo Galvan, Kenny
     King, Alliance Youth Sports Association, Douglas Aronson,
     and Denise Aronson

Joseph A. Boyle, Esq.
Michael Andrew Innes, Esq.
KELLEY DRYE & WARREN LLP
One Jefferson Road, 2nd Floor
Parsippany, NJ 07054
     Attorneys for Defendants Riddell, Inc., Riddell Sports
     Group, Easton-Bell Sports, LLC, EB Sports Corporation, RBG
     Holdings Corporation, and All American Sports Corporation

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

In these consolidated actions,[1] Plaintiffs maintain that Defendants Riddell, Inc., Riddell Sports Group, Easton-Bell Sports, LLC, EB Sports Corporation, RBG Holdings Corporation, and All American Sports Corporation (collectively, "Defendants" or "Riddell") marketed their football helmets based on allegedly false or misleading claims that the helmets were equipped with unique concussion reduction technology, and in some instances, that the helmets could reduce concussions by as much as 31%. According to Plaintiffs, Defendants' helmets are incapable of reducing the incidence of concussions compared to other football helmets on the market. Plaintiffs in this action thus contend that they were harmed by paying a $50 price premium for Riddell's helmets which offer no greater protection against concussions than other helmets.

The Court having dismissed their consolidated amended complaint, Plaintiffs filed a Second Amended Complaint ("SAC") to clarify the nature of their claims and to satisfy the heightened pleading standard applicable to their fraud-based claims. This action is before the Court upon Defendants' motion

---

[1] On April 10, 2014, the Court consolidated two related cases for pretrial purposes only: Thiel v. Riddell, Inc., et al., Civil No. 13-7585 (JBS/JS), and Aronson v. Riddell Inc., et al., Civil No. 14-126 (JBS/JS). [Docket Item 16.]

to dismiss the SAC. [Docket Item 50.] Defendants argue that the SAC further obfuscates Plaintiffs' claims, ignores the specificity requirements of Rule 9(b), Fed. R. Civ. P., and fundamentally fails to state plausible claims of consumer fraud.

For the reasons discussed below, the Court will grant in part and deny in part Defendants' motion to dismiss. The Court finds that Plaintiffs' amended pleading largely cures the deficiencies previously identified in their initial consolidated pleading. As detailed below, the Court will permit Plaintiffs' consumer fraud claims to proceed based on allegedly false or misleading marketing statements regarding "concussion reduction technology" and a 31% reduction in concussions for helmets not included in the UPMC study, including youth helmets. However, the Court will dismiss Plaintiffs' consumer fraud claims to the extent they are based on marketing statements which accurately reflect the results of the UPMC study or based on an alleged omission. The Court will also dismiss Plaintiffs' unjust enrichment and assumpsit claims with the exception of the Cahokia School District's claim for unjust enrichment.

## II. BACKGROUND

### A. Facts

The Court accepts as true the following facts from Plaintiffs' Second Amended Complaint. [Docket Item 45.] Although Plaintiffs have added significant detail to their amended

pleading and narrowed their theory of liability, the essential allegations supporting their claims remain unchanged.

### 1.    Background

Defendants design, manufacture, and market football helmets which they claim possess concussion reduction technology. (SAC ¶ 5.) These helmets include the Revolution, Revolution Speed, and Riddell 360.[2] (Id. ¶ 5.) Plaintiffs contend that Defendants' repeated reference to concussion reduction technology in advertising and marketing materials was intended to "convey to consumers that these football helmets can reduce the incidence of concussion when compared to other modern football helmets available for sale from other manufacturers."[3] (Id. ¶ 6.) According to Plaintiffs, however, "objective and reliable research" shows that Defendants' claims are deceptive marketing gambits because the helmets "do not provide the promised 'Concussion Reduction Technology' or result in decreasing the incidence of concussions." (Id. ¶ 7.)

---

[2] In their initial consolidated pleading, Plaintiffs specifically defined these three Riddell helmet models as the helmets at issue. The SAC identifies these helmets as among those at issue, but not exclusively so.

[3] For comparative purposes, Plaintiffs specifically identify the following adult helmet models on the market: Riddell VSR-4; Xenith X2, X1, and Epic; Schutt ION 4D, Schutt DCT, and VTD, Air XP, Air XP Pro VTD, and DNA Pro; Rawlings Quantum Plus, Impulse, and Tachyon. Plaintiffs also identify the following youth models: Xenith X2E; Schutt Recruit, XP, XP Hybrid, and Vengeance.

Plaintiffs allege that Defendants began an effort, as early as 2002, to capitalize on increased public awareness of and concern about concussions. (Id. ¶¶ 45-48.) To this end, Defendants allegedly solicited a scientific study regarding the protective benefits of their Revolution helmet. (Id. ¶ 49.) Beginning in 2002, the University of Pittsburgh Medical Center ("UPMC") compared concussion rates among high school athletes who wore the Riddell Revolution helmet with those who wore "traditional helmets." (Id. ¶ 50.) The UPMC study, published in a peer-reviewed neurology journal, found that the Revolution helmet reduced concussions by 31% as compared to traditional helmets. (Innes Decl., Ex. A [Docket Item 50-3.])

Plaintiffs recount in great detail the many reasons they contend the UPMC study was flawed in design and implementation, "infected with potential bias and conflicts of interest," and "fundamentally unreliable." (Id. ¶ 49.) As in the Amended Complaint, Plaintiffs emphasize that Riddell provided a grant to pay the salaries of the two primary authors of the study. (Id. ¶ 51.) A third author, Thad Ide, is a Riddell employee. (Id.) Moreover, Plaintiffs allege that the study was designed to reach the pre-determined conclusion that the Revolution helmet could reduce concussions as compared to other helmets; that it was a "prospective cohort study" as opposed to a random study; that the traditional helmets were not new, but refurbished; that the

5

participants were not randomly assigned helmets; that the authors disregarded 15% of the collected data without sufficient explanation and manipulated other data to reach a pre-determined conclusion; and that initial data failed to show a statistically significant difference between the helmets. (Id. ¶¶ 54-64.) According to Plaintiffs, the above flaws are consistent with and corroborated by the criticisms of several peer-reviewers. (Id. ¶¶ 70-72.)

Plaintiffs further contend that UPMC warned Defendants regarding their reliance on the study's results. UPMC allegedly instructed Defendants "that this data should not be use[d] as a marketing ploy or marketing tactic from a scientific paper that was not for those purposes." (Id. ¶ 66.) UPMC also told Defendants not to say that the Revolution helmet provides better protection, but Defendants disregarded this admonition. (Id. ¶ 67.) Plaintiffs allege that UPMC also cautioned Defendants in other ways regarding the appropriate use of the study's results, namely that Defendants should refer to the 2.3% reduction in absolute risk as found by the study, as opposed to the 31% reduction in relative risk.[4] (Id. ¶ 68.) Defendants allegedly

---

[4] Plaintiffs explain that absolute risk is the risk of developing a condition over time, whereas relative risk is used to compare risk as between two different groups. (Id. ¶ 68.)

ignored UPMC's warnings and failed to disclose these warnings to consumers. (Id. ¶ 69.)

### 2. Riddell's marketing statements

Plaintiffs contend that, based solely on the results of the UPMC study, Defendants began to market their helmets as possessing concussion reduction technology. Some advertisements contained explicit references to a 31% reduction in concussions for players wearing the Revolution helmet. (Id. ¶ 74.) For example, "Research shows a 31% reductions in concussions in players wearing Riddell Revolution Helmets."[5] (Id.) Defendants, however, allegedly made this same 31% reduction claim when advertising other helmets in the Revolution "family" like the IQ, IQ HITS, Youth, Speed, and Speed Youth, even though the UPMC study only included the Revolution helmet. (Id.; Id. ¶ 78.) Plaintiffs note similar statements in a March 16, 2009 press release referring to research which showed that the Revolution helmet reduces "the risk of concussion by nearly a third." (Id. ¶ 77.)

