Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF
CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND .................................................................................. 4

I.    RIDDELL DEVELOPS HELMETS WITH INNOVATIVE CONCUSSION
      REDUCTION TECHNOLOGY, AND MODERNIZES FOOTBALL HELMETS ......... 4

      A.    Riddell's Concussion Reduction Technology ........................................ 4
      B.    Competitors' Claims of Concussion Reduction ..................................... 6
      C.    Additional Research Further Supports Riddell's CRT Claims ............... 7

II.   RIDDELL'S MARKETING OF HELMETS WITH CRT ..................................... 8

      A.    Riddell's Sales Channels and Customers ............................................. 8
      B.    Plaintiffs' "Common Message" Cannot Be Found in Riddell's Marketing ......... 9

            1.    Riddell Catalogs .................................................................. 9
            2.    Mailers and Print Ads ........................................................ 10
            3.    Retail Point of Sale .......................................................... 11
            4.    Riddell Website ................................................................ 12

      C.    Riddell Ceases Use of the Phrase Concussion Reduction Technology
            in 2012 ............................................................................................ 12

III.  THE NAMED PLAINTIFFS' DEFICIENT INDIVIDUAL CLAIMS .................... 13

      A.    New Jersey – Douglas and Denise Aronson ...................................... 13
      B.    New Jersey – Norma Thiel .............................................................. 14
      C.    Florida – Nicholas Farrell .............................................................. 15
      D.    California – Gustavo Galvan ........................................................... 16
      E.    Arizona – Alliance Youth Sports Association .................................... 17

STANDARD FOR CLASS CERTIFICATION ........................................................ 18

PLAINTIFFS' PROPOSED CLASS DEFINITIONS ................................................ 19

ARGUMENT ................................................................................................... 19

I.    PLAINTIFFS CANNOT CERTIFY A CLASS BASED ON A THEORY OF
      LIABILITY THAT THEY ABANDONED AT THE PLEADING STAGE ................ 19

      A.    The Court Dismissed Plaintiffs' Theory that "Concussion Reduction
            Technology" is False Because No Helmet Can Reduce Concussions ........... 20
      B.    Plaintiffs' Arguments for Certification Rely On The Abandoned Theory ......... 21

II.   PLAINTIFFS FAIL TO SATISFY THE PREREQUISITES OF RULE 23(A) ........... 24

      A.    The Legal Requirements of Typicality and Adequacy ......................... 24
      B.    Plaintiffs' Claims Are Markedly Different From Absent Class Members ......... 25

            1.    Plaintiffs Proposed Subclasses are Overbroad ......................... 26
            2.    The Factual Circumstances of Plaintiffs' Claims Are Unique ......... 26

i

3.      Plaintiffs Only Fit Two of the Eight Proposed Subclasses ..................... 28

C.     The Changing Market Over the Class Period Renders Typicality Absent ......... 29

D.     Defendants Have Unique Defenses to Plaintiffs' Individual Claims
That Render Plaintiffs' Interests Antagonistic to those of the Class ................ 30

       1.      New Jersey – Douglas and Denise Aronson ............................ 30
       2.      New Jersey – Norma Thiel ................................................ 30
       3.      Florida – Nicholas Farrell ................................................ 31
       4.      California – Gustavo Galvan ............................................. 31
       5.      Arizona – Alliance Youth Sports Association ........................ 32

III.    PLAINTIFFS CANNOT CERTIFY A CLASS UNDER RULE 23(B)(3) ................... 34

A.     Individualized Inquiries Regarding Alleged Deceptive Acts
And Causation Defeat Predominance ......................................................... 35

       1.      Individualized Oral Representations To Institutional Purchasers
Prevent Certification ....................................................... 35
       2.      Individualized Representations To Non-Institutional Purchasers
Prevent Certification ....................................................... 38

B.     Plaintiffs Are Not Entitled To Any Presumptions of Common Proof ................ 39

       1.      Arizona .......................................................................... 40
       2.      California ....................................................................... 41
       3.      Florida .......................................................................... 43
       4.      New Jersey ..................................................................... 45

IV.    PLAINTIFFS CANNOT PROVE DAMAGES ON A CLASSWIDE BASIS ............... 46

A.     Plaintiffs' Damages "Model" Does Not Fit Their Theory Of Liability .............. 47
B.     Plaintiffs' Damages "Model" Does Not Account for Other Variables ............... 51
C.     Plaintiffs' Proposed Classes Will Require Individual
Damages Inquiries and Create Inter-Class Conflicts ......................................... 53

V.    PLAINTIFFS' PROPOSED CLASSES ARE NOT READILY
ASCERTAINABLE ......................................................................................... 55

A.     Plaintiffs Fail to Demonstrate the Ascertainability of "Direct Purchasers" ........ 55
B.     Plaintiffs Fail to Demonstrate the Ascertainability of "Retail Purchasers" ......... 56

VI.    CERTIFICATION OF A CLASS UNDER RULE 23(B)(2) SHOULD BE
REJECTED .................................................................................................... 58

VII.   CERTIFICATION UNDER RULE 23(C)(4) SHOULD BE REJECTED ..................... 59

CONCLUSION .......................................................................................................... 60

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adami v. Cardo Windows, Inc.*,
  299 F.R.D. 68 (D.N.J. 2014) (Simandle, J.) ..........................................................56

*Adrienne Roggenbuck Trust v. Development Resources Grp.*,
  505 Fed. App'x 857 (11th Cir. 2013) ....................................................................44

*Allen v. Hyland's Inc.*,
  300 F.R.D. 643 (C.D. Cal. 2014) ...........................................................................27

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)...........................................................................................25, 28

*Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*,
  503 F.3d 256 (3d Cir. 2007)...............................................................................3, 60

*Argabright v. Rheem Mfg. Co.*,
  No. CV 15-5243, 2016 WL 4402819 (D.N.J. Aug. 16, 2016)..................................1

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998)....................................................................................33

*Beck v. Maximus, Inc.*,
  457 F.3d 291 (3d Cir. 2006)....................................................................................25

*Bello v. Beam Global Spirits & Wine, Inc.*,
  No. 11-cv-5149 .......................................................................................................58

*Bright v Asset Acceptance, LLC*,
  292 F.R.D. 190 (D.N.J. 2013) (Simandle, J.) ........................................................51

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013)........................................................................... *passim*

*Cellco Partn. v. Hope*,
  No. CV11-0432 PHX DGC, 2011 WL 3159172 (D. Ariz. July 26, 2011)..............56

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)...................................................................................................59

*City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*,
  No. CV 13-4595 (NLH/JS), 2015 WL 5769951 (D.N.J. Sept. 29, 2015)...................18, 34, 57

iii

*Clark v. Prudential Ins. Co. of Am.*,
  289 F.R.D. 144 (D.N.J. 2013) ........................................................................25, 39

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) .................................................................... *passim*

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) ............................................................47, 48, 52

*Cornelis v. B & J Smith Assocs. LLC*,
  No. CV-13-00645-PHX-BSB, 2014 WL 1828891 (D. Ariz. May 8, 2014) ...............32, 33, 35

*Crozier v. Johnson & Johnson Consumer Cos, Inc.*,
  901 F. Supp. 2d 494 (D.N.J. 2012) .................................................... *passim*

*Curley v. Cumberland Farms Dairy, Inc.*,
  728 F.Supp. 1123 (D.N.J. 1989) ....................................................................36

*De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*,
  269 F.R.D. 445 (E.D. Pa. 2010)....................................................................36

*Demmick v. Cellco P'ship*,
  No. CIV.A. 06-2163 JLL, 2010 WL 3636216 (D.N.J. Sept. 8, 2010)....................................46

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012).........................................................................25

*Eisenberg v. Gagnon*,
  766 F.2d 770 (3d Cir.1985).......................................................................25, 35

*Fitzpatrick v. General Mills*,
  653 F.3d 1279 (11th Cir. 2011) ...............................................................43, 44

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,
  No. CIV.A. 03-4558, 2012 WL 379944 (D.N.J. Feb. 6, 2012) ...................... *passim*

*Fraker v. Bayer Corp.*,
  No. CVF08-1564 AWI GSA, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ..........................23

*Freid v. Nat'l Action Fin. Servs., Inc.*,
  No. CIV. A. 10-2870 SRC, 2011 WL 1547257 (D.N.J. Apr. 20, 2011).................................29

*Gates v. Rohm and Haas Co.*,
  655 F.3d 255 (3rd Cir. 2011) ........................................................................60

*Gaul v. Bayer Healthcare LLC*,
  2013 U.S. Dist. LEXIS 188951 (D.N.J. June 19, 2013) ......................................23

*Glick v. E.F. Hutton & Co.*,
    106 F.R.D. 446 (E.D.Pa.1985) ............................................................36

*Gonzalez v. Proctor & Gamble Co.*,
    247 F.R.D. 616 (S.D. Cal. 2007) .................................................41, 42

*Goodman v. Lukens Steel Co.*,
    777 F.2d 113 (3d Cir. 1985), aff'd, 482 U.S. 656 (1987) ......................25

*In re Grand Theft Auto Video Game Consumer Litig.*,
    251 F.R.D. 139, 157 (S.D.N.Y. 2008). .................................................53

*Gregurek v. United of Omaha Life Ins. Co.*,
    No. CV 05-6067-GHK, 2009 WL 4723137 (C.D. Cal., Nov. 10, 2009) ..........28, 38

*Grimmelmann v. Pulte Home Corp.*,
    CV-08-1878-PHX-FJM, 2010 WL 2744943 (D. Ariz. July 9, 2010) ....................40

*Harnish v. Widener Univ. Sch. of Law*,
    833 F.3d 298 (3d Cir. 2016) .................................................34, 45

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013) .................................................57

*Hodges v. Vitamin Shoppe, Inc.*,
    No. CIV. A. 13-3381 (SRC), 2014 WL 200270 (D.N.J. Jan. 15, 2014) ................23

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    CA 05-485-JJF, 2010 WL 8591815 (D. Del. July 28, 2010) ....................27

*Johnson v. Organo Gold Int'l, Inc.*,
    No. CV 15-390-LPS, 2016 WL 2771124 (D. Del. May 13, 2016) ..............29, 30, 31

*Johnston v. HBO Film Mgmt, Inc.*,
    265 F.3d 178 (3d Cir. 2001) .................................................35, 36

*Jorge v. Toyota Motor Ins. Servs., Inc.*,
    No. A-4926-04T2, 2006 WL 2129026 (N.J. Super. A.D. Aug. 1, 2006) ................53

*Lavie v. Procter & Gamble Co.*,
    105 Cal. App. 4th 496 (Cal. 2003) ..........................................43

*In re LifeUSA Holding Inc.*,
    242 F.3d 136 (3d Cir. 2001) .................................................36

*Loomis v. U.S. Bank Home Mortg.*,
    912 F. Supp. 2d 848 (D. Ariz. 2012) ........................................23

*Macfarlan v. Ivy Hill SNF, LLC.*,
   675 F.3d 266 (3d Cir.2012)........................................................................20

*Malack v. BDO Seidman, LLP*,
   617 F.3d 743 (3d Cir. 2010)......................................................................39

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir.2012).....................................................18, 19, 53, 55

*Mazza v. Am. Honda Motor Co. Inc.*,
   666 F.3d 581 (9th Cir. 2012) ...............................................................39, 42

*McNair v. Synapse Grp, Inc.*,
   No. 06-5072, 2009 WL 1873582 (D.N.J. June 29, 2009), *aff'd*, 672 F.3d 213
   (3d Cir. 2012)..........................................................................................46

*Moheb v. Nutramax Labs., Inc.*,
   No. 12-3633-JFW, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ...........................43

*Monsanto Co. v. Campuzano*,
   206 F. Supp. 2d 1252 (S.D. Fla. 2002) .......................................................56

*In re Motions to Certify Classes Against Court Reporting Firms for Charges
   Relating to Word Indices*,
   715 F. Supp. 2d 1265 (S.D. Fla. 2010) .......................................................44

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) .....................................................................57

*New Hampshire v. Maine*,
   532 U.S. 742 (2001).................................................................................20

*In re Nifedipine Antitrust Litig.*,
   246 F.R.D. 365 (D.D.C. 2007).....................................................................53

*O'Shea v. Littleton*,
   414 U.S. 488 (1974).................................................................................59

*Opperman v. Allstate New Jersey Ins. Co.*,
   No. CIV. 07-1887 (RMB/JS), 2009 WL 3818063 (D.N.J. Nov. 13, 2009)...........................25

*Papergraphics Int'l, Inc. v. Correa*,
   910 A.2d 625 (N.J. Super. App. Div. 2006) ..................................................56

*Paton v. La Prade*,
   524 F.2d 862 (3d Cir. 1975).......................................................................25

*In re Pharm. Ben. Mgrs. Antitrust Litig.*,
No. CV 03-4730, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ........................................ *passim*

*Pop's Pancakes, Inc. v. NuCO2, Inc.*,
251 F.R.D. 677 (S.D. Fla. 2008) ........................................................................................38

*Reyes v. Netdeposit, LLC*,
802 F.3d 469 (3d Cir. 2015)................................................................................................36

*Riddell Inc. v. Schutt Sports, Inc.*,
724 F. Supp. 2d 963 (W.D. Wis. 2010) .........................................................................1, 23

*Riddell, Inc. v. Schutt Sports, Inc.*,
724 F. Supp. 2d 981 (W.D. Wis. 2010) ...............................................................................6

*Robinson v. Hornell Brewing Co.*,
No. 11-cv-2183, 2012 WL 1232188 (D.N.J. Apr. 11, 2012)(Simandle, J.) ..........................59

*Saavedra v Eli Lilly and Co.*,
2:12-CV-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014).....................................52

*In re Schering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009).................................................................................................24

*Schutt Athletic Sales Co. v. Riddell, Inc.*,
727 F. Supp. 1220 (N.D. Ill. 1989) .......................................................................28, 41, 43

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
MDL No. 1703, Nos. 05 C 4742, 05 C 2623, 2007 WL 4287511
(N.D.Ill.Dec.4, 2007) ..........................................................................................................26

*In re Sears, Roebuck & Co. Tools Mktg. and Sales Practices Litig.*,
05 C 4742, 2012 WL 1015806 (N.D. Ill. Mar. 22, 2012) ....................................................44

*Seibert v. Quest Diagnostics Inc.*,
No. CIV. 11-0304 KSH, 2014 WL 1293510 (D.N.J. Mar. 31, 2014).....................................25

*Siemer v. Ass. First Capital Corp.*,
2001 WL 35948712 (D. Ariz. Mar. 30, 2001) ..............................................................33, 40

*In re Sony Gaming Networks And Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012).................................................................................35

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ..............................................................................................27

*Stephenson v Bell Atl. Corp.*,
177 FRD 279 (D.N.J. 1997) (Simandle, J.) ...........................................................34, 35, 36

*Stratton v. Am. Med. Sec., Inc.*,
    266 F.R.D. 340 (D, Ariz. 2009) ...............................................................40

*Toback v. GNC Holdings, Inc.*,
    No. 13-80526-CIV, 2013 WL 5206103 (S.D. Fla. Sept. 13, 2013) .........................23

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
    No. 2:06-cv-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015)...........................57

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...............................................................58, 59

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...............................................................59

*Webber v. Esquire Deposition Servs.*,
    439 F. App'x 849 (11th Cir. 2011). (Motion, ) ................................43, 44

*Weiss v. York Hospital*,
    745 F.2d 786 (3d Cir.1984) ...............................................................25

*Zlotnick v. Premier Sales Grp, Inc.*,
    480 F.3d 1281 (11th Cir. 2007) ...............................................35, 43, 44, 56

**Statutes**

35 U.S.C. § 101 ...............................................................6

A.R.S. § 12-541 ...............................................................32

Cal. Civ. Code § 1761 ...............................................................31

Fla. Stat. 501.201. ...............................................................56

N.J.S.A. 56:8–1 ...............................................................56

N.J.S.A. § 56:8-19 ...............................................................53

**Other Authorities**

7B Federal Practice and Procedure § 1781, at 40–41 ...............................36

Fed. R. Civ. P. 23 ............................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...............................................................20

Fed. R. Evid. 702 ...............................................................47

Defendants Riddell, Inc., Riddell Sports Group, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. (collectively "Riddell" or "Defendants") respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs seek certification of eight statewide classes.  For each of the four states at issue, Plaintiffs propose two classes consisting of (i) all persons who purchased new Riddell helmets with CRT directly from Riddell ("Direct Purchasers"); and (ii) all persons who purchased new Riddell helmets with CRT from retail stores that Riddell sold to ("Retail Purchasers").  None of these classes warrant certification.

Plaintiffs cannot certify a class based on a theory of liability that is not in the case.  The Court dismissed Plaintiffs' First Amended Complaint because Plaintiffs' case was "so unclear and inconsistent that it fail[ed] to satisfy the plausibility standard."  Plaintiffs' two paradoxical theories in the FAC were: (A) no football helmet is able to reduce concussions, and (B) Riddell's CRT helmets are "comparatively ineffective at reducing concussions" when compared to "other currently available brands or models."[1]  To save their claims, Plaintiffs abandoned theory "A" in favor of theory "B" – the claim that Riddell's CRT helmets were less effective than other less expensive helmets on the market.[2]  Yet Riddell never made such a broad comparative claim.[3]  In

---

[1] Op. on Mot. to Dismiss First Amended Complaint (FAC), (Dkt. No. 41), at 2-3, 30-31.

[2] *See* FAC, Dkt. No. 45, at ¶ 11; Op. on Mot. to Dismiss SAC, (Dkt. No. 65), at n.17 ("Plaintiffs' claims are not based on the helmets' alleged inability to <u>prevent</u> concussions . . . [but] the relative ability . . . to reduce concussion compared to other helmets on the market.").

