Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO EXCLUDE THE EXPERT
REPORT AND TESTIMONY OF ROBERT KLEIN**

***Confidential***

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

LEGAL STANDARD ............................................................................................. 2

ARGUMENT:
    KLEIN'S OPINION SHOULD BE EXCLUDED BECAUSE
    IT ADDS NOTHING THAT WILL ASSIST THE TRIER OF FACT ............................ 4

I.    KLEIN'S SURVEY DOES NOT PROVIDE EVIDENCE OF IMPLIED
    MEANINGS OF THE CLAIM ............................................................................ 4

    A.    Klein Did Not Examine the Claim in Context .................................... 4
    B.    Klein Did Not Employ a Control to Isolate Pre-Existing Beliefs ........ 5
    C.    Klein's Coding Substituted Biased Interpretations
        for the Inconclusive Statements of Respondents .............................. 6

II.    KLEIN'S SURVEY DOES NOT PROVIDE EVIDENCE THAT
    CONSUMERS PLACE ANY VALUE ON THE "CONCUSSION
    REDUCTION TECHNOLOGY" CLAIM ........................................................... 10

    A.    Klein Set the CRT Helmet as the Presumptive Choice....................... 10
    B.    Klein Used a Leading "Something for Nothing" Question ................. 11

III.    KLEIN'S SURVEY DID NOT CAPTURE MEMBERS
    OF THE PUTATIVE CLASS ............................................................................ 13

    A.    Klein Did Not Limit His Survey to Tackle Football
        Players, but Included Flag Football Players ...................................... 13
    B.    Klein Did Not Survey Non-Coach Institutional Decision-Makers ..................... 14
    C.    Klein Did Not Survey Decision-Makers for Players Under Middle School
        Age ............................................................................................... 15
    D.    Klein Did Not Survey Decision-Makers for Non-School, Middle- and
        High-School-Age Players or College and Adult Players..................... 17
    E.    Klein's Survey Could Not Capture Perceptions Existing
        When the Claim Was Made ............................................................ 17

CONCLUSION ................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015)...............................................................................1, 3

*In Re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) .......................................................................3, 4

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).....................................................................................1, 2, 3, 4

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)....................................................................................3

*Neale v. Volvo Cars of North Am.*,
  LLC, No. 2:10-cv-4407 (DMC) (MF), 2013 WL 784962 (D.N.J. Mar. 1,
  2013) ...................................................................................................................2, 3, 4

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.
  Co.*,
  290 F.3d 578 (3d Cir. 2002)....................................................................................6

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000)....................................................................................4

*Saavedra v. Eli Lilly & Co.*,
  No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ..................3

**Other Authorities**

Fed. R. Evid. 702 .........................................................................................................2, 3, 4

Fed. R. Civ. P. 23 ........................................................................................................3, 4

Defendants Riddell, Inc., Riddell Sports Group, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. (collectively, "Riddell" or "Defendants") respectfully submit this Memorandum of Law in support of their motion to exclude the Expert Report of Robert L. Klein, (Cecchi Decl., Ex. 28, the "Report") and the deposition testimony of Mr. Klein dated January 11, 2017 (Declaration of James B. Saylor dated February 9, 2017, the "Saylor Decl.", Ex. 24).[1]

## PRELIMINARY STATEMENT

On November 29, 2016, Robert L. Klein submitted a report entitled "Survey Methodology and Results" in support of Plaintiffs in this matter.  Klein is a principal of a market research company called Applied Marketing Science.  According to his Report, Klein directed a national telephone survey of 201 parents of elementary-school-aged football players and of 195 coaches of middle- and high-school football players who claimed involvement in the decision to purchase their teams' football helmets.  Klein's stated assignment was two-fold: to "determine what is communicated by Riddell's use of the phrase 'Concussion Reduction Technology' in conjunction with the marketing of its football helmets" and to "determine the extent to which this communication would be material to consumer purchase decisions."  Report at 2.  From the results of the survey, Klein concluded that "the phrase 'Concussion Reduction Technology' used in marketing Riddell football helmets communicates that these helmets are safer and offer better protection than other football helmets" and that "this claim has a material and positive impact on customer purchase decisions."  *Id.*

---

[1]     Pending before the Court is Plaintiff's Motion for Class Certification, as well as Defendants' four *Daubert* motions to exclude the testimony of Plaintiff's experts. Defendant request that the *Daubert* motions be decided prior to the Motion for Class certification. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).

