Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF CHARLES COWAN

*Confidential*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

THE COWAN TESTIMONY.................................................................................... 3

LEGAL STANDARD................................................................................................. 7

ARGUMENT .............................................................................................................. 9

    I.      DR. COWAN'S TESTIMONY SHOULD BE EXCLUDED
           BECAUSE IT CANNOT ASSIST THE TRIER OF FACT ................................. 9

    II.     THE COWAN TESTIMONY SHOULD BE
           EXCLUDED BECAUSE IT IS NOT RELIABLE ............................................. 13

CONCLUSION........................................................................................................... 18

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015).............................................................................1, 8

*Children's Broad. Corp. v. Walt Disney Co.*,
    245 F.3d 1008 (8th Cir. 2001) ...........................................................................9

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ............................................................................ *passim*

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. Aug. 1, 2014) ....................................................7, 8, 17

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579, 113 S. Ct. 2786 (1993).......................................................... *passim*

*Deficcio v. Winnebago Indus.*,
    No. 11–7406 (MLC). 2014 WL 4211274 (D.N.J. Aug. 25, 2014) ........................13

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..........................................................................................14

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)................................................................................8

*Neale v. Volvo Cars of N. Am., LLC*,
    No. 2:10-cv-4407 (DMC)(MF), 2013 2013 WL 785059 (D.N.J. Mar. 1, 2013) .....................7

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)................................................................................7

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ................................................... *passim*

*Saavedra v. Eli Lilly & Co.*,
    No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ................8

*United States v. Downing*,
    753 F.2d 1224 (CA3 1985) .................................................................................9

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..............................................................................14

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................ *passim*

Fed. R. Civ. P. 23 ................................................................................................ 8, 10

Defendants Riddell, Inc., Riddell Sports Group, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. (collectively, the "Defendants") respectfully submit this memorandum in support of their motion to exclude the Expert Report of Charles D. Cowan, PhD (Cecchi Decl., Ex. 36) (the "Report") and the deposition testimony of Dr. Cowan dated January 11, 2017 ((Declaration of James B. Saylor dated February 9, 2017, the "Saylor Decl.", Ex.11).[1]

## PRELIMINARY STATEMENT

In support of their motion for class certification, Plaintiffs are required to demonstrate that damages can be determined on a classwide basis.  They rely on the Cowan Report to meet that burden.  That reliance is misplaced.  The Cowan Report does not meet the indicia of fit and reliability required by the Supreme Court's decision in *Daubert*.  Put simply, Plaintiffs have proposed a methodology that does not properly measure the harm allegedly caused by Defendants' conduct in the case, and it is therefore not relevant nor helpful to the trier of fact. The fact that Plaintiffs have failed to meet their burden is demonstrated by the decision of the Eastern District of Pennsylvania on January 18, 2017 excluding Dr. Cowan's report and denying class certification in a major multi-district litigation.  There, as here, Dr. Cowan failed to propose a methodology that fit the claims in the case, failed to isolate the effect on reimbursement rates due to the defendants' allegedly wrongful conduct, and opined that he had not tested his methodology but would do so when he obtained more information from the defendants.  *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017).  The similarities between Dr. Cowan's failed report in that case and the Report he has submitted here warrant the same result.

---

[1]     Pending before the Court is Plaintiff's Motion for Class Certification, as well as Defendants' four *Daubert* motions to exclude the testimony of Plaintiff's experts. Defendant request that the *Daubert* motions be decided prior to the Motion for Class certification. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).

Here, as in *In re Pharmacy Benefit Managers Antitrust Litigation*, Dr. Cowan's proposed methodology does not satisfy *Comcast v. Behrend* and is unfit under *Daubert*. Dr. Cowan's proposed methodology for assessing damages does not match Plaintiffs' theory of liability. Plaintiffs allege that Riddell's marketing of helmets with "Concussion Reduction Technology" ("CRT") was false and misleading because Riddell's CRT helmets are no more effective at reducing the risk of concussion than "other comparable helmets available on the market". Dkt. 65 at 9, 12. Damages are claimed to be the class members paying a "premium" to Riddell for CRT without receiving a benefit in return."

