Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
## <u>TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF BARRY D. JORDAN</u>

*Confidential*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD.............................................................................................................. 2

DR. JORDAN'S REPORT AND OPINION ............................................................................ 4

ARGUMENT ......................................................................................................................... 13

I.      DR. JORDAN'S TESTIMONY SHOULD BE EXCLUDED  BECAUSE IT IS
        NOT RELIABLE........................................................................................................... 13

        A.      Dr. Jordan's Method and Hypothesis is Not Testable. ...................................... 14

        B.      Dr. Jordan's Method Has Not Been Subject To Peer Review. ........................... 16

        C.      Dr. Jordans's Method Has A High Potential Rate of Error. ............................... 17

        D.      Dr. Jordan did Not Utilize the His Own Existing  Standards When Giving
                His Opinion in this Matter ................................................................................ 17

        E.      Dr. Jordan's Method is Not Generally Accepted,  Or Even Consistently
                Utilized By Dr. Jordan ...................................................................................... 18

        F.      There is No Relationship Between Dr. Jordan's Methodology  And That
                Which has been Established To Be Reliable ....................................................... 19

        G.      Dr. Jordan's Methodology Is Not Consistent With The Non-Judicial Uses........ 19

II.     DR. JORDAN'S TESTIMONY SHOULD BE EXCLUDED  BECAUSE IT IS
        NOT RELEVANT TO THE CASE................................................................................ 22

CONCLUSION..................................................................................................................... 24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adamson v. Ortho-McNeil Pharm., Inc.*,
   463 F. Supp. 2d 496 (D.N.J. 2006) ...................................................................23

*In re Bayer Healthcare and Merial Ltd. Flea Control Products Marketing and
   Sales Practices Litig.*,
   752 F.3d 1065 (6th Cir. 2014) .........................................................................3

*In re Blood Reagents Antitrust Litig.*,
   783 F.3d 183 (3d Cir. 2015)........................................................................1, 2

*Calhoun v. Yamaha Motor Corp.*,
   350 F.3d 316 (3d Cir. 2003)......................................................................3, 13

*In Re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ...................................................................2

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786 (1993)............................................................ *passim*

*Dunkin' Donuts Inc. v. Patel*,
   174 F. Supp. 2d 202 (D. N.J. 2001) ..............................................................16

*Fraker v. Bayer Corp.*,
   No. CVF08-1564 AWI GSA, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ............................24

*Gaul v. Bayer Healthcare LLC*,
   2013 U.S. Dist. LEXIS 188951 (D.N.J. June 19, 2013) ....................................23, 24

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)......................................................................................21

*Hilt v. SFC, Inc.*,
   170 F.R.D. 182 (D. Kan. 1997).......................................................................16

*Hodges v. Vitamin Shoppe, Inc.*,
   No. CIV. A. 13-3381 (SRC), 2014 WL 200270 (D. N.J. Jan. 15, 2014)................................24

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)............................................................................3

*Johns v. Bayer Corp.*,
   Civil No. 09cv1935 AJB (DHB), 2013 WL 1498965 (S.D. Cal. April 10,
   2013) ..........................................................................................14, 17

ii

*Jones v. Syntes USA Sales, LLC*,
   2010 WL 3311840 (D. N.J. Aug. 19, 2010) ....................................................................3

*Kannankeril v. Terminix Int'l, Inc.*,
   128 F.3d 802 (3d Cir. 1997)...........................................................................................13

*Lauria v. Amtrak*,
   145 F.3d 593 (3d Cir. 1998)...........................................................................................22

*Loomis v. U.S. Bank Home Mortg.*,
   912 F. Supp. 2d 848 (D. Ariz. 2012) .............................................................................24

*Magistrini v. One House Martinizing Dry Cleaning*,
   180 F. Supp.2d 584 (D.N.J. 2002), *aff'd* 68 Fed. Appx. 356 (3d Cir. 2003)..........................21

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
   306 Fed. Appx. 781 (3d Cir. 2009)...........................................................................14, 22

*Neale v. Volvo Cars of North Am., LLC*,
   No. 2:10-cv-4407 (DMC)(MF), 2013 WL 784962 (D. N.J. Mar. 1, 2013) ....................2, 3, 13

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000)..............................................................................................2

*In re Pharmacy Benefit Managers Antitrust Litig.*,
   2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ......................................................................3

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008)...........................................................................................13

*Riddell, Inc. v. Schutt Sports, Inc.*,
   724 F. Supp.2d 963 (W.D. Wis. 2010) ...........................................................................16

*Scheuerman v. Nestle Healthcare Nutrition, Inc.*,
   Civ. 10-3684 (FSH), 2012 WL 2916827 (D.N.J. July 17, 2012)................................10, 23

*Sierra Club v. Cedar Point Oil Co.*,
   73 F.3d 546 (5th Cir. 1996) ...........................................................................................16

*Toback v. GNC Holdings, Inc.*,
   No. 13-80526-CIV, 2013 WL 5206103 (S.D. Fla. Sept. 13, 2013)................................24

*U.S. v. Mehanna*,
   735 F.3d 32 (1st Cir. 2013)............................................................................................22

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010)...........................................................................................22

*Wolfson-Verrichia Group, Inc. v. Metro Commer. Real Estate, Inc.*,
  Civil Action No. 5:08-cv-4997, 2013 WL 1286184 (E.D. Pa. March 28, 2013)..............21, 22

**Other Authorities**

Fed. R. Civ. P. 23 ...................................................................................................................2, 3

Fed. R. Civ. P. 26 ...............................................................................................................15, 16

Fed. R. Evid. 702 .......................................................................................................... *passim*

Defendants Riddell, Inc., Riddell Sports Group, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. (collectively, the "Defendants") respectfully submit this Memorandum of Law in support of their motion to exclude the Expert Report of Dr. Barry Jordan (Cecchi Decl., Ex. 30, the "Report") and the deposition testimony of Dr. Jordan dated January 12, 2017 (Declaration of James B. Saylor dated February 9, 2017, the "Saylor Decl.", Ex. 12).[1]