Plaintiffs allege that Defendants used promotional videos to tout the safety of their helmets, including specific design

---

[5] Plaintiffs note that some advertisements contained a more complete statement: "[R]esearch has shown that players wearing the Riddell Revolution football helmet are 31% less likely to suffer a concussion than players wearing traditional football helmets." (Id. ¶ 76.) Other advertisements referenced up to a 41% reduced risk of concussions. (Id.)

and technological features that Defendants presented as making the helmets safer. (Id. ¶ 79.) According to Plaintiffs, one such video, which is still available on Defendants' websites, states that "on-file reconstructive studies on concussive events showed that many of the players were being struck to the side of the head and the face so we developed our patented side impact protection . . . to better handle those blows to the side of the head and the face." (Id.) Plaintiffs assert that Defendants also promote the safety of their helmets at marketing events called "Protection Tour[s]" intended to "deliver[] expert-driven health and safety education to youth football players, parents and coaches nationwide." (Id. ¶ 80.) Similarly, Defendants advertised at youth-focused events such as NFL Play 60 Youth Football Clinics. (Id. ¶ 84.) Defendants also allegedly advertise extensively on social media and the internet and make "the same concussion reduction claims." (Id. ¶ 83.) For example, Plaintiffs provide a screenshot of a Facebook page stating that "the Riddell 360 Youth Helmet is the next evolution of Riddell CRT (Concussion Reduction Technology)." (Id.)

In summary, Plaintiffs contend that "Defendants, through their website, direct sales force, product packaging, promotional advertisements and marketing, and retailers" made the following types of claims regarding the concussion reduction capabilities of their helmets:

8

- "Riddell's exclusive Concussion Reduction Technology protects young athletes against concussions and impact."
- "The most advanced piece of modern concussion prevention in the game today!"
- "Safer, more protective, and advanced frontal helmet protection designed to reduce concussions."
- "Riddell Revolution CRT (Concussion Reduction Technology) to keep young players safe on the field."
- "Riddell's Concussion Reduction Technology provides increased protection against concussions and impact."
- "The helmet's Revolution Concussion Reduction Technology uses three principal design elements – an offset shell, mandible extensions and energy managing S-Pads – to provide superior protection for players on the field."

(Id. ¶ 85.)

Plaintiffs allege that, despite Defendants' claims, there is no material difference in terms of concussion prevention between Riddell's helmets and other football helmets. (Id. ¶ 86.) Nevertheless, based on claims regarding increased safety and reduced concussions, Defendants charge price premiums of $50 per helmet as compared to other comparable helmets available on the market. (Id. ¶ 81.)

### 3. Alleged falsity of Riddell's marketing claims

Plaintiffs allege that several studies show, and the majority of independent experts agree, that Defendants' claims regarding "concussion reduction technology" are false or misleading. (Id. ¶ 92.) For example, as Plaintiffs previously noted in their initial consolidated pleading, a University of Wisconsin study considered whether a particular brand of football helmet or mouth guard was more effective at reducing

9

concussions and found no statistically significant difference in the rate of concussions regardless of the helmet used.[6] (Id. ¶ 60.) The researchers stated, "Despite what manufacturers might claim, newer and more expensive equipment may not reduce concussion risk . . . [s]o is it worth the significant extra cost to families and schools?" (Id. ¶ 61.) Plaintiffs contend that the University of Wisconsin study is the largest prospective study of the brand of helmets worn by high school football players in the United States. (Id. ¶¶ 93, 95.)

_____

[6] The Court has examined the studies and reports cited in the SAC and upon which Plaintiffs' claims are based. See Miller v. Clinton Cnty., 544 F.3d 542, 550 (3d Cir. 2008) ("A court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiffs['] claims are based on the document.") (internal quotation and citation omitted); Gaul v. Bayer Healthcare LLC, 2013 U.S. Dist. LEXIS 188951, at *4 (D.N.J. June 19, 2013). As noted in this Court's earlier opinion,

> The University of Wisconsin study compared the relative effectiveness of a particular brand of football helmet to reduce the incidence of concussions. 51% of the players in the study wore helmets by Riddell, compared with 30% by Schutt and 19% by Xenith. "The most commonly worn helmet models by brand were the Riddell Revolution Speed (n=617), Schutt DNA Pro+ (n=420), and Xenith X1 (n=272)." The study concluded that "helmet brand, age, and recondition status were not associated with a lower risk of SRC in high school football players." Notably, the University of Wisconsin study recognized its results in contrast to the UPMC study in 2006 which concluded that new Riddell Revolution helmets reduced the risk of concussions by 31% compared with traditional helmets. The University of Wisconsin study noted limitations in the UPMC study due to insufficient information regarding the age of the helmets in the control group and the exposure data for each player.

In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *3 n.4 (internal citations omitted).

Plaintiffs emphasize that the Wisconsin study was not funded by Defendants and was "more robust" than the UPMC study. (Id. ¶¶ 94-95.)

Plaintiffs further allege that Defendants knew their helmets cannot actually reduce the incidence of concussions. (Id. ¶ 97.) For example, according to Plaintiffs, court documents related to a Colorado lawsuit indicate that Defendants received a report in 2000 from Biokinetics, a biomechanics firm hired by the NFL, showing that "no football helmet, no matter how revolutionary, could prevent concussions."[7] (Id.) Plaintiffs also recount in detail an investigation by the Federal Trade Commission ("FTC") regarding Defendants' 31% concussion reduction claim.[8] (Id. ¶ 87.)

---

[7] The Court previously examined the Biokenetics report to Riddell dated November 15, 2000 and noted that it begins by stating, "Football helmets have proven to be exceptionally effective in the prevention of severe head injury." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *4 n.6.

[8] The Court also discussed the FTC investigation in its prior opinion:

> After investigating whether "Riddell falsely represented from at least 2008 until early 2011 that research proves that Revolution varsity and youth football helmets reduce concussions and the risk of concussions by 31% as compared to other varsity and youth football helmets," the FTC concluded that the UPMC study did not prove that Riddell Revolution varsity football helmets reduced the risk of concussion by 31% compared with other varsity helmets. Moreover, the FTC noted that the UPMC study did not test the effectiveness of Riddell youth football helmets in reducing concussions as compared to other youth helmets. The FTC emphasized two significant limitations in the UPMC study: (1) "Revolution helmets were not randomly distributed across all of the

The SAC alleges in far greater detail than the Amended Complaint that each of the named plaintiffs was exposed to Defendants' claims that their helmets offer more protection against concussions than other helmets, Plaintiffs purchased at least one of Defendants' helmets for a price premium, and they suffered economic harm because the helmets do not provide the promised protection. (Id. ¶¶ 104-116.) For example, Plaintiffs allege that Douglas and Denise Aronson purchased a Revolution Speed football helmet for their son in or around August, 2011. (Id. ¶ 104.) Before entering high school, "a representative offering Riddell Football Helmets for sale" appeared at a club football practice and indicated that Defendants helmets were "the best . . . for preventing concussions because [they] had concussion reduction technology." (Id. ¶ 105.) Subsequently, after learning that the high school would not provide Riddell helmets to the players, at their son's urging, Denise Aronson visited Defendants' website. (Id. ¶ 106.) While on the website,

_____

participants in the study" and (2) "[p]layers in the control group who suffered concussions were younger than test group players who suffered concussions." Nevertheless, the FTC decided in April, 2013 not to recommend enforcement action at that time because Riddell had abandoned its 31% reduction claim and a Virginia Tech study appeared to show that "Revolution varsity helmets perform much better than Riddell's 'traditional' VSR-4 helmet in reducing concussion risks attributable to linear acceleration, one of the primary forces to which helmets are subject." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *4 n.7.

Denise Aronson allegedly observed Defendants' claim that their helmets have concussion reduction technology, and based on this claim, purchased the Revolution Speed helmet directly from Defendants. (Id.) The SAC provides similar detail as to how the other plaintiffs were exposed to Defendants' allegedly false or misleading marketing claims.