[3] To the extent Plaintiffs suggest that general statements such as "CRT provides the preeminent foundation from which to draw inspiration and improve" (*see e.g.,* Cecchi Decl. Ex. 20) imply a superiority to competitors helmets, they are wrong.  *See Argabright v. Rheem Mfg. Co.,* No. CV 15-5243 (JBS/AMD), 2016 WL 4402819, at *19 (D.N.J. Aug. 16, 2016); *see also Riddell Inc. v. Schutt Sports, Inc.,* 724 F. Supp. 2d 963, 978-80 (W.D. Wis. 2010) (dismissing Schutt's claims of false advertising because unqualified comparative claims do not imply superiority over any particular product).  In any event, Plaintiffs do not contend that such statements were made to the class as a whole, as would be necessary for class treatment.

addition, other manufacturers made claims of concussion reduction, and their helmets were similar in price, or more expensive, than Riddell's helmets with CRT.  Because the facts therefore do not support theory "B", Plaintiffs' Motion and their experts revert to theory "A" and seek certification based on the alleged inability of any helmet to reduce the risk of concussion.[4] Even if theory "A" were still in the case, there can be no common question because the Court has found that Riddell has scientific support for its claims that CRT reduces the incidence of concussion as compared to traditional helmets.[5]  Plaintiffs' Motion should be denied for this reason alone.

In addition, Plaintiffs cannot pass the rigorous analysis required by Rule 23.  With respect to Rule 23(a), the named Plaintiffs fail to satisfy typicality and adequacy because they do not fall within most of their proposed classes (which are, in any event, overbroad), their experiences are markedly different from any "typical" claim, and they are all subject to unique defenses.  Nor do Plaintiffs meet the even more demanding requirements of Rule 23(b)(3).  Plaintiffs claim Riddell disseminated a "common message that Riddell helmets with concussion reduction technology were better at reducing concussions than *all* other helmets on the market" (emphasis added).[6]

---

[4] The Court in *In re Pharm. Ben. Mgrs, Antitrust Litig*., No. CV 03-4730, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) found that Plaintiffs' Counsel here ignored law of the case which would have made their burden more difficult (rule of reason analysis rather than a per se analysis) and "fail[ed] to couch their arguments in terms that acknowledge that significance." *Id.* at *2, n.6.

[5] *See* Dkt. No. 65, at 3 (dismissing claims that accurately reflect the results of the 2006 University of Pittsburgh Medical Center Study, hereinafter "UPMC Study").  Plaintiffs and their experts treat all of the helmets at issue in this case the same, conceding that they all contain the CRT that was tested in the UPMC Study.  Plaintiffs cannot "establish that 'the technology in place in [all the helmets at issue in this case] is not the same technology 'shown' to reduce concussions."  Dkt. No. 65, at 32.  Plaintiffs' experts also acknowledge that "vast majority of impacts recorded [in youth football] are below the magnitude generally associated with concussions." *See* Declaration of James Saylor ("Saylor Decl."), Ex. 12, at 201-07; *id.*, Ex. 14.

[6] Motion, at 3-4.  Plaintiffs' Motion (at fn. 2) refers to their allegation that Riddell made false and misleading claims regarding the ability of its helmets to reduce the incidence of concussions by 31%.  But Plaintiffs do not contend that they were exposed to the "31% claim" or that the "31% claim" would be appropriate for class treatment.  Accordingly, Plaintiffs have waived any

Yet Plaintiffs do not – because they cannot – provide any evidence that Riddell had such a common message.  Riddell's institutional purchasers, who are the "vast majority" of Plaintiffs' proposed class members, communicated orally with sales representatives.  These purchasers had long relationships with Riddell and negotiated unique deals to meet their own needs.  Class treatment of such claims is plainly inappropriate.  With regard to individual purchasers (from Riddell's website or from retail stores), Plaintiffs merely point to "a series of advertising claims [strung] together without any clear commonality beyond a general assertion of concussion reduction", which include non-actionable statements accurately describing the UPMC Study.[7]

Plaintiffs also fail to provide a viable methodology for calculating damages that fits their theory of liability, as required by *Comcast v. Behrend*.  In fact, the opinion of Plaintiffs' damages expert was just excluded in a large class action based on similar flaws to those here.  *In re Pharm. Ben. Mgrs. Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017).  His proposed methodology does not examine competitor's helmets, or other helmets on the market during the proposed class period.  Instead, Plaintiffs would calculate damages based solely on Riddell's gross profit margins during the time when Riddell sold only traditional helmets, as compared to the profits on CRT helmets.  This wholly fails to measure the harm alleged by Plaintiffs.  In addition, Plaintiffs' proposed damages methodology all but abandons the $50 premium that they plead as their ascertainable loss throughout this case.  The methodology has significant additional problems, which are detailed fully in the accompanying Expert Report of Laura Stamm and Defendant's motion to exclude his testimony filed herewith.[8]

---

argument that class certification as to the "31% claim" is proper.  *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 259 (3d Cir. 2007).

[7] Dkt. No. 41, at 35.

[8] *See* Cecchi Decl., Ex. 36, at ¶ 34.  Plaintiffs' damage report is otherwise fatally flawed.  Saylor Decl., Ex. 3.

In addition to failing to meet the Rule 23 requirements, Plaintiffs' classes are not objectively ascertainable under the Third Circuit's heightened requirements for certification. Plaintiffs' "Direct Purchaser" classes improperly include people like Nicholas Farrell, who did not purchase from Riddell at all, but gave his mother's cash to his high school coach for a helmet. It would be impossible to identify class members like Mr. Farrell. Moreover, the fact that high schools (like Mr. Farrell's) and other institutional purchasers (like Plaintiff Alliance Youth) sold and rented helmets to players makes those purchasers impossible to ascertain without individual inquiry. As to the proposed "Retail Purchaser" classes, Plaintiffs did not even try to identify these purchasers or show that it would be feasible to do so (nor could they).

For the reasons set forth herein and all supporting papers, the Motion should be denied.

## FACTUAL BACKGROUND

I. **RIDDELL DEVELOPS HELMETS WITH INNOVATIVE CONCUSSION REDUCTION TECHNOLOGY, AND MODERNIZES FOOTBALL HELMETS**

A. **Riddell's Concussion Reduction Technology**

Riddell has designed, developed, and manufactured football helmets and other protective sports gear, since its founding in 1929. Riddell has been at the forefront of each wave of innovation: introducing the first molded plastic shell football helmet in the 1930s; the first chin strap and plastic face mask in the 1940s; and, the first football helmet to meet National Operating Committee on Standards for Athletic Equipment ("NOCSAE") standards in the 1970s.

In the late 1990s, Riddell researched technology aimed at enhancing a football helmet's ability to reduce the risk of concussions.[9] The NFL funded Biokinetics & Associates Ltd.'s ("Biokinetics") research of the biomechanics of concussion-causing impacts in football. From

---

[9] *See* Declaration of Thad Ide ("Ide Decl.", attached to the Saylor Declaration as Ex. 1) at ¶ 10. According to NOCSAE, who lists Plaintiffs' expert Dr. Cantu as Vice President, NOCSAE certified helmets reduce concussion risk. *See* Saylor Decl. Ex. 16; *id.* Ex. 15, at 46-47.

1998 – 2000, Biokinetics assisted Riddell with the development of a prototype helmet based on its findings that the majority of these impacts occurred to the side of the head and face.

These efforts ultimately led to the development of the Revolution helmet, first released in 2002, which modernized football helmet design.  The Revolution helmet was the first helmet to incorporate "Concussion Reduction Technology" ("CRT"), which includes three principal design elements: (1) jaw flaps that extend forward to cover more of the wearer's mandible ("extended mandible" protection); (2) increased padding in the jaw flap area; and (3) increase in the distance from the wearer's head to the inside of the shell ("offset shell").  traditional helmets, whose design features preceded the Revolution, had no similar technology.[10]

In 2002, Riddell provided a grant to the University of Pittsburgh Medical Center to conduct a three-year on-field study of CRT and the incidence of concussion ("UPMC Study").  The UPMC Study investigated over 2000 high school players, around half of whom wore the Revolution helmet, with CRT (test group), and half of whom wore traditional helmets, which did not have CRT (control group).  The UPMC Study found that players wearing a helmet with CRT saw a 31% reduced risk of concussions compared to players wearing traditional helmets.[11]

Riddell's modern helmets come in a variety of price points, with a variety of features unrelated to CRT.[12]  It is undisputed that every Riddell helmet, youth and adult, released after the Revolution contained CRT.[13]  Thus, as this Court has recognized, Plaintiffs cannot challenge "that 'the technology in place in [all the helmets at issue in this case] is not the same technology

---

[10] *See* Ide Decl., at ¶¶ 11-17; Saylor Decl., Ex. 27, at Response No. 24.

[11] *See* Saylor Decl., Ex. 28. This Court has found that Plaintiffs have no claim for marketing that accurately reflects the results of the UPMC Study, regardless of any "purported flaws."  Dkt. No. 65, at 3.

[12] *See* Ide Decl., ¶¶ 22-23.

[13] *See generally*, Motion (treating all CRT helmets as equal); Cecchi Decl. Exs. 28, 29, 30, 36.

'shown' to reduce concussions."[14]  Riddell was granted two patents for CRT.[15]  The patented

elements of CRT are indisputably "new and useful" under federal patent law.[16]  These patents

were upheld as valid after challenge from Riddell's primary competitor, Schutt.[17]

### B.   Competitors' Claims of Concussion Reduction

In response to the UPMC Study, Plaintiffs' expert Dr. Robert Cantu stated: "I would like

to commend Riddell for having the courage to come forward with a new football helmet after

manufacturers, for many years, were unwilling to do so because of liability issues.  This has

forced competitors to attempt to make a better product as well."[18]  As noted by Dr. Cantu,

Riddell's competitors quickly followed its lead in introducing modern helmets.  Schutt released

its DNA helmet in 2003.[19]  This helmet, along with later Schutt models such as the ION, were

found to infringe on Riddell's patents for CRT.[20]  Throughout the entire relevant time period,

Schutt's website prominently advertised that "[e]ach Schutt Adult football helmet and Schutt

Youth Football Helmet models exceeds the NOCSAE standard for football and is designed with

the intent to reduce the risk of concussions."[21]  Another competitor, Xenith, was founded in 2006

---

[14] *See* Dkt. No. 65, at 32; Ide Decl., at ¶¶ 22-23.

[15] *See* Saylor Decl., Ex. 34, US Patent Nos. 6,934,971 (the "971 patent"), 7.240,376 (the "376 patent").  *See also, e.g.*, Cecchi Decl, Ex. 12, at 91161-70 (2010 Catalog listing '971 and '376 Patents in each helmet advertised as containing Concussion Reduction Technology).

[16] *See* 35 U.S.C. § 101.

[17] *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 981, 997 (W.D. Wis. 2010), order clarified (July 28, 2010) (rejecting challenges that Riddell's CRT patents were invalid or indefinite).

[18] *See* Saylor Decl., Ex. 28, at 285.  Dr. Cantu, in his deposition, similarly praised Riddell for being ahead of the curve and for having an "outstanding research program and [] research director." Saylor Decl., Ex. 15, at 31-33.

[19] *See* https://www.schuttsports.com/team-schutt.

[20] *See also* Saylor Decl., Ex.35.  The claims found to be infringing in paragraph 2 of the Judgment against Schutt are the elements of Riddell's CRT technology.

[21] Saylor Decl., Ex. 71.  Further, Schutt's website claimed that its helmets could absorb 24-44% more impact than Riddell's, and its representatives told customers that they are "similar in price

with the "sole mission [of] reducing the risk of concussion-related traumatic brain injury."[22]

Xenith advertised that its helmets "minimize the sudden violent movement of the head that may

cause a concussive episode," and that player surveys suggested a 50% reduction in

concussions.[23]

In early 2011, the FTC launched an investigation into various helmet manufacturers'

advertising practices, including claims by Riddell, Schutt, and Xenith.  The FTC closed its

investigation against Riddell in April 2013, without action.  The FTC did not take any issue with

Riddell's use of the phrase "Concussion Reduction Technology."[24]  Importantly, on the other

hand, the FTC directed Schutt and Xenith to discontinue their unsupported concussion claims.[25]

### C.     Additional Research Further Supports Riddell's CRT Claims

Further third-party research has confirmed the findings of the UPMC Study.  A 2014

study by researchers at Virginia Tech-Wake Forest University is the only other epidemiological

study to examine the difference in concussion rates between Riddell's helmets with CRT and

traditional helmets.  That study found that players wearing a Riddell helmet with CRT saw a

"53.9% reduction in concussion risk . . . compared with the [traditional] VSR4 helmet."[26]

Plaintiffs' experts cannot cite any study that contradicts these findings. The 2014 University of

Wisconsin study "compared different brands of [modern, not traditional or standard] football

helmets, unlike the UPMC study which compared a specific helmet model with 'traditional'

---

to the Riddell 'Revolution' helmet but provide better protection against concussions."  *See*
Saylor Decl., Exs. 72, 73.

[22] *See* Saylor Decl., Ex. 74, at 49729. https://www.xenith.com/pages/about-us (founded 2006).

[23] Saylor Decl., Ex. 74, at 49737.

[24] *See generally,* Saylor Decl., Ex. 31.

[25] *See* Saylor Decl., Exs. 32, 33.

[26] Saylor Decl., Ex. 30.

helmets. . . . [N]othing in the Wisconsin study suggests that Riddell misrepresented the results of the UPMC study."[27]

## II.   **RIDDELL'S MARKETING OF HELMETS WITH CRT**

In 2007, Riddell began using the phrase "Concussion Reduction Technology" to describe the design elements tested in the UPMC Study.  Riddell accurately described the study's findings in its marketing, conveying the non-actionable message that helmets with CRT were shown to perform better than traditional helmets.  Riddell did not claim superiority to other helmets.

### A.   **Riddell's Sales Channels and Customers**

Riddell sells its helmets to: (1) institutional customers; (2) retailers, who resell the helmets to their customers; and, (3) individuals who purchase over the Riddell website.  The vast majority of Riddell's helmet sales are made to institutional customers, including NFL and NCAA teams, high schools, and youth leagues.  Riddell primarily markets its helmets to institutional customers through sales representatives, and distributes its catalogs and mailers to those customers.  Some of Riddell's customers, primarily youth leagues and schools, purchase helmets from Riddell sales representatives, and then resell or rent helmets to their players.[28]

Riddell's retailer customers were ████████████ chain stores, such as Dick's Sporting Goods, which purchased youth helmets from Riddell during a limited time frame.  The youth helmets that Riddell sold to these retailers were the *only* helmets Riddell ever sold with consumer product packaging.  Every other Riddell helmet – whether sold to an institutional

---

[27] *See* Dkt. No. 65, at 30.  While Plaintiffs did not identify any additional studies, Dr. Cantu produced a 2016 study.  *See* Saylor Decl., Ex. 19.  This study did not address the incidence of concussions (only the severity of symptoms), and expressly stated that concussion incidence rates could not be determined from the data that was collected.  *See id.*, at 1388-89.  Like the Wisconsin study, this study did not test the difference between Riddell helmets with CRT and traditional helmets, and therefore cannot undercut accurate reporting of the UPMC Study.

[28] Ide Decl., at ¶¶ 28-29; Saylor Decl., Ex. 5 at 33-34 ("85 percent or more" of sales are to institutions).

customer, or to an individual who purchased online or over the phone – was packaged in a plain box or clear plastic bag.[29]

### B. Plaintiffs' "Common Message" Cannot Be Found in Riddell's Marketing

Riddell never disseminated a "common message that Riddell helmets with concussion reduction technology were better at reducing concussions than all other helmets on the market," as Plaintiffs contend.[30]  Plaintiffs' "representative examples" of Riddell's marketing make no such claim, and CRT was consistently presented with accurate reporting of the UPMC Study.[31]

### 1. Riddell Catalogs

Riddell's catalogs were only distributed to Riddell sales representatives to give to institutional customers, some of whom refused catalogs because they "know what [they] want." Not only are the catalogs for institutional customers only, but they also do not contain Plaintiffs' alleged "common message."  Plaintiffs ignore the 2007 Football Catalog, because it does not even refer to "Concussion Reduction Technology" or "CRT."[32]  The 2008 and 2009 Catalogs use "CRT", but only in connection with certain helmet models and only alongside citations to, and accurate descriptions of, the UPMC Study (which this Court found not to be actionable) such as: "[r]esearch shows that players wearing the Riddell Revolution are 31% less likely to suffer a concussion *when compared to traditional football helmets*."[33]  The catalogs also state that

---

[29] *See* Saylor Decl., Ex. 27 at Response No. 11; Ide Decl., at ¶ 34.

[30] *See* Motion, at 4.

[31] These examples are nothing like the third-party statements Plaintiff included in the Second Amended Complaint. *See* Dkt. No. 65, at 32-33 (citing SAC ¶ 85); *see* SAC ¶ 85 (repeating third party sources with general claims).

[32] *See* Saylor Decl., Ex. 36.