For the reasons described below, however, Klein's study does not support either of the conclusions that he draws.  Indeed, because of fatal faults in design and execution, it provides no useful information on any issue material to this litigation and should be discarded.  Klein's study tells us nothing about the phrase "concussion reduction technology" beyond what the phrase itself says, and he never asked respondents to compare the safety of helmets with concussion reduction technology against "other football helmets."  Further, even taking Klein's conclusion at face value, his study provides no evidence that the "other football helmets" that respondents have in mind are the same as the competing football helmets available in the marketplace during the class period, as opposed to traditional football helmets.  Discovery in this case shows that when Riddell's Concussion Reduction Technology was featured in comparison to other helmets, it was almost exclusively to traditional helmets.  Klein therefore does not test the comparison as to which Riddell's statement actually was made.  As to materiality, Klein surveyed the wrong population and did not capture an appropriate sample of football helmet purchase decision-makers, nor did he present a realistic purchase decision that would justify a conclusion of materiality.

After reading Klein's report, one is no better informed than before starting it.  Klein's survey missed every chance to provide information useful to the fact-finder about the meaning and possible impact of the phrase "concussion reduction technology."  Under the precedent discussed below, Klein's Report and testimony should be ruled inadmissible under Federal Rule of Evidence 702.

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  *See also Neale v. Volvo Cars of N. Am.*, LLC, No. 2:10-cv-4407 (DMC) (MF), 2013 WL 784962 at

*1 (D.N.J. Mar. 1, 2013).  Federal Rule of Evidence 702 permits a qualified witness to testify in

the form of an opinion or otherwise if: "(a) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert has reliably applied the principles and methods to the

facts of the case."  *Neale*, 2013 WL 784962 at *1 (citing Federal Rule of Evidence 702).  Rule

702's three basic requirements for expert testimony to be admitted are: (1) the evidence must be

useful to a finder of fact; (2) the witness must be qualified to provide the testimony; and (3) the

proposed evidence must be reliable or trustworthy.  *See In Re ConAgra Foods, Inc.*, 302 F.R.D.

537, 549 (C.D. Cal. 2014) (citations omitted).

The Third Circuit has held that expert testimony used to support class certification must

comply with *Daubert*.  *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir.

2015) ("[A] plaintiff cannot rely on challenged expert testimony, when critical to class

certification, to demonstrate conformity with Rule 23 unless plaintiff also demonstrates, and the

trial court finds, that the expert testimony satisfies the standard set out in Daubert."); *In re

Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 323 (3d Cir. 2008) ("Expert opinion with

respect to class certification like any matter relevant to a Rule 23 requirement, calls for rigorous

analysis.  It follows that opinion testimony should not be uncritically accepted as establishing a

Rule 23 requirement…").

In considering expert testimony presented in connection with a motion for class

certification, a district court acts as a gatekeeper to exclude evidence that does not meet Rule

702's reliability standard.  *See Saavedra v. Eli Lilly & Co.,* No. 2:12-cv-9366-SVW, 2014 WL

7338930, at *4-7 (C.D. Cal. Dec. 18, 2014) (finding plaintiffs' proposed measure of damages

"highly flawed" and denying plaintiffs' motion to certify a damages class under Rule 23(b)(3)).

Rule 702 requires that the expert testimony help the trier of fact to understand the evidence or to

determine a fact in issue.  *Neale*, 2013 WL 784962 at *3 (granting the plaintiff's motion to

exclude defendant's proffered expert opinion because it was "speculative and without

foundation.")  If the expert's testimony is irrelevant or unreliable, it will not help the trier of fact

to determine a fact in issue and it should be excluded.