Instead of proposing a methodology that considers competitor helmets, however, Dr. Cowan would look only to Riddell's internal data. Dr. Cowan in fact ignores competitor's prices and focuses on Riddell's gross profit margins ("GPM") from before the modern helmet era. This methodology does not match Plaintiffs' theory of liability. It says nothing about any premium actually paid by class members to Riddell compared to what they would have paid for competitor helmets. Dr. Cowan's proposed comparison of sales of Riddell's "traditional" helmets prior to 2002 with later sales of Riddell's modern helmets addresses a claim that the Court has already held to be non-actionable because Riddell has scientific support in the UPMC Study that its CRT helmets reduce the incidence of concussion as compared to traditional helmets.

In addition, Dr. Cowan cannot establish the $50 premium that Plaintiffs have consistently alleged as their loss in this case. As the Court put it, "[t]he brunt of Plaintiffs' allegations is that they paid a $50 price premium for Defendants' helmets based on representations that the helmets could reduce the incidence of concussions and therefore chose not to purchase less expensive helmets which were available at the time." Dkt. 65 at 24, n. 14. While Dr. Cowan discusses the $50 premium, he does not actually rely on it in his proposed GPM methodology and, using the

hypothetical numbers Dr. Cowan cites in his report, his methodology would result in a "premium" of $17, much less than the $50 premium he contends is "established" in this case.

Dr. Cowan's testimony is also not reliable because it is not based on any usable data. Dr. Cowan admits that he has not collected any data, and has not relied on any information about Riddell's products, sales, or profits. Dr. Cowan appears to think that his damages model can be changed later on, after he gets data from Riddell. The *In re Pharmacy Benefit Managers Antitrust Litigation* court rejected this same ploy, excluding Dr. Cowan's report where he said it would not "be possible" to test his methodologies "without information from the defendants." 2017 WL 275398 at *5. Under *Comcast* and existing Third Circuit precedent, Plaintiffs do not get a second shot at a damages model. Dr. Cowan's failure to provide a complete methodology, now, at class certification, requires that his report be excluded. *Id.*

Even if Dr. Cowan's assumption that he will be able to get certain data from Riddell was an acceptable opinion (it is not), he focuses on the wrong information. He also wholly ignores information that would be necessary to isolate the effect of the challenged marketing on Riddell's helmet prices. For example, Dr. Cowan does not take into account "soft costs" that would change over the relevant time period, the data is from the wrong time frames, and he cannot address Riddell's prices increases that occurred five years prior to any of the challenged marketing claims.

For the reasons set forth herein and in the Expert Report of Laura Stamm, the Cowan Report and Dr. Cowan's testimony should be excluded.

## <u>THE COWAN TESTIMONY</u>

In his Report, Dr. Cowan posits several different calculations of "damages based on unjustified premiums", which he defines as prices paid "above and beyond the usual profit margins for certain Riddell helmet lines." (Cecchi Decl., Ex. 36, at 2). Helmets sold at the

Manufacturer's Suggested Retail Price ("MSRP") include "cost, planned profit margin and the additional premium".[2]  In that case, the calculation of damages would be "straightforward." Dr. Cowan would simply multiply $50 by the number of helmets sold.  Report at 3.  Dr. Cowan rejects this approach because he concedes that helmets are sold at or below Riddell's list price. As a result, "actual premium will vary from $0 to $50 for individual helmet sales", depending on the price paid relative to MSRP.  Thus, according to Dr. Cowan, if a helmet is sold for more than $50 below MSRP, "the actual premium paid is accepted as zero."  Report at 4.