## PRELIMINARY STATEMENT

Dr. Barry Jordan's opinion is neither reliable nor relevant.  His opinion is one that Plaintiffs successfully abandoned to save this case from dismissal.  Dr. Jordan believes, in contradiction to Plaintiffs' other medical expert, Dr. Cantu, that football helmets do not reduce the instances of concussions whatsoever.  However, the 2006 study done by Riddell at the University of Pittsburgh Medical Center ("the UPMC Study") provided evidence that individuals who wore modern helmets with concussion reduction technology ("CRT") had a decreased risk of concussion compared to individuals wearing a traditional helmet that did not have CRT. Saylor Decl., Ex. 28.  Dr. Jordan appears to disagree with this Court's finding that the results of the UPMC Study are not subject to challenge.  Dr. Jordan's opinion is entirely contrary to the scientific and medical literature in the concussion field, including those of the National Operating Committee on Standards in Athletic Equipment ("NOSCAE").  The opinion is also not reliable because his method for surveying the universe of literature is undefined, the content of the universe of literature is undefined, the basis for reaching his conclusions is undefined, and the question of what constitutes "support" in the medical scientific literature is based solely on

---

[1]     Pending before the Court is Plaintiff's Motion for Class Certification, as well as Defendants' four *Daubert* motions to exclude the testimony of Plaintiff's experts. Defendant request that the *Daubert* motions be decided prior to the Motion for Class certification. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).

Dr. Jordan's ill-defined and subjective view.  His proposed testimony is irrelevant and inadmissible for the additional reason that his methodology does not "fit" with plaintiffs' theory of liability.  Thus, the testimony will not help the trier of fact to understand the evidence or determine a fact in issue.  His opinion should therefore be excluded under Rule 702 and *Daubert*.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).  *See Neale v. Volvo Cars of N. Am., LLC*, No. 2:10-cv-4407 (DMC)(MF), 2013 WL 784962 at *1 (D. N.J. Mar. 1, 2013).  Rule 702 permits a qualified witness "to testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  *Id.* at *2 (citing Rule 702).  Rule 702's three basic requirements for expert testimony to be admitted are: (1) the evidence must be useful to a finder of fact; (2) the witness must be qualified to provide the testimony; and (3) the proposed evidence must be reliable or trustworthy.  *See In Re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014) (citations omitted).  The burden is on Plaintiffs to show, by a preponderance of the evidence, that Rule 702 is satisfied.  *See Daubert*, 509 U.S. at 592 n.10; *In re ConAgra*, 302 F.R.D. at 549; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

The Third Circuit has held that expert testimony used to support class certification must comply with *Daubert*.  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("[A] plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless plaintiff also demonstrates, and the trial court finds,

2

that the expert testimony satisfies the standard set out in Daubert."); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008) ("Expert opinion with respect to class certification like any matter relevant to a Rule 23 requirement, calls for rigorous analysis.  It follows that opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement . . .").  A recent Eastern District of Pennsylvania case barred Plaintiffs' damages expert in this case (Dr. Cowan), under *Daubert* and then denied class certification.  *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017).

Rule 702 "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony."  *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321  n.9 (3d Cir. 2003) (internal quotations omitted).  Expert testimony must help the trier of fact to understand the evidence or to determine a fact in issue.  *Neale*, 2013 WL 784962 at *3 (granting the plaintiff's motion to exclude defendant's proffered expert opinion because it found it "speculative and without foundation.")  "The *Daubert* standard requires [that . . . ] expert testimony is grounded in methods and procedures of science, [and that it] provides more than a subjective belief or unsupported speculation, and be not only relevant but reliable."  *Id.*, at *2 (quoting *Daubert*, 509 U.S. at 589).

The Courts should avoid a "battle of the experts" and exclude any expert whose testimony is not qualified, not reliable, or not relevant.  *See In re Bayer Healthcare and Merial Ltd. Flea Control Prods. Mktg. and Sales Practices Litig.*, 752 F.3d 1065, 1077 (6th Cir. 2014) (plaintiff unable to show that defendant's studies substantiating their claims were unreliable, inaccurate, or not relevant); *see also Jones v. Syntes USA Sales, LLC*, 2010 WL 3311840, at *9-

3

10 (D. N.J. Aug. 19, 2010) (striking an expert for being unqualified, using unreliable methods, and giving irrelevant testimony).

## DR. JORDAN'S REPORT AND OPINION

Dr. Barry Jordan submitted a six-page report in support of his testimony in this matter. The majority of the Report is dedicated to his qualifications and experiences, which Defendant does not contest for the purposes of this motion.[2]  The only portions of the report that are responsive to this case appear on the second, third, and fourth pages in the subsections titled "Introduction" and "Conclusions."  Report at 2-4.  In his "Introduction," Dr. Jordan explains that he has been retained to offer an opinion on the Riddell Revolution series of helmets, which includes a footnote listing 24 types of Riddell football helmets that are within his "understanding" of what the Revolution series includes.  Report at 2.  However, during his deposition, Dr. Jordan admitted that he did not even know if all of the helmets cited in the footnote contained Concussion Reduction Technology.  Saylor Decl., Ex. 12 at 10:11-20.

Dr. Jordan also states in his Introduction that based on his knowledge and experience, he "can affirmatively state that the claim by Riddell that the Revolution series football helmets reduce the risk of concussion is not supported by the scientific literature."  Report, at 2.  Just as with Dr. Cantu, this very basic and bald conclusion became the subject of equivocation by Dr. Jordan.  During his deposition, he conceded that "it would have been more accurate if [he] said reduced the rate of concussion, or the incidence of concussion, instead of risk of concussion."  Saylor Decl., Ex. 12 at 120:19-121:3.  Nowhere in his report or during his deposition did Dr.

---

[2]   The vast majority of Dr. Jordan's experience comes from the sport of boxing.  Cecchi Decl., Ex. 30, at Ex. A.  Boxing is not like football when it comes to athletic headgear, which may explain why Dr. Jordan knew nothing of NOCSAE standards on football helmets.  This is an important omission from his analysis, as NOCSAE states that helmets that pass its test do provide concussion protection. *See* Saylor Decl., Exs. 15, 18.