## B.   Procedural background

As previously noted in the Court's Opinion dated January 15, 2015, this action began as two separate cases filed in the District of New Jersey. See In re Riddell Concussion Reduction Litig., Civ. 13-7585 (JBS/JS), 2015 WL 224429, at *4 (D.N.J. Jan. 15, 2015). The Court consolidated the actions for pretrial purposes only as In Re Riddell Concussion Reduction Litigation, Civ. 13-7585 (JBS/JS). On May 12, 2014, Plaintiffs, four individuals and one school district, filed an Amended Complaint against seven defendants: Riddell, Inc.; Riddell Sports Group; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corporation; RBG Holdings Corporation; All American Sports Corporation. [Docket Item 17.] By Opinion and Order dated January 15, 2015, the Court granted in part and denied in part Defendants' motion to dismiss the Amended Complaint. In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *14. The Court denied Defendants' motion to the extent it was based on Plaintiffs' alleged failure to comply with Rule 8. Id. The Court

13

granted Defendants' motion to the extent it was based on
Plaintiffs' failure to comply with Rule 9(b) and Rule 12(b)(6).
Id. The Court dismissed Plaintiffs' claims without prejudice,
except for those under the Illinois Consumer Fraud Act which the
Court dismissed for lack of standing. Id.

On March 5, 2015, Plaintiffs filed their Second Amended
Complaint.[9] [Docket Item 45.] The twelve-count SAC names the same
defendants and asserts the same claims as the Amended Complaint
except for Plaintiffs' claim under the Illinois consumer fraud
law.[10] Plaintiffs assert these claims on behalf of themselves and
all others similarly situated in four discrete subclasses: New
Jersey, Florida, California, and Arizona.[11]

---

[9] Plaintiffs in the SAC are the same as those in the Amended
Complaint with the addition of the Alliance Youth Sport
Association, an entity that runs a youth football league. (SAC ¶
114.)
[10] Plaintiffs' claims consist of the following: (1) violation of
the New Jersey Consumer Fraud Act; (2) violation of the Florida
Deceptive and Unfair Trade Practices Act; (3) violation of the
"Unfair" Business Acts and Practices provision of the California
Business and Professional Code; (4) violation of the "Deceptive"
Acts and Practices provision of the California Business and
Professional Code; (5) violation of the "Unlawful" Business
Practices provision of the California Business and Professional
Code; (6) violation of the Misleading Advertising provision of
the California Business and Professional Code; (7) violation of
the California Consumers Legal Remedies Act; (8) violation of
the Arizona Consumer Fraud Act through misrepresentation; (9)
violation of the Arizona Consumer Fraud Act through omission;
(10) unjust enrichment; (11) assumpsit and quasi-contract; and
(12) declaratory judgment.
[11] Like the Amended Complaint, Plaintiffs' proposed class
definition in the SAC suggests a nationwide class: "All
purchasers of Riddell Football Helmets promoted as containing

The instant motion to dismiss soon followed. [Docket Item 50.] Plaintiffs filed opposition [Docket Item 55] and Defendants filed a reply [Docket Item 58].[12]

## C.  Parties' arguments

Defendants contend in the instant motion to dismiss that Plaintiffs have failed to cure the deficiencies in their initial pleading as identified by the Court and seek dismissal of Plaintiffs' claims pursuant to Rule 9(b) and Rule 12(b)(6), Fed. R. Civ. P. Defendants maintain that the SAC is even less clear than Plaintiffs' Amended Complaint. Defendants principally argue that Plaintiffs have not plausibly alleged that Defendants' marketing claims are false. Additionally, Defendants argue that

---

concussion reduction technology within the United States from the beginning of the applicable statutes of limitation period through the present." (Am. Compl. ¶ 117.) Plaintiffs, however, direct certain counts in the SAC to specific state subclasses.
[12] The parties also filed supplemental submissions regarding litigation in the Southern District of West Virginia, Midwestern Midget Football Club Inc. v. Riddell, Inc., Civ. 15-00244, 2015 WL 3797107, at *1 (S.D.W. Va. June 18, 2015), in which Riddell Inc. is alleged to have violated the West Virginia Consumer Credit and Protection Act based on the same or similar marketing statements at issue in the present action. Id. at *3-5. The court issued an opinion on June 18, 2015 denying Riddell's motion to dismiss which raised many of the same arguments this Court now confronts. Id. at *5. However, the court subsequently vacated its opinion and requested supplemental briefing in light of the Fourth Circuit's decision in In re GNC Corp., 789 F.3d 505 (4th Cir. 2015). As such, this Court does not rely on the reasoning in Midwestern Midget. Nor is the GNC case, which considered the "two different theories of recovery in a false advertising claim" under the Lanham Act, binding in the instant action, in which Plaintiffs assert claims under various state consumer protection laws. Id. at 514.

Plaintiffs fail to distinguish between various marketing statements; that Plaintiffs have not adequately alleged ascertainable loss and causation; that Plaintiffs' allegations fail to satisfy Rule 9(b); that Plaintiffs' claims under the Arizona Consumer Fraud Act are time-barred; that Plaintiffs have not adequately alleged "unfair" and "unlawful" business practices claims under California law; and that Plaintiffs' equitable claims must be dismissed.

In response, Plaintiffs assert that they have cured the deficiencies previously identified by the Court by providing, among other things, additional details regarding each plaintiff's purchase(s) and the specific statements to which each plaintiff was exposed. Plaintiffs argue that, contrary to Defendants' arguments, literal falsity is not required to state a claim under the various consumer protection laws and that the SAC contains the necessary allegations to state a claim under these laws. Moreover, Plaintiffs argue that they have adequately alleged ascertainable loss and causation and stated facially plausible claims upon which relief may be granted. Plaintiffs also defend the viability of their equitable claims. Alternatively, Plaintiffs request leave to file a third amended complaint.

## III. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Id. A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

Rule 9(b), Fed. R. Civ. P., imposes heightened pleading standards for a complaint alleging fraud, requiring a party to "state with particularity the circumstances constituting fraud or mistake." This requirement is intended "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Ciro. V. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

**IV.   DISCUSSION**

    **A.   Rule 9(b)**

Because the Court previously dismissed Plaintiffs' claims in part due to a failure to satisfy the heightened pleading standard of Rule 9(b), the Court will begin by considering whether Plaintiffs have cured the Rule 9(b) deficiencies previously identified. The Court finds that they have.

Plaintiffs' claims, to the extent they sound in fraud or misrepresentation, "must state with particularity the circumstances constituting fraud." Rule 9(b), Fed. R. Civ. P. The level of particularity required is sufficient details to put Defendants on notice of the "precise misconduct with which they are charged." Seville, 742 F.2d at 791; Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007). "This requires a plaintiff to plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means." Grant v. Turner, 505 F. App'x 107, 111 (3d Cir. 2012), cert. denied, 133 S. Ct. 2770 (U.S. 2013) (citing Frederico, 507 F.3d at 200).

In its earlier opinion, the Court found Plaintiffs' Amended Complaint lacking because it merely provided "examples of Defendants' marketing statements without identifying which specific statement(s), if any, Plaintiffs were exposed to." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *9.

The Court was particularly troubled by Plaintiffs' attempt to rely on a variety of disparate marketing statements some of which referred to a 31% reduction in concussions, others of which did not. Id. The Court also observed that some of the purportedly false and deceptive marketing statements concerned youth helmets, while others did not. Id. Importantly, the Court rejected Plaintiffs' assertion that all of the named plaintiffs were exposed to variants of a core message of concussion reduction and concussion reduction technology. Id. at n.12. The Court found Plaintiffs' "belated attempt to distill a common theme from the marketing statements reproduced in the Amended Complaint" insufficient to provide Defendants notice as to the nature of Plaintiffs' claims. Id.

The SAC provides greater clarity as to the nature of Plaintiffs' claims. Plaintiffs specify the types of marketing statements which they allege are false or misleading. The SAC contains specific statements which clearly fall into three distinct categories: 1) statements that reference a 31% reduction in the incidence of concussions; 2) statements that reference "concussion reduction technology;" and 3) statements that reference youth helmets. Although there is some variation in the exact language allegedly used by Defendants within these broader categories, Plaintiffs are correct that a common theme can be readily distilled. The SAC is far clearer than the

19

Amended Complaint in identifying the nature and substance of
these allegedly false or misleading marketing claims upon which
Plaintiffs' claims are based. Moreover, Plaintiffs have pleaded
with requisite particularity the types of statements to which
each plaintiff was exposed, as well as the timeframe and
circumstances of such exposure. See In re L'Oreal Wrinkle Cream
Mktg. & Sales Practices Litig., Civ. 12-03571 (WJM), 2013 WL
6450701, at *6 (D.N.J. Dec. 9, 2013) (finding general
allegations that plaintiffs relied on allegedly false and
misleading statements quoted in the complaint sufficient to
satisfy Rule 9(b)).