[33] *See* Cecchi Decl., Ex. 9, at RIDDELL00090583, 90585 (only referencing CRT in connection with Revolution IQ and IQ Youth, with warning that no helmet can prevent concussions); 90581-582, 90584 (description or citation to UPMC Study); *id.*, Ex. 10, at 90711, 90713; 907089-710, 90711; Cecchi Decl., Ex. 11, at RIDDELL00090916 (referring to "Revolution Technology"),

"Contact in football may result in CONCUSSION-BRAIN INJURY which no helmet can prevent."  The 2010 – 2012 catalogs include similar warnings, accurate descriptions of the UPMC Study's results, and citations to the UPMC Study where coaches or athletic directors could find the full text.[34]  The 2013 – 2015 Catalogs do not contain "Concussion Reduction Technology" at all.[35]

### 2. Mailers and Print Ads

The two sample "mailers" Plaintiffs cite were only sent to Riddell's institutional customers, who had many other sources of information regarding CRT.[36]  The 2010 "rush mailers" direct the recipient to contact their sales representative, who could answer any questions they might have.[37]  The recipients of these mailers had already received prior mailers that provided complete details regarding the UPMC Study."[38]  The print ads cited by Plaintiffs were placed in publications typically distributed to organizations that run football programs (and not

---

90915, 90917, 90918, 90920, 90921, 90923, 90925, 90927 (warning that no helmet can prevent concussions); 90915-90917, 90922-90924 (description or citation to UPMC Study).

[34] *See* Cecchi Decl., Ex. 12 at  RIDDELL00091157, 91159, 91160, 91162, 91163, 91165, 91167, 91169 (warning that no helmet can prevent concussions); 91157 – 91158, 91164, 91166 (description or citation to UPMC Study); *id*., Ex. 13, at RIDDELL00091304, 91305, 91306, 91310 (warnings); 91299, 91301, 91303, 91308, 91312 (description or citation to UPMC Study); *id*., Ex. 14, at 91515, 91516 (warnings); 91511, 91518 (description or citation to UPMC Study); *id*, Ex. 15. at RIDDELL00091657, 91658, 91662, 91663, 91664, 91666, 91672, 91674.

[35] *See* Saylor Decl., Exs. 37, 38, 39.  Plaintiffs cite to a "CRT Inventory spreadsheet" that appears to indicate that the 2013 Football Catalog contained the term CRT.  But this list was authored in April 2012 – before the 2013 Catalog was available for distribution to Riddell's institutional customers in the Fall of 2012. *See id.*, Exs. 10; *id.* Ex. 9, at 79:6-80:21; *id.* Ex. 5, at 236:11 – 19 ("[I]t was our intention to remove [Concussion Reduction Technology/CRT] prior to the 2013 sales year, which began in September of 2012.").

[36] *See* Motion, at 5; Cecchi Decl., Exs. 16, 17.  Plaintiffs misrepresent that these mailers contain "brochures advertising Concussion Reduction Technology." *See* Motion, at 5.  Each mailer contains a letter, which refers to a single helmet as containing Concussion Reduction Technology.  The accompanying "brochure" makes no mention of CRT.  *See* Cecchi Decl., Ex. 16, at RIDDELL00011436, 11438, 11440, 11442.

[37] *See* Cecchi Decl., Ex. 16, at RIDDELL00011436, 11440.

[38] *See* Saylor Decl, Ex. 76, at RIDDELL-FTC-000829.

ordinary consumers).[39]   None present the phrase "Concussion Reduction Technology" in

isolation, and each provide accurate details about the UPMC Study, references to CRT design

features, and/or links to additional information.[40]   Moreover, no Plaintiff alleges that they have

ever received any mailer or print advertisement from Riddell.

### 3.      Retail Point of Sale

Plaintiffs' examples of Riddell's "retail point of sale" marketing would only be available

to customers who purchased from retail stores during the time that Riddell was selling to those

stores.[41]   Plaintiffs cite to hangtags, which would be affixed to the helmet inside of a retail box,

and exterior product packaging.[42]   These materials provided accurate information concerning the

UPMC Study and CRT.  Riddell's 2010 hangtags contained a lengthy and accurate description of

the UPMC Study.[43]   And, in 2011 and 2012, Riddell incorporated a similarly detailed description

of the UPMC Study onto the exterior product packaging.[44]

---

[39] *Id.* Ex. 6, at 362.  Riddell only placed print advertisements in trade publications, such USA Football and American Youth Football magazines, which are directed toward coaches, athletic directors, and equipment managers. Ide Decl., at ¶ 35.

[40] *See* Cecchi Decl., Ex. 18 (citing to the 2006 UPMC Study and stating that "Research shows a 31% reduction in the risk of concussion in players wearing Riddell Revolution Helmets when Compared to traditionally designed helmets"); Cecchi Decl., Ex. 19 (same); Cecchi Decl., Ex. 20 ("Every Riddell Helmet features Riddell Concussion Reduction technology (CRT) with the shell offsets, extended mandibles, and energy managing liner extensions to reduce the force of helmet impacts."); Cecchi Decl., Ex. 21 (similar accurate description of the UPMC Study).

[41] This is important, because the only named "retail purchaser" Plaintiff, Gustavo Galvan, testified that he purchased helmets from Dick's Sporting before Riddell sold to Dick's, never received any retail packaging, and paid double the list price with cash. *See, infra*, 17.

[42] *See* Motion, at 6 (citing Cecchi Decl., Exs. 22-25).

[43] *See* Cecchi Decl., Ex. 23, at RIDDELL-FTC-001223 (Copyright 2010, "Research shows that players wearing a Riddell Revolution are 31% less likely to suffer a concussion when compared to traditional football helmets.")

[44] The packaging stated: "CONCUSSION REDUCTION TECHNOLOGY claim: Based on a study by the University of Pittsburgh Medical Center and partially funded by Riddell showing reduced concussion risk in High School football players wearing the Revolution helmet vs. traditional helmets.  Neurosurgery, Feb. 2006, V. 58, N. 2.  While this study did not test the Revolution Youth helmet, the Youth helmet has similar design properties as the Revolution

### 4.      Riddell Website

The web pages attached to Plaintiffs' motion provide even more helpful detail.  For example, the "Revolution Concussion Reduction Technology" tab provides: (1) a detailed background of the "design and development of the Revolution"; (2) a description CRT's elements; (3) an accurate description of the UPMC study; and, (4) a link to the "Neurosurgery Study" under "Revolution PDFs to Download."  Each helmet page contains *another* accurate description of the UPMC Study and its comparison to *traditional* helmets.[45]  Other marketing materials likewise reflect accurate information regarding the UPMC Study.[46]

### C.      Riddell Ceases Use of the Phrase Concussion Reduction Technology in 2012



Throughout the class period, the helmet options available to consumers – and thus the basis of Plaintiffs' comparative claims – shifted as new models were introduced, all of which contained CRT or similar technology along with various other features and benefits separate from CRT.[47]

---

helmet.  Contact in football may results in CONCUSSION-BRAIN INJURY which no helmet can prevent."  *See* Cecchi Decl., Ex. 25.

[45] *See* Cecchi Decl., Ex. 26, at RIDDELL-FTC-000882, 887 – 896.

[46] Saylor Decl., Ex. 77 (Fact Sheet on the Revolution helmet, which includes information on developmental research, the elements of CRT, and details of the UPMC Study); *id.* Ex. 78 (Riddell webpage providing a free, full copy of the UPMC study); *id.* Ex. 79 (Riddell webpage with UPMC Study fact sheet)).

[47] Ide Decl., at ¶¶ 22-23.

III.   **THE NAMED PLAINTIFFS' DEFICIENT INDIVIDUAL CLAIMS**

    A.   **New Jersey – Douglas and Denise Aronson**

Plaintiffs' Motion, pleadings, and interrogatory responses claim that: (1) in 2006 or 2007, "prior to [the Aronsons' son] entering high school" they met with a "Riddell representative" who "conveyed that the Riddell Football Helmets he was offering for sale was the best helmet for preventing concussions"; (2) "in 2011, after learning that his high school team was not providing a Riddell Football Helmet," their son asked them to purchase one; and, (3) prior to purchasing a Revolution Speed, "Plaintiffs and their son viewed the Riddell website, which again, in the same manner as the Riddell representative, promised that the Revolution helmets had technology that would prevent better protection against concussions than other football helmets."[48]  Yet these responses are directly contradicted by the Aronsons' deposition testimony:

- The 2006-2007 meeting with a "Riddell representative" that the Aronsons refer to was described by Mr. Aronson as a presentation by unidentified salesmen, touting the concussion reduction abilities of both Xenith helmets and Riddell helmets.[49]

- Following this meeting, the Aronsons purchased a Xenith helmet (not a Riddell) for their son in 2009, because "it was presented to [the Aronsons] as being safer for him."[50]

- Mrs. and Mr. Aronson were never present for any presentation by a Riddell representative, and there is no evidence in the record to suggest that any representative from Riddell made a presentation to the Aronsons or their son.[51]

---

[48] Motion, at 12; Saylor Decl., Ex. 42, at Response No. 4; SAC, ¶ 105-106.  There is ***no*** evidence that anyone from Riddell ever made a presentation to the Aronsons.

[49] Saylor Decl., Ex. 40, at 45:9 – 47:3 (describing presentations by unidentified salesmen selling both Riddell and Xenith helmets that were "generally about football helmets and concussion reduction").

[50] Saylor Decl., Ex. 41, at 111:22 – 112:16, 136:19 – 138:12, 50:15 – 51:7.

[51] Saylor Decl., Ex. 40, at 50:17 – 51:25 (describing presentation by unidentified salesman selling the Revolution, but that Mr. Aronson did not catch the presentation, and Mrs. Aronson was not present), 107:12 – 14 ("Q: Have you ever heard the phrase 'concussion reduction technology'?  A: No.").

13

- The Aronsons' son played high school football for an entire year before he asked his parents to purchase a Riddell Revolution Speed for him.[52]

- Mr. Aronson has never heard the term "Concussion Reduction Technology," and Mrs. Aronson only heard of the term from her son.[53]

- Mrs. Aronson's son took her to the Riddell website a single time, to purchase the helmet, and she did not remember seeing the phrase Concussion Reduction Technology during that visit.  Ms. Aronson was not even controlling the computer, her son was.[54]

- Mrs. Aronson's sole reason for purchasing the Revolution Speed is because her son told her he wanted it because "he felt [it] was safer for him."[55]

- The Aronsons did not investigate any other helmets (including much cheaper Riddell helmets that also contain CRT) before purchasing the Revolution Speed.[56]

## B.    New Jersey – Norma Thiel

Plaintiffs' Motion and pleadings claim that: (1) in April 2013, Ms. Thiel purchased a Riddell 360 helmet for her son; (2) "[p]rior to purchase, Ms. Thiel saw Riddell You-tube videos advertising the Riddell 360 and describing how concussion reduction technology could better protect the head from concussions than other helmet models on the market"; and (3) "[w]hile Ms. Thiel considered other helmets, the claims made by Riddell concerning concussion reduction technology were dispositive."[57]  Yet these allegations are contradicted by Ms. Thiel's interrogatory answers and testimony:

- Riddell ceased all use of the phrase "Concussion Reduction Technology" in Fall of 2012, more than 6 months before Ms. Thiel's April 24, 2013 purchase.[58]

---

[52] Saylor Decl., Ex. 41, at 69:17 – 71:16.

[53] *Id.* Ex. 40, at 107:12 – 14.; *see also id.* Ex. 41, at 127:8 – 25.

[54] *Id*., Ex. 41, 78:13 – 83:9. Ms. Aronson was not even controlling the computer, her son was. *Id.*

[55] *Id.*, Ex. 41, 124:2 – 16.

[56] *Id.*, Ex. 41, at 85:20-86:8.

[57] Motion, at 13; SAC, at ¶ 109.

[58] See 12, *supra*; Saylor Decl., Ex. 45.

- The sole piece of Riddell marketing that she relied upon, a Youtube video showcasing the Riddell 360, was published on March 19, 2013 and not once mentions the phrase "Concussion Reduction Technology," "CRT," or any iteration thereof.[59]

- Ms. Thiel did not investigate any other helmets (including much cheaper Riddell helmets that also contain CRT) before purchasing the Riddell 360.[60]

- Ms. Thiel had a free Riddell Revolution available to her, through her sons' school, but chose to purchase the Riddell 360 anyway because her son wanted it. [61]

## C.     Florida – Nicholas Farrell

Plaintiffs' Motion claims that: (1) Mr. Farrell was exposed to claims by Riddell that its helmets possess Concussion Reduction Technology, including through a "Riddell team sales catalogue"; (2) Mr. Farrell purchased a Revolution Speed helmet "in late April/May of 2011 directly from Riddell's team sales"; and, that (3) Mr. Farrell purchased this helmet "based upon Riddell advertisements, that the Riddell Revolution helmet was better at reducing concussions than other helmets on the market."[62]  Yet these claims are contradicted by Mr. Farrell's interrogatory answers and testimony:

- Mr. Farrell's head football coach at West Port High School presented him and his teammates with the Revolution Speed and encouraged they all purchase it.[63]

- One of Mr. Farrell's assistant football coaches had a follow up discussion with Mr. Farrell after the presentation, and told him "[t]hat [he] should purchase the helmet."[64]

---

[59] Saylor Decl., Ex. 43, at 76:20 – 77:5, 102:24-104:3; *id.* Ex. 46.  Plaintiffs' Motion goes to great lengths to suggest CRT is in this video, but the Court is free to view the video for its true contents.

[60] Saylor Decl., Ex. 43, at 74:16 – 77:5.

[61] *Id.*; *id.* at Ex. 44, at Response No. 9; *see also id.*, Ex. 43, at 25:19 – 26:9 (Ms. Thiel testified that her son "br[ought] me the video, show[ed] me the video, that he was adamant that this was what was good for him").

[62] Motion, at 14.

[63] Saylor Decl, Ex. 47, at 28:22 – 29:7.

[64] *Id.*, at 56:7 – 17.

- Mr. Farrell's coaches were so persuasive that "a lot of people" on the high school team ("around 10") purchased the Revolution Speed after the presentation.[65]

- Mr. Farrell never saw a "Riddell team sales catalogue."  Mr. Farrell testified to a catalog that contained "other brand[s] of helmets as well," and insisted that "I never said it was a Riddell catalog."  This non-Riddell catalog contained a comparison chart that "indicated that the Revolution Speed helmet . . . was the best helmet in the comparison."[66]

- Mr. Farrell "really noticed" the Revolution Speed when his favorite college player started wearing it.  Mr. Farrell's other sources of information were not Riddell advertisements: NCAA and NFL broadcasts, Sports Illustrated magazine, and "things on the internet."[67]

- Mr. Farrell viewed the Riddell website once to get "sizes and all that," then "used that information to go on Google and did my research [on third party websites] from there."[68]

- Mr. Farrell did not purchase his Revolution Speed from Riddell.  Rather, he gave his *mother's* cash to his coach for a helmet.  Mr. Farrell does not know who his coach bought the helmet from, when his coach bought the helmet, or how much he paid for it.[69]

- ████████████████████████████████████████████████████████████
  ████████████████████████[70]

- The 2011 purchase date for Mr. Farrell's helmet further suggests that the Revolution Speed he received was used (or old) because it had an "initial season" of 2010.[71]

### D.    California – Gustavo Galvan

As to California Plaintiff Gustavo Galvan, Plaintiffs' Motion and pleadings claim that:

(1) he purchased a Riddell helmet for his son in June of 2011[72]; (2) he relied on Riddell's retail

packaging and Riddell's statement of "superior Concussion Reduction Technology"; and, (3) his

---

[65] *Id.*, at 32:17 – 33: 2.

[66] *Id.*, at 76:16 – 78:12, 75:3 – 78:5, 80:3 – 5.

[67] *Id.*, at 41:13-24, 42:3 – 45:8, 79:16-23, 24:3 – 25:23.

[68] *Id.*, at 74:3 – 15.

[69] Saylor Decl. Ex. 48, at Response No. 3; *id.* Ex. 47 at 71:17-24, 30:6-15, 32:4-12.

[70] *See* Saylor Decl., Ex. 51, at RIDDELL00103305 – 307, 310.

[71] *See* Saylor Decl., Ex. 50, at Pls_Photos0000019.

[72] Saylor Decl., Ex. 53, at ¶ 7. The FAC similarly describes the purchase of a single Riddell Revolution helmet.  Dkt. No. 17, at ¶ 73.

purchase was made at a Dick's Sporting Goods in California.[73]  Yet Mr. Galvan's interrogatory

answers and testimony contradict these claims:

- Mr. Galvan did not know he had any claim against Riddell until he spoke with a "friend through his family" early in 2016 [two years after Plaintiffs' Counsel sued Riddell on his behalf], after which point he "got in touch with the attorneys."[74]

- Mr. Galvan did not purchase a helmet for his son, but rather bought two helmets for players on a team that he coached.[75]

- Mr. Galvan did not, and could not have, relied on Riddell's retail packaging. ███████ Indeed, Mr. Galvan testified that he received his helmet in a plastic bag, with a one-page black and white "flyer," not Riddell's multi-color book-styled hang tag.[76]

- Mr. Galvan has no proof that he actually purchased a helmet from Dick's, and Plaintiffs have put forward no evidence that Dick's has any way of tracking purchasers like Mr. Galvan.[77]

- Mr. Galvan contends that he paid $200 for each Revolution Edge helmet he purchased, nearly double the list price on Riddell's website at the time.[78]

- Mr. Galvan did not rely on any claims of "superior concussion reduction technology" on the Riddell website.  He relied on the 31% comparison to traditional helmets found in the UPMC Study, and the fact that the prices he paid for the Revolution Edge helmets were more reasonable than more expensive models from Schutt and Xenith.[79]

E.   **Arizona – Alliance Youth Sports Association**

Plaintiffs' Motion claims that: (1) Alliance Youth's former Executive President Kenny

King met with a Riddell sales representative, Taylor Hanohano, in February of 2010; (2) Mr.

---

[73] SAC, ¶ 111; Motion, at 14-15.

[74] Saylor Decl., Ex. 54, at 52:2 – 54:10, 61:24 – 64:9.