There is no presumption of admissibility under Rule 702 and *Daubert*.  The burden is on

the proponent of the evidence to show, by a preponderance of the evidence, that Rule 702 is

satisfied.  *See Daubert*, 509 U.S. at 592 n.10; *In re ConAgra*, 302 F.R.D. at 549; *Oddi v. Ford

Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

**<u>ARGUMENT:</u>**
**KLEIN'S OPINION SHOULD BE EXCLUDED BECAUSE**
**<u>IT ADDS NOTHING THAT WILL ASSIST THE TRIER OF FACT</u>**

**I.    <u>KLEIN'S SURVEY DOES NOT PROVIDE EVIDENCE OF IMPLIED
       MEANINGS OF THE CLAIM</u>**

**A.    <u>Klein Did Not Examine the Claim in Context</u>**

Klein did not present the phrase "concussion reduction technology" as a marketing

statement being made by the helmet manufacturer (*e.g.* Riddell).  Instead, he presented it as

emanating from an unspecified source and not necessarily even in a marketing context:  "If you

saw a football helmet and were told it features 'concussion reduction technology,' what would

you expect from that helmet?"  Report at 9.  This is very unusual in a consumer perception

survey of an advertising statement.  Normally, the statement is presented in the context of what is

self-evidently an advertisement, and/or is characterized as such in the question.  This is

important, because the source of a communication affects both its meaning and its credibility to

the receiver.  For example, a parent answering Klein's question might imagine seeing a helmet at

4

the football field and being told by an authority figure such as the coach that it has concussion

reduction technology.  Such a parent would likely process the claim very differently than if they

saw the statement in a Riddell advertisement.  As Dr. Kurt Carlson observes in his Rebuttal

Expert Report, people understand that marketers are trying to persuade them to buy something.

Saylor Decl., Ex. 2, at 4.15 - 4.16.  Indeed, responses like "they're trying to sell me the product"

usually are among the most frequent responses to open-ended meaning questions like the ones

Klein asked.  The absence of such responses in Klein's data show that Klein's survey failed to

cue respondents that they were to respond to "concussion reduction technology" as a marketing

message.  It should have, because that is the way real members of the putative class encountered

it.

By removing "concussion reduction technology" from its marketing context, Klein led

respondents to inflate both the importance and the credibility of the statement "concussion

reduction technology."  Saylor Decl., Ex. 2 at 4.15-4.17.  Some respondents appeared to treat the

phrase as a marketing statement and express skepticism about it, but it is likely that others, who

otherwise would have, did not.  This, like the other biases in Klein's survey, predictably would

tend to influence the survey to find a greater number of respondents who would expect a

significant comparative safety benefit than if the phrase were in connection with a claim by a

seller of the product, presented in its real-world marketing context.

### B.      Klein Did Not Employ a Control to Isolate Pre-Existing Beliefs

Consumers do not interpret statements about products in a vacuum.  They carry their past

experience with all advertising for products they have seen, and this experience colors how they

perceive a statement about a product benefit.  Consumers generally expect that marketers are

trying to sell them something.  They also generally expect, from long exposure to advertising,

that marketers are trying to highlight a benefit that is a point of differentiation from other

products.  In the case of football helmets, with which Klein's survey sample was supposed to have prior purchasing experience, consumers understand that helmets are a piece of safety equipment and therefore expect producers to compete mainly on issues of safety.  These notions are termed "preexisting beliefs" by survey researchers and are viewed as sources of noise in surveys.  *See* Saylor Decl., Ex. 2, at 4.19, citing S. S. Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3D ED. 359 (2011) at 376.

All of these expectations make it likely that consumers expect a manufacturer of football helmets to be claiming that its product is safer than competing products.  Any marketing statement about a helmet that is in any way related to safety is likely to prompt at least some subjects to respond that the helmet is claimed to be safer than other helmets.  The use of control questions and/or control groups, to assess the extent to which consumers report these beliefs spontaneously, is necessary to deduct this source of noise from the true impact of the concussion-reduction-technology statement.  *See id.*  As noted by Dr. Carlson, several responses to the survey indicated a general belief that all helmets reduce concussions.  Saylor Decl., Ex. 2, at 4.19, n.62.  Klein's study thus likely inflates, and is not a reliable indicator of, the proportion of consumers who would perceive "concussion reduction technology" to convey greater safety than other football helmets independent of their existing perceptions.

### C.   Klein's Coding Substituted Biased Interpretations for the Inconclusive Statements of Respondents

The purpose of a consumer perception survey in false advertising litigation is to discover the implied meanings of marketing statements.  The literal, or express, meanings of claims do not require survey evidence to establish.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (where advertising claims are literally false, plaintiff need not prove that the buying public was actually misled).  The purpose

6

of these surveys is to get a representative group of consumers to make literal and explicit, in their

responses, what is only implicit in the statement or advertisement being tested.