Dr. Cowan rejects a methodology that would compare Riddell sales to sales of its competitor, Schutt.  Despite the more than 18 months that Plaintiffs had to conduct discovery needed for such a comparison, Dr. Cowan would now "demand more detailed data."  However, Dr. Cowan says Plaintiffs did not purse this because of unspecified concerns about feasibility and reliability.  Report at 10.  Yet during his deposition, Dr. Cowan conceded that an analysis of competitive helmets "might be" feasible but he had not considered it.[3]

Despite all of the above, Dr. Cowan proposes to calculate an aggregate amount of damages (and not damages due to each class member).  Dr. Cowan claims he can create a fictional proxy of "unlawful premiums charged by Riddell."  He posits that such a proxy can be found by comparing gross profit margins ("GPM") from 1998 to 2002, the time period *before* Riddell introduced CRT (*i.e.*, profits on Traditional helmets) with Riddell's GPM from the time period *after* the CRT marketing claims (which he incorrectly states as 2008 to the present). Report at 5-8.  Dr. Cowan has not even done this yet, but he claims he will calculate for the purposes of comparison an "Actual GPM" for the period during which CRT helmets were

---

[2]     Riddell refers to its standard prices as a "list price," and not an MSRP.

[3]     Saylor Decl., Ex. 11 at 98:17 – 98:21.

4

marketed with the claim and sold at a premium.  He then will create an "Expected GPM" that
estimates what would have been observed during the same time period, without the claim or the
premium.  Dr. Cowan's fictional "Expected GPM" apparently will come from Riddell's sales
data from 1998 to 2002.  *Id.*  This methodology does not even reference the alleged $50
premium, despite Dr. Cowan's statement that the existence of such a premium has "been
established."  Report at 3.  Furthermore, this method cannot calculate damages on a per helmet
sold basis.[4]  In his Report, Dr. Cowan claims that even this methodology will still require
monthly financial statements from Riddell.  *Id.* at 9.

     During his deposition, it became clear that Dr. Cowan is not committed to his
methodology, that he intends to rely on data he has not seen, and that he has not actually tested
his proposed GPM comparison.  Examples of this testimony include:

> Q.    And so today you don't know whether [Riddell's] profit
> margin varied from product to product or – or helmet to helmet or
> in time frame, correct?
>
> A.    *No idea. I don't need to know that* before I actually do the -
> - the research I've proposed. I just need to know that there will be
> information about profits.[5]
>
>             ****
>
> Q.    So is the -- so is it your – your position that you don't -- for
> purposes of calculating damages in this case, you don't need to
> know whether there were less expensive comparable products on
> the market at the time the plaintiffs purchased the Riddell helmets
> in question?
>
> A.    *No, I don't need to know that now. I might need to know it
> in the future, but I'll determine that after I see what data's
> available.* But right now, I was asked to come up with a method

---

[4]     Dr. Cowan testified that he is "only proposing to estimate aggregate damages, not
damages on a per helmet basis."  Saylor Decl., Ex. 11 at 79:20 – 80:14.

[5]     Saylor Decl., Ex. 11 at 65:12 – 65:15 (emphasis added).

for calculating damages without going through the whole exercise.[6]

Q.      What whole exercise?

A.      Of determining what the -- how to calculate the premium.[7]

                    ****

Q.      So -- so if you've done everything necessary to demonstrate that you can calculate damages in this report, why would you ever need to go to any of the competitors for their data?

A.      Because I cover that in the report to say that it's another possibility for comparison.

Q.      But you haven't done it?

A.      I'm sorry, I haven't done what?

Q.      But you haven't done that, collected data from other competitors?

A. *I haven't collected data from anybody.*[8]

                    ****

Q.      Why is it not an appropriate methodology to compare the prices of the helmets that were on the market simultaneously as opposed to this time lapse comparison you're doing and proposing?