Jordan explain how he reached the conclusions in the "Introduction" section of his report or how the change from "risk" to "incidence" affected his opinion.  This is troubling, because by abandoning the word "risk" for "rate" or "incidence", it would appear Dr. Jordan is uncomfortable saying no helmet can reduce the risk of concussion, but rather he believes no helmet can reduce "rate" or the "incidence" of concussion.

In the "Conclusions" subsection of his report, Dr. Jordan explains that "having surveyed the present state of medical literature, documents relevant to this case, and incorporat[ed] [his] years of experience as a Neurologist, [he] [is] able to make the following conclusions."  Report at 2.  This cursory explanation is followed by seven bullet points of Dr. Jordan's conclusions.  Report at 2-4.  No further support is provided to explain how he reached his conclusions.

In the section on the fifth page titled "References," Dr. Jordan lists seven cherry-picked documents that he evidently referenced to write his report.  Report at 5.  His "References" are: (1) the Consensus Statement on Concussions from the International Conference held in Zurich in 2012; (2) the 2007 Guskiewski UNC Study; (3) the 2013 Gammons Article; (4) the Wisconsin Study; (5) a 2011 article by Daneshvar, *et al.*; (6) the Cobb Study; and (7) the 2009 Benson Article.  *Id.*  However, during his deposition, he conceded that it would be impossible to list everything he actually referenced when writing his report.  Saylor Decl., Ex. 12 at 18:14-18; 23:4-13.  Finally, on the seventh page of his report, there is a subsection called "Documents Considered," which lists nine documents: two of which are medical studies: the UPMC Study and the Wisconsin Study; the other seven documents are pleadings, orders, and transcripts from this case.  Report at 7.

Dr. Jordan's first conclusion is that:

> [t]he definition of concussion is highly varied in the scientific community.  One of many definitions of concussions states that

> concussion is a brain injury characterized as a complex pathophysiological process affecting the brain, induced by biomechanical forces (1). The clinical manifestation of this condition results in transient neurological impairment thought to be secondary to a functional disturbance rather than a gross structural injury of the brain. These neurological signs and symptoms resolve spontaneously over a period of time.

Report at 2. The internal reference that Dr. Jordan uses to imply that changes in the accepted definition of concussion over time are relevant to this case, is the Consensus Statement on Concussions from the International Conference held in Zurich in 2012. The consensus statements are part of the medical literature that he surveyed. *Id.* at 36:23-25; 173:19-24. However, during his deposition, Dr. Jordan acknowledges that the definition of concussion from that statement was the same as the one from 2001. *Id.* at 38:21-23. He also conceded that he has no idea what definition of concussion Riddell uses. *Id.* at 34:12-15; 60:18-61:2. Thus, he has no idea if it is the same as his definition (from 2001 or 2012).

Dr. Jordan's second conclusion is that:

> The exact incidence of sport related concussion (SRC) is difficult to ascertain. Firstly, concussion is often underreported and/or unrecognized. Athletes may not be forthcoming with concussion symptoms for fear of termination of their participation and removal from the event. In addition, athletes, coaches and parents are unfamiliar with the signs and symptoms of concussion and therefore SRC may not be clinically acknowledged. Secondly, the certainty of the diagnosis of concussion at times can be challenging, therefore affecting the accuracy of calculated incidence rates of SRC. The clinical examination represents the "gold standard" for the diagnosis of concussion. Although many SRC can be definitively diagnosed a percentage of the time, there are subsets of SRC that cannot be reliably diagnosed and are classified as probable or possible concussion.

Report, at 2-3. Dr. Jordan explained, "[w]hat I mean by that is that it's difficult to, at times it's difficult to make the diagnosis of concussion. So if there is inherent difficulties in making a

6

diagnosis of concussion, then it's going to be difficult to get a clear idea of what the incidence

rate is, because you may have a misdiagnosis." Saylor Decl., Ex. 12 at 81:15-23.  To Dr. Jordan,

the "gold standard" for diagnosis is "you have to examine the athlete to determine that they had a

concussion or not – you can't simply go by one's recollection of possible symptoms they might

have had during a game that might have occurred months ago." *Id.* at 82:13-18.  Dr. Jordan

makes no critique of Riddell that ties to this bullet point.  Moreover, the UPMC Study set forth a

concussion standard that it was using and that professionals would be diagnosing the players.

Neither Dr. Jordan nor Dr. Cantu take issue with that part of the UPMC Study.  *Id.* at 153:1-16;

Saylor Decl., Ex. 15 at 164:12-165:8.  Nor could they.

> Next, Dr. Jordan concludes:

> > Currently, there are no reliable tests to determine impact threshold
> > or force necessary to induce a concussion.  The basic mechanism of
> > concussion is the rapid acceleration and deceleration of the head.
> > The measurement of these accelerations by telemetry systems
> > utilizing helmet sensors are notably inaccurate, therefore failing to
> > identify the minimum force necessary to result in concussion.
> > Furthermore, impacts to the head occur at a wide range of
> > magnitudes and concussion symptoms are independent of impact
> > magnitude (2).  Accordingly, impact testing utilizing accelerometers
> > does not accurately capture the nature of the pathophysiological
> > aspects of these accelerations.

Report, at 3.  Dr. Jordan cites to the 2007 Guskiewski UNC Study in his report for this

conclusion.  *Id.*  Dr. Jordan admits that there are plenty of tests that attempt to determine the

impact threshold or force necessary to induce a concussion.  Saylor Decl., Ex. 12 at 90:11-24.

However, Dr. Jordan acknowledges that he does not consider himself an expert on reliability of

such testing.  Saylor Decl., Ex. 12 at 91:11-15. Furthermore, Dr. Jordan admits that he is not

aware of a minimum force necessary to result in a concussion. Saylor Decl., Ex. 12 at 98:11-13.