For example, it is apparent from the pleadings that the
Aronson's son was exposed to claims of the helmets' purported
concussion reduction technology at a club football practice, and
his mother, Denise Aronson, observed similar claims when she
visited Defendants' website prior to purchasing a Riddell
Revolution Speed helmet directly from Riddell. (SAC ¶¶ 104-106.)
Plaintiff Norma D. Thiel allegedly watched Riddell Youtube
videos advertising the Riddell 360 which hyped technology that
could better protect the head from concussions compared to other
helmets on the market. (Id. ¶ 109.) Plaintiff Nicholas W.
Farrell was exposed "to Concussion Reduction Technology claims,
as well as the 31% reduction claim" in ads appearing on the
internet and in magazines. (Id. ¶ 110.) Plaintiff Gustavo Galvan

was similarly exposed to both types of claims on Riddell's
website and on product packaging. (Id. ¶ 111.) Plaintiff Kenny
King, individually and as Executive President of the Alliance
Youth Sports Association, was exposed to concussion reduction
technology claims through a Riddell sales representative and the
2010 Riddell sales catalog. (Id. ¶ 114.) The Court finds the
above details sufficient to satisfy Rule 9(b) because there is
no longer any question as to what statements each plaintiff saw
or heard and where such statements appeared.[13]

The Court similarly finds that Plaintiffs have adequately
clarified "the precise substance of the alleged
misrepresentations which gives rise to [Plaintiffs'] claims," as
well as the "essential theory" of the case." In re Riddell
Concussion Reduction Litig., 2015 WL 224429, at *10.
Fundamentally, Plaintiffs allege that Defendants' helmets "are
no more effective at reducing concussions than any other helmets
on the market." (SAC ¶ 11.) According to Plaintiffs, "objective

---

[13] Although Plaintiffs do not quote verbatim the marketing
language which they allegedly saw or heard prior to purchasing
Defendants' helmets, Plaintiffs have adequately described and
provided examples of this language. The Court is similarly
unpersuaded by Defendants' argument that Plaintiffs have failed
to identify the helmets to which Defendants' helmets are
comparatively ineffective at reducing concussions. The Court is
satisfied with the list of these comparator helmets provided in
the SAC regardless of the fact that Plaintiffs do not precisely
state when these helmets first came on the market. (SAC ¶ 11
n.1.) The SAC is clear that Plaintiffs' list consists of other
helmets available on the market at the relevant times.

and reliable research, which was not funded by Defendants, has
shown that claims of concussion reduction related to football
helmets are not valid and are instead simply a marketing tool."
(Id. ¶ 7.) Having narrowed the marketing statements about which
Plaintiffs complain and having omitted, among other things, any
reference to the Cleveland Clinic study, Plaintiffs have more
precisely articulated the basis of their claims. Indeed, the
Court previously observed that

> Specifying the type of misrepresentation to which Plaintiffs
> were exposed – either that the Football Helmets decrease the
> incidence of concussions compared with competitors' helmets,
> or that the Football Helmets decrease concussions at all, and
> the precise contours of misrepresentations as to youth
> helmets – will advance this case and provide due notice for
> purposes of both Rule 9(b) and Rule 12(b)(6), as discussed
> below. It appears that such theory or theories will be
> actionable if the present ambiguity and unclarity is cured.

In re Riddell Concussion Reduction Litig., 2015 WL 224429, at
*10 n.15. Because Plaintiffs have specified the type of
misrepresentations to which they were exposed, the Court finds
the previously identified ambiguity adequately cured to satisfy
Rule 9(b) and to place Defendants on notice as to the "precise
misconduct with which [they are] charged." Frederico, 507 F.3d
at 200 (citation omitted).

Plaintiffs in the SAC have also pleaded causation or injury
with requisite specificity and particularity. Unlike the Amended
Complaint, the SAC indicates where Plaintiffs purchased the
product at issue, as well as the manner and timeframe in which

22

they were exposed to Defendants' alleged misrepresentations. The SAC alleges the exact or approximate price that each non-organizational plaintiff paid for the helmets they purchased. Additionally, Plaintiffs quantify the "price premium" each plaintiff paid for the helmets as $50. Contrary to Defendants' assertion, Plaintiffs need not identify, at the pleadings stage, the exact price of every helmet they could have purchased but did not. Consequently, the SAC is distinguishable from the complaint in In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig., Civ. 08-939 (DRD), 2009 WL 2940081 (D.N.J. Sept. 11, 2009), which omitted details regarding where plaintiffs purchased the product at issue, how much they paid, how much of a premium they claimed to have paid, and when, if ever, plaintiffs were exposed to defendant's alleged misrepresentations. Id. at *13. Further unlike Toshiba, Plaintiffs in the present action more than conclusorily allege that they would not have purchased the helmets if they knew they did not possess the ability to reduce the incidence of concussions.[14] Therefore, Plaintiffs' allegations are sufficient to satisfy Rule 9(b).

_____

[14] For these same reasons, the Court finds that Plaintiffs' have adequately pleaded causation and reliance to satisfy Rule 12(b)(6). The Court does not presume Plaintiffs' knowledge of the Schutt Sports litigation which appears to have predated the purchases at issue here. Nor will the Court be overly mechanistic in assessing Plaintiffs' allegations regarding

**B.   Rule 12(b)(6)**

**1.   Facial plausibility**

The Court now turns to the more difficult question of whether the SAC satisfies Rule 12(b)(6), Fed. R. Civ. P. Defendants again argue that Plaintiffs' claims fail under Rule 12(b)(6) because Plaintiffs have not pleaded a plausible theory of consumer fraud. Specifically, Defendants contend that Plaintiffs have not alleged facts demonstrating that the 31% concussion reduction claim is false. Likewise, Defendants argue that Plaintiffs have not plausibly alleged that their claim regarding concussion reduction technology is false.

As this Court previously explained, "[a] claim has facial plausibility when the plaintiff pleads factual content that

---

causation and reliance. Defendants argue that Plaintiffs failed to specifically allege that "they would not have purchased" helmets if not for the alleged misrepresentations. (Def. Br. at 30.) Plaintiffs' allegations are clear enough that they relied on the alleged misrepresentations in making the purchases at issue and they would not have done so had they not been exposed to Defendants' allegedly false or misleading statements prior to purchase. The Court's approach is consistent with many of the cases cited by Defendants. See Mickens v. Ford Motor Co., 900 F. Supp. 2d 427, 447 (D.N.J. 2012); Beaver v. Inkmart, LLC, Civ. 12-60028, 2012 WL 3822264, at *4 (S.D. Fla. Sept. 4, 2012); Lorenzo v. Qualcomm Inc., 603 F. Supp. 2d 1291, 1304 (S.D. Cal. 2009). Additionally, Plaintiffs need not identify the exact helmet they would have purchased had they not purchased a Riddell helmet. The brunt of Plaintiffs' allegations is that they paid a $50 price premium for Defendants' helmets based on representations that the helmets could reduce the incidence of concussions and therefore chose not to purchase less expensive helmets which were available at the time. Plaintiffs have provided a list of such helmets.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." <u>Id.</u> (quotations and citation omitted). Additionally, to state a plausible claim for relief under the state consumer protection laws at issue here, Plaintiffs must allege that Defendants' marketing statements were false, deceptive, or misleading.[15] <u>See In re GNC Corp.</u>, 789 F.3d 505, 514 (4th Cir. 2015).