[75] *Id*., Ex. 55, at Response No. 4.

[76] *Id*., Ex. 27, at Response No. 11; *id.* Ex. 54, at 24:20 – 24, 27:17 – 28:21.

[77] *Id.*, Ex. 54, at 30:1 – 12, 73:23 – 74:1.

[78] *Id.* Ex. 54, at 30:11 – 15.  Riddell never sold the Revolution Edge for anywhere close to $200 – it was offered on Riddell's website for $108.99 when Mr. Galvan alleges to have paid $200 per helmet at a Dick's Sporting Goods.  *See id.*, Ex. 58; *id.* Ex. 54, at 19:13 – 19.

[79] *Id.* Ex. 54, at 119:13 – 121:3.

Hanohano represented that the Revolution helmets offered "superior concussion reduction technology"; (3) Mr. King relied upon concussion reduction statements in the Riddell 2010 sales catalog; and, (4) Mr. King began purchasing helmets in 2010 based on these representations.[80] Alliance Youth's interrogatory answers and testimony contradict those claims:

- After his initial meeting with Mr. Hanohano, Mr. King did not only purchase CRT helmets.  He also purchased a large number of traditional "Riddell Attack" helmets.[81]

- Mr. King identified a full-page ad for the Riddell Attack in the 2010 Catalog that he relied upon, which refers to the helmet as "traditional Football Helmet Technology."[82]

- 
[83]

## STANDARD FOR CLASS CERTIFICATION

Rule 23 "does not set forth a mere pleading standard."  *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013) (quotation omitted).  Plaintiffs must prove that Rule 23 is met by a preponderance of the evidence, and the Court "must undertake a rigorous analysis of the evidence to determine if the standard is met."  *Carrera v. Bayer Corp.,* 727 F.3d 300, 306 (3d Cir. 2013).  "[A] plaintiff must satisfy the four elements set forth in Rule 23(a), as well as the requirements of one of the three subsections in Rule 23(b)."  *City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*, No. CV 13-4595 (NLH/JS), 2015 WL 5769951, at *3 (D.N.J. Sept. 29, 2015).  Courts must also "address the ascertainability of a class as a 'preliminary' or 'implied' requirement" to certification. *Id.*, at *4; *see Carrera,* 727 F.3d at 305; *Marcus v. BMW of N. Am.,*

---

[80] Motion, at 15-16, 25.

[81] *See, e.g.* Saylor Decl., Ex. 67 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *see also id.* Ex, 68; *id.* Ex. 62, at 15.

[82] *See id*., Ex. 57, at 57:18 – 59:24; *id.* Ex. 62, at 15.

[83] *Supra*, note 81; *id.* Ex. 61 at Response Nos. 8, 9.

*LLC*, 687 F.3d 583, 591 (3d Cir.2012).  Plaintiffs must prove that putative class members are

"currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 592–93.

## PLAINTIFFS' PROPOSED CLASS DEFINITIONS

While Plaintiffs claim to seek "four separate statewide classes", they propose eight (two

for each state).  Plaintiffs' "Direct Purchasers" and "Retail Purchasers" classes are defined as:

> All persons who reside in the States of Arizona, California, Florida
> or New Jersey who have purchased new Riddell Football Helmets
> with concussion reduction technology ("CRT") from Riddell, Inc.
> within the applicable statute of limitations periods established by the
> laws of their state of residence (the "Class Period") through the date
> of class certification.

> All persons who reside in the States of Arizona, California, Florida,
> or New Jersey who have purchased new Riddell Football Helmets
> with concussion reduction technology ("CRT") from a retail
> merchant (███████████████████████████████████
> ███████████████████████████████████████████████
> ███████████████████████████) within the
> applicable statute of limitations periods established by the laws of
> their state residence through the date of class certification.

## ARGUMENT

I.  **PLAINTIFFS CANNOT CERTIFY A CLASS BASED ON A THEORY OF
    LIABILITY THAT THEY ABANDONED AT THE PLEADING STAGE**

Plaintiffs' Motion relies on theory "A", which this Court dismissed (and which Plaintiffs

abandoned to avoid dismissal a second time): that Riddell's advertisements are false because no

football helmet can reduce the incidence of concussions.[84]  Plaintiffs are precluded from

certifying a class based on dismissed claims.  *In re Ford Motor Co. E-350 Van Prods. Liab.

Litig. (No. II)*, No. CIV.A. 03-4558, 2012 WL 379944, at *9 (D.N.J. Feb. 6, 2012).  Plaintiffs are

also estopped from relying on this abandoned theory "simply because [their] interests have

---

[84] *See, e.g.* Motion, at 1, 17; Cecchi Decl., Ex. 29, at 4; Cecchi Decl., Ex. 30, at 2.

changed." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).[85]  In any event, the UPMC

Study shows that CRT is better than traditional helmet technology, and all of the helmets at issue

in this case have CRT.  There is no basis to claim otherwise.

> **A.**   **The Court Dismissed Plaintiffs' Theory that "Concussion Reduction**
> **Technology" is False Because No Helmet Can Reduce Concussions**

The dismissed FAC asserted two theories of liability that this Court found contradictory

and implausible: (A) Riddell's claims regarding "concussion reduction technology" are false

because of the "inability of any football helmets to reduce concussions"; and (B) Riddell's

claims regarding "concussion reduction technology" are false because Riddell's helmets

containing CRT are no "more effective at preventing or reducing concussions compared to other

currently available brands or models."[86]  In dismissing the FAC, the Court held:

> Plaintiffs' essential theory of the case is so unclear and inconsistent
> that it fails to satisfy the plausibility standard under Rule 12(b)(6).
> Plaintiffs in the Amended Complaint, in briefing, and at oral
> argument have not articulated how the marketing claims at issue are
> false.  **It remains unclear whether Plaintiffs contend that**
> **Defendants' claims of concussion reduction are false because the**
> **[CRT Helmets] cannot reduce concussions at all or if these**
> **helmets cannot reduce concussions by 31% as compared to**
> **other helmets**.[87]

The Court directed Plaintiffs to "specify the helmets or group of helmets to which Defendants'

Helmets are comparatively ineffective," or "[i]f Plaintiffs do not rely on comparative

effectiveness, and instead base their claims on the inability of any football helmets to reduce

concussions, then their pleading should make that clear."[88]

---

[85] *See also Macfarlan v. Ivy Hill SNF, LLC.*, 675 F.3d 266, 272 (3d Cir.2012)

[86] Dkt. No. 41, at 31.

[87] Dkt. No. 41, at 2-3 (emphasis added).

[88] *Id.* at 30-31.

Plaintiffs filed a Second Amended Complaint ("SAC"), which Defendants moved to dismiss.  The Court found to make clear "that Plaintiffs' claims are …. based on the … relative ability (or inability) of Defendants' helmets to reduce concussions ***compared to other helmets on the market***."[89]  The Court dismissed all other claims of Plaintiffs' case with prejudice, and held that:

- "Plaintiffs may not base their consumer fraud claims on marketing statements which accurately reflected the results of the UPMC study";

- "Plaintiffs have not plausibly alleged a consumer fraud claims based on statements regarding specific design features of their helmets"; and,

- "Plaintiffs' consumer fraud claims cannot proceed based on an omission or failure to disclose."[90]

The Court further found that Plaintiffs did not "establish that 'the technology in place in [all the helmets at issue in this case] is not the same technology 'shown' to reduce concussions."[91]  Thus, as the Court found: (1) Riddell has valid scientific support for its claim that helmets with CRT reduce concussion risk compared to traditional helmets; and, (2) every helmet at issue in this case contains CRT.  This precludes a claim that "Concussion Reduction Technology" is false.[92]

### B.    Plaintiffs' Arguments for Certification Rely On The Abandoned Theory

Plaintiffs' entire case must rest upon theory "B": that Riddell misrepresented that its helmets can reduce concussions better than "any other helmets on the market"; and that "most

---

[89] Dkt. No. 65, at n.17 (emphasis added); *see also id.* at 36-37.

[90] *Id.* at 29, 36-37, 50.

[91] *Id.* at 32.

[92] Dkt. No. 65, at 29-30.  The Court also found that Plaintiffs had no scientific authority to dispute the results of the UPMC Study: "The University of Wisconsin study, the only other scientific study mentioned in the SAC, compared different brands of football helmets . . . [N]othing in the Wisconsin study suggests that Riddell misrepresented the results of the UPMC study."  *Id.*

consumers … compared premium priced Riddell Revolution models to less expensive Schutt models, as well as older Riddell models like the VSR-4."  SAC, ¶¶ 11, 81.

Yet Plaintiffs' proof is only relevant to theory "A" (that no helmets can reduce the risk of concussions).  For example, Plaintiffs argue that "[t]here is not enough known about the mechanism of concussion to affirmatively state that a helmet can reduce the incidence of concussion."[93]  Plaintiffs' medical experts conclude that "[h]elmets have not been proven to reduce SRC [sports-related concussions] and are only of benefit in preventing more serious brain injuries such as skull fracture and intracranial hemorrhage."[94]  Plaintiffs' damages expert proposes a damages model that would compare Riddell's profits on traditional helmets to Riddell's profits on CRT helmets (*see* 49-50 *infra*), and specifically rejects a model that would compare Riddell's prices to those of other helmets on the market.[95]  And Plaintiffs' survey purports to assess opinions of helmets with CRT against those without CRT (*i.e.*, traditional).[96]  All of this purported proof is contradicted by the UPMC Study, and this Court's prior rulings.

Even if Plaintiffs had not abandoned theory "A" [97] – that no helmets can reduce the risk of concussions – they still have no evidence to support that claim.[98]  The Court has already found

---

[93] See Motion at 8 (citing Cecchi Decl., Ex. 29).

[94] *See* Cecchi Decl., Ex. 30, at 4.

[95] Cecchi Decl., Ex. 36, at ¶ 34 ("[A] comparison of Schutt sales to Riddell sales was considered for the purposes of damages calculation . . . [but] [t]his would demand more detailed data, with ultimately no promise of the availability of comparable sufficient to reliably estimate premiums for every Riddell CRT product line . . . [and thus] this alternative was not pursued").

[96] Cecchi Decl., Ex. 28, at 20; Saylor Decl., Ex. 2, at 4.20 – 4.25.

[97] Plaintiffs place undue reliance on a single portion of the Court's decision on Defendants' motion to dismiss the Second Amended Complaint: "[T]o the extent Defendants' helmets cannot in fact reduce concussions, Plaintiffs have provided a plausible basis that [marketing statement regarding CRT] are false, misleading, or deceptive." Dkt. No. 65, at 33-34.  Plaintiffs' interpretation of this passage, however, is implausible because it is in conflict with the entire reason for the Court's Opinions dismissing the FAC and allowing the SAC to survive.

[98] In any event, Plaintiffs avoided a lack of substantiation theory at the pleading stage because it finds no basis in law.  *See* Dkt. No. 41, at 34 ("Having eschewed a theory based on lack of

the UPMC Study's results provide substantiation for Riddell's advertising.  Moreover, the *only other* available scientific evidence which tested the efficacy of new helmets with CRT against traditional helmets supports Riddell's CRT claims. (*See supra*, at 7-8).  And, it is true for Riddell to state that its helmets contain CRT.[99]  The only "evidence" of falsity Plaintiffs cite in their Motion – the Wisconsin Study – does not contradict the UPMC Study's results.[100]  One of Plaintiffs' medical experts, Dr. Cantu, even admitted that his report should not have suggested that no helmet can reduce concussion: "To some degree, I definitely believe that [football helmets reduce the risk of concussion]."[101]  Nor is the use of CRT *misleading*, as this Court has already found, where it is simply a statement of the design features of a helmet.[102]

The reason Plaintiffs offer no evidence to support theory "B" is that there is no evidence of a common message that Riddell made comparative claims to competitor helmets, or "any other helmets on the market."  Plaintiffs' Motion does not cite to a single instance where Riddell claimed superiority in concussion reduction with respect to other helmets.  Even if Riddell had

---

substantiation, Plaintiffs must affirmatively allege the falsity of Defendants' claims."); *Hodges v. Vitamin Shoppe, Inc*., No. CIV. A. 13-3381 (SRC), 2014 WL 200270, at *4 (D.N.J. Jan. 15, 2014); *Gaul v. Bayer Healthcare LLC*, 2013 U.S. Dist. LEXIS 188951, at *4 (D.N.J. June 19, 2013) (same); *Fraker v. Bayer Corp*., No. CVF08-1564 AWI GSA, 2009 WL 5865687, at *8 (E.D. Cal. Oct. 6, 2009); *Toback v. GNC Holdings, Inc*., No. 13-80526-CIV, 2013 WL 5206103, at *3 (S.D. Fla. Sept. 13, 2013); *Loomis v. U.S. Bank Home Mortg*., 912 F. Supp. 2d 848, 859 (D. Ariz. 2012).

[99] Dkt. No. 65, at 31-32.  Riddell did not explicitly state that other helmets containing CRT were actually tested in the UPMC Study, and even if such a claim had been made, "the falsity [would be] a technical one" because Plaintiffs do not contend that the technology is any different. *Riddell, Inc.*, 724 F. Supp. 2d at 980.

[100] Dkt. No. 65, at 29-30.  As addressed above, Plaintiffs' expert, Dr. Cantu, produced a 2016 study published in the American Journal of Sports Medicine regarding concussion *characteristics* that he purportedly relied upon.  For multiple reasons, this study does not contradict the results of the UPMC Study. *See supra,* at 8.

[101] Saylor Decl., Ex. 15, 152:15-153:12.

[102] Dkt. No. 65, at 32.

done so, other manufacturers also advertised that their helmets reduced concussion risk, and offered helmets that were similar in price, or more expensive than Riddell CRT models.[103]

## II.   PLAINTIFFS FAIL TO SATISFY THE PREREQUISITES OF RULE 23(a)

Plaintiffs cannot satisfy the class certification prerequisites of Rule 23(a).[104]  Plaintiffs claim that typicality is met because "Plaintiffs, like all Class members, were exposed to Defendants' CRT marketing and purchased a Riddell CRT Helmet," and that they are adequate representatives because they have been "injured by the same conduct." (Motion at 23-24). Neither is true.  Plaintiffs' class definitions are not limited to purchasers who "were exposed to Defendants' CRT marketing."  Rather, they include all purchasers of CRT helmets.  Regardless, Plaintiffs' are atypical, inadequate representatives of absent class members, and Riddell has unique defenses to each of the Plaintiffs' claims.

### A.   The Legal Requirements of Typicality and Adequacy

Rule 23(a)(3) requires that the "claims of defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P.  23(a)(3).  "[T]he typicality requirement is meant to ensure that class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation."  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 600 (3d Cir. 2009).[105]  Rule 23(a)(4) requires that

---

[103] Plaintiffs' reference to "any other helmets on the market" is purposely vague.  Is that "all" other, "any" other or just "some" other?  If it is "any" or "some" helmet, then it includes traditional football helmets, and the CRT claim is true because the UPMC study supports it.  If all includes "every" other football helmets, that fails as well because: (i) the Plaintiffs point to no advertisements that the class saw that says or implies that; (ii) "every" includes traditional football helmets, a claim which is supported by the UPMC study; and (iii) Plaintiffs' theory of damages does not survey the prices of every other (or any other) non-Riddell helmet.

[104] As explained below, even if Plaintiffs can show there is evidence of a common question applicable to the class as a whole (which Defendants dispute due to the method and context in which claims regarding CRT were presented to the class), individualized inquiries predominate over those common issues, and preclude certification under Rule 23(b)(3).

[105] The analysis of typicality focuses on whether "the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that

Plaintiffs adequately represent the interests of the class.  Fed. R. Civ. P. 23(a)(4); 23(g)(4);

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).  The typicality and adequacy

analyses often "tend[ ] to merge" because both look to potential conflicts and to "whether the

named plaintiff's claim and the class claims are so interrelated that the interests of the class

members will be fairly and adequately protected in their absence."  *Beck v. Maximus, Inc.*, 457

F.3d 291, 296 (3d Cir. 2006) (citing *Amchem*, 521 U.S. at 626 n. 20).

The claims of class representatives are not adequate or typical when the class is

overbroad or encompasses class members with individualized knowledge. *Opperman v. Allstate

New Jersey Ins. Co.*, No. CIV. 07-1887 (RMB/JS), 2009 WL 3818063, at *5 (D.N.J. Nov. 13,

2009).[106]  Further, "a fraud case may be unsuited for treatment as a class action if there was

material variation in the representations made or in the kinds or degrees of reliance by the

persons to whom they were addressed."  Advisory Committee Note to Fed. R. Civ. P. 23.  Where

class representatives were not exposed to the same messages as other members of the class,

typicality fails.  *See Clark v. Prudential Ins. Co. of Am.,* 289 F.R.D. 144, 184 (D.N.J. 2013).  Nor

is a class representative typical or adequate if they are subject to a unique defense.  *Beck*, 457

F.3d at 296*; see also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

### B.      Plaintiffs' Claims Are Markedly Different From Absent Class Members

Plaintiffs' proposed subclasses are overbroad, some absent class members possess higher

levels of sophistication than others, some were not exposed to the claims at issue at all, and some

---

upon which the claims of other class members will perforce be based."  *Eisenberg v. Gagnon*,
766 F.2d 770, 786 (3d Cir.1985) (quoting *Weiss v. York Hospital*, 745 F.2d 786, 809 n. 36 (3d
Cir.1984)).