Instead of merely categorizing the explicit responses of his subjects, Klein and his coders

took answers by respondents that were just as ambiguous as the concussion-reduction-

technology phrase, and then interpreted the *implied* meanings of those answers.  Klein admitted

this during his deposition when challenged on his coders' dubious interpretations of some of

these answers, often from incomplete or garbled transcriptions by the interviewers.  As he

testified:

> I think what they're doing is trying to capture the meaning of what
> the person said in the code so that we could tabulate them.  And to
> that extent, you need to, I don't think it's read between the lines, but
> you need to fill in some blanks in the – I mean, if you look at
> [respondent] 91, you got to – clearly this is an interviewer who is
> doing, let's say, shorthand of capturing what the person said.  But, I
> mean, it should reduce concussions.  It depends on how reputable a
> dealer is, how long they've been in business, you have to sort of put
> yourself into the shoes of the respondent, and then try and capture
> that in the codes you assign.

Saylor Decl., Ex. 24 at 130:3-20.  In fact, it is inappropriate for coders to "fill in some blanks"

and engage in other such acts of interpretation when coding responses.  A properly designed and

executed questionnaire on implied should elicit literal, explicit results from respondents that

require no further interpretation.  If coders are going to infer implied meaning from respondents'

answers, they are providing no more evidence than if they skipped the step of interviewing

respondents and simply interpreted the implied meanings of "concussion reduction technology"

for themselves.

The substitution of coder interpretation for actual respondent answers also serves to mask

the fact that many respondents may have disqualified themselves from the proposed class if full

responses had been elicited.  The proposed class comes to this Court with certain limitations:

they cannot have purchased a concussion reduction technology helmet based on truthful

reporting of the concussion reduction study by UPMC[2]; they cannot contend that any

misapprehension about concussion reduction technology resulted from the omission of

information; they cannot claim that the concussion reduction technology helmets do not possess

the design elements of concussion reduction technology; and claims based on generalized notion

of concussion reduction are not certifiable.  The survey's process of allowing coders to fill in the

blanks obscures answers that would reveal any of these non-actionable elements in the responses

of survey participants.

As a result of his coding of supposedly implied meanings in subjects' responses, Klein

ends up putting words in respondents' mouths in his report, where he concludes that high

percentages of consumers perceive "concussion reduction technology" to mean that "these

helmets are safer and offer better protection than other football helmets."  Report at 23.  Most of

the responses that Klein tallies as supporting this conclusion *never mentioned other football*

*helmets* – that implied meaning was added by Klein.  Klein and his coders inferred that a

respondent was comparing a helmet with concussion reduction technology to "other football

helmets" in such instances as:  (1) whenever a respondent used the word "safer"; (2) whenever a

respondent used some variant of "reducing" in reference to concussions, i.e., merely paraphrased

the statement that the interviewer had just read; and even (3) indicated that the helmet would

"prevent" injury or "absorb the shock," without any comparative connotation.  Report at 21, Ex.

5; 22, Ex. 6.  Tellingly, the coding categories that supported Klein's conclusion were collectively

denoted "Safety Comments" in his coding scheme, which is accurate.  *Id.*  Almost any response

---

[2]       The University of Pittsburgh Medical Center conducted a three-year on-field study of
CRT and the incidence of concussion, and found that players wearing a helmet with CRT
saw a 31% reduced risk of concussions compared to players wearing traditional helmets.

relating to the safety of helmets was coded as supporting Klein's conclusion that a helmet with concussion reduction technology is perceived to be safer than "other football helmets."  Many of these responses did not signal an implied comparison, and the ones that did signal a comparison did not specify the referent – for example, whether the helmet would reduce concussions relative to how many concussions would occur if it did not have the concussion reduction technology, or with previous generations of helmets not currently in the market, or with no helmet at all.