A.      Well, if you remember, I actually proposed both, and then when you asked me earlier about methodologies, I said you could do not only the simultaneous comparison, but the timelines comparison, and then on top of that, you could set that up as a four-way experimental design to do that calculation. *I didn't preclude doing the other one; I just said that we weren't proposing to pursue it at this time. However, that doesn't mean that I wouldn't decide to do that in the future.* I'm just saying that the initial analysis may be able to be conducted entirely on the Riddell data. And I don't know and I won't know until I see the Riddell

---

[6]     Saylor Decl., Ex. 11 at 82:11 – 83:19 (emphasis added).

[7]     Saylor Decl., Ex. 11 at 82:11 – 82:25 (emphasis added).

[8]     Saylor Decl., Ex. 11 at 85:6 – 85:21 (emphasis added).

data. But -- so I -- I have offered that as an alternative and I've
said, you know, essentially it's a backup. But there's no reason to
think that I need to implement that right now.[9]

****

Q.      Would it be a closer comparison to compare helmets that
contain concussion reduction technology before and after their
advertising claims regarding the benefits of concussion reduction
technology?

A.      For what purpose?

Q.      Determining damages.

A.      Well, the answer is I don't know. And the reason I don't
know is because it, again, depends on the granularity of the data
that I get back. If I can break out specific costs of goods sold, other
types of costs, the soft costs, the profit margins, each of those may
have a different story to tell. So I'm not going to know that until I
get into the data. But *I don't want to limit myself to doing only one
thing or the other, so I'm going to leave the book open on how I'm
going to make the comparisons*.[10]

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and

the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct.

2786 (1993). *See Neale v. Volvo Cars of N. Am., LLC*, No. 2:10-cv-4407 (DMC)(MF), 2013

2013 WL 785059 at *1-2 (D.N.J. Mar. 1, 2013). The burden is on the proponent of the evidence

to show, by a preponderance of the evidence, that Rule 702 is satisfied. *See Daubert*, 509 U.S. at

592 n.10; *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. Aug. 1, 2014); *see also*

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000). Rule 702 only permits a qualified

witness to testify if:

---

[9]      Saylor Decl., Ex. 11 at 119:22 – 121:7 (emphasis added). The Cowan Report does not
mention any "four-way experimental design".

[10]     Saylor Decl., Ex. 11 at 142:10 – 143:2 (emphasis added).

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

Expert testimony submitted in support of class certification must comply with *Daubert*. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("[A] plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*."); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008); *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *16 (E.D. Pa. Jan. 18, 2017).

In considering expert testimony presented in connection with a motion for class certification, a district court acts as a "gatekeeper" to exclude evidence that does not meet Rule 702. *See Saavedra v. Eli Lilly & Co*., No. 2:12-cv-9366-SVW, 2014 WL 7338930, at *3 (C.D. Cal. Dec. 18, 2014). Before admitting expert testimony for the purpose of deciding class certification, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *See In Re ConAgra Foods, Inc.,* 302 F.R.D. at 549. In addition, where, as here, the parties have offered competing experts on the critical issue of damages, "[w]eighing conflicting expert testimony at the certification stage is … integral to the rigorous analysis Rule 23 demands". *In re Hydrogen Peroxide*, 552 F.3d at 323.

8

## ARGUMENT

### I.   DR. COWAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT CANNOT ASSIST THE TRIER OF FACT

Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue".  Fed. R. Evid. 702.  As explained by the Supreme Court:

> This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702–18. See also *United States v. Downing,* 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The consideration has been aptly described by Judge Becker as one of "fit." *Ibid.*

*Daubert*, 509 US at 591.

In addition to being "sufficiently tied to the facts of the case", expert damages testimony must match the plaintiff's theory of liability.  *See In re Pharmacy Benefit Managers*, 2017 WL 275398, at *19; *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (finding district court properly excluded expert testimony based on an earlier, broader statement of the plaintiff's claims in the case); *cf. Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) (for class certification, "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event").