> Dr. Jordan's next conclusion is that:

> Laboratory test data utilizing various techniques such as the drop or pendulum tests do not accurately reflect the dynamics associated with concussion on the playing field. Accordingly, epidemiological studies assessing the on field performance of football helmets are necessary to supplement laboratory test data. However, the majority of epidemiological studies have not demonstrated the effectiveness of one helmet from another in reducing the risk of concussion in football (3,4). This lack of high level evidence results from significant methodological flaws in study design, including nonrandomization, retrospective analyses, selective recall bias, selection bias, underreporting of concussions, and inaccuracy of concussion diagnosis (5).

Report at 3. Dr. Jordan makes three different references as his "support" for his conclusions: the 2013 Gammons Article; the Wisconsin Study; and a 2011 article by Daneshvar *et al.* During his deposition, Dr. Jordan said he based this bullet point on his "experience in the field, also based on [his] survey of the medical literature." Saylor Decl., Ex. 12 at 128:23-3. He conceded, however, that laboratory tests can accurately measure some variables associated with concussions, such as linear acceleration and, to a lesser extent, rotational acceleration. *Id.* at 129:12-21. Moreover, Dr. Jordan is not an expert on laboratory tests. *Id.* at 131:21-132:6. That much is apparent as, the drop test used by NOCSAE resulted in NOSCAE stating that helmets that pass its laboratory tests do in fact provide protection against concussions. *See* Saylor Decl., Ex. 16. Dr. Jordan did not even consult the NOCSAE standards. Saylor Decl., Ex. 12 at 255:5-10. However, Dr. Jordan considers standards as "Level 1" evidence. *Id.* at 230:16-19. Thus, his universe of scientific and medical literature is woefully lacking. Despite this fact, Dr. Jordan concludes baldly, "[a]ccording to the current medical information that's available, there is no strong evidence that the helmet can reduce the rate of concussion." *Id.* at 137:9-12.

Dr. Jordan also concludes:

> Furthermore, data assessing the efficacy of helmet technology reducing the risk of concussion among professional, collegiate, and

> high school football players cannot be extrapolated to be valid
> among youth football players under the age of 14 years.  The clinical
> characteristics of head impact exposure in youth football are
> distinctly different than those encountered among their older
> counterparts (6).

Report at 3.  For support on this conclusion, Dr. Jordan references the Cobb Study.  *Id.*  At his

deposition, Dr. Jordan also explained that this conclusion is based on:

> [t]he manifestation of concussions in professional, college and high
> school football players, secondary to differences in ages, differences
> in exposure, differences in physiological makeup.  Younger athletes
> may take longer to recover from concussion.  They may be more
> susceptible to concussion.  So evidence, if there was evidence to say
> something benefitted a professional football player, you can't
> necessarily assume that that would benefit an athlete less and 14
> years of age.

Saylor Decl., Ex. 12 at 164:17-165:5.

However, the Cobb Study found that the younger the child, the lower the magnitude of

head impacts from tackle football.  The rate for 7 to 8-year-old players is less than that for 9 to

12-year olds, and both of these groups have impact magnitudes "less than that of high school

players." Saylor Decl., Ex. 14 at 2471.  The UPMC Study studied high school players.  No

opinion is offered as to why, if CRT tested as it did for high school players, it would not be even

more protective for younger players who experience lower magnitude impacts.  To ask the

question is to answer it.  Logic and common sense say CRT is more protective for younger

players, and indeed there is no opinion concluding otherwise.

Dr. Jordan next makes a very confusing conclusion:

> There is no high level of evidence supporting the efficacy of one
> helmet compared to another in reducing concussion risk.  Although
> there is strong evidence that helmet use reduced head injury risk in
> sports such as skiing, snowboarding and bicycling, the evidence that
> helmets reduce the risk of concussion is inconclusive (7).

Report at 4. This is directly contradicted by Dr. Cantu, who concedes football helmets *do* reduce

the risk of concussion and that in other sports the evidence is that helmets provide even better

protection. Saylor Decl., Ex. 15 at 87:12-24.  Thus, two different experts, on the same side of a

case, examined the same medical literature, and came to opposite conclusions.  During his

deposition, Dr. Jordan acknowledges that there is what he considers "weak" evidence that

supports the efficacy of one helmet compared to another in reducing concussion risk. Saylor

Decl., Ex. 12 at 229:7-18.[3]  Of course, he says that standards are strong evidence.  Yet, he did not

consider the standard setting body NOCSAE's statement that football helmets do protect against

the risk of concussion.  Nor did he attempt to harmonize the NOCSAE standards with his own

conclusory opinion.

> Dr. Jordan's last conclusion is that:

> > In conclusion, the mechanical event necessary for the induction of a
> > concussion is the acceleration and deceleration of the head.  There
> > is no existing strong evidence that a helmet can prevent these
> > movements of the head and therefore significantly reduce the
> > incidence of SRC.  Helmets have not been proven to reduce SRC
> > and are only of benefit in preventing more serious brain injuries such
> > as skull fracture and intracranial hemorrhage.  Accordingly, the
> > claim by Riddell that the Revolution series football helmets reduce
> > the risk of concussion is not supported by scientific literature.

Report at 4.  For this claim, Dr. Jordan does not cite to any of his seven references.  Curiously,

nowhere in Dr. Jordan's report does he say that his true opinion is actually that no helmet can

protect against concussions.  But, he admitted that multiple times during his deposition.  *See*

---

[3]     This opinion does not support a claim of consumer fraud.  *See* Dkt. 65 at 28; *Scheuerman v. Nestle Healthcare Nutrition, Inc.*, Civ. 10-3684 (FSH), 2012 WL 2916827, at *7 (D.N.J. July 17, 2012) ("At best, Plaintiffs can prove that Nestle's studies were not sufficiently strong; while this may be enough to make out an ordinary claim not premised on a theory of fraud, it is insufficient to demonstrate entitlement to relief under" the consumer protection laws of New Jersey).

Saylor Decl., Ex. 12 at 29:20-23 ("no helmet has the ability to reduce the incidence of

concussion."); *id.* at 32:19-21; *id.* at 50:12-15 ("no helmet could reduce the risk of concussion.");

*id.* at 127:15-23 (There is no greater protection against the risk, rate, and incidence of concussion

from wearing a helmet and wearing ***no*** helmet when playing football)(emphasis added).