---

[15] <u>Smajlaj v. Campbell Soup Co.</u>, 782 F. Supp. 2d 84, 98 (D.N.J. 2011) ("[T]he gravamen of the claim in this case is that the consumer was improperly led to purchase a product because of a false or misleading claim on the part of the seller."); <u>Engel v. Novex Biotech LLC</u>, Civ. 14-03457, 2014 WL 5794608, at *2 (N.D. Cal. Nov. 6, 2014) ("In an action for false advertising under the UCL and CLRA, the plaintiff bears the burden of proving the defendant's advertising claim is false or misleading.") (quotation omitted); <u>Kuehn v. Stanley</u>, 91 P.3d 346, 351 (Ariz. Ct. App. 2004) ("To succeed on a claim of consumer fraud, a plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise. An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information.") (citations omitted); <u>In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.</u>, 955 F. Supp. 2d 1311, 1331-32 (S.D. Fla. 2013) ("Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. [D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the

As discussed above, it is no longer the case that Plaintiffs' pleading "fails to articulate a consistent theory of liability against Defendants." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *11. It is now clear that Plaintiffs assert that Defendants claimed in marketing and advertising that their helmets possessed concussion reduction technology and could reduce the incidence of concussions, but their helmets are no more capable of reducing concussions than any other helmet available on the market. Plaintiffs allege that Defendants repeatedly made marketing claims of the following three types: 1) claims that reference a 31% reduction in the incidence of concussions; 2) claims that reference "concussion reduction technology;" and 3) claims that reference youth helmets. Because "[f]alsity here depends on the precise nature of the alleged misrepresentations," id. at *12, the Court will address whether each type of marketing statement or claim supports a plausible claim of consumer fraud.

### a.   31% reduction claims

Defendants argue that the supposed shortcomings in the UPMC study do not establish that their claims of a 31% reduction in concussions were false or misleading. Indeed, this Court previously observed that "Plaintiffs must affirmatively allege

---

circumstances, to the consumer's detriment.") (citations and quotations omitted).

the falsity of Defendants' claims, and merely identifying certain flaws in the UPMC study is insufficient." Id. (citing Hodges v. Vitamin Shoppe, Inc., Civ. 13-3381 (SRC), 2014 WL 200270, at *4 (D.N.J. Jan. 15, 2014); Fraker v. Bayer Corp., Civ. 08-1564, 2009 WL 5865687, at *8 (E.D. Cal. Oct. 6, 2009)).

Plaintiffs allege that numerous advertisements included the following phrase or some slight variation thereof, "Research shows a 31% reductions in concussions in players wearing Riddell Revolution Helmets." (SAC ¶ 74.) Defendants allegedly made this same 31% reduction claim when advertising other helmets in the Revolution "family" like the IQ, IQ HITS, Youth, Speed, and Speed Youth, even though the UPMC study only included the Revolution helmet. (Id.) Plaintiffs note that some advertisements contained a more complete statement: "[R]esearch has shown that players wearing the Riddell Revolution football helmet are 31% less likely to suffer a concussion than players wearing traditional football helmets." (Id. ¶ 76.) Other advertisements referenced up to a 41% reduced risk of concussions. (Id.) Plaintiffs also acknowledge in the SAC that "[m]ost of the advertisements also included a reference to the Neurosurgery article." (Id.)

Plaintiffs do not assert that Defendants mischaracterized the findings of the UPMC study (i.e., that the UPMC study did not in fact conclude that Riddell Revolution helmets reduced the

incidence of concussions by 31% as compared to traditional helmets). Instead, Plaintiffs contend that the UMPC study "was flawed both in its design and implementation" and "infected with potential bias and conflicts of interest," all of which render it "fundamentally unreliable." (Id. ¶ 49.) However, as this Court and others have recognized, identifying flaws in a scientific study does not necessarily make marketing statements based on such a study false or misleading. See Gaul v. Bayer Healthcare LLC, 2013 U.S. Dist. LEXIS 188951, at *4 (D.N.J. June 19, 2013) (finding that marketing statements based on an allegedly unreliable study tended to prove that such statements were unsupported, "but not that they are false"); Scheuerman v. Nestle Healthcare Nutrition, Inc., Civ. 10-3684 (FSH), 2012 WL 2916827, at *7 (D.N.J. July 17, 2012) ("At best, Plaintiffs can prove that Nestle's studies were not sufficiently strong; while this may be enough to make out an ordinary claim not premised on a theory of fraud, it is insufficient to demonstrate entitlement to relief under" the consumer protection laws of New Jersey, Pennsylvania, and California). See also Adamson v. Ortho-McNeil Pharm., Inc., 463 F. Supp. 2d 496, 503 (D.N.J. 2006) (finding that marketing statements were accurate and therefore not misleading or deceptive).

In Riddell, Inc. v. Schutt Sports, Inc., 724 F. Supp. 2d 963 (W.D. Wis. 2010), the court addressed these identical

28

marketing statements in the context of claims for false advertising under § 43(a) of the Lanham Act. Id. at 969. The court found that many of the same purported flaws in the UPMC study as identified by Plaintiffs here "give reasons to doubt the results of the study, but they do not show that the study was unreliable." Id. at 974. Moreover, the court observed that publication of the study's results in a respected, peer-reviewed journal provides some evidence that the study is in fact reliable. Id. The court noted that statements that "research shows a 31-41% reduction in concussions in players wearing Riddell Revolution helmets" reported "exactly what the study shows, so it cannot be literally false." Id. at 975-76. Notably, the court found that, at most, such a statement, when made in reference to helmets in the Revolution "family" that were not subject of UPMC study, could be misleading or deceptive. Id. at 976.

The Court finds this reasoning persuasive and concludes that Plaintiffs may not base their consumer fraud claims on marketing statements which accurately reflected the results of the UPMC study, regardless of the study's purported flaws. Furthermore, Plaintiffs have not identified any scientific study that supports their claim that Defendants' 31% reduction claims were false or misleading. See Kardovich v. Pfizer, Inc., Civ. 13-7378 (RRM), 2015 WL 1506996, at *6 (E.D.N.Y. Mar. 31, 2015)

29

(finding that plaintiffs' reliance on scientific studies and materials that did not correspond to defendant's marketing statements prevented plaintiffs from plausibly alleging that defendant's representations were false, deceptive, or misleading). The University of Wisconsin study, the only other scientific study mentioned in the SAC, compared different brands of football helmets, unlike the UPMC study which compared a specific helmet model with "traditional" helmets. The Wisconsin study found no correlation between helmet brand, age, and recondition status and a reduced risk of concussions. Although the Wisconsin study concluded differently from the UPMC study and noted certain limitations in the UPMC study, nothing in the Wisconsin study suggests that Riddell misrepresented the results of the UPMC study. Accordingly, Plaintiffs have not plausibly alleged that accurate characterizations of the UPMC findings in advertising were false or misleading. However, as discussed further below in regards to Defendants' statements about youth helmets, Plaintiffs have stated a plausible consumer fraud claim based on marketing statements that reference a 31% reduction in concussions when advertising helmets that were not involved in the UPMC study.[16]

---

[16] The FTC investigation, like the NAD report in Gaul, only questions the reliability of the UPMC study. It does not establish that Defendants' 31% reduction claims are false or misleading. After examining the methodology of the UPMC study,

### b.   Concussion reduction technology claims

Defendants similarly contend that Plaintiffs have not plausibly alleged that their marketing statements regarding concussion reduction technology are false or misleading. In addition to marketing claims that referred to a 31% reduction in concussions, Plaintiffs allege that Defendants advertised the ability of their helmets to reduce concussions by promoting certain design features with which the helmets were allegedly equipped, as well as more general references to "concussion reduction technology."

As for specific design features, Plaintiffs allege that Defendants used promotional videos, "Protections Tours," and appearances at youth-focused events like NFL Play 60 Youth Football Clinics to promote the safety of their helmets, including specific design and technological features. (Id. ¶¶ 79, 80, 84.) By way of example, a video on Defendants' website allegedly touts "patented side impact protection . . . to better handle those blows to the side of the head and the face." (Id.