[106] Similarly, unique characteristics of a named representative will render his or her claims
atypical of the class.  *See, e.g.*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 124 (3d Cir. 1985),
aff'd, 482 U.S. 656 (1987); *Paton v. La Prade*, 524 F.2d 862, 875 (3d Cir. 1975); *Seibert v. Quest
Diagnostics Inc.*, No. CIV. 11-0304 KSH, 2014 WL 1293510, at *9-11 (D.N.J. Mar. 31, 2014).

were exposed to different messages by different means.  And, for *all but two of the eight proposed subclasses*, Plaintiffs are not even "part of the class" they seek to certify.

### 1.     Plaintiffs Proposed Subclasses are Overbroad

All of Plaintiffs' proposed classes are overbroad because they include all persons who purchased "Riddell Football helmets *with* concussion reduction technology." (Motion at 23-24). This is not limited to helmets that were *marketed* as containing CRT.[107]  Thus, they necessarily include purchasers who were *never* exposed to CRT marketing, who may have been misled by an omission, or who saw the accurate information about the UPMC Study in the "representative samples" Plaintiffs cite – all of whom have no claim.  Further, all of the proposed classes extend through the date of certification, despite the undisputed fact that Riddell ceased its use of "CRT" by the fall of 2012.  There could be no valid claims after that date.  Plaintiffs' proposed retail classes are likewise overbroad because Plaintiffs do not limit the relevant time period to when Riddell actually sold its helmets to the identified retailers.[108]  Plaintiffs' proposed retail classes will include people like Plaintiff Gustavo Galvan, who never saw Riddell's product packaging because he allegedly purchased from a Dick's Sporting Goods before Riddell sold any helmets to Dick's.  *See supra*, at 11.

### 2.     The Factual Circumstances of Plaintiffs' Claims Are Unique

Plaintiffs' proposed classes also fail because they would contain members who were exposed to different marketing claims, with varied levels of detail, through different mediums:[109]

---

[107] Riddell helmets released after the fall of 2012 were *never* marketed by Riddell as containing CRT.  These models include the (adult and youth) Speedflex, Victor, and Foundation.  *See* Ide Decl., at ¶¶ 25-26.

[108] As identified in Plaintiffs' retailer class definition(s), these include Dick's Sporting Goods, the Sports Authority, Academy Sports, Scheels, Hibbett Sports, MC Sports, and Modell's.  *See* Saylor Decl., Ex. 27, at Resp. 11.

[109] *See supra*, p. 8 to 12.  *See, e.g., In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, MDL No. 1703, Nos. 05 C 4742, 05 C 2623, 2007 WL 4287511, at *6 (N.D.Ill.Dec.4,

- Plaintiffs Norma Thiel and the Aronsons were not exposed to the same oral representations and catalogs as teams, leagues, and other Direct Purchasers in New Jersey (or any other state), nor would they have been exposed to the product packaging that the proposed New Jersey Retail Purchasers saw.

- Florida Plaintiff Nicholas Farrell gave his mother's cash to his coach in exchange for a helmet as a result of his coach (not a Riddell sales representative) claiming some alleged superiority with respect to the Revolution Speed – a representation that no other absent class members in the Direct Purchaser class from Florida, individuals or institutions, would have been exposed to. Like other Direct Purchasers, he would not have seen the product packaging that is fundamental to a Retail Purchasers' claim. Mr. Farrell's purchase was not coupled with any common message about CRT.

- California Plaintiff Gustavo Galvan purchased his helmets from a retail store, before Riddell sold to that retail store. Therefore he was not exposed to Riddell's retail packaging.[110] Nor was he exposed to the same catalogs and oral representations to which institutional Direct Purchasers in California would have received.

- Arizona Plaintiff Alliance Youth, unlike individual purchasers in the Direct Purchaser class in Arizona, negotiated directly with a Riddell Sales Representative over the price of the helmets and additional equipment he was purchasing, received oral representations about their features, and obtained special, unique bulk discount pricing. Alliance Youth then resold or rented those helmets to its players and teams in the league.[111] Like other Direct Purchasers, it never received product packaging. Even assuming that Kenny King's account of his meeting with Taylor Hanohano is believable (which Defendants' dispute given the evidence to the contrary), the Court

---

2007) (typicality not met "where a putative class is exposed to a varied mix of representations communicated through different channels and absorbed in different ways and to different degrees"); *Allen v. Hyland's Inc*., 300 F.R.D. 643, 662 (C.D. Cal. 2014) (plaintiff who purchased several products "through a catalogue provided by a cooperative and did not view the packaging in the store at the time of purchase" was not typical of class of retail buyers).

[110] *See Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1019–20 (9th Cir. 2011) (proposed class representative who did not see challenged materials was not typical). It is questionable whether Mr. Galvan read any product information that accompanies his helmet before he purchased. *See* Saylor Decl. Ex. 54, at 24.

[111] Courts have declined to find typicality (or commonality) between individual buyers and bulk purchasers. For example, in *In re Graphics Processing Units Antitrust Litig*., a federal court found that the antitrust claims of representative plaintiffs', who purchased a "a single graphics card through [defendant's website]," were not typical of the putative class, which "include[d] wholesale purchasers who . . . purchased a vast array of products on individually negotiated terms." Because "[t]he wholesale purchasers therefore came to the negotiating table in a fundamentally different position than the representative plaintiffs," the court held that representative individual purchasers would be unable "to adequately marshal the absent wholesale purchasers' claims." 253 F.R.D. 478, 490 (N.D. Cal. 2008). *See also, e.g., In re Intel Corp. Microprocessor Antitrust Litig*., CA 05-485-JJF, 2010 WL 8591815, at *31 (D. Del. July 28, 2010) (organizational customers had "different needs, methods of purchase, and pricing").

"would have to conduct thousands of individualized inquiries into the content of each sales presentation" to determine if every other pitch was the same.[112]

Beyond exposure to different messages from different sources, members of the Direct Purchaser classes have widely varied levels of sophistication that makes Plaintiffs' claims atypical.  *See Schutt Athletic Sales Co. v. Riddell, Inc.,* 727 F. Supp. 1220, 1223 (N.D. Ill. 1989) (Riddell's institutional customers are "experienced and sophisticated buyers of football equipment"). Plaintiffs' classes mix together parents and players, NFL and NCAA equipment managers, seasoned football coaches, athletic trainers, and other professionals.  Institutional purchasers have a level of sophistication and knowledge of Riddell's products (both modern and traditional) atypical of parents, and most of them purchased Riddell helmets *before* and *after* claims regarding CRT were disseminated.[113]  Plaintiffs' survey expert also splits his survey groups between coaches and parents, conceding that they would react to claims differently.[114]  Alliance Youth, like other institutional purchasers, has an atypical experience for an additional reason – it resold and rented the helmets for which it is claiming damages.[115]

### 3.    Plaintiffs Only Fit Two of the Eight Proposed Subclasses

Each subclass must, on its own, meet the requirements of Rule 23.  *See* Fed. R. Civ. P. 23(c)(5)  A Plaintiff must be "part of the class" he or she seeks to represent.  *See Amchem*, 521

---

[112] *See Gregurek v. United of Omaha Life Ins. Co.*, No. CV 05-6067-GHK (EMOx), 2009 WL 4723137, at *7 (C.D. Cal., Nov. 10, 2009).

[113] The difference in sophistication between professionals such as athletic trainers and parents is evidenced by Plaintiffs' medical expert's publications on these issues to the various groups.  Dr. Cantu provided a comprehensive paper for the National Athletic Trainers Association on the management of concussion.  *See* Saylor Decl., Ex. 23.   Dr. Cantu also wrote a book called Concussion and Our Kids, where he gives parents a different definition of concussion than he gave athletic trainers in the NATA paper, and presents the issues in much less complex ways. *See* Saylor Decl., Ex. 17.

[114] *See* Cecchi Decl., Ex. 28, at 4.  Plaintiffs' survey expert failed to include other groups, such as administrators of youth leagues, and athletic trainers, equipment managers, and/or athletic directors from high schools, colleges, and pro teams. Saylor Decl., Ex. 2, at 12, n.1.

[115] *See, e.g.,* Saylor Decl., Ex. 66.

U.S. at 625–26; *Freid v. Nat'l Action Fin. Servs., Inc.*, No. CIV. A. 10-2870 SRC, 2011 WL 1547257, at *6 (D.N.J. Apr. 20, 2011); *Johnson v. Organo Gold Int'l, Inc.,* No. CV 15-390-LPS, 2016 WL 2771124, at *7 (D. Del. May 13, 2016).  Plaintiffs have eight subclasses: one Retail Purchaser class, and one Direct Purchaser class, for four states.  Yet, there are no named Plaintiffs for particular subclasses, and some of the named Plaintiffs do not fall within the class definitions at all.[116]  Plaintiffs could only be "part of the class" with respect to two proposed subclasses: Direct Purchasers in New Jersey and Arizona.

### C.   The Changing Market Over the Class Period Renders Typicality Absent

This Court held that Plaintiffs' claim is based on a comparison to other helmets "available on the market."  Yet Plaintiffs make no effort to tie the helmets available on the market to the classes' purchases, despite it being a vital part of their theory.  Typicality is lacking because of the continued release of new products into the marketplace during the class period, which altered the landscape of available alternatives and affected the perceptions of consumers. Specifically, during the class period, fewer and fewer traditional models were on the market, and by 2012, the market was overwhelmingly modern.  Plaintiffs' survey expert fails to take into account *any* variables relevant to available alternatives, and disregards the evolution of consumer opinion on concussions that continues through the present day.[117]

---

[116] In New Jersey, neither the Aronsons nor Ms. Thiel fall within the definition of the "Retail Purchaser" subclass because they purchased online.  Similarly, Alliance Youth does not fall within the "Retail Purchaser" subclass for Arizona.  Mr. Galvan and Mr. Farrell do not fit into either the "Retail Purchaser" or "Direct Purchaser" subclasses for California or Florida.  Mr. Galvan did not purchase from one of the specific retail stores enumerated in Plaintiffs' definition, at a time when Riddell sold its helmets to that retailer.  Mr. Farrell's mother paid cash for his helmet to his coach, who purchased the helmet from an unidentified source. *Supra*, 13-17.

[117] *See* Saylor Decl., Ex. 2, at 4.1 – 5.5; *id.* Ex. 5, at 53 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Plaintiffs' medical experts' concede that the scientific landscape has also changed. *Id.* Ex. 15, at 174-75.

### D. Defendants Have Unique Defenses to Plaintiffs' Individual Claims That Render Plaintiffs' Interests Antagonistic to those of the Class

#### 1. New Jersey – Douglas and Denise Aronson

For more than two and a half years, the Aronsons claimed that there was a meeting with a sales representative (who turned out to be selling Xenith helmets) and a subsequent 2009 helmet purchase (which turned out to be a Xenith helmet). (*See supra*, at 13.)  Purchasing a competitor's helmet because they believed it to be "safer" than Riddell's is unique to the Aronsons. (*See supra*, at 13).  The Aronsons' testimony confirms that *they never* met with a Riddell representative, had no recollection of the contents of Riddell's website, never compared alternative models by other manufacturers, and did not even know that Riddell had other helmets with CRT that were less expensive than the helmet they purchased.  Indeed, the Aronsons purchased the Revolution Speed at the request of their son, who controlled the computer while when they visited the Riddell website to make their purchase. (*See supra*, at 14.)

#### 2. New Jersey – Norma Thiel

As discussed above, Riddell ceased using the term in Fall of 2012 – half a year before Ms. Thiel made her purchase on April 24, 2013.  (*See supra*, at 14.)  Ms. Thiel purchased a Riddell 360 for her son because he told her this was the helmet he wanted, and showed her a YouTube video about the helmet.  That YouTube video, which Ms. Thiel identified at her deposition and which she solely relied upon in making her purchase, does not contain the phrase Concussion Reduction Technology.  A Riddell Revolution (containing CRT) was also available to her for free through her son's school. (*Id.*)  Ms. Thiel ignored the availability of this helmet, and the fact that it contained CRT, and instead purchased the more expensive Riddell 360 because her son asked for it, not because she saw it had CRT.

### 3.      Florida – Nicholas Farrell

Mr. Farrell's mother, and not Mr. Farrell, paid cash to Mr. Farrell's high school football coach to purchase a Revolution Speed.  That coach, not Riddell, presented the helmet to Mr. Farrell's team and encouraged players to purchase it.  Mr. Farrell could not testify to any statement by Riddell that he was exposed to – rather, he was interested in the helmet because of his coaches' presentation and follow-ups, information he saw in a third-party catalog, vague "google searches," and the fact that his favorite college player used the helmet.  It is unknown where Mr. Farrell's coach purchased the Revolution Speed he eventually sold to him, how much the coach paid for the helmet (if anything), or if the helmet was new or used.[118]

### 4.      California – Gustavo Galvan

Mr. Galvan's allegations suffer from a unique question of credibility,  Mr. Galvan testified he did not even know he filed this lawsuit, or its details until early 2016. (*See supra*, at 17.)  It was only at that time that Plaintiffs' Counsel revealed that Mr. Galvan did not buy a football helmet for his son, but instead purchased two Revolution Edge helmets for players on a team that he coached. (*Id.*) This alone gave Riddell a unique defense to his CLRA claim, because only a "consumer" who purchased goods for "personal, family, or household purposes" may bring suit.[119]  In addition, Mr. Galvan claims to have paid nearly double Riddell's list price in cash at a Dick's, at a time before Riddell ever sold helmets to Dick's.  This means he grossly overpaid an unauthorized seller, and was never exposed to the retail product packaging that the Retail Purchaser class members would have seen.  Mr. Galvan testified that he received the

---

[118] This is important not only for damages, but because Plaintiffs' classes are purchasers of "new" Riddell helmets.

[119] Cal. Civ. Code § 1761(d) (defining "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for *personal, family, or household purposes*") (emphasis added).

helmet in a plastic bag, with no box, and that it was accompanied by a black and white 1-page

flyer, not Riddell's traditional hangtag. Mr. Galvan also testified that he refused to consider

*more expensive* Xenith and Schutt models, thus paradoxically claiming he purchased *Riddell*

*helmets* because they were less expensive than "other helmets on the market." (*See supra*, at 17.)

### 5.   Arizona – Alliance Youth Sports Association

Alliance Youth has a particularly large number of unique defenses that render it an

inadequate class representative. Fundamentally, it is even questionable whether Alliance Youth

has "exhibited a commitment to vigorously prosecute this case."[120] Alliance Youth's claims are

otherwise barred by the one-year statute of limitations under the AFCA.[121] The oral

representations by Riddell's sales representative upon which Kenny King purportedly relied in

purchasing Riddell helmets occurred in 2010.[122] Alliance Youth's interrogatory responses

acknowledge that Kenny King discovered the facts that gave rise to his claims in 2012, and

documentary evidence confirms that occurred no later than February 20, 2012.[123] Arizona law

---

[120] *See* Motion, at 25. It is unclear that Alliance Youth has *any* present interest in pursuing class claims. Alliance Youth's suit was originally brought on an individual basis by its former Executive President, Kenny King. Mr. King has since been dismissed from the case. Dkt. No. 65, at n.20. He also left Alliance Youth in June 2016. Saylor Decl., Ex. 60. Plaintiffs' Counsel continued to prosecute this case at the direction of Mr. King after this time, serving interrogatory responses on August 31, 2016 that continued to state he was "Executive President." *See id.*, Ex. 61. Alliance Youth's current Executive President, Oliver Ross, and its Board of Directors had no knowledge of this case until they received a debt collection notice from Riddell. At that time, Mr. Ross contacted Mr. King, who only then told them of this lawsuit. *Id.*, Ex. 58, at 19:14 – 21:8. Mr. Ross testified that he would seek authorization of the Board of Directors to continue, and Plaintiffs' Counsel has assured a resolution authorizing suit is coming, but it has not been provided. *Id.*, Ex. 58, at 28:9 – 33:23, 98:24 – 17; *id.*, Ex. 70, at 1-2.

[121] See A.R.S. § 12-541(5); *Cornelis v. B & J Smith Assocs. LLC*, No. CV-13-00645-PHX-BSB, 2014 WL 1828891, *6 (D. Ariz. May 8, 2014).

[122] *See* Saylor Decl., 59, at Response No. 4.

[123] *See* Saylor Decl., Ex. 59, at Response No. 8; *id.*, Ex. 57, at 97:19 – 103:24; *id.* Ex, 65. Mr. King: (1) attended "NFL Youth Football Summits," *id.* Ex. 57, at 98:18-23, *id.* Ex. 64; (2) Received information and meeting minutes from the Sports Concussion Coalition of Arizona, *id.* Ex. 57, at 97:19-98:9; *id.* Ex. 63; *id.* Ex. 57, at 100:3-103:3; and, (3) received specific information there is "no evidence of superiority" with regard to the prevention of concussion by football helmets. *Id.* Ex. 65.

requires that any cause of action accrue from the date that the "plaintiff knows or with reasonable diligence should have known the facts underlying the cause."[124]   Accordingly, because Alliance Youth did not bring suit until 2014, more than one-year after it should have known about its claim, it's suit is barred by the ACFA statute of limitations.[125]   Even if Alliance Youth claims it did not know with reasonable diligence of its claims until one year before suit was filed, the unique circumstances of their knowledge defeat typicality.[126]

In addition, Alliance has significant problems with causation.  Alliance Youth claims only purchases of CRT helmets.[127]   However, through Mr. King, Alliance Youth both purchased helmets with CRT and helmets without CRT.  Mr. King testified that he also relied upon Riddell's 2010 catalog, which advertised one of the two helmets he purchased as "traditional Football Helmet Technology." (*See supra*, at 18.) These facts, and resolution of the questions of credibility concerning Mr. King's continuously changing position on how much alternative Schutt helmets would have cost him – a key allegation considering that the Riddell Sales Representative that sold to him testified that he was instructed to beat a higher price from a Schutt dealer[128] – render Alliance Youth an atypical and inadequate representative.