      Worse, this interpretive coding was not done by impartial judges unfamiliar with the research hypothesis, but by staff at Klein's company who had been briefed by Plaintiffs' counsel and knew what result their client wanted.  Saylor Decl., Ex. 24 at 27:20-28:16; 69:11-70:13.  It can be appropriate to use coders who are not "blinded" in surveys where the coding is mechanical and there is little danger of influence from coder bias, but Klein's survey is not such an instance.  The researchers' bias is reflected even in the instructions that they gave to interviewers in directing the conversation.  The researchers instructed the interviewers to shut down respondents who wanted to discuss "what a concussion is," because this subject was not of interest to Klein.  Report at 14 n.3; Saylor Decl., Ex. 24 at 157:18-159:11.  But "concussion" is one-third of "concussion reduction technology;" if the purpose of the survey truly was to explore what consumers understand the phrase to mean, this would be a natural aspect on which to collect and code responses.  Klein's clients, however, wanted to avoid creating evidence on the definition of a concussion, an area their experts flagged as significant for them in this litigation.  Thus, respondents' natural answers were distorted by result-driven bias.

## II.    KLEIN'S SURVEY DOES NOT PROVIDE EVIDENCE THAT CONSUMERS PLACE ANY VALUE ON THE "CONCUSSION REDUCTION TECHNOLOGY" CLAIM

### A.    Klein Set the CRT Helmet as the Presumptive Choice

Klein's question about helmet purchasing was phrased in an unconventional and biased

way.  The question was:

> If you were choosing a helmet for your football players and you were told it featured 'concussion reduction technology' how likely would you be to choose that helmet as compared to other football helmets without 'concussion reduction technology?'  All other things being equal would you say that:
>
> - you would be more likely to choose the helmet with concussion reduction technology
>
> - it would have no effect on your choice of that helmet
>
> - you would be less likely to choose the helmet with concussion reduction technology
>
> - or you don't know or have no opinion?

Report at 9.

Relatively subtle changes in question wording can dramatically effect survey responses

by biasing the ways in which respondents think about the question.  *See* Saylor Decl., Ex. 2 at

4.20.  Klein's question is written as to be unbalanced, putting the helmet with concussion

reduction technology on an unequal footing compared with "other football helmets."

Klein's purchasing question sets up a comparison in the minds of respondents, many of

whom did not report seeing anything comparative in the concussion-reduction-technology phrase

in their answers to the first question.  The comparison is to unspecified "other football helmets;"

but the question only mentions alternative helmets once, while repeatedly focusing respondents

on the helmet with concussion reduction technology.  Starting with the use of the word "it" in the

first clause to identify the helmet "you [are] choosing," the question goes on to be framed in

terms of "that helmet" or "the helmet with concussion reduction technology" and whether the respondent would be more or less likely to choose "that helmet." This phrasing sets up the helmet with concussion reduction technology as the focus of the question or the "default choice." Saylor Decl., Ex. 2, at 4.20. As Dr. Carlson discusses, research has found that such unbalanced phrasing of questions is suggestive, and tends to bias responses in favor of the choice that is framed as the alternative being considered. *Id.* at 4.21 – 4.22.

### B.    Klein Used a Leading "Something for Nothing" Question

Klein's question set up, as the alternative to the helmet with concussion reduction technology, unspecified "other football helmets without 'concussion reduction technology.'" It then asked: "All other things being equal would you say that …" and then asked respondents to choose between the helmets. Report at 9. By saying "all other things being equal," Klein set up a choice in which the other football helmets are identical in every way to the helmet with concussion reduction technology. The imaginary other helmet thus would have all other features and benefits, the same appearance, the same brand, the same manufacturing quality, and the same price. The helmet with concussion reduction technology is precisely the alternative other helmet with the addition of one possible benefit. Saylor Decl., Ex. 24 at 152:7-154:17.

Klein's question boils down to asking respondents if they were offered a benefit, which may or may not be useful or believable, absolutely for free, in an otherwise identical product, would they take it? This question is leading, to the point of being merely rhetorical. No matter what the benefit was, it is surprising that any respondent did not agree that they would accept it. Klein's exercise, however, has nothing to do with real-world purchasing decisions. In the real world, one manufacturer's benefit is offered against other, sometimes similar, benefits offered by other manufacturers. Often, a price premium is associated with a material benefit. The promoted benefit occurs in the context of other, unrelated benefits offered for the various

11

products.  In the real world, a benefit is material only if the consumer considers it as a significant factor in the trade-offs of various benefits and price that take place in any purchase decision. Klein's formulation of the question took none of this into account.