In *In re Pharmacy Benefit Managers*, the court found that Dr. Cowan's expert opinion did not satisfy *Daubert*.  Importantly, this is a major multi-district litigation with a long history and numerous parties.  The plaintiffs submitted expert reports of Dr. Cowan and another expert in support of their motion for class certification.  The defendant argued, among other things, that the expert evidence did not fit plaintiffs' different theories of antitrust impact as required by

*Comcast. In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *17. The court agreed:

> Plaintiffs' expert submissions here are similarly defective. First, they assign any differential found to be the result of Defendants' alleged conduct. Second, while the SAC asserts two distinct antitrust conspiracies—a conspiracy among PBMs and a conspiracy between PBMs, plan sponsors, and chain pharmacies—Dr. Cowan and Dr. Seguin fail to propose a model capable of distinguishing the damages that are attributable to each of the two theories of liability. The teaching of *Comcast* is that antitrust plaintiffs must match a damages model to their theory of liability. … ***In the context of Daubert, the failure to match the damages model to the theory of antitrust impact renders the expert opinion unfit*** since it cannot assist the Court at this point in the litigation in applying the Rule 23 requirements or assist the trier of fact later on to determine damages attributable to the purported antitrust violation.

*Id.* at *19-20 (emphasis added).

Here too, Dr. Cowan's failure to "match the damages model" to Plaintiffs' theory of liability renders his testimony "unfit" under *Daubert* and Rule 702.[11] In their First Amended Complaint, Plaintiffs asserted two theories: (A) Riddell's claims regarding "concussion reduction technology" are false because of the "inability of any football helmets to reduce concussions"; and, (B) Riddell's claims regarding "concussion reduction technology" are false because Riddell's helmets containing CRT are no "more effective at preventing or reducing concussions compared to other currently available brands or models." Dkt. No. 41, at 31. The Court found this theory of liability to be implausible. Plaintiffs then filed a Second Amended Complaint, asserting claims which this Court understood to be about "the relative ability (or inability) of Defendants' helmets to reduce concussions compared to other helmets on the market." Dkt. No. 65, at n.17.

---

[11]    And, as set forth in Defendants' Opposition to Class Certification, Dr. Cowan's report also does not satisfy *Comcast* or the requirements of Rule 23 for class certification.

10

Accordingly, any proposed classwide damages model must be tied to the only theory of liability left in the case; *i.e.*, that Riddell's marketing is false and misleading because CRT helmets are less effective at reducing concussions than other helmets on the market.  At a minimum, any damages analysis would need to consider some data from Riddell's competitors, including information regarding:  (i) the relative efficacy of these helmets with respect to reducing the incidence of concussion; and (ii) any price differences between these helmets.  Yet Dr. Cowan did not even consider using competitor data.  *See* Report at 10 (implying that such a comparison would not be feasible or reliable); Saylor Decl., Ex.11 at 68:4-16 ("if I can get all the information from Riddell in their financial statements, why would I need to go outside?"); 88:23-89:9 (testifying that he does not know whether a comparison of Riddell's CRT helmets versus other helmets on the market would be a viable analysis, or how many competitors he would use in such a comparison).  Plaintiffs have not even attempted to obtain this critical information through the long discovery process in this case.

Moreover, in addition to not proposing a model that matches Plaintiffs' "comparative ineffectiveness" theory of why Riddell's CRT marketing was misleading, Dr. Cowan actually proposes a methodology based on an entirely different theory of liability that is no longer in the case.  Dr. Cowan proposes to measure the alleged unlawful premium as a function of "Excess GPM" associated with CRT helmets as compared to Riddell's traditional helmets.  But that comparison is foreclosed by the Court's ruling that Plaintiffs cannot assert claims based on advertising that accurately represents that CRT helmets are more effective at reducing concussions than traditional helmets (as shown by the UPMC Study).[12]

---

[12]    The University of Pittsburgh Medical Center conducted a three-year on-field study of CRT and the incidence of concussion, and found that players wearing a helmet with CRT saw a 31% reduced risk of concussions compared to players wearing traditional helmets.