      Dr. Jordan is able to make this bald assertion because he has implemented his own

system of rating and evaluating cases.  More specifically, "[s]cientific studies are usually

classified by level of evidence.  Level 1 being the highest level, level 2 and level 3, and level 3

being the lowest level of evidence.  The [Virginia Tech Study] is a level 3, and [the UPMC

Study] at best is going to be a level 2.  There is no level 1 evidence." Saylor Decl., Ex. 12 at

70:18-24.

      Dr. Jordan says his made up ranking system is set forth in "the medical literature," but

provided no examples of what medical literature he used as a source for this ranking system.

Saylor Decl., Ex. 12 at 71:4-5.   The ranking system is also completely absent from his report.

*Id.* at 71:21-23.  Dr. Jordan then explained that he uses the terms "level 1 evidence," "strong

evidence" and "high level evidence" interchangeably.  *Id.* at 76:24-77:10.  So, Dr. Jordan

explains, "[w]hat I refer to by saying 'strong evidence' [in the report] is level 1 evidence.  I just

didn't outline it specifically."  *Id.* at 76:9-23. Level 1 evidence includes "standards" but

apparently not the standard from the body setting standards for football helmets NOCSAE. *Id.* at

230:16-19.  NOSCAE states that helmets that pass its test (as all Riddell helmets do) provide

protection against concussions.  Saylor Decl., Ex. 16.  Using Dr. Jordan's own idiosyncratic

method, there is level 1 evidence, NOCSAE standards, and it supports Riddell's claims.  There is

no "level 1" evidence contradicting Riddell's claim.  Saylor Decl., Ex. 12 at 247:17-23; 72:4-7.

Thus, Riddell's claim that its helmets reduce the incidence of concussion has uncontradicted "level 1" support.

During his deposition, Dr. Jordan stated that he can say Riddell's claims are "not supported by scientific literature" because "the quality of [the UPMC Study and the Virginia Tech Study] and the methodological issues are poor, and in fact, the [UPMC Study] was industry supported, which these one, two weren't concerned about the objectivity of the report. The [Virginia Tech Study] was a retrospective study and as has been outlined in some of the other papers that we have here, from the epidemiological standpoint, there is many [sic] methodological flaws that question the validity, the scientific validity of these studies." Saylor Decl., Ex. 12 at 68:3-16. However, the UPMC Study was peer reviewed and this Court found that even after reviewing the Wisconsin study, "Plaintiffs have not identified any scientific study that supports their claim that Defendants' 31% reduction claims were false or misleading. Dkt. 65 at 29. Thus, Dr. Jordan has no support for his opinion and his criticism of the UPMC Study as "weak" does not support a consumer fraud claim. *See* n. 3, *supra*.

Dr. Jordan does not opine as to whether the Riddell Revolution series of helmets are better (or worse) than any other modern helmet available on the market. Dr. Jordan admitted during his deposition that when he was talking about "the market" he did not specify what kind of market he meant and he did not examine any market or what helmets were available on "the market." Saylor Decl., Ex. 12 at 26:12-28:4. Further, he did not compare the Revolution series of football helmets against any of the Schutt series of helmets. *Id.* at 42:19-43:4. He did not examine Riddell's claims with respect to any other manufacturers' football helmets. *Id.* at 42:7-10. Dr. Jordan does not even know what marketing claims are at issue in this case. Saylor Decl.,

*Id.* at 32:7-12.  Therefore, his opinion should be excluded.  *See Neale*, 2013 WL 784962, at *3

(expert excluded for not examining the facts of the case before him).

<u>**ARGUMENT**</u>

## I.   DR. JORDAN'S TESTIMONY SHOULD BE EXCLUDED <u>BECAUSE IT IS NOT RELIABLE</u>

An expert's opinion "must be based on the methods of science rather than on subjective

belief or unsupported speculation." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir.

2003).  Although "'[t]he evidentiary requirement of reliability is lower than the merits standard of

correctness, a litigation must "make more than a *prima facie* showing that his expert's

methodology is reliable."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247 (3d Cir. 2008).

*In re Paoli R.R. Yard PCB Litig.* set out factors that can be used to assess whether an

expert's methodology is reliable:

> (1)   whether a method consists of a testable hypothesis;
> (2)   whether the method has been subject to peer review;
> (3)   the known or potential rate of error;
> (4)   the existence and maintenance of standards controlling the technique's operation;
> (5)   whether the method is generally accepted;
> (6)   the relationship of the technique to methods which have been established to be reliable;
> (7)   the qualifications of the expert witness testifying based on the methodology;[4] and
> (8)   the non-judicial uses to which the method has been put.

35 F.3d 717, 742 n.8 (3d Cir. 1994).  This list is neither exhaustive nor applicable in every case.

*Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806-07 (3d Cir. 1997).  Determining

admissibility of an expert's testimony focuses on the expert's "principles and methodology, not

---

[4]   Riddell does not contest Dr. Jordan's qualifications, so this factor is intentionally omitted from the discussion below.

13

on the conclusions that they generate." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed.

Appx. 781, 789 (3d Cir. 2009) (quoting *Daubert*, 509 U.S. at 595).

     A.     <u>**Dr. Jordan's Method and Hypothesis is Not Testable.**</u>

Rule 702 analysis centers on an expert's methodology, and yet it is striking that Dr.

Jordan's methodology is never identified in his report, much less described.  Dr. Jordan's

methods are purely subjective and untestable by anyone other than him.  His methodology

appears to be that he surveyed his view of the "present state" of medical literature.  This process

does not result in a testable hypothesis.  Those wanting to replicate his methodology would

literally have no means of determining what he considered, how he evaluated whatever it is he

considered, how he ruled out whatever it is that he did not consider, and how he reached his

conclusion.  His methodology is inherently subjective.  The universe of medical literature is not

defined or set forth.