---

the FTC concluded that the UPMC study did not prove that Riddell Revolution varsity football helmets reduced the risk of concussion by 31% compared with other varsity helmets and noted that the UPMC study did not test the effectiveness of Riddell youth football helmets in reducing concussions as compared to other youth helmets. Accordingly, the Court's decision to distinguish between claims that accurately reported the results of the UPMC study from claims that applied those results to helmets not involved in the study is consistent with the FTC's investigation and findings.

at 79.) Plaintiffs also quote the following marketing claim,
"The helmet's Revolution Concussion Reduction Technology uses
three principal design elements – an offset shell, mandible
extensions and energy managing S-Pads – to provide superior
protection for players on the field." (Id. ¶ 85.) Plaintiffs do
not allege that the helmets lack these specific design features.
Plaintiffs do not even allege, as did Schutt in Schutt Sports,
that different Riddell helmets contain different design features
from those in the Revolution helmet which were subject to
testing in the UPMC study. Even if Plaintiffs had made such an
allegation, the Court would agree with the court in Schutt
Sports that it is Plaintiffs' burden to allege and establish
that "the technology in place in these other helmets is not the
same as the technology 'shown' to reduce concussions." Riddell,
Inc. v. Schutt Sports, Inc., 724 F. Supp. 2d 963, 976 (W.D. Wis.
2010). Therefore, the Court finds that Plaintiffs have not
plausibly alleged a consumer fraud claim based on statements
regarding specific design features of their helmets.

    The Court finds differently as to Defendants' more general
references to "concussion reduction technology." Plaintiffs
offer, among others, the following examples of such statements:
"Riddell's exclusive Concussion Reduction Technology protects
young athletes against concussions and impact;" "Riddell
Revolution CRT (Concussion Reduction Technology) to keep young

players safe on the field;" and "Riddell's Concussion Reduction
Technology provides increased protection against concussions and
impact." (Id. ¶ 85.) Plaintiffs maintain that these references
to concussion reduction technology are false or misleading
because "there is no material difference in the Riddell Football
Helmets and other football helmets available to consumers in
regard to concussion reduction." (SAC ¶ 86.) Essentially,
Plaintiffs allege that Defendants' helmets are unable to reduce
concussions compared to other available helmets, and any
reference to concussion reduction technology is thus inherently
false, misleading, or deceptive.[17] The University of Wisconsin
study, which concluded that no brand of football helmet was
comparatively better at reducing the incidence of concussions,
lends plausibility to Plaintiffs' allegation that Riddell's
helmets are no more capable of reducing the incidence of
concussions than other football helmets on the market. The
Wisconsin study directly contradicts claims of concussion
reduction technology which purportedly provides increased
protection against concussions. Beyond a reference to specific

---

[17] Unlike the Amended Complaint, the SAC is clear that
Plaintiffs' claims are not based on the helmets' alleged
inability to prevent concussions. Plaintiffs, instead, assert a
claim based on the relative ability (or inability) of
Defendants' helmets to reduce concussions compared to other
helmets on the market. For this reason, the Court questions the
relevance of the Biokinetics report which Plaintiffs contend
warns that no helmet can prevent concussions.

design and technological features, the phrase "concussion reduction technology" necessarily implies the ability to reduce concussions. At the very least, based on the allegations in the SAC, such a phrase may have misled or deceived consumers regarding the ability of Defendants' helmets to reduce the incidence of concussions. Consequently, to the extent Defendants' helmets cannot in fact reduce concussions, Plaintiffs have provided a plausible basis that these marketing statements are false, misleading, or deceptive.

### c.   Youth helmets claims

Defendants also argue that Plaintiffs have not identified any statements related to youth helmets which are false or misleading. Plaintiffs allege that Defendants made marketing statements about youth helmets that referenced both a 31% reduction in concussions and concussion reduction technology. As discussed above, the Court must distinguish between Defendants' statements invoking a 31% reduction in concussions which were made in relation to the Riddell Revolution helmet on which the UPMC study was based and those which were made in relation to helmets not involved in the UPMC study. Plaintiffs allege that Defendants advertised certain youth helmets with reference to a 31% reduction in concussions, including the "Youth" and "Speed Youth" helmets. (SAC ¶ 74.) Plaintiffs have plausibly alleged that Defendants' reference to a statistic from a study which did

not include any youth helmet models is at least misleading or deceptive. The Court further finds that the reasoning above regarding references to concussion reduction technology applies with equal, if not greater, force to Defendants' alleged marketing of youth helmets.[18]

### d. Omission-based claims

Although the Court finds that Plaintiffs' consumer fraud claims may proceed based on allegedly false or misleading marketing statements, Plaintiffs have not plausibly alleged a consumer fraud claim based on an omission which Defendants failed to disclose. Based on the alleged flaws in the UPMC study, the 2000 Biokinetics report, and the FTC investigation, Plaintiffs allege that Defendants were aware that their helmets could not reduce the incidence of concussions. The SAC states:

> Defendants failed to disclose what they knew for certain –
> that significant evidence establishes that their Riddell
> Football Helmets provide no material difference in concussion
> reduction. Coupled with their affirmative statements to the
> contrary, Defendants' failure to disclose to consumers that
> there is no material difference in concussion reduction of
> their helmets would, and did, mislead reasonable purchasers
> of such helmets into paying a premium price for such helmets.

---

[18] The Court finds no need to address a letter stating that "[g]round-breaking research shows that athletes who wear Riddell Revolution Youth helmets were 31% less likely to suffer a concussion than athletes who wore traditional football helmets." (SAC ¶ 78.) As Defendants correctly note, Plaintiffs do not allege that any of the plaintiffs received this letter.

(Id. ¶ 98.) The SAC thus offers nothing more than the vague and conclusory allegations which the Court previously found insufficient to plead an omission-based consumer fraud claim. In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *10. Beyond Plaintiffs' inability to identify a discrete omission which Defendants allegedly failed to disclose to consumers, the SAC does not plausibly allege that Defendants knew their helmets could not reduce the incidence of concussions prior to the purchases at issue here. First, the SAC states that "[m]ost of the advertisements also included a reference to the Neurosurgery article," (SAC ¶ 76), so it is questionable whether the supposed flaws in the UPMC study were actually concealed. Second, the Court credits Defendants' argument that any reliance on the University of Wisconsin study to support an omission-based claim would be inappropriate because the study was published in 2014 well after Plaintiffs made the purchases at issue. Third, the Biokinetics report, far from making clear that "no football helmet, no matter how revolutionary, could prevent concussions" as Plaintiffs allege, begins with the opposite assertion: "Football helmets have proven to be exceptionally effective in the prevention of severe head injury." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *14 n.6. Moreover, as explained above, this case is not about the ability of Defendants' helmets to prevent concussions, but their relative

36

ability to reduce the incidence of concussions as compared to competitors' helmets. Therefore, the Court finds that Plaintiffs' consumer fraud claims cannot proceed based on an omission or failure to disclose. Such claims may only proceed based on affirmative misrepresentations which Plaintiffs plausibly allege were false, misleading, or deceptive as discussed above.

### 2.   Ascertainable loss

Defendants argue that Plaintiffs' pleading fails to allege ascertainable loss or injury as required by the consumer protection laws of New Jersey, Florida, Arizona, and California. The Court previously dismissed Plaintiffs' claims under the New Jersey Consumer Fraud Act ("NJCFA") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") for failure to adequately plead ascertainable loss or injury because the "Amended Complaint merely state[d] that each plaintiff paid a 'price premium' for Defendants' product and fails to identify the specific price paid or allege any other facts necessary to plead injury or ascertainable loss." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *13. This is no longer the case. The SAC includes substantially more detail regarding the price each plaintiff paid for the helmets at issue and specifies the approximate "price premium" Plaintiffs paid as $50. Plaintiffs' pleading therefore sufficiently pleads ascertainable

37

loss and injury under the NJCFA and FDUPTA. See Lieberson v. Johnson & Johnson Consumer Companies, Inc., 865 F. Supp. 2d 529, 541-42 (D.N.J. 2011) ("The Court finds that absent any specific information concerning the price of the Products or the price of any comparable products, Plaintiff's allegations concerning the ascertainable loss are nothing more than unsupported conclusory statements that are insufficient to withstand a motion to dismiss."); Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) ("[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.") (quoting Rollins, Inc. v. Heller, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)). To the extent Defendants dispute Plaintiffs' calculation of the premium they paid for the helmets at issue, they are free do so as this litigation progresses. Consequently, the Court will deny Defendants' motion to dismiss to the extent it is based on Plaintiffs' purported failure to plead ascertainable loss or injury.[19]