---

[124] *Cornelis*, 2014 WL 1828891, at *7 (citation omitted).

[125] *See* Saylor Decl., Ex. 59, at Response No. 4; *see id.*, Ex. 75; Dkt. No. 17.

[126] Because Riddell ceased use of the term CRT in the fall of 2012, more than 1-year before even the *first* Plaintiff brought suit in this case (December of 2013), the claims of *all putative members* of the proposed Arizona class will suffer from statute of limitations issues.  Despite the obvious problems this will cause for the Court, Plaintiffs have put forward no proof to show how any absent class members in Arizona could be ascertained on objective criteria, that numerosity could be satisfied, or that the individualized inquiries into Riddell's statute of limitations defenses to *every* Arizona class member would not predominate and render class administration unmanageable. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998) ("whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification"); *In re Ford Motor*, 2012 WL 379944, at *35-37.

[127] Motion, at 15-16.

[128] Saylor Decl., Ex. 8, at 92:2 – 93:19.

## III.    PLAINTIFFS CANNOT CERTIFY A CLASS UNDER RULE 23(B)(3)

A class cannot be certified under Rule 23(b)(3) unless "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *City Select*, 2015 WL 5769951, at *3 (citing Fed.R.Civ.P. 23(b)(3)).  "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast,* 133 S. Ct. at 1432.  The Court must "closely scrutinize plaintiffs' arguments in support of their motion for class certification …to insure that any efficiencies gained by class resolution of common issues are not outweighed by the individual issues presented for adjudication."  *Stephenson v Bell Atl. Corp.*, 177 FRD 279, 290 (D.N.J. 1997) (Simandle, J.).  The predominance inquiry is "especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304 (3d Cir. 2016).

Plaintiffs contend that Rule 23(b)(3) is met because: "Any trial in this matter will overwhelmingly focus on common evidence of Defendants' conduct … relating to marketing and advertising of Riddell CRT Helmets, what CRT claims to be, and its inability to reduce the incidence of concussions better than any other football helmet on the market."  (Motion at 26). Plaintiffs fail to carry their burden under Rule 23(b)(3), ignoring individualized determinations of deceptive conduct and causation that this Court will be compelled to resolve.[129]

---

[129] Indeed, the very fact that this Court dismissed claims that are based on accurate reporting of the results of the UPMC Study mandates that any absent class member who was exposed to those statements has no claim.

34

### A.    Individualized Inquiries Regarding Alleged Deceptive Acts And Causation Defeat Predominance

All of the consumer fraud statutes at issue in this case require proof of a deceptive act and causation and/or reliance, which Plaintiffs are required to prove by a preponderance of the evidence.[130]  Plaintiffs' Motion alleges a "common message" by Riddell that does not accurately reflect Riddell's marketing regarding CRT, and the context in which those claim were made. Individual issues regarding the sophistication of absent class members, and the fact that the "vast majority" of Riddell's customers relied on unscripted oral presentations and direct negotiations with Riddell sales representatives, will likewise predominate.

### 1.    Individualized Oral Representations To Institutional Purchasers Prevent Certification

There is no dispute that Plaintiffs seek to certify classes, the "vast majority" of which are institutional purchasers who negotiated directly with Riddell sales representatives, on multiple occasions, for all of their helmet orders. (See Motion, at 6).[131]  As to these institutional purchasers, "resolution of the claims would require individualized deceptive act and causation inquiries."  *In re Ford Motor*, 2012 WL 379944, at *30.  As this Court previously explained:

> In any class action based upon fraudulent misrepresentations, there is a significant risk that individualized issues will overwhelm those common to the class . . . This risk is amplified in cases involving oral communications, which by their very nature tend to be individualized and not suitable for class treatment.

*Stephenson*, 177 F.R.D. at 290-91.  *See also Eisenberg*, 766 F.2d at 786–87; *Johnston v. HBO Film Mgmt, Inc.*, 265 F.3d 178, 190-191 (3d Cir. 2001)("as a general rule, an action based

---

[130] *Zlotnick v. Premier Sales Grp, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (FDUTPA); *Crozier v. Johnson & Johnson Consumer Cos, Inc.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012) (NJCFA); *In re Sony Gaming Networks And Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 967-69 (S.D. Cal. 2012) (UCL, FAL, and CLRA); *Cornelis*, 2014 WL 1828891 (ACFA).

[131] *See also* Saylor Decl., Ex. 5, at 33-34 (█████████████████████████ ███████.

substantially on oral rather than written communications is inappropriate for treatment as a class action").  To the extent that these purchasers are also making claims based on catalogs or other written materials in addition to oral representations, Plaintiffs were required to demonstrate that there is (1) similarity among written representations; (2) similarity among the oral representations; and (3) similarity between the written representations and the oral representations.  *See Stephenson*, 177 F.R.D. at 291.[132]

Only where there is evidence of "uniform, scripted, and standardized sales presentations" may such a class be certified.  *See In re LifeUSA Holding Inc.*, 242 F.3d 136, 146-47 (3d Cir. 2001) (vacating class certification order because oral representations were not shown to be scripted and uniform); *see also Johnston*, 265 F.3d at 190-191; *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, 269 F.R.D. 445, 466-68 (E.D. Pa. 2010) (denying certification due to lack of predominance and superiority where "any alleged fraud or misrepresentation occurred without standard, uniform sales pitches made across-the-board to . . . customers").[133]

Plaintiffs' Motion offers no evidence, and there is none, that Riddell's representatives made uniform representations to potential purchasers.  Riddell sales representatives' success is based on customer service, relationship building, personalized face-to-face sales pitches and helmet fittings over long-term relationships with their customers.[134]  The sales process is not

---

[132] *Curley v. Cumberland Farms Dairy, Inc.*, 728 F.Supp. 1123, 1132 (D.N.J. 1989); *Glick v. E.F. Hutton & Co.*, 106 F.R.D. 446, 449 (E.D.Pa.1985); *see also* 7B Federal Practice and Procedure § 1781, at 40–41, & § 1782, at 56.

[133] The only exception to the Third Circuit's "general rule" against certification of the classes Plaintiffs' propose is where the defendant is an illegitimate business operating as a "complete sham."  *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 492 (3d Cir. 2015) (remanding to consider evidence of "fundamentally fraudulent scheme" involving telemarketer scripts).  Plaintiffs do not, and could not credibly, lodge such an accusation at Riddell.  Plaintiffs' heavy reliance on Reyes throughout their brief is therefore misplaced.

[134] Saylor Decl., Ex. 8, at 92; *id.*, Ex. 9, at 20, 150-151; *id.*, Ex. 82, at RIDDELL00011245 (█

████████████████████████████████████████████████████

regularly recorded, nor are Riddell sales representatives' efforts scripted.[135]  Representatives

answer individualized questions, respond to individualized needs, and negotiate individualized

deals with each institutional customer.[136]  ██████████████████████████████████

████████████████████████████████████████████████████████████████[137]

Plaintiffs present CRT as a uniform misrepresentation but "fail to acknowledge that whether [the

allegedly misleading statement] was deceptive depends, in part, on the knowledge and/or

understanding of each [Riddell] customer."  *In re Ford Motor*, 2012 WL 379944, at *9.

Plaintiffs allege that Riddell "created a consistent uniform message of CRT by utilizing

approximately 250 sales representatives to provide information about CRT" because sales

representatives met once per year, and sales catalogs were given to sales representatives to give

to their customers if needed.  (Motion at 23.)  ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████; and, the testimony they cite about distribution of Riddell

catalogs expressly states that there are institutional customers in Plaintiffs' proposed class who

have dealt with Riddell so long that they decline a copy of the catalog.  (Cecchi Decl., Ex. 6, at

63:18-23.)  Moreover, Riddell's executives encouraged representatives to present accurate

information about CRT.[138]  Given the above, the Court "would have to conduct thousands of

---

[135] *See* Ide Decl., at ¶¶ 30-31.  Thad Ide, Riddell's 30(b)(6) witness, testified that the company doesn't know to what extent (if at all) its hundreds of sales representatives communicated the phrase CRT or the UPMC study's results to their institutional customers.  Saylor Decl., Ex. 5, at 56, 157-160; *see also id.* Ex. 6, at 345 ("[A]n institutional customer may hear different discussion points from his sales representative as other customers might."), 361-362 (explaining that sales representatives are free to distribute marketing materials "as they see fit.").

[136] *See* Ide Decl., at ¶¶ 31-32; *id.*, Ex. 6, at 371:21-372:5; *id.* Ex. 82, at 2.

[137] *See* Saylor Decl., Ex. 8, at 66-68; *id.* Ex. 9, at 80-81, 87-88.

[138] *See* Saylor Decl., Ex. 80 (email chain between sales person and Mr. Ide); *id.*, Ex. 81 (email chain between sales person and Ms. Chonko). For example, in March 2010, a sales representative requested information about the UPMC Study and how to discuss CRT with an institutional customer. ████████████████████████████████████████████████████

individual inquiries into the content of each sales presentation" to determine if every other pitch was the same. *See Gregurek*, 2009 WL 4723137, at *7.

Plaintiffs' characterization of a label, or the number of times "Concussion Reduction Technology" appears in a catalog (*see* Motion at 4-6) miss the mark – rather, "the [allegedly misleading material], the oral representations, [other materials received], and any other interaction that [Riddell] may have had with the consumer must be considered." *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 687 (S.D. Fla. 2008). This is not a typical consumer fraud case "given the nature of the interaction between the potential plaintiffs and [Riddell]." *Id.* Unlike cases where "the consumers had a one-time purchase or interaction with the defendant business," the present case presents "additional issues regarding other representations or negotiations between the consumer and [the] business." *Id.* Accordingly, Plaintiffs' direct purchaser classes could never be certified because these individualized inquiries for institutional customers defeat predominance.

### 2. Individualized Representations To Non-Institutional Purchasers Prevent Certification

Plaintiffs' failure to show predominance also extends to those who purchased off the Riddell website (who may be members of the "Direct Purchaser" classes), and individuals who purchased from a retailer, like Dick's, that Riddell sold to (who may be members of the "Retail Purchaser" classes). Individualized deceptive conduct and causation inquiries are demonstrated by the differing representations and materials to which class members were exposed. For example, Plaintiffs' Motion suggests that the Aronsons, Ms. Thiel, Mr. Farrell and Mr. Galvan

understood CRT to mean that Riddell's helmets were better than "any other helmet on the market." None of them received this understanding from Riddell's marketing materials, nor could they have because Riddell did not make such claims. The "representative samples" of statements on Riddell's website and "retail point of sale" show the phrase "Concussion Reduction Technology" together with additional information.

These materials could not reasonably support a finding that class members were all exposed to the "common message" that Riddell's helmets with CRT were better than "any other helmet on the market." Rather, these materials contain information about research that went into the development of CRT, the UPMC Study's results and its comparison to traditional helmets, and other information relevant to the alleged "common message" that Plaintiffs' urge this Court to find. (*See supra*, 2-3). This disparity of messages and content requires denial of class certification. *See Clark*, 289 F.R.D. at 190 (denying certification where "varying communications with [customers] and individualized determinations necessary to gauge materiality and equitable relief").[139]

### B.   Plaintiffs Are Not Entitled To Any Presumptions of Common Proof

Plaintiffs' Motion attempts to evade the fact that individualized issues will predominate by arguing that various exceptions and presumptions can apply under their respective consumer fraud statutes.[140] These arguments fail for the reasons set forth below.

---

[139] Even if the Court found that "Concussion Reduction Technology," in isolation, could be interpreted to imply superiority to all other helmets on the market as Plaintiffs suggest, this Court would have to conduct individualized inquiries to excise members of the class that were exposed to accurate statements about the UPMC Study. *Mazza v. Am. Honda Motor Co. Inc.*, 666 F.3d 581, 596 (9th Cir. 2012) (the class must "include only members who were exposed to advertising that is alleged to be materially misleading" and "exclude those members who learned of [any alleged omitted information] before they purchased").

[140] The Third Circuit has emphasized the limited application of presumptions in class action cases and public policy reasons for their limitations. *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 755 (3d Cir. 2010).

### 1.    Arizona

Plaintiffs claim that they can show reliance under the ACFA based on putative class members' purchase of the helmets, standing alone, but the ACFA only allows such a presumption in cases involving intentional fraudulent concealment.  (Motion at 29-30 (citing *Siemer v. Ass. First Capital Corp.*, 2001 WL 35948712, at *4 (D. Ariz. Mar. 30, 2001)).  *See Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 349 (D, Ariz. 2009) (distinguishing *Siemer* and reiterating that "the overwhelming authority in Arizona specifically requires proof of actual reliance."); *Grimmelmann v. Pulte Home Corp.*, CV-08-1878-PHX-FJM, 2010 WL 2744943, at *8 (D. Ariz. July 9, 2010) ("[t]he presumption of reliance has since been applied . . . only in fraud cases based on omissions").  Here, Plaintiffs' claim affirmative misrepresentations.[141]

In any event, Arizona Plaintiff Alliance Youth is a prime example of the individualized inquiries this Court would have to conduct.  Alliance Youth orally negotiated a unique deal, for helmets both with CRT and without CRT, ████████████████████████████████ ████████████  The Parties dispute numerous facts concerning the alleged deceptive acts and causation underlying Alliance Youth's claims, including the contents of the oral negotiations, the motivation of Alliance Youth's purchase, and whether or not Riddell was required to "beat" a Schutt dealer's price (and whether any "less expensive" helmets were indeed available to Alliance Youth).  The testimony of Kenny King, Alliance Youth's former Executive President, tends to show he was focused on price, and did not choose Riddell for CRT.  He purchased helmets without CRT, and told Riddell's sales representative that met him that he had to beat a

---

[141] Dkt. No. 65, at 36-37.  The Court expressly acknowledged that Plaintiffs' claims were based on affirmative misrepresentations.

price offered by a Schutt dealer.[142]  Despite Mr. King's changing story on the Schutt offer,[143] Alliance Youth has continued to purchase Riddell helmets after bringing this lawsuit and after CRT was discontinued.[144]  And, like other institutional purchasers, Alliance Youth was sophisticated and exposed to information that put them on notice of their allegations here.[145]

### 2.      California

Plaintiffs' Motion claims that they need not demonstrate individualized causation, reliance or injury under the UCL, FAL, and CLRA.  Yet no presumption of reliance may be had under the UCL, FAL, or CLRA unless the claim involves "a single, specific misrepresentation of a particular fact, and the claims of all class members stem from this particular source."  *See Gonzalez v. Proctor & Gamble Co.,* 247 F.R.D. 616, 623 (S.D. Cal. 2007) (denying certification because of "wide variety of representations" in various sources).  Plaintiffs claim reliance may be inferred on a class wide finding of materiality because "there is no factual dispute that consumers believe the term CRT means the helmet will provide greater protection against concussions as compared to other helmets," "[e]veryone was exposed to the same messaging regarding CRT,"  and "there was no disparate information from Riddell about its helmets with CRT."  (Motion, at 30-32.)  That is not true.  Instead, the individualized issues in this case resemble those that precluded a finding of predominance under the UCL, FAL, and CLRA in *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*  In *Pierce-Nunes,* the plaintiff contended that

---

[142] *See* Saylor Decl., Ex. 8, at 92-94.; *id.* Ex. 57, at 57:18 – 59:24 (Mr. King testified that he relied on an advertisement regarding "traditional football helmet technology"); *id.* Ex. 62, at 15; *id.* Exs. 69-70 (█████████████████████████████████████████████████████████████ ██████████████████████.

[143] *See id.* Ex. 59, at Response No. 9 (████████████████████████████████████████████ *id.* Ex. 57, at 37-38 (███████████████████████████████████████████████ ████████████████.

[144] *See* Saylor Decl., Ex. 57, at 86-87; *id.* Ex. 69.

[145] Saylor Decl., Ex. 59, at Resp. No. 8; *id.* Ex. 65; *Schutt,* 727 F. Supp. at 1223.

"because he is challenging the very name of the product itself – LED TV – common issues predominate because class members' exposure to the challenged deception is apparent." No. CV 14-7242-DMG (KSX), 2016 WL 5920345, at *7 (C.D. Cal. June 23, 2016). The court found, however, that plaintiff "will not be able to demonstrate, with common proof, even under a reasonable consumer standard, that each class member had the same understanding of the product labeling, let alone *relied* on the LED TV label" because "approximately 90%" of the packaging disclosed additional information that clarified the label and created varied representations that made any classwide presumptions inappropriate. *See id.*

As in *Pierce-Nunes,* the representative samples that Plaintiffs cite show that putative members of the proposed California classes who examined Riddell's website, product packaging, catalogs, and other marketing materials, would have been exposed not only to the phrase "CRT," but also detailed information about the UPMC Study's results and the comparison of helmets with CRT to helmets of traditional design, not "any other helmet on the market" as Plaintiffs' suggest.[146] The Court cannot infer materiality upon a unique interpretation of CRT. Instead, the Court will have to conduct individualized inquiries to "include only members who" took away this unique interpretation and "exclude those members" who were exposed to any other information about CRT. *Mazza*, 666 F.3d at 596.

Further, materiality on a classwide basis cannot be shown because Riddell's consumers possess varied sophistication. "Where the advertising or practice is targeted to a particular group or type of consumers, either more sophisticated or less sophisticated than the ordinary consumer, the question whether it is misleading to the public will be viewed from the vantage point of

---

[146] The court in *Pierce-Nunes* also observed a separate obstacle to certification that is relevant here – members of the class may have relied upon "their own research, speaking with sales people, comparison shopping, or recommendations [from third parties]." 2016 WL 5920345, at *7; *see supra*, at 16-17.

members of the targeted group, not others to whom it is not primarily directed." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 512 (Cal. 2003).[147]  The differing sophistication among the potential class members destroys any common presumption of materiality that Plaintiffs advocate.  *See, e.g. Schutt*, 727 F. Supp. at 1223.