Klein's survey results do not establish that respondents would pay even a penny for a helmet with concussion reduction technology over an otherwise identical helmet.  Saylor Decl., Ex. 24 at 155:8-20.  Survey and statistical methods are available for assessing the value of an advertised product attribute to consumers.  Klein acknowledged at his deposition that such an analysis could have been done; however, that was not his project.  *Id.* at 155:21-25.  As a result, Klein's analysis sheds no light on whether any member of the class would have been willing to pay, let alone did in fact pay, even a cent extra for a concussion reduction technology helmet. By the same token, Klein's analysis sheds no light on whether any class member, upon learning that concussion reduction technology allegedly does not work, would feel shortchanged by even a cent relative to the value they thought they were getting in the product they purchased.

This part of Klein's survey only establishes the truism that people will accept something for nothing.  It does not establish whether that something was of great value or almost worthless to them.  Moreover, it does not establish that a "concussion reduction technology" claim would drive the sales of any football helmets.  Klein's survey provides no support for his conclusion that the concussion-reduction-technology claim "has a material and positive impact on consumer purchase decisions" because he made no attempt to propose a realistic consumer purchase decision to respondents or to establish what value, if any, respondents placed on the claim. Klein's survey questions about helmet purchasing therefore provide no information of use to the trier of fact in this case.

### III.   KLEIN'S SURVEY DID NOT CAPTURE MEMBERS OF THE PUTATIVE CLASS

The putative classes in this action are defined as various groups of "purchasers" of certain Riddell helmets, either "direct" or "retail."  They seek economic damages.  Their theory is that they were misled into purchasing the Riddell helmets.  The purpose of Klein's survey is to determine whether class members could have been deceived by the phrase "concussion reduction technology" into believing something that Plaintiffs allege to be untrue.  The appropriate population is therefore football helmet purchase decision-makers.  Although Klein set out to capture at least part of this population, he committed several serious errors that make his survey unrepresentative of all but a very small part of it.  As a result, Klein cannot generalize his results to offer an opinion about the entire putative Plaintiff classes.

### A.   Klein Did Not Limit His Survey to Tackle Football Players, but Included Flag Football Players

Flag football is a form of football in which players do not tackle each other, but remove a flag or belt from the ball carrier.  With much more limited physical contact, flag football is played with different, less protective equipment, including specialized lighter helmets.  Flag football has grown in popularity among players of all ages, including the youth players relevant to Klein's survey.  Its popularity is driven at least in part by the safety benefits versus tackle football including concussions.  Indeed, Dr. Cantu, one of Plaintiffs medical experts advocates that players play no tackle football until age 14.  Saylor Decl., Ex. 17, at 59.

Klein's survey qualified respondents based on whether they indicated that they coach "football" or their children play "football," not distinguishing between tackle and flag football.  An unknown percentage of respondents to Klein's survey may have been involved in flag football and had flag football in mind when answering the questions.  Klein appears never to have thought of this.  At his deposition, he dismissed the problem, saying that even if some of his

respondents were thinking of flag football and of players who play with different helmets, "concussion reduction technology" should still mean the same thing.  Saylor Decl., Ex. 24 at 50:8-53:9.  But any respondents who were not purchasers of tackle football helmets were not part of the population Klein should have been surveying, and may have had different perceptions, especially of the importance of concussion reduction technology and whether it would affect their purchase decisions.  Klein admitted that he would not have asked his survey questions to parents or coaches of soccer or hockey players, even though concussions are also a hazard in those sports.  Saylor Decl., Ex. 24 at 52:23-53:3.  The same logic should apply to flag football players.

**B.      Klein Did Not Survey Non-Coach Institutional Decision-Makers**

Klein surveyed only coaches, and not any other administrative staff, of high-school and middle-school football teams.  He did not ask the coaches whether they were the ones at their institutions who decided which football helmets to purchase.  At many schools, equipment managers, trainers or other officials make that decision, which coaches may (or may not) participate.  For example, Plaintiff Douglas Aronson coached high school football for 13+ years (after playing in the NFL).  Yet he was not involved in purchasing decisions by that high school.  Saylor Decl., Ex. 40, at 45-48.  By surveying only coaches, Klein captured only a portion of the decision-makers for middle- and high-school players, while including some respondents in his survey who did not make the purchase decision.  Further, by including coaches, who work most closely with the players, Klein may have reached respondents who regarded concussions as more important than those who made the actual purchase decisions, and who were not as close to budgetary and other considerations that affect purchases.