11

In addition, Dr. Cowan's methodology does not match the Plaintiff's alleged ascertainable loss in this case – the $50 premium allegedly charged by Riddell over other non-CRT helmets.  Plaintiffs have repeatedly relied on this alleged premium:

> Commensurate with these concussion reduction promises are price premiums that Defendants charge for their Riddell Football Helmets.  Indeed, while less expensive comparable products are readily available, the Riddell Football Helmets are sold at a higher price based on promises of increased safety and reduced concussions. ***The price premium is $50 per helmet***.

Second Amended Complaint, ¶ 81 (emphasis added).  In ruling on Riddell's motion to dismiss, the Court recognized that "[t]he brunt of Plaintiffs' allegations is that they paid a $50 price premium for Defendants' helmets based on representations that the helmets could reduce the incidence of concussions and therefore chose not to purchase less expensive helmets which were available at the time."  Dkt. 65 at 24, n. 14.  The Court likewise found that Plaintiffs adequately pled "ascertainable loss or injury" because the Second Amended Complaint "includes substantially more detail regarding the price each plaintiff paid for the helmets at issue and specifies the approximate 'price premium' Plaintiffs paid as $50."  *Id.* at 37.  Dr. Cowan himself claims (without citing any evidence) that it has been "established" that there was an unlawful premium.  Report at 3.

Plaintiffs and absent class members must prove ascertainable loss or injury as an element of their claims under the consumer protection laws they rely on here, and must set forth a method for "calculat[ing] the premium they paid for the helmets at issue."  Dkt. 65 at 37.  Accordingly, the $50 premium should figure prominently in any proposed damages analysis, and cannot be proven through the use of averages or formulas applied class-wide without regard to the class member's individual loss or injury.  *See In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398 at *21 (excluding Dr. Cowan's opinion because national averages could not

demonstrate the "antitrust impact" element of plaintiffs' claims). Yet Dr. Cowan's proposed analysis operates without regard to whether a purchaser actually paid a $50 "premium", no premium, or something less than $50. While Dr. Cowan makes the conclusory statement that the $50 "could serve as an upper bound for dollar damage estimates", and opines that "the actual premium paid will vary from $0 to $50 for individual helmet sales", he does not actually use the $50 in his proposed methodology for estimating the premium by comparing Riddell's GPM at different periods in time. In fact, his methodology is "inconsistent with his assertion of a $50 premium for helmets sold at MSRP." (Saylor Decl., Ex. 3 at 3.40).[13] *See id; Deficcio v. Winnebago Indus.*, No. 11–7406 (MLC). 2014 WL 4211274, at *6 (D.N.J. Aug. 25, 2014) (noting that because the expert "did not even follow his own methodology", the court was "unsure how his 'method consists of a testable hypothesis'") (citation omitted).

Accordingly, Dr. Cowan's testimony does not fit the actual claims in this case, or the Plaintiff's alleged loss, and this Court should not consider his testimony for the purposes of class certification.

## II.    THE COWAN TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS NOT RELIABLE

Dr. Cowan's testimony should be excluded for the additional reason that it is not "based on sufficient facts or data" (Rule 702) and is therefore unreliable and speculative. As the Eastern District of Pennsylvania explained recently, in excluding Dr. Cowan's expert report in *In re Pharmacy Benefit Managers Antitrust Litigation*:

> The "reliability" prong requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id.* (quoting *Paoli II* at 742 (quoting *Daubert*, 509 U.S. at 590)). … The reliability prong

---

[13]    In fact, his own hypothetical results in an estimated premium of approximately $17 – not $50. (Saylor Decl., Ex. 3 at 3.40).

> "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quotations omitted)..