What he means by "present state" of the literature is also not defined.  Indeed, Riddell

stopped using "CRT" in its marketing in 2012, so any "present state" of literature that include the

time period after 2012 is not a reliable standard.  Mr. Jordan fails to explain how the "present

state" of scientific and medical literature could be an accurate reflection of the information that

was available to Riddell at the time of the marketing claims at issue in this case. *See, e.g., Johns*

*v. Bayer Corp*., Civil No. 09cv1935 AJB (DHB), 2013 WL 1498965, at *17 (S.D. Cal. April 10,

2013) (finding that an expert relying on studies and evidence outside the class period is

irrelevant).

Dr. Jordan's methodology is further subjective because it is based on his own, undefined

criteria and no identifiable factors.  He determined what constitutes the medical literature and

subjectively assigned it a "level" of evidence.  During his deposition, Dr. Jordan stated that the

"medical literature" he refers to is the "medical literature that relates to sports concussion and

14

sports neurology in general."  Saylor Decl., Ex. 12 at 17:18-22.  When asked to specify, he said it includes "some of the references" that he cited in his report.  *Id.* at 17:23-18:3.  However, Dr. Jordan also stated that the list of seven references in his report was ***not*** the universe that he relied on in making his report, and that he also relied on his "experience in the field, and it would be impossible for [him] to recall all the articles [he's] read over the last 30 years in relation to sports concussion." *Id.* at 18:10-18.  He conceded that he did not list every article "[s]imply because  . . . it would be too large of a sample  . . . ." *Id*. at 23:4-13.  His list of "References" includes only seven items of "scientific and medical literature", all of which fails to contradict  the claim that Riddell Revolution Series of football helmets reduce the incidence of concussions.  The UPMC Study supports such a claim and, as this Court found, "nothing in the Wisconsin Study suggests that Riddell misrepresented the results of the UPMC study."  Dkt. No. 65 at 30.

Moreover, Dr. Jordan's arbitrary system of ranking studies with "levels of evidence" is inherently flawed.  The ranking system is not explained in his report and is barely explained in his deposition beyond stating that there are three different levels of strength of evidence.  Saylor Decl., Ex. 12 at 70:18-24.  No factors or criteria are set forth so that anyone else looking at the same studies as Dr. Jordan may be able to guess what level he might assign to them.

Dr. Jordan's report also fails to truly explain his methodology, or accurately reflect his opinion in this matter.  Absent from his report is any explanation for how he arrived at his conclusions, beyond stating that he "surveyed the present state of medical literature, documents relevant to this case, and incorporating [his] years of experience as a Neurologist."  Report at 2.  An expert's report must contain "complete statements of all opinions the witness will express and the ***basis and reasons for them***." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).  Dr. Jordan provides no basis or reasons for the conclusions he provides in his expert report.  Nor

does Dr. Jordan explain why a company must have "level 1" evidence before it can make a claim about its products, or how to determine what an advertisement can say when there is (allegedly) no "level 1" evidence addressing the issue, but there is "level 2" evidence supporting the claim and no evidence directly contradicting the claim.

An expert report must include how and why the expert reached a particular result, not merely a list of the expert's conclusory opinions. *See, e.g.*, *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202 (D. N.J. 2001), *adopted by*, 174 F. Supp. 2d 202, 204 (D. N.J. 2001) (excluding an expert for failing to comply with Rule 26 by failing to set forth the basis and reasons for the opinions included in his memorandum).  The Court in *Dunkin' Donuts* held:

> An expert report under Rule 26 'is intended to set forth the substance of the direct examination of the expert witness,' and must 'disclose the data and other information considered by the expert.' Advisory Committee Notes to the 1993 Amendments to Rule 26. To satisfy the Rule, 'the report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them.'

*Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 211 (D.N.J. 2001) (quoting *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 185 (D. Kan. 1997).  "The purpose of the reports is to avoid the disclosure of 'sketchy and vague' expert information."  *Id.* (quoting *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996)).

## B.       Dr. Jordan's Method Has Not Been Subject To Peer Review.

If Dr. Jordan's methodology cannot be tested or replicated, as discussed above, it is far from meeting the rigorous standard of peer review.  The UPMC Study, on the other hand, was the subject of peer review, which gives less credence to Dr. Jordan's subjective dismissal of the entire study.  *See Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp.2d 963, 975 (W.D. Wis. 2010). This is also a curious opinion considering that Dr. Jordan also stated "level 1" evidence has to be

peer reviewed, like the UPMC Study was, and that he will not typically rely on a non-peer

reviewed study.  Saylor Decl., Ex. 12 at 263:5-21.   Yet Dr. Jordan's hypothesis is that playing

football with no helmet offers the same protection against protection from concussion than

wearing, for example, a Riddell CRT helmet.  No study that Dr. Jordan relied on makes such a

claim.  Thus, Dr. Jordan's report would not survive the level of scrutiny that he applies to the

UPMC Study.

       C.     **Dr. Jordans's Method Has A High Potential Rate of Error.**

Not being able to replicate or identify any logic to the method employed by Dr. Jordan

whatsoever makes the potential rate of error astronomical.  He also is admittedly considering the

"present state" of the scientific and medical literature, which is constantly evolving and

changing.  Whether something is known now in the scientific community about concussions is

not a reliable means of assessing what was known during the relevant time period in this matter:

2009 to 2012.  Adding anything into this evaluation of the case that occurred after 2012 only

adds to the obvious potential for error or change. *See, e.g., Johns v. Bayer Corp.*, Civil No.

09cv1935 AJB (DHB), 2013 WL 1498965, at *17 (S.D. Cal. April 10, 2013) (finding that an

expert opinion relying on studies and evidence outside the class period is irrelevant).  Plaintiffs

make no effort to establish how Riddell can be held liable *post hoc* based on scientific

discoveries that had not yet occurred at the time it made the challenged marketing claims.

Especially where, as the Court has already recognized, the existing science (the UPMC Study)

supports the marketing claims.

       D.     **Dr. Jordan did Not Utilize the His Own Existing**
             **Standards When Giving His Opinion in this Matter**

Dr. Jordan stated, with certainty, that one cannot given an opinion unless there is "level

1" evidence support.  "Level 1 evidence is what is needed to make a definitive conclusion or

statement. . . .  Because just in terms of levels of evidence, if it's a level 1 evidence, that's pretty

convincing and substantiated evidence of what the findings are as being accurate and true."