_____

[19] The Court also rejects Defendants' argument regarding ascertainable loss and injury under Arizona and California law. Defendants' argument in this regard is essentially a repeat of their argument regarding reliance and causation. They contend that Plaintiff Galvan does not allege that he would have purchased an alternative product and that the Arizona Plaintiffs

### 3.   Arizona Consumer Fraud Act

Defendants argue that Plaintiffs' claims under the Arizona Consumer Fraud Act must be dismissed because Plaintiff Alliance Youth Sports' claim is barred by the one-year statute of limitations. Such an argument is an affirmative defense and "the burden of establishing its applicability to a particular claim rests with the defendant." Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc., 730 F.3d 263, 271 (3d Cir. 2013). A statute of limitations defense may be raised by motion under Rule 12(b)(6) if the limitations bar is apparent on the face of the complaint. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014). It is not clear from the SAC whether Alliance Youth's claims are time-

---

continued to purchase Defendants' helmets from July, 2010 through March, 2013. (Def. Br. at 29.) However, the SAC does in fact allege that Galvan researched helmets from a variety of manufacturers and decided to purchase a Riddell Revolution helmet based on claims of superior concussion reduction technology. (SAC ¶ 111.) The Court sees no reason to require Plaintiffs to restate what is already clear: Galvan would have purchased a helmet from another manufacturer had he not relied on Defendants' marketing statements regarding concussion reduction technology. As for the Arizona Plaintiffs, the Court rejects Defendants' contention that continued purchases of Defendants' helmets prevents as a matter of law a showing of injury-in-fact. Under the Arizona Consumer Fraud Act, "An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information." Kuehn v. Stanley, 91 P.3d 346, 351 (Ariz. Ct. App. 2004). That the Arizona Plaintiffs continued purchases may merely show that they relied on Defendants' alleged misrepresentations. It does not, on the face of the pleading, invalidate their alleged monetary injuries.

barred. The SAC alleges that "Mr. King . . . relied upon
Riddell's statements and began purchasing Riddell Revolution
Youth helmets for the Alliance Youth Sport[s] Association in
July of 2010, which purchases continues [sic] at least through
March of 2013, because he thought they offered better concussion
protection than less expensive Schutt models." (SAC ¶ 114.) This
statement suggests that Alliance Youth may have continued to
purchase Defendants' helmets beyond March 2013. Therefore, it is
not apparent on the face of the pleading that Alliance Youth's
claims are time-barred.[20]

---

[20] Defendants also challenge Plaintiff Kenny King's standing to
assert a claim under the Arizona Consumer Fraud Act because the
SAC alleges only that he made purchases on behalf of Alliance
Youth. Plaintiffs do not allege that Mr. King purchased helmets
in his individual capacity, that is, for his own use. "[A]
person who can violate the Act or be a victim under the Act
includes 'any natural person or his legal representative,
partnership, domestic or foreign corporation, any company,
trust, business entity, or association, any agent, employee,
salesman, partner, officer, director, member, stockholder,
associate, or trustee.' Waste Mfg. & Leasing Corp. v. Hambicki,
900 P.2d 1220, 1223 (Ariz. Ct. App. 1995) (quoting
A.R.S. § 44-1521.6). As such, Alliance Youth has standing to
assert a claim under the Arizona Consumer Fraud Act. Kenny King
has not alleged personal injury or any injury distinct from
those suffered by Alliance Youth. See Allen v. Wright, 468 U.S.
737, 751 (1984) ("A plaintiff must allege personal injury fairly
traceable to the defendant's allegedly unlawful conduct and
likely to be redressed by the requested relief."). Therefore,
the Court will dismiss Kenny King from this action for lack of
standing.

### 4.   California "unfair" and "unlawful" business practices claims

The Court is unpersuaded by Defendants' argument that Plaintiffs have failed to adequately allege claims under the "unfair" and "unlawful" prongs of the California Unfair Competition Law.[21] The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200; see also Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). The unlawful prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 539 (Cal. 1999) (quotations and citation omitted). "By proscribing 'any unlawful' business practice, [the UCL] 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." Id. at 539-40 (quotations and citation omitted). "[Consumer Legal Remedies Act ("CLRA")] violations may serve as the predicate for 'unlawful' business practice actions under the UCL." Herron v. Best Buy Co.

---

[21] Plaintiffs assert claims under the "unfair," "unlawful," and "deceptive" prongs of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., as well as claims under the False and Misleading Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq. and the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.

Inc., 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013). Defendants do
not persuasively argue, nor does the Court find that the SAC
fails to state a claim under the CLRA. Therefore, the Court will
not dismiss Plaintiffs' claim based on the "unlawful" prong of
the UCL.

The Court similarly rejects Defendants' critique of
Plaintiffs' claim under the "unfair" prong of the UCL. The UCL
does not define the term "unfair," and the definition of
"unfair" conduct against consumers remains "in flux" among
California courts. Davis v. HSBC Bank Nevada, N.A., 691 F.3d
1152, 1169 (9th Cir. 2012); see also Graham v. Bank of Am.,
N.A., 172 Cal. Rptr. 3d 218, 232 (Cal. Ct. App. 2014) ("The
standard for determining what business acts or practices are
'unfair' under the UCL for consumer actions remains
unsettled."). Before Cel-Tech, courts held that "an 'unfair'
business practice occurs when it offends an established public
policy or when the practice is immoral, unethical, oppressive,
unscrupulous or substantially injurious to consumers." S. Bay
Chevrolet v. Gen. Motors Acceptance Corp., 85 Cal. Rptr. 2d 301,
316 (Cal. Ct. App. 1999) (citation omitted). Courts applied a
balancing test weighing "the utility of the defendant's conduct
against the gravity of the harm to the alleged victim . . . ."
Id. (citation omitted).

The Cel-Tech court found that the balancing test was "too amorphous" and it "provide[d] too little guidance to courts and businesses." Cel-Tech, 973 P.2d at 543. The court held that "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Id. at 544. However, the court restricted this new test to allegations of anti-competitive practices by competitors and emphasized that it does not "relate[] to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law." Id. at n.12.

Like the Ninth Circuit in Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718 (9th Cir. 2007), this Court will not apply the Cel-Tech standard in the absence of a clear holding from the California Supreme Court. Id. at 736. The Court finds that Plaintiffs have adequately pleaded harm from Defendants' alleged conduct and Defendants have not articulated any "reasons, justifications, or motives, or utility of [its] conduct to weigh against the alleged harm." Pirozzi v. Apple, Inc., 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013) (quotations and citation omitted). Moreover, "[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides." Paduano

43

v. Am. Honda Motor Co., 88 Cal. Rptr. 3d 90, 104 (Cal. Ct. App. 2009) (quotations and citation omitted). Defendants also provide no support for their contention that economic injury is insufficient to plead harm under the UCL. See Kwikset Corp. v. Superior Court, 246 P.3d 877, 884 (Cal. 2011) ("[P]rivate standing [under the UCL] is limited to any person who has suffered injury in fact and has lost money or property as a result of unfair competition.") (quotations and citation omitted). Therefore, the Court will deny Defendants' motion to dismiss to the extent it is based on an alleged failure to properly plead a claim under the "unlawful" prong of the UCL.

### 5. Equitable relief

Defendants also argue that Plaintiffs' claims for equitable relief must be dismissed. Plaintiffs maintain in opposition that these claims are pleaded in the alternative to their consumer fraud claims and may proceed irrespective of the viability of their consumer fraud claims. The Court previously dismissed Plaintiffs' claims for equitable relief, namely their claims for unjust enrichment, assumpsit and quasi-contract, and declaratory relief, without prejudice "because each [was] premised on the underlying allegation of false advertising which the Court ha[d] found insufficiently pleaded." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *14. Because the Court will now permit Plaintiffs' consumer fraud claims to proceed, the

44

Court must address Defendants' renewed arguments regarding Plaintiffs' equitable claims.