California Plaintiff Gustavo Galvan's own experience is illustrative of some of the individualized issues this Court will face.  First, Mr. Galvan testified that price was a factor, and that he ignored more expensive helmets from Schutt and Xenith – a complicating factor on causation for which Plaintiffs' remaining comparative theory cannot account.  Additionally, Mr. Mr. Galvan claims he purchased the helmets from Dick's, but before Riddell did business with that chain.  He testified that he received them in a plastic bag with a third party's "black and white flyer," *not* Riddell's product packaging. (*See supra*, at 17.)  *See Moheb v. Nutramax Labs., Inc.*, No. 12-3633-JFW (JCx), 2012 WL 6951904, at *4 (C.D. Cal. Sept. 4, 2012) (declining presumption of reliance when purchasers may have relied on third parties, including "retailers' sales pitches").  Accordingly, a California class will present the same individualized issues for this Court to resolve as the other classes.

### 3.   Florida

Plaintiffs incorrectly assert that the "issue of causation is common among Plaintiff and all Florida class members" because the FDUTPA does not require findings of "individualized proof of subjective reliance," citing *Fitzpatrick v. General Mills*, 653 F.3d 1279, 1283 (11th Cir. 2011), and *Webber v. Esquire Deposition Servs.*, 439 F. App'x 849, 851 (11th Cir. 2011).  (Motion, at 33-34).  Yet this Court and "multiple appellate decisions" have observed that *Fitzpatrick* and

---

[147] Plaintiffs' chart of Consumer Protection Laws, filed with their Motion for Class Certification as Dkt. No. 189-8, inaccurately cites to *Lavie* as defining the reasonable consumer as "an ordinary member of the public." *See* Cecchi Decl., Ex. 52.

*Webber* failed to address causation and did not account for developments in state court decisions reinforcing the causation requirement under the FDUTPA. *In re Ford Motor*, 2012 WL 379944, at *29; *see also In re Sears, Roebuck & Co. Tools Mktg. and Sales Practices Litig.*, 05 C 4742, 2012 WL 1015806, at *10 (N.D. Ill. Mar. 22, 2012) (rejecting *Fitzpatrick* and *Webber*, and finding that the "great weight of recent authority" in Florida state courts "holds that causation typically requires individualized proof").[148]  Ignoring this, Plaintiffs attempt to characterize the FDUTPA as solely focused on the representations at issue.  This is incorrect.

Even under the incorrect standard that Plaintiffs set forth, "differences in the circumstances under which putative class members purchased [the products at issue] create many individualized factual and legal issues with respect to the FDUTPA claim." *Webber,* 439 F. App'x at 851.  Like the decision affirmed in *Webber*, this case includes buyers who consistently purchased through Riddell at "negotiated special rates," before and after its marketing of CRT. *In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices,* 715 F. Supp. 2d 1265, 1268 (S.D. Fla. 2010). And as in *Webber*, the reselling and renting of helmets by institutional customers in this case makes it "impossible to ascertain the ultimate payor" without individualized inquiries. *Id.* at 1275.

There is no evidence that Florida Plaintiff Nicholas Farrell was exposed to any claims by Riddell.  Rather, his decision was driven by other sources: his high school football coaches, TV broadcasts where he "really noticed" the helmet because his favorite player wore it, and a third party catalog that said the Revolution Speed was the "best helmet in [a] comparison" of multiple

---

[148] Plaintiffs also cite to *Adrienne Roggenbuck Trust v. Development Resources Grp.*, 505 Fed. App'x 857 (11th Cir. 2013) for the proposition that "justifiable reliance" is not a required element under the FDUTPA – a fact that does not alter that causation is required.

manufacturers' helmets.[149]  Moreover, Mr. Farrell's mother gave him cash to purchase a football helmet from his coach – his coach did not provide a receipt, and appears to have profited on the sale.  "Resale" issues like those presented by Mr. Farrell's high school, where coaches are pitching and selling helmets to their players, present individualized issues of causation and injury.[150]  The facts of Mr. Farrell's claim demonstrate why individualized issues predominate.

### 4.    New Jersey

Plaintiffs argue the NJCFA's "causal nexus" to ascertainable loss is automatically satisfied because of the use of CRT and the allegedly corresponding "premium price."  (Motion, at 37.)  Plaintiffs cite no authority for this broad presumption, because the Third Circuit has expressly rejected it: "The problem for the plaintiffs is that the state courts have held that the ascertainable-loss and causal-relationship elements of the NJCFA . . . are not met by the kind of price-inflation theory . . . advanced by the plaintiffs." *Harnish,* 833 F.3d at 312–13 (citation omitted) ("[I]ndividualized questions about how the 'diverse group' of class members reacted to the alleged fraud predominated instead and precluded class certification.")[151]

State and federal courts in New Jersey have long found "presumptions" cannot be "automatically used to eliminate a particular element" of a cause of action in the class action

---

[149] Saylor Decl., Ex. 47, at 77-78.  *See supra*, at 15-16.

[150] If Plaintiffs contend that Mr. Farrell is a "direct purchaser," it would be impossible to find class members like him without individualized inquiries into sales and rental records of all of Riddell's institutional customers.

[151] Plaintiffs also cite *In re Mercedes-Benz Tele Aid Contract Litigation* to support their argument that causation can be established merely by showing that Plaintiffs "did not get what they paid for." Br. at 37; 257 F.R.D. 46, 74 (D.N.J. 2009).  But *Tele Aid* is an omission/nondisclosure case, and claims based on alleged omissions have been dismissed. Dkt. No. 65, at 36-37.  Recent Third Circuit caselaw makes clear that the predominance inquiry of Rule 23 cannot be met by Plaintiffs' price premium allegations. *See, e.g. Harnish,* 833 F.3d at 304.  Moreover, Plaintiffs' presumption that all purchasers paid an alleged premium is false, as conceded by their own expert who considered that some may have paid less than $50 below Riddell's list price for certain helmets. *See* Cecchi Decl., Ex. 36, ¶ 14.

context, a fact that is "particularly true with regard to causation for a NJCFA claim." *Demmick v. Cellco P'ship*, No. CIV.A. 06-2163 JLL, 2010 WL 3636216, at *16 (D.N.J. Sept. 8, 2010) (collecting cases); *see also McNair v. Synapse Grp, Inc.*, No. 06-5072, 2009 WL 1873582, at *8-10 (D.N.J. June 29, 2009), *aff'd*, 672 F.3d 213 (3d Cir. 2012).  If common proof is to be used, it "must be capable of demonstrating causation as to the individual proposed class members." *Demmick*, 2009 WL 1873582, at *17.  Even where a court finds written materials to be "sufficiently uniform," the presence of "oral representations that may have varied" destroy predominance in class actions under the NJCFA. *Id.*

Plaintiffs' class representatives in New Jersey demonstrate there can be no common finding of causation for absent class members.  Norma Thiel relied on a Riddell video that did not contain the phrase Concussion Reduction Technology.  (*See supra*, at 15.)  Likewise, neither Douglas nor Denise Aronson actually saw any presentation by a Riddell sales representative.  Plaintiffs' proof is the hearsay advice of their son.  (*Id.*)  These parties cannot prove that any uniform CRT representations could have caused them ascertainable loss.

## IV.  PLAINTIFFS CANNOT PROVE DAMAGES ON A CLASSWIDE BASIS

Plaintiffs did not meet their burden of establishing damages that are capable of measurement on a class-wide basis, as required by the Supreme Court in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432-33 (2013).  As set forth below and in the Expert Report of Laura Stamm, (Saylor Decl., Ex. 3), among other things, Plaintiffs' expert, Charles D. Cowan, does not propose or attempt to consider only those damages that follow from Plaintiffs' theory of liability, and fails to isolate the effect on pricing of the allegedly false and misleading claims at issue.  These same deficiencies – a "damages model [that] does not matchup with Plaintiffs' theories of liability" and assigns any differential to Riddell's alleged conduct without regard to other variables – recently led to the exclusion of Dr. Cowan's testimony and denial of class

46

certification in *In re Pharmacy Benefit Managers Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398, at *19-22, 31 (E.D. Pa. Jan. 18, 2017) (rejecting Dr. Cowan's report that "assign[ed] any differential found [in pharmacy reimbursement rates] to be the result of Defendants' alleged conduct"). The same reasoning applies here.[152]

### A.   Plaintiffs' Damages "Model" Does Not Fit Their Theory Of Liability

Plaintiffs' Motion should be denied because it fails to provide a damages model that is consistent with their theory of liability, as required by *Comcast*. In *Comcast*, the plaintiffs had asserted four separate theories of liability for antitrust violations. Only one theory (related to reduced competition from cable companies acting as "overbuilders") could be certified. Yet the plaintiffs' proposed damages model did not differentiate between the damages attributable to that theory versus those attributable to the uncertified theories. As the Court explained:

> We start with an unremarkable premise. If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. ***It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.*** If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

*Comcast*, 133 S. Ct. at 1433 (emphasis added).

The *Comcast* analysis applies equally in consumer fraud cases – damages models must fit the alleged theory of how class members were misled and harmed. For example, in *In Re ConAgra Foods*, *Inc.*, consumers brought a class action against Wesson Oil alleging that it deceptively and misleadingly marketed cooking oil in violation of numerous state consumer

---

[152] The Eastern District of Pennsylvania also excluded Dr. Cowan's testimony under Rule 702 and *Daubert*. As set forth in Defendants' Motion to Exclude Testimony of Charles Cowan, his testimony in this case likewise fails to satisfy *Daubert* for several reasons and should be excluded.

protection laws.  302 F.R.D. 537 (C.D. Cal. 2014).  The district court concluded that Rule

23(b)(3) was not satisfied because plaintiffs' method of proving damages was not tied to their

theory of liability.  *Id.* at 578.  The district court stated:

> Plaintiffs' specific theory of liability in this case is that the "100% Natural" label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients. Under ***Comcast***, therefore, [plaintiff's expert] ***must be able to isolate the price premium associated with misleading consumers in that particular fashion***. It does not appear from his declaration and deposition testimony that he intends to do so. Rather, it appears he intends merely to calculate the price premium attributable to use of the term "100% Natural" and all of the meanings consumers ascribe to it. This does not suffice under *Comcast*.

*Id.* at 578-79 (emphasis added).  Similarly, in *Werdebaugh v. Blue Diamond Growers*, the court

rejected a number of proposed damage models because they were not tied to "the harm

attributable to Defendant's labeling claims," and that the one potentially viable model left the

court "unable to determine how much of the purported price premium is due to Defendant's use

of the at-issue labeling claims, as opposed to Defendant's successful advertising campaigns or

promotions."  *Id.* at *12.  No. 12-CV-02724-LHK, 2014 WL 7148923, at *3, 12 (N.D. Cal. Dec.

15, 2014).

  Dr. Cowan's proposed methodology similarly fails to match Plaintiffs' surviving theory

of liability.  This Court allowed Plaintiffs SAC to survive dismissal upon a finding that it was

"clear that Plaintiffs' claims are . . . based on the helmets' alleged inability . . . to reduce

concussion compared to other helmets on the market."  *See* Dkt. No. 65, at n.17.  Indeed,

Plaintiffs allege that "despite Defendants' claims, there is no material difference in terms of

concussion prevention *between Riddell's helmets and other football helmets ...* [yet] Defendants

charge price premiums of $50 per helmet *as compared to other comparable helmets available on*

*the market."  See* SAC, ¶¶ 11, 81 (emphasis added).   Accordingly, any proposed class-wide

damages model must be tied to Plaintiff's theory "B" – that CRT helmets were comparatively ineffective to competitors' offerings.  In other words, Riddell helmets containing CRT must be compared against Schutt and Xenith helmets (or other competitors' helmets).  This would have compared: (i) the relative efficacy of these helmets with respect to reducing the incidence of concussion; and (ii) any price differences between these helmets.

Plaintiffs' proposed damages model does not do that.  Dr. Cowan proposes to compare unspecified financial data showing Riddell gross profit margin ("GPM") from the time period *before* Riddell marketed CRT (*i.e.*, profits on traditional helmets) with Riddell's GPM from the time period *after* the CRT marketing claims.  Dr. Cowan is not calculating a "premium" that Riddell received for sales of helmets marketed as CRT when compared to its competitors.  Rather, he proposes to measure a "premium" amounting to the difference between Riddell helmets sold from 1998 to 2002, prior to the introduction of the Revolution, against those sales of the Revolution series of helmets sold after Riddell made the CRT claims in its marketing, beginning in 2007.[153]  This comparison – of traditional helmets to CRT helmets – is the exact comparison that the Court already found could not serve as a basis for any false advertising claims because the UPMC Study showed an improvement that cannot be challenged.[154]

Moreover, by comparing Riddell's pre-CRT sales with post-CRT sales, Plaintiffs' damages methodology assumes that all post-CRT sales are attributable to false or misleading marketing, and that any purchaser therefore suffered damage.  *See Comcast*, 133 S. Ct. at 1434.

---

[153] Dr. Cowan's claim that any difference in GPM is the price premium is inconsistent with his own opinion that helmet sales after the CRT claim was made in 2007, are, in general, comprised of: cost of goods sold; planned profit margin; and the $50 improper premium.  Cecchi Decl. Ex. 36, at ¶13 p 4.  His analysis makes no attempt to allocate that portion of Riddell's gross profit margin during the class period that is attributable to "planned profit margin."

[154] *See* Dkt. No. 65, at 2-3, 29-32 (finding that the UPMC Study's results could not be questioned and Plaintiffs had no claim "that 'the technology in place in [all the helmets at issue in this case] is not the same technology 'shown' to reduce concussions").

49

Not only is this not tied to the theory that is left in the case, but would include any sales induced by claims this Court has found to be non-actionable, and purchases induced by features and benefits in the Revolution series of helmets *other than* CRT. *See* Ide. Decl., at ¶ 23. In addition, Plaintiffs repeatedly allege that Riddell charged an improper $50 "premium", which they claim is the ascertainable loss to Plaintiffs and the proposed classes. Inexplicably, however, while Dr. Cowan concedes the $50 premium and explains how he would account for discounts off of MSRP, his proposed gross profit margin calculation does not actually do anything with the alleged $50 premium.

Incredibly, Dr. Cowan specifically rejects any comparison of competitor sales – which would undoubtedly be necessary to measure the "economic impact" of the harm caused by Riddell's alleged marketing comparing CRT helmets to other helmets on the market. Indeed, while Plaintiffs state that they can establish damages on a class-wide basis through "common economic evidence" (Motion at 39), the only "common economic evidence" that Dr. Cowan proposes to use is evidence from Riddell's internal data.[155] This proved fatal in *In re Dial Complete Mktg. & Sales Practices Litig*., where the plaintiffs' experts made no "effort to determine which products might serve as effective comparators to [the product at issue], or even determine which criteria should be used to determine whether a particular product would serve as an effective comparator." 312 F.R.D. 36, 78 (D.N.H. 2015). Even if Dr. Cowan's model attempted to look for comparable products, he would need to control for the fact that Riddell's

---

[155] Plaintiffs' citation to *In re US Food Service Pricing Litigation* is unavailing. There, the Second Circuit found the plaintiffs had a reliable method to calculate damages, which was the difference between what the plaintiffs should have paid and what they actually paid. 729 F.3d 108, 122 (2d Cir. 2013) ("[T]he measure of damages for [the injury at issue] is straightforward: customers are entitled to the difference between the amount they paid on fraudulently inflated cost-plus invoices and the amount they should have been billed.") Dr. Cowan does not provide anything remotely similar to the direct link between injury (fraudulent invoices) and damages (overpayments) as existed in *US Food Service*.

largest competitors also made concussion reduction claims during the class period.  (*See supra*, at 6-7); *see Werdebaugh,* 2014 WL 7148923, at *6, n.3 (discussing that a failure to control for competitors' similar claims renders a damages model insufficient).

Just as in *Comcast*, there is no effort to tie the damages model to the claims that remain in the case, or weed out class members whose claims rest on dismissed theories.  This is fatal because "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."  *Comcast*, 133 S. Ct. at 1435 (citation omitted).  The *Comcast* damages model improperly "assumed the validity of all four theories of antitrust impact" and therefore would have "identif[ied] 'damages' that are not the result of reduced overbuilding, or, in other words, that are not the certain result of the wrong."  *Comcast*, 133 S. Ct. at 1434.  Dr. Cowan's model suffers the same fate, and cannot serve as a basis for class-wide damages.

### B.   Plaintiffs' Damages "Model" Does Not Account for Other Variables

Even if Dr. Cowan's methodology was sufficiently tied to Plaintiffs' remaining theory of liability, it still fails to satisfy *Comcast* because it does not "control for other critical factors."  *See Werdebaugh,* 2014 WL 7148923, at *12.   Plaintiffs argue that they do not need to set forth a "precise mathematical calculation," (Motion at 38), but this does not excuse Dr. Cowan's mere assurances that he can account for complicating factors in the future.  *Comcast* requires that a Plaintiff  "present evidence of a reliable methodology for calculating damages on a class-wide basis . . . Mere assurance that a methodology *could be* applied" is insufficient.  *Bright v Asset Acceptance, LLC*, 292 F.R.D. 190, 202-03 (D.N.J. 2013) (Simandle, J.).