14

C.     **Klein Did Not Survey Decision-Makers for Players Under Middle School Age**

Klein surveyed two groups of respondents, each associated with a different age range of youth football players.  For players of middle- and high-school age, Klein surveyed coaches.  For younger players of elementary school age, Klein surveyed parents.  Why?  Klein testified that his assistants conducted preliminary interviews with a convenience sample of acquaintances involved in football in the Boston area and, based on these interviews, concluded that whereas coaches primarily select the helmets for middle- and high-school teams, parents are the primary decision-makers for helmets at the elementary school level.

When the data from the national sample came in, they showed that Klein's conclusion from his preliminary interviews was incorrect.  Klein asked parents, in question Q2, whether they purchased their children's helmets.  It turned out that 130 of the sample of 201 parents (65%) indicated that they did *not* purchase the helmets.  Further, Klein never asked the parents who purchased their children's helmets whether they were the ones who *decided* what helmet they would purchase, and Klein testified that parents sometimes are told by coaches or other school officials to go and purchase a specific helmet at the local sporting goods store.  Saylor Decl., Ex. 24 at 20:13-21:10.  Thus, even of the 71 parents who purchased their children's helmets, some had no role or discretion in choosing which helmet to purchase.

Again this case provides an apt example.  Alliance Youth Sports ran a youth football league composed of many teams and many levels of players (midgets, pee wee, etc.).  All of the helmet purchasing decisions were made, not by a coach or parent, but by the Executive Director of the league.  He purchased strictly from Riddell because of pricing, including bulk discounts.  Saylor Decl., Ex. 8 at 90-93.  Alliance then offered those helmets to league participants to rent or buy.  Saylor Decl., Ex. 66.  Other than the Riddell option, parents did not have a choice nor did coaches, as to which helmet to purchase.  In the rare instances parents asked to have a choice,

they were then permitted to act on their own.  Alliance's records show that the vast majority of parents/players simply allowed Alliance's choice to dictate.  Parents' involvement in helmet purchase decisions is the exception and not nearly the rule, as is further proven by ████████ ████████ Riddell's sales that are made to non-institutional purchasers.  Saylor Decl., Ex. 1 at 33-34 ██████████████████████████████.

      As a result, Klein's results to question Q1 (asking what was communicated by the phrase), which was asked of all 201 parents initially surveyed, was asked primarily of people who do not purchase football helmets, who are not members of the putative class, and whose perceptions are irrelevant to this litigation.  His results to Q3 (asking how the phrase would affect their purchase decision) were obtained from a partially inappropriate sample, but in any case, on a sample too small for reliable generalization (71 people).

      Klein should have realized, when he inspected the results of Q2 showing that the vast majority of parents he had surveyed did not buy their children's helmets, that his initial conclusion from his preliminary interviews was erroneous: parents are *not* the primary helmet purchase decision-makers for elementary school aged children, at least insofar as his survey reached them.  He should have scrapped the results from the parent portion of his survey, realizing they are largely irrelevant to the proposed class in this litigation, and started over with a sample that would include elementary-school coaches and any other actual decision makers.  Instead, he reported the results of a survey of a population that does not represent the Plaintiff class.  This is in addition to including people who would not even make the relevant purchase because their children are playing flag football.

**D.** **Klein Did Not Survey Decision-Makers for Non-School, Middle- and High-School-Age Players or College and Adult Players**

Klein's survey completely omitted any participants in the flourishing private football programs that take place outside of the school teams among players of middle- and high-school age. Saylor Decl., Ex. 24 at 36:25-37:24. For this age group, his survey was focused entirely on coaches working for schools. Klein suggested during his deposition that these same coaches also coach out-of-school programs, including those for younger children, and therefore their perceptions should generalize to this context. Saylor Decl., Ex. 24 at 22:7-16. But Klein presents no evidence that this is true. His survey did not determine whether any of the coaches he surveyed also coaches out-of-school teams. As noted with Alliance, non-school based programs' equipment decisions are driven primarily by cost issues. If the cost is too high, teams cannot be fielded and the league fails. *See* Saylor Decl., Ex. 66 at 35-36. And, Klein's survey explicitly focused his coach respondents on the decisions they made for their school-based teams, by asking respondents about their "role in making decisions for the [middle/high] school team you coach." Report at 12, 13.