2017 WL 275398, at *17.  In addition, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In *In re Pharmacy Benefits Managers*, Dr. Cowan proposed eight different ways in which he could calculate damages.  Dr. Cowan did not conduct the tests since he claimed it would not "be possible to do without information from the defendants" and instead merely "present[ed] the tests [he] believe[s] will be helpful in determining whether the claims of the plaintiffs hold."  *Id.* at *5.  That was not sufficient in that case, and it is not sufficient here.  Dr. Cowan's deposition testimony made clear that he has not "collected any data", and in fact would consider changing his methodology to suit any data he may get from Riddell in the future.  Saylor Decl., Ex. 11 at 84:9-85:4 (stating he would collect data from Riddell to calculate damages if the proposed class is certified); 82:11-22; 85:21 (stating he hasn't "collected data from anybody"); 106:11-22.  Indeed, Dr. Cowan has not even done any calculations apart from the one "hypothetical" used in his Report.  *Id.* at 55:22-55:24.

Moreover, and as set forth in further detail in the Expert Report of Laura Stamm, the data that Dr. Cowan says he *would* rely on to determine damages is incomplete and inappropriate for calculating damages in this case.  Among other things, the Cowan Report ignores the multitude of factors that go into price and/or profit margin increases and therefore "does not isolate the effect on pricing of the allegedly false and misleading claims at issue."  Saylor Decl., Ex. 3 at 1.8, pp. 20-30.  *See also In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at

*19-22, 31  (rejecting Dr. Cowan's report that "assign[ed] any differential found [in pharmacy reimbursement rates] to be the result of Defendants' alleged conduct").

Dr. Cowan does not account for differences in "products, competition, economic conditions, and costs other than manufacturing costs [that] could have resulted in price and/or profit margin increases during the period after the Revolution helmet was introduced and before the allegedly false and misleading advertisements appeared."  Saylor Decl., Ex. 3 at 1.8.  Indeed, "Riddell must recover *all* of its costs through its product sales, not just its manufacturing costs, and companies consider all such costs in pricing decisions."[14]  *Id.* at 3.22.  Nor does the proposed methodology have any way to account for the effect on pricing of those marketing claims that the Court has found to be permissible (*i.e.*, claims accurately representing the UPMC Study), or other legitimate marketing claims.  *Id.* at 3.27.[15]

Dr. Cowan's choice of time period is also problematic.  As explained in the Stamm Report:

> [B]y focusing on Riddell's gross profit margins, the Cowan Report purports to measure a price premium on Defendants' "modern" helmets sold after 2006 relative to Defendants' "traditional" helmets sold prior to 2002 – helmets that were not comparable.  This is a fundamental flaw in the Cowan Report.

---

[14]   Because Dr. Cowan calculates a GPM before the subtraction of operating costs, he is inappropriately including as damages any increase in price that is attributable to increases in these costs.  Saylor Decl., Ex. 3 at 3.17.

[15]   The Stamm Report identifies several factors that Dr. Cowan could have explored that could support a price difference between "traditional helmets and modern helmets sold after 2006", including: "value from design elements that are unrelated to the allegedly false and misleading claims (including CRT Design Elements introduced prior to the CRT Marketing Period and Non-CRT Design Elements, such as improved ease of removing the helmet over the ears and reduced facial exposure along parts of the face covered by the new mandible protection); legitimate marketing claims made related to Non-CRT Design Elements or claims that accurately reported the results of the UPMC study; increases in costs other than manufacturing costs related to the modern helmets; or differences in competitive or economic conditions; and changes in the mix of products offered by Riddell."  Saylor Decl., Ex. 3 at 3.14.

Saylor Decl., Ex. 3 at 1.7.  In addition, Riddell was able to increase its prices at the time the

Revolution helmet was launched in 2002.  Yet Dr. Cowan "inappropriately *includes* as Excess

GPM any change in GPM due to price increases associated with the introduction of Riddell's

new design elements, including both CRT Design Elements and Non-CRT Design Elements, into

Riddell's helmets", even though that price increase could not have been caused by the allegedly

false and misleading marketing that did not begin until 2007.  Saylor Decl., Ex. 3 at 3.18.  As the

Stamm Report explains:

> Suppose for example, that in 2002, Riddell was able to raise the
> price by $50 with the introduction of the modern helmets and it can
> be determined that $25 of that price increase was associated with
> CRT Design Elements and $25 with non-CRT Design Elements.
> Suppose further that in 2007, the price remains unchanged.  Because
> the price did not increase after the introduction of the alleged false
> and misleading claims, no portion of the premium should be
> attributed to damages.  However, the Cowan Report, by virtue of its
> comparison of the price in 2007 with the price in 2001 will conclude
> there was a $50 increase in price and, because of its failure to
> consider any other reasons for the price increase, will consider the
> entire increase to be a premium related to the alleged false claims.