Saylor Decl., Ex. 12 at 74:12-25.  However, Dr. Jordan conceded that his "survey of the

scientific and medical literature  . . .  did not uncover any kind of level 1 evidence comparing one

football helmet to the other with respect to the efficacy of either in reducing concussions."  *Id.* at

231:2-8.  Therefore, he should be precluded from making any statements about the failure to

helmets to prevent the risk of concussion because he himself has no "level 1" evidence to support

his own conclusion.  Moreover, the NOCSAE standard is "level 1" evidence and it supports

Riddell's claim that a football can reduce the incidence of concussion. Dr. Jordan's opinions

against Riddell are contrary to his own method.

### E.    Dr. Jordan's Method is Not Generally Accepted, Or Even Consistently Utilized By Dr. Jordan

As mentioned above, Dr. Jordan did not implement his own techniques for coming to a

conclusion when he gave his opinion in this matter. There is no indication whatsoever in his

report that Dr. Jordan utilized any consistent method in evaluating the scientific and medical

literature that underlie his conclusions.  He also testified at his deposition that the NOCSAE

standards are included in the medical and scientific literature that he referenced to come to his

conclusions.  Saylor Decl., Ex. 12 at 48:14-18.  NOCSAE specifically lists standards that include

concussion reduction. Saylor Decl., Ex. 16.  That means there is "level 1" evidence within the

medical literature that says football helmets can protect against concussion.  However, Dr.

Jordan admitted that he did not know what the NOCSAE standards are or whether it would be

considered "level 1" evidence in his mind. Saylor Decl., Ex. 12 at 254:8-257:4.  Perhaps he is

unwilling to do so because then he would have to concede that the directly on point standard,

which would be level 1 evidence, directly refutes his central conclusion that no helmet can

protect against the risk of concussion.  In any event, Dr. Jordan provided no support that his level

of evidence of analysis is employed by others.  Nor does he demonstrate that his method, with

respect to what can be claimed based on what levels of evidence exist, is generally accepted.

      **F.**    **There is No Relationship Between Dr. Jordan's Methodology**
              **And That Which has been Established To Be Reliable**

This Court has already found that Plaintiff has no basis to contest the UPMC Study.  Dkt.

65 at 29-30.  Dr. Jordan indicates in his Report that he reviewed the UPMC Study, but gives no

explanation for his basis or reason for rejecting the finding of the study in his report.  Report at 7.

Nowhere in his Report does Dr. Jordan attempt to undercut the UPMC Study. During his

deposition, he admitted that if they had randomized the study, it would be considered "level 1"

evidence.  Saylor Decl., Ex. 12 at 137:23-138:15.  He also admitted that it was more reliable than

other studies because it was a prospective study, not a retrospective study.  *Id.* at 137:23-138:15;

23:14-24:5; 153:1-16.  So, one is left wondering how Dr. Jordan could jump to the conclusion

that he can "affirmatively state that the claim by Riddell that the Revolution series football

helmets reduce the risk of concussion is not supported by the scientific literature." Report at 2.

Dr. Jordan also does not mention other supportive studies identified by Riddell's expert, Dr.

Thomas Gennarelli.  Once again, there is no way to figure out what method Dr. Jordan used to

determine what he considered and why (or why not) one study is included and another is not.

Such an arbitrary set of decisions regarding the data to be considered lacks reliability and

testability.

      **G.**    **Dr. Jordan's Methodology Is Not Consistent With The Non-Judicial Uses**

Dr. Jordan's methodology is so loose and ephemeral as to constitute no methodology at

all.  His conclusions are so far outside the state of scientific and medical literature (even as it has

been vaguely identified by Dr. Jordan), that Plaintiffs' other expert, on the same topic, disagrees

with Dr. Jordan.  Dr. Jordan also does not, and cannot, account for the NOCSAE standards that are directly contrary to his claim that no helmet can reduce the risk of concussion.  Dr. Jordan is not in sync with his fellow expert or the concussion standards that govern the manufacturing of football helmets.  As such, he fails this factor as well.

Dr. Jordan also struggled to agree with the basic principles of studies that said helmets and concussions.  For example, when looking at the Christy Collins Study published in 2016, he said the following:

> Q: "…] all football helmets should provide similarly acceptable protection against concussions. . . .  Do you believe that the authors of this study are concluding that football helmets provide protection against concussions?
>
> A: No . . .  My reading of this is that the helmets are similar in providing protection . . . [a]gainst concussion.  But it doesn't say how much protection. . . .  ***It could be negative protection***.

Saylor Decl., Ex. 12 at 318:16-321:23 (emphasis added).  Dr. Jordan, a man who wants to be deemed an expert in his field, and who allegedly surveyed the scientific and medical literature to come to his conclusions, is unable to glean the basic underlying principles accepted by a study's authors.  If he does not know what is meant by the English meaning of the word "protection" when it is used in the scientific literature, it is impossible to credit any conclusions he arrived at by reading that literature.  It seems the guiding principle of his method is to contort or disregard the English language in these studies, if the natural meanings of those words are contrary to his own beliefs.  *Id.* at 327:20-333:12.  "This type of 'reading between the lines' – drawing conclusions based on the absence of evidence and personal interpretation of the meaning of testimony – is entirely subjective and speculative."  *Wolfson-Verrichia Grp. Inc. v. Metro*

*Commer. Real Estate, Inc.*, Civil Action No. 5:08-cv-4997, 2013 WL 1286184, at *11 (E.D. Pa. Mar. 28, 2013).