Defendants argue that Plaintiffs' unjust enrichment and assumpsit claims must be dismissed because they are premised on a fraud or tort theory and they are not independently viable.[22] Defendants correctly note, and Plaintiffs concede, that "New Jersey does not recognize unjust enrichment as an independent tort cause of action." McGuire v. BMW of N. Am., LLC, Civ. 13-7356 (JLL), 2014 WL 2566132, at *3 (D.N.J. June 6, 2014).[23] To state a claim for unjust enrichment under New Jersey law,

---

[22] The Court will not distinguish between Plaintiffs' claims for unjust enrichment and assumpsit. See Stone v. White, 301 U.S. 532, 534 (1937) (explaining that unjust enrichment "is the lineal successor of the common count in indebitatus assumpsit for money had and received"); New York Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co., Civ. 10-148 (SRC), 2012 WL 209349, at *2 (D.N.J. Jan. 24, 2012) ("One cause of action for unjust enrichment at common law was the action in assumpsit for money had and received, which is equitable in spirit, although legal in form, and is maintainable when the defendant has received money which in equity and good conscience belongs to the plaintiff.") (quotations omitted). Indeed, as discussed herein, the Court finds Plaintiffs' equitable claims premised on the same alleged misconduct which provides the basis for their consumer fraud claims. Fundamentally, Plaintiffs' allegations sound in tort, not quasi-contract.

[23] With the exception of Illinois, Plaintiffs do not argue that applicable state law conflicts with or materially varies from New Jersey law. Indeed, courts in this District have applied New Jersey law to unjust enrichment claims in the class action context. See Avram v. Samsung Electronics Am., Inc., Civ. 11-6973 (KM), 2013 WL 3654090, at *20 (D.N.J. July 11, 2013) ("Unjust enrichment is a shared feature of many states' common law. For unjust enrichment claims, many courts have found that there is no actual conflict between different states' laws.").

plaintiff must show that "it expected remuneration from the
defendant at the time it performed or conferred a benefit on
defendant and that the failure of remuneration enriched
defendant beyond its contractual rights." VRG Corp. v. GKN
Realty Corp., 135 N.J. 539, 554 (1994). In the present action,
Plaintiffs allege that they paid a price premium to purchase
Defendants' helmets based on representations that such helmets
could reduce the incidence of concussions. Because the helmets
allegedly failed to provide these concussion reduction benefits,
Plaintiffs contend that it would be unjust and inequitable for
Defendants to retain the revenues derived from the sales at
issue. (SAC ¶¶ 219-220.) Accordingly, Plaintiffs' pleadings are
indistinguishable from those in McGuire where the court found
allegations that "Defendant concealed certain defects in and
misrepresented the qualities and functionality" of the product
at issue insufficient to state a claim for unjust enrichment.
McGuire, 2014 WL 2566132, at *3. As in McGuire, Plaintiffs here
do not allege that they "did not receive the product he
purchased or otherwise conferred a benefit on [Defendants] under
a quasi-contractual relationship with the expectation of
remuneration." Id. at *3. See also Pappalardo v. Combat Sports,
Inc., Civ. 11-1320 (MLC), 2011 WL 6756949, at *11 (D.N.J. Dec.
23, 2011) (dismissing unjust enrichment claim premised on tort
theory where plaintiffs alleged that defendants made

46

misrepresentations about the product at issue). Therefore, the Court will dismiss Plaintiffs' unjust enrichment and assumpsit claims except as provided below.[24]

Plaintiffs maintain that their unjust enrichment claim under Illinois law is viable as an independent claim. The Court agrees. "In Illinois, to state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." Cleary v. Philip Morris Inc., 656 F.3d 511, 516 (7th Cir. 2011) (quotation and alteration omitted). "An unjust enrichment claim may be predicated on either quasi-contract or tort." Reid v. Unilever U.S., Inc., 964 F. Supp. 2d 893, 922 (N.D. Ill. 2013). The Seventh Circuit has observed that "[t]he Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action." Cleary, 656 F.3d at 516. As

---

[24] Defendants also accurately note that courts in this District have dismissed unjust enrichment claims where plaintiffs purchased the products at issue from a third-party and not directly from the manufacturer-defendant. See Avram v. Samsung Electronics Am., Inc., Civ. 11-6973 (KM), 2013 WL 3654090, at *21 (D.N.J. July 11, 2013) ("When consumers purchase a product from a third party, they confer a benefit on that third party, not on the manufacturer."). This provides an additional reason to dismiss claims for unjust enrichment asserted by Plaintiffs who have not alleged that they purchased the helmets at issue directly from Riddell.

such, this Court proceeds based on the understanding that Illinois law does not require an underlying claim for breach of contract or tort, and the Cahokia School District's claim for unjust enrichment may proceed at this time based on the allegations of fraud and misconduct discussed throughout this opinion, namely the alleged misrepresentations Defendants' made regarding their helmets. See Stevens v. Interactive Fin. Advisors, Inc., Civ. 11-2223, 2015 WL 791384, at *16 (N.D. Ill. Feb. 24, 2015).[25] Therefore, the Court declines to dismiss the Cahokia School District's unjust enrichment claim at this time.

As for Plaintiffs' claim for declaratory relief, Defendants similarly argue that such a claim must be dismissed because it is entirely derivative and dependent on Plaintiffs' insufficiently pleaded consumer fraud claims. Because the Court will permit Plaintiffs' consumer fraud claims to proceed, such an argument is inapposite and unpersuasive. The Court also rejects Defendants' argument that the pleadings do not support entitlement to declaratory relief. Plaintiffs have adequately

---

[25] As Plaintiffs properly note, this is no longer a case where Plaintiffs allegations of consumer fraud are insufficient to state a claim. The present action is thus distinct from Ass'n Ben. Servs., Inc. v. Caremark RX, Inc., 493 F.3d 841 (7th Cir. 2007). See Id. at 855 ("[W]e merely conclude that, when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, were fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable.").

alleged on-going misconduct by Defendants and that monetary damages may not adequately compensate potential class members. (SAC ¶¶ 227-28.) Accordingly, dismissal at this stage would be premature. See Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC, 945 F. Supp. 2d 543, 566 (D.N.J. 2013) (noting that dismissal of claim for declaratory relief was premature at motion to dismiss stage given the court's "wide discretion to provide declaratory relief"). The Court will consider appropriate relief only when liability is established. See, e.g., Lewis v. Bank of Am. NA, Civ. 13-7717, 2013 WL 7118066, at *4 (C.D. Cal. Dec. 18, 2013) ("At this juncture, it would be premature to find that injunctive relief may not be granted."); Lawn v. Enhanced Serv. Billing, Inc., Civ. 10-1196, 2010 WL 2773377, at *6 (E.D. Pa. July 13, 2010) ("This Court will address the issue of remedies, including the possibility of injunctive relief, if there is a finding of liability."). Consequently, the Court will deny Defendants' motion to dismiss to the extent it seeks dismissal of Plaintiffs' claim for declaratory relief.

## V.   CONCLUSION

For the reasons discussed above, the Court will grant in part and deny in part Defendants' motion to dismiss. The Court will permit Plaintiffs' consumer fraud claims to proceed based on allegedly false or misleading marketing statements regarding

49

"concussion reduction technology" and a 31% reduction in concussions for helmets not included in the UPMC study, including youth helmets. As explained above, the Court rejects Defendants' arguments for dismissal under the Arizona Consumer Fraud Act and the California Unfair Competition Law. The Court will also permit the Cahokia School District's claim for unjust enrichment and Plaintiffs' claim for declaratory relief to proceed at this time. However, the Court will grant Defendants' motion to dismiss to the extent Plaintiffs' consumer fraud claims are based on marketing statements which accurately reflect the results of the UPMC study. Nor will Plaintiffs be permitted to pursue consumer fraud claims based on an alleged omission. The Court will also grant Defendants' motion to the extent it seeks dismissal of Plaintiffs' unjust enrichment and assumpsit claims. The Court will dismiss Plaintiff Kenny King from this action for lack of standing. Because the Court previously granted Plaintiffs an opportunity to amend and the Court finds that further amendment would be futile, the claims now dismissed will be dismissed with prejudice. An accompanying Order will be entered.


__August 3, 2015__                    __s/ Jerome B. Simandle__
Date                                  JEROME B. SIMANDLE
                                      Chief U.S. District Judge


50