As set forth in further detail in the Expert Report of Laura Stamm, and Defendants' motion to exclude Dr. Cowan's testimony under *Daubert*, Dr. Cowan's proposed methodology is seriously flawed and unreliable.  (Saylor Decl., Ex. 3)  Among other things, and in addition to

failing to account for profits due to marketing claims this Court has already found to be non-actionable, the Cowan Report ignores the multitude of factors that impact Riddell's pricing and profit margins, ████████████████████████████████████████████████████ ████████████████████████████████████████ (*Id.* at 3.14-3.24).  In addition, Dr. Cowan's choice of time period ignores the changing market and results in a comparison of helmets that are not comparable and were on the market at different times.  (*Id.* at 3.28-3.31). Dr. Cowan elected against the use of a comparison between the sales and margins associated with Revolution series from 2002-07 (pre-CRT claims) and from 2007-2012 (post-CRT claims). The Cowan Report also purports to measure damages for the period from 2008 to present, despite the fact that Riddell stopped making the CRT claims in 2012.  Dr. Cowan's attempt to create a damages model also fails because it does not analyze any price paid per helmet or break out the alleged premium paid by any purported class member.

Moreover, Dr. Cowan admits that he has not "collected any data", and repeatedly testified that he would consider changing his methodology to suit any data he may get from Riddell or its competitors (and that his report does not account for many variables).[156]  Yet Dr. Cowan's failure to test his proposed methodologies because it would not "be 'possible to do so without information from the defendants'" required exclusion of his report in *Pharmacy Benefit Managers*.  *See* 2017 WL 275398, at *5, 30-31.[157]  In sum, Plaintiffs' proposed method for

---

[156] *See, e.g.,* Saylor Decl., Ex. 11, at 84:9-85:21 ("I haven't collected data from anybody"), 55 (speaking of "hypothetical" data in the report); 62-65 (failure to account for advertising claims and claims left in the case); 78-80 (does not account for whether or not any purchaser paid a premium); 89-91 (does not account for other purchase options) 103-04, 111-13, 119-31, 161 (discussing incomplete "investigation" and unaccounted for variables).

[157] *See also Saavedra v Eli Lilly and Co.,* 2:12-CV-9366-SVW, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014); (plaintiffs' proposed damages expert had advanced "no damages model at all" because he had not collected certain data and had not determined which attributes would be used in his analysis); *In re ConAgra Foods, Inc*., 302 FRD at 552 (proposed expert did not

calculating damages is "so insubstantial as to amount to no method at all" and cannot meet Plaintiffs burden under Rule 23. *In re Nifedipine Antitrust Litig*., 246 F.R.D. 365, 371 (D.D.C. 2007).

    **C.**    **Plaintiffs' Proposed Classes Will Require Individual
             Damages Inquiries and Create Inter-Class Conflicts**

       Class certification should be denied because there are individual issues relating to whether class members suffered any injury at all, either because they did not in fact pay a premium, or because they would have purchased the helmet regardless of Riddell's CRT marketing claims. *See, e.g., Marcus*, 687 F.3d at 612 (vacating certification order because "individual proof would be needed to determine whether a particular class member broke the causal link between defect and ascertainable loss").[158]

       Plaintiffs and absent class members must prove ascertainable loss or injury as an element of their claims under the consumer protection laws they rely on here, and must set forth a method for "calculat[ing] the premium they paid for the helmets at issue." Dkt. 65 at 37. Accordingly, the $50 premium should figure prominently in any proposed damages analysis, and cannot be proven through the use of averages or formulas applied class-wide without regard to the class member's individual loss or injury. *See Pharmaceutical Benefits Managers*, 2017 WL 275398 at *21 (excluding Dr. Cowan's opinion because national averages could not demonstrate the "antitrust impact" element of plaintiffs' claims). Yet Dr. Cowan's proposed analysis operates

---

"identify any variables he intends to build into the models" or "any data presently in his possession to which the models can be applied").

[158] With respect to Plaintiffs' NJCFA claims, Plaintiffs must prove "ascertainable loss", which will require individualized inquiries. N.J.S.A. § 56:8-19; *see Jorge v. Toyota Motor Ins. Servs., Inc.,* No. A-4926-04T2, 2006 WL 2129026, at *3 (N.J. Super. A.D. Aug. 1, 2006) ("damages are an essential element of any claim brought under the CFA"); *In re Grand Theft Auto Video Game Consumer Litig*., 251 F.R.D. 139, 157 (S.D.N.Y. 2008) ("Like the reliance requirement, the ascertainable loss requirement may create individualized issues that bar the certification of a consumer-fraud class action.").

without regard to whether a purchaser actually paid a $50 "premium", no premium, or something less than $50.  By only comparing Riddell's GPMs from 1999-2000 and 2007-today, there is no way to ascertain those purported class members which paid a $50 premium, those who paid between $1 and $49.99 in premium and those who paid no premium.  This dilutes the claim of purported class members who, under Cowan's theory, paid a $50 premium.  Dr. Cowan admits that the $50 premium amount will decrease if there is a discount off of Riddell's suggested retail price ("MSRP").[159]  Dr. Cowan opines that if a CRT helmet is sold for "more than $50 below MSRP, the actual premium paid is accepted as zero."  (Cecchi Decl., Ex. 36, at ¶14.)  Thus, even according to Plaintiff's own damages expert, a purchaser who purchased a Revolution series helmet for more than $50 below MSRP, has no ascertainable loss.  (*See*, *e.g.*, Dkt. No. 65 at 37-38).

While Plaintiffs' Motion and the Cowan Report do not explain how exactly damages would be calculated for any individual Plaintiff or class member – and in fact Dr. Cowan admits he has not considered that – the named Plaintiffs themselves demonstrate that the proposed classes could include numerous class members who have suffered no injury at all.  (Saylor Decl., Ex. 11, at 122-25.)  For example, Plaintiff Norma Thiel cannot prove damages where she testified that the school helmet available to her for free was a Riddell Revolution helmet, which would have contained CRT.  (*Supra*, at 15.) Other proposed class members, including named Plaintiff Alliance Youth, resold or rented the Riddell helmets they purchased, and any amounts received would have to be accounted for. (*Supra*, at 18.)

As was the case in *Pharmacy Benefit Managers*, the Cowan Report fails to establish a viable methodology for class wide damages. *See* 2017 WL 275398 (E.D. Pa. Jan. 18, 2017).

---

[159] Riddell refers to its standard prices as a "list price," and not an MSRP.

## V.    PLAINTIFFS' PROPOSED CLASSES ARE NOT READILY ASCERTAINABLE

The Third Circuit requires Plaintiffs to meet a "heightened" ascertainability requirement in order to certify a class. *See, e.g.*, *Marcus*, 687 F.3d at 592. This requires a plaintiff to prove, "by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria, and a trial court must undertake a rigorous analysis of the evidence to determine if the standard is met." *Carrera.*, 727 F.3d at 306. Plaintiffs must propose a method of identifying class members that is "administratively feasible," which "means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." *Id.* at 307–08. "A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Id.* at 306. Plaintiffs have failed to provide any evidence in support of an administratively feasible method of identifying class members, and their Motion must therefore be denied.

### A.    Plaintiffs Fail to Demonstrate the Ascertainability of "Direct Purchasers"

Plaintiffs contend that their proposed "Direct Purchaser" classes are objectively ascertainable "because Riddell maintains records to identify every Direct Purchaser." (Motion at 43-44). Yet Plaintiffs seek to include individuals like Florida Plaintiff Nicholas Farrell as a "direct purchaser" (a classification that Defendants dispute) despite the fact Mr. Farrell did not purchase from Riddell and Riddell has no record of his purchase. (*See supra*, at 15-16.) Plaintiffs propose no method to objectively identify individuals like Mr. Farrell, and therefore they fail to establish that the Direct Purchaser classes are ascertainable.

These "resale" issues also frustrate class treatment of Riddell's institutional purchasers. Many institutional purchasers resell or rent the helmets they buy from Riddell, which makes their

assertions of injury and class membership individualized.[160]  Some of these Direct Purchasers are

even for-profit resellers.[161]  All four of the state consumer protection statutes at issue require

some degree of demonstrable injury,[162] and many of the organizational "Direct Purchasers" will

have been reimbursed for their purchases.[163]  As a result, individualized fact-finding would be

required to determine whether each institutional purchaser has the requisite standing, injury-in-

fact, and/or ascertainable loss to bring a claim under the applicable statute.  *See Carrera*, 727

F.3d at 307 ("[A] trial court should ensure that class members can be identified without extensive

and individualized fact-finding or 'mini-trials.'); *Adami v. Cardo Windows, Inc*., 299 F.R.D. 68,

85 (D.N.J. 2014) (Simandle, J.) (finding a lack of ascertainability because individualized fact-

finding concerning class membership and injury would be required).

### B.    Plaintiffs Fail to Demonstrate the Ascertainability of "Retail Purchasers"

Plaintiffs contend that absent members of the proposed Retail Purchaser classes can

submit claim forms under penalty of perjury, which, if challenged, could be "cross-checked" by

tracing "Universal Product Codes" ("UPC") to the records of retailers that they claim are "clearly

---

[160] *See, supra,* at 15-16; Saylor Decl., Ex. 66.

[161] Saylor Decl., Ex. 6, at 352:23 – 353:3 (" ███████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████ ).

[162] *See, e.g.*, N.J.S.A. 56:8–1 et seq. (New Jersey statute explicitly requires "ascertainable loss"); Fla. Stat. 501.201 et seq. (discussed in *Zlotnick*, 480 F.3d at 1284 (elements in Florida action include "actual damages")).

[163] Each consumer fraud statute at issue is also loath to include class members who may resell products.  *See, e.g., Papergraphics Int'l, Inc. v. Correa*, 910 A.2d 625, 629 (N.J. Super. App. Div. 2006) (plaintiff was not a "consumer" under the NJCFA because it resold the consumer product at issue); *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1269 (S.D. Fla. 2002) (A cause of action for civil damages under FDUTPA is legally insufficient in the absence of a showing that the plaintiff has not previously been engaged in the business involved); *Cellco Partn. v. Hope*, No. CV11-0432 PHX DGC, 2011 WL 3159172, at *4 (D. Ariz. July 26, 2011) ("Arizona courts have also clearly suggested that the ACFA protects only those who are actually consumers in the transaction.").

available to verify the claim(s) of all members of the proposed retail classes."  Motion, at 44-45.
But, Plaintiffs have no evidence that the retailers at issue in this case could perform such "cross-checks," that the retailers applied any UPCs to Riddell's retail packaging, or that class members would have any information available to "cross-check" at all.  Plaintiffs only subpoenaed two of the ███ retailers at issue in this case, and even as to those retailers they conspicuously omit citation to any evidence to show their ability to perform such "cross checks."[164]  Plaintiffs offer nothing more than the "say-so of putative class members," which is insufficient.  *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013).

Nevertheless, Plaintiffs submit that this method "more than meets the burden of proof at class certification," citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015).  Motion at 45.  It is incomprehensible that Plaintiffs would cite this out-of-circuit case where it has been specifically rejected in light of the Third Circuit's heightened ascertainability standard, described in *Carrera* and other cases. *City Select*, 2015 WL 5769951, at *9.  Plaintiffs fall far short of meeting their burden in this Circuit.  For example, the plaintiffs in *Carrera* made the effort to hire an expert in class administration who set forth a screening model to "detect claims that are submitted fraudulently."  *Carrera*, 727 F.3d at 311.  Still, this was insufficient because it failed to show how such a model would actually work. *Id.*  Here, Plaintiffs did not even offer proof that their method could actually work.

---

[164] Contrary to Third Circuit precedent, Plaintiffs' proposed method gives no more than "assurances that records are readily available without providing evidence" that retailer records in this case can be used to identify class members.  See *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 WL 3623005, at *10 (E.D. Pa. June 10, 2015) (citing *Carrera*, 727 F.3d at 308).

Plaintiffs also offer that "a receipt or other proof of purchase (such as a photograph of the helmet[165]) would be definitive." (Motion, at 45.) However, under Third Circuit precedent, a receipt is not "definitive." *Bello v. Beam Global Spirits & Wine, Inc.,* No. 11-cv-5149 NLH-KMW, 2015 WL 3613723, at *12 (ascertainability lacking because of insufficient proposal to screen fraudulent claims based on receipts). Plaintiffs provided no evidence to suggest that absent class members would have retained any receipts from helmet purchases ranging from 2007 to 2012. Indeed, the *only* named Plaintiff to purchase from a retailer has no proof of purchase and changed his purchase story multiple times.[166] Plaintiffs' assurances cannot substitute for actual proof. *Carrera*, 727 F.3d at 307. Plaintiffs have therefore failed to prove ascertainability, and certification must be denied.

## VI.   CERTIFICATION OF A CLASS UNDER RULE 23(B)(2) SHOULD BE REJECTED

Plaintiffs' Motion states, in a single sentence, that they seek to certify a class "under Fed. R. Civ. P. 23(b)(2) for declaratory and injunctive relief."[167] They make no argument that class certification under Rule 23(b)(2) is appropriate. Rather, they claim that a common question in this case is "whether each Class/subclass is entitled to declaratory, injunctive or other equitable

---

[165] It goes without saying that a photograph is proof of nothing other than current possession.

[166] *See supra*, at 16-17. The Aronsons also show another example of how one may come into possession of a helmet – their son who they purchased the Revolution Speed for passed it along to his brother after his school offered him a Revolution Speed for free. Saylor Decl., Ex. 41, at 177-178.

[167] Rule 23(b)(2) allows for class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). However, this Rule only applies "when a single injunction or declaratory judgment would provide relief to each member of the class. . . . It does not authorize class certification when each class member would be entitled to an individualized award of damages." *Wal-Mart*, 564 U.S. at 361. "[I]ndividualized monetary claims belong in Rule 23(b)(3)." *Id.* At 362.

relief, including restitution and disgorgement, and if so, the nature of such relief."[168]  This is

plainly insufficient to carry Plaintiffs' burden and, in any event, because Plaintiffs are seeking

individualized monetary claims, certification under 23(b)(2) is inappropriate.  *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 362 (2011).

Injunctive relief under 23(b)(2) is also inappropriate because Plaintiffs have not shown

that they have standing or are "likely to suffer future injury."  *City of Los Angeles v. Lyons*, 461

U.S. 95, 105 (1983).  In a class action, the likelihood of future injury must exist for at least one

named plaintiff.  *See Warth v. Seldin*, 422 U.S. 490, 502 (1975*); O'Shea v. Littleton*, 414 U.S.

488, 494 (1974).  The threat of the injury must be "real and imminent" and not "conjectural or

hypothetical," and "past exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse

effects." *Lyons,* 461 U.S. at 101-02; *O'Shea*, 414 U.S. at 495-96.[169]  Plaintiffs point to no such

potential injury, and their request for certification should be denied.

## VII.   CERTIFICATION UNDER RULE 23(C)(4) SHOULD BE REJECTED

Plaintiffs' "alternatively seek certification of the Classes under Fed. R. Civ. P. 23(c)(4)

on the issue of whether Defendants' use of the term Concussion Reduction Technology ("CRT")

is objectively false, unfair, deceptive, and/or misleading to reasonable consumers because of the

fact that no football helmet can reduce the incidence of concussions any better than other football

---

[168] Rule 23(b)(2) is limited to injunctive or declaratory relief.  *See* Fed. R. Civ. P. 23 (b)(2), and
even if it more broadly provided for broader "equitable relief," Plaintiffs' claims for equitable
relief under theories of unjust enrichment and assumpsit have been dismissed by the Court.  *See*
Dkt. No. 65, at 46-47.

[169] For example, in *McNair v. Synapse Group, Inc*., the Third Circuit held that consumers who
were no longer customers of the defendant lacked standing for injunctive relief because they
were "not currently subject to [Defendant's] allegedly deceptive techniques."  672 F.3d 213,
224-25 (3rd Cir. 2012); *see also Robinson v. Hornell Brewing Co.,* No. 11-cv-2183, 2012 WL
1232188, at *5-7 (D.N.J. Apr. 11, 2012)(Simandle, J.).

helmet, 'traditional' or otherwise, on the market." As Plaintiffs cite no authority and make no argument for certification under Rule 23(c)(4), the issue is waived.[170] Moreover, as set forth above, this is another aspect of Plaintiff's Motion that seeks to resurrect a theory of liability that they abandoned. (*See* 1-2, *supra*).[171] In addition, the Third Circuit requires a Court's decision certifying an issue to "explain how class resolution of the issue(s) will fairly and efficiently advance the resolution of class members claims, including resolution of remaining [individualized] issues." *Gates,* 655 F.3d at 273. Plaintiffs provide no such explanation, nor could they, where the individualized issues do not relate to the issue Plaintiffs seek to certify. Issue certification should therefore be denied.

## CONCLUSION

For all of the reasons set forth above and in the accompanying expert reports and affidavits, Riddell respectfully requests that the Court deny Plaintiffs' Motion in its entirety, and grant such other and further relief as the Court deems just and proper.

Dated:   Parsippany, New Jersey
         February 9, 2016

Respectfully submitted,

By: */s/ Joseph A. Boyle*
     Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950
*Attorneys for Defendants*

---

[170] *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 259 (3d Cir. 2007) ("failure to raise an argument in one's opening brief waives it").

[171] Not only is this question resolved in the negative by the UPMC Study itself, but Plaintiffs provide no analysis whatsoever as to how the Third Circuit's multi-factor test for certification under Rule 23(c)(4) could be met in this case. *See* Motion, at 17; *see also Gates v. Rohm and Haas Co*., 655 F.3d 255, 272-73 (3rd Cir. 2011) (setting forth "non-exclusive list of factors" for Court to consider in issue certification under Rule 23(c)(4)).