Klein made no attempt at all to survey anyone relating to football helmets for college players or adults, saying that was not part of his assignment. Saylor Decl., Ex. 24 at 36:8-19. These segments of the putative class obviously may have different priorities and perceptions relating to concussions, as well as different experience with football helmets. Klein's results are not generalizable to this part of the class, and are biased as to the class as a whole to the extent that these segments would have different views about concussion reduction technology.

**E.** **Klein's Survey Could Not Capture Perceptions Existing When the Claim Was Made**

The marketing history of Riddell's helmets is set forth in detail in Riddell's memorandum in opposition to class certification. Riddell began marketing its Revolution helmet, with

concussion reduction technology, in 2002.  Riddell's core concussion-related marketing claims

for the helmet, starting in 2007, were based on the finding of the UPMC Study that the new

helmet reduced the risk of concussions by 31% compared with traditional helmets.  From then

until the present, every youth and adult Riddell helmet introduced has incorporated concussion

reduction technology.  Riddell's innovation forced its major competitors to develop their own

technologies for concussion control, which they introduced within a few years of Riddell's

Revolution.  Like Riddell, these companies no longer introduced youth or adult helmets without

some form of enhanced concussion protection relative to pre-2002 helmets.

Riddell still had traditionally designed football helmets in its catalog until 2012, when it

discontinued them.  At that time, Riddell also ceased using the phrase "concussion reduction

technology" and promoting the results of the UPMC Study, because the traditional helmets

against which Revolution helmets had been compared were no longer sold.  This history is

important because it means that consumers were only exposed to the "concussion reduction

technology" messaging during 2007 to 2012.  In this period, unlike today, the innovation was

relatively recent and older, traditionally designed helmets could still be purchased from Riddell

and its competitors.  The media coverage and information environment regarding concussions

and football was also very different during this time.  Because this is the period when helmet

purchasers could have been influenced and allegedly suffered economic damages by exposure to

the "concussion reduction technology" message, it is the perceptions of consumers from 2007 to

2012, and not today, with which Klein should have been concerned.

There is no fully satisfactory solution for surveying people's impressions years in the

past.  Locating respondents who purchased helmets between 2007 and 2012 and asking them to

recall their past impressions would be logistically difficult and methodologically unreliable.  But

the absence of an easy solution does not negate the problem, which Klein never acknowledges. When football coaches or parents are asked about "concussion reduction technology" in 2017, there are several possibilities of how they might contextualize the question.  If they have been involved in football for a number of years, and remember the revolution in helmet design that took place in the 2000s, they might even recall the "concussion reduction technology" message from those years.  They may recall that this technology was juxtaposed with older, traditional helmets that were then still in the marketplace, and understand that this is a dated statement about technology that has now become the standard in helmets.  Alternatively, these veteran parents and coaches might assume that "concussion reduction technology" is a *new* message being introduced in 2017, and perhaps refers to *still further* innovation beyond the previous improvements in concussion reduction that they are familiar with.  Neither of these attempts to contextualize "concussion reduction technology" fits with Plaintiffs' claims in this case. Meanwhile, newer coaches and parents, who may be unaware of helmet innovation in the 2000s, are faced with a marketing phrase that does not exist, and would not make much sense, in the helmet marketplace that they know.

Klein could have provided at least some context to respondents by presenting "concussion reduction technology" in the context that originally surrounded it.  In Riddell marketing, the phrase was often surrounded by explanatory language about the nature of the technology and references to the UPMC Study, such as "Research shows a 31% reduction in the risk of concussion in players wearing Riddell Revolution helmets when compared to traditionally designed football helmets."  Saylor Decl., Exs. 25, 26.  This would have been a much more realistic representation of the actual consumer experience of encountering "concussion reduction

technology."  As it stands, Klein's survey tell us nothing about how class members perceived the phrase during the class damages period.

## CONCLUSION

For all of the reasons set forth above, Riddell respectfully requests that the Court grant this Motion, and grant such other and further relief as the Court deems just and proper.

Dated:   Parsippany, New Jersey
         February 9, 2017

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: */s/ Joseph A. Boyle*
    Joseph A. Boyle

Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950
*Attorneys for Defendants*