Saylor Decl., Ex. 3 at 3.21.  In other words, even if Dr. Cowan's GPM comparison approach

were appropriate here (which it is not for the reasons set forth in Section I, *supra*), he should

have looked to the sales and margins associated with Revolution series from the time period

where Riddell was selling CRT helmets but was not making the challenged marketing claims

(2002 through 2007) and the time period during which Riddell was making the claims (2007

through 2012).[16]  The Cowan Report also improperly purports to measure damages for the period

from 2008 to present, despite the fact that Riddell stopped making the CRT marketing claims in

---

[16]     As explained in the Stamm Report: "If a comparison of comparable competitive products
during the CRT Marketing Period is not possible because of the availability of data on
competitive products, then the next best methodology would be a comparison of the
prices of Riddell helmets containing CRT Design Elements from just before and just after
the allegedly false and misleading marketing."  Saylor Decl., Ex. 3 at 3.2.

2012. *Id.* at 3.32.  During his deposition. Dr. Cowan conceded there would be no damages after Riddell stopped making the marketing claims.[17]

In sum, Dr. Cowan's promises that he *could* get data - the *wrong* data - to which he would apply his proposed methodology means that his methodology cannot "properly … be applied to the facts in issue" and the Cowan Report and his deposition testimony should be excluded.  *In Re ConAgra,* 302 F.R.D. at 549; *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *17.

In addition, Dr. Cowan's methodology is "unreliable because it finds damages for class members who have suffered no damage."  *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *21.  Dr. Cowan provides no method for excluding purchasers who paid no premium at all.  Under his own theory that the "actual premium paid" could be $0 where the purchase price was at least $50 below MSRP.  As explained in the Stamm Report,

> As an illustrative example, assume that the price premium is $50 and that there are two class members: Class Member A, who paid the MSRP, and Class Member B, who bought a helmet at a $50 discount.  According to Dr. Cowan, the individual who paid MSRP should receive $50 in damages and the individual who had a $50 discount would have no damages.   By including both purchase prices in the proposed GPM analysis and calculation of class-wide damages, Class Member A would not be able to recover the full $50 premium paid and Class Member B would recover some positive amount of damages when, according to Dr. Cowan, this individual should not have received any damages at all.

Saylor Decl., Ex. 3 at 3.36.  Dr. Cowan's approach therefore would fail to fully compensate Class Member A for the alleged harm, diluting those claims, and would over-compensate Class Member B and others who bought at significant discounts.  This alone renders Dr. Cowan's report insufficient under *Daubert* and *Comcast*.

---

[17]     Saylor Decl., Ex. 11 at 161:5-22.

## CONCLUSION

For all of the reasons set forth above, Riddell respectfully requests that the Court grant

this Motion, and grant such other and further relief as the Court deems just and proper.


Dated:   Parsippany, New Jersey                   Respectfully submitted,
         February 9, 2017
                                                  KELLEY DRYE & WARREN LLP

                                                  By: */s/ Joseph A. Boyle*
                                                       Joseph A. Boyle

                                                  Michael C. Lynch
                                                  Melissa E. Byroade
                                                  James B. Saylor
                                                  KELLEY DRYE & WARREN LLP
                                                  One Jefferson Road
                                                  Parsippany, New Jersey 07054
                                                  (Tel.) (973) 503-5900
                                                  (Fax) (973) 503-5950
                                                  *Attorneys for Defendants*