Based on the *In Re Paoli* Factors, Dr. Jordan's testimony and report should be excluded as unreliable.  In *Wolfson-Verrichia Group, Inc.*, the Court excluded the Plaintiff's expert as unreliable, finding that "[t]he principal problem underlying [the expert's] analysis is that there is no meaningful explanation as to how it was performed.  Instead, [the expert] stated that he reached his opinions by deliberating upon the evidence, and interpreting it in light of his experience . . ." *Wolfson-Verrichia Grp.,* 2013 WL 1286184, at *11.  Likewise, Dr. Jordan's testimony should be excluded because there is no meaningful explanation as to how his analysis was performed, other than interpreting what Dr. Jordan views as the evidence in light of his experience, and it fails seven of the *In Re Paoli* factors.  "[W]ithout a reliable method, result-oriented 'judgment' cannot be distinguished from scientifically or methodologically-based judgment." *Magistrini v. One House Martinizing Dry Cleaning*, 180 F. Supp.2d 584, 606 (D.N.J. 2002), *aff'd* 68 Fed. Appx. 356 (3d Cir. 2003).

Dr. Jordan's opinion has "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  To say no helmets prevent concussion, Dr. Jordan has unjustifiably extrapolated from an accepted premise to an unfound conclusion.  In doing so he has contradicted Dr. Cantu and dismissed confounding findings from the scientific and medical literature.

Dr. Jordan should be excluded because his report and his analysis does not provide how he reached his conclusions.  Likewise, his conclusions do not touch on the issue at hand in this matter, which is whether Plaintiffs can support a claim that the Riddell Revolution series of helmets are better at reducing the risk of concussions than other helmets on the market.  There is

no part of that claim that could be based on the now thoroughly debunked, abandoned and dismissed notion that no football helmet can reduce the risk of concussion.

## II.     DR. JORDAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS NOT RELEVANT TO THE CASE

The third factor that Courts consider when evaluating whether an expert should testify is relevance. *Daubert*, 509 U.S. at 589. An expert's testimony must "aid the jury in resolving a factual dispute." *Lauria v. Amtrak*, 145 F.3d 593, 599 (3d Cir. 1998) (quoting *Daubert*, 509 U.S. at 591). This element imposes on the Court to determine "whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010). The standard associated with the relevance analysis "is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that it will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed. Appx. 781, 790 (3d Cir. 2009) (internal citations omitted). "Fit" asks whether there is a sufficient connection 'between the expert's testimony and the facts that the jury is being asked to consider." *Wolfson-Verrichia Grp.,* 2013 WL 1286184, at *33 (quoting *Schiff*, 602 F.3d at 172-73). "It is common ground that a trial court may bar expert testimony if that testimony will not assist the jury to sort out contested issues." *U.S. v. Mehanna*, 735 F.3d 32, 79 (1st Cir. 2013).

Dr. Jordan's testimony does not fit the facts that the jury is being asked to consider. A fact finder will not be asked to consider whether helmets protect against concussions at all. Allowing Dr. Jordan to testify that no helmet can protect against concussion, which is what he opines in his deposition testimony but omits from his report, would serve only to confuse the issues and mislead the jury. Allowing testimony that is contrary to Plaintiffs' theory of the case does not "fit" the issues that the jury will be asked to decide.

As this Court and others have recognized, identifying flaws in a scientific study does not necessarily make marketing statements based on such a study false or misleading.  *See Gaul v. Bayer Healthcare LLC*, 2013 U.S. Dist. LEXIS 188951, at *4 (D.N.J. June 19, 2013) (finding that marketing statements based on an allegedly unreliable study tended to prove that such statements were unsupported, "but not that they are false"); *Scheuerman v. Nestle Healthcare Nutrition, Inc.*, Civ. 10-3684 (FSH), 2012 WL 2916827, at *7 (D.N.J. July 17, 2012) ("At best, Plaintiffs can prove that Nestle's studies were not sufficiently strong; while this may be enough to make out an ordinary claim not premised on a theory of fraud, it is insufficient to demonstrate entitlement to relief under" the consumer protection laws of New Jersey).  *See also Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 503 (D.N.J. 2006) (finding that marketing statements were accurate and therefore not misleading or deceptive).

In order for Plaintiffs to succeed on their false advertising claim, they will need to provide evidence that shows the Riddell Revolution series of helmets are not better at reducing concussions than any other helmet on the market.  They will not be able to meet their burden with an expert who believes that helmet simply do not decrease the incidence of concussion.  This theory has been rejected by this Court (Dkt. No. 41, at 2-3, 30-31) and abandoned by Plaintiffs (Dkt. No. 65, n.17, 36-37).

Equally damning is that Dr. Jordan conceded in his deposition that he was really supporting a non-substantiation claim:  "Q: So essentially your contention is, is that Riddell has not substantiated its claim that the Revolution series of football helmets reduced the risk of concussions?  . . . A: Absolutely." Saylor Decl., Ex. 12 at 151:3-8.  The question before the fact finder is not one of non-substantiation.  *See* Dkt. No. 41 at 34 ("Having eschewed a theory based on lack of substantiation, Plaintiffs must affirmatively allege the falsity of Defendants' claims.");

23

*Hodges v. Vitamin Shoppe, Inc.*, No. CIV. A. 13-3381 (SRC), 2014 WL 200270, at \*4 (D. N.J. Jan. 15, 2014); *Gaul v. Bayer Healthcare LLC*, 2013 U.S. Dist. LEXIS 188951, at \*4 (same); *Fraker v. Bayer Corp.*, No. CVF08-1564 AWI GSA, 2009 WL 5865687, at \*8 (E.D. Cal. Oct. 6, 2009); *Toback v. GNC Holdings, Inc.*, No. 13-80526-CIV, 2013 WL 5206103, at \*3 (S.D. Fla. Sept. 13, 2013); *Loomis v. U.S. Bank Home Mortg.*, 912 F. Supp. 2d 848, 859 (D. Ariz. 2012).

In sum, Dr. Jordan's testimony does not aid Plaintiffs in pursuing their false advertising claim and will not aid the jury in reaching a verdict on the advertising claim because his testimony is not relevant. Accordingly, Dr. Jordan's testimony and report should be excluded.

## **CONCLUSION**

For all of the reasons set forth above, Riddell respectfully requests that the Court grant this Motion in its entirety, and grant such other and further relief as the Court deems just and proper.

Dated:   Parsippany, New Jersey
         February 9, 2017

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: */s/ Joseph A. Boyle*
      Joseph A. Boyle

Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950
*Attorneys for Defendants*