Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF MOTION TO EXCLUDE THE
<u>EXPERT REPORT AND TESTIMONY OF CHARLES COWAN</u>**

*Confidential*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ..................................................................................................................................2

I. THE EASTERN DISTRICT OF PENNSYLVANIA'S DECISION TO EXCLUDE DR. COWAN'S REPORT AND OPINION SHOULD NOT BE IGNORED .............................2

II. DR. COWAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT CANNOT ASSIST THE TRIER OF FACT ................................................3

III. DR. COWAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS NOT RELIABLE ........................................................................7

CONCLUSION................................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................................3, 7

*Goldenberg v. Indel, Inc.*,
  No. 09-5202, 2012 WL 3780555 (D.N.J. Aug. 2012) ................................................................8

*In Re Jacoby Airplane Crash Litig.*,
  No. 99-6073 (HAA), 2007 WL 2746833 (D. N.J. Sept. 19, 2007)............................................9

*In re Nifedipine Antitrust Litig.*,
  246 F.R.D. 365 (D.D.C. 2007)....................................................................................................8

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017)................................................................2, 3, 6, 7

*Schwartz v. Avis Rent a Car Sys.*,
  No. 11-4052 (JLL), 2014 WL 4272018 (D. N.J. Aug. 28, 2014) ..............................................9

*In Re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D. D.C. 2002)..............................................................................................3, 7

Defendants respectfully submit this reply memorandum in further support of their Motion to Exclude the Expert Report and Testimony of Dr. Charles D. Cowan (Dkt. No. 218, "Motion").

## PRELIMINARY STATEMENT

Plaintiffs do not even attempt to respond in any depth to the Rebuttal Report of Laura B. Stamm, which thoroughly debunks the Expert Report of Dr. Charles Cowan (the "Cowan Report"). Dr. Cowan himself is entirely silent in response to Riddell's Motion and the Stamm Report. Nor did Plaintiffs take Ms. Stamm's deposition. The final evidence of Plaintiffs' capitulation is that Plaintiffs do not make any effort to address the decision of the Eastern District of Pennsylvania in *Pharmacy Benefits Managers*, which excluded Dr. Cowan's proposed methodologies for many of the same reasons that should result in Dr. Cowan's exclusion in this case. Dr. Cowan also fails to identify the ascertainable loss of each class member or provide a damage methodology that can be uniformly applied to class members. These deficiencies irreparably harm both the merits of Plaintiffs' claims and their attempt to certify a class.

Plaintiffs' charade regarding the $50 premium unravels in Plaintiffs' Opposition. Dr. Cowan admits that there is no $50 premium for each helmet sold, because many Riddell helmets are discounted. To avoid the individual question presented by varying discounts on helmet sales (that vary the premium), Dr. Cowan disowns the $50 premium that Plaintiffs have expressly alleged represents the ascertainable loss element of the state consumer protection laws at issue.[1] Instead, he proposes a comparison between Riddell's gross profit margins from 1998 to 2002 on pre-Revolution helmets to gross profit margins on the Revolution series of helmets sold during the class period. His attempt at this comparison is flawed, does not fit this case, and as such, fails to satisfy *Daubert*.

---

[1] *See* Dkt. No. 65, at 2; Declaration of James B. Saylor (Dkt. No. 215, the "Saylor Decl."), Exs. 42, 46, 50, 57, 61 (responses to Interrogatory No. 10).

1

**ARGUMENT**

I. **THE EASTERN DISTRICT OF PENNSYLVANIA'S DECISION TO EXCLUDE DR. COWAN'S REPORT AND OPINION SHOULD NOT BE IGNORED**

Plaintiffs seek to downplay the import of the ruling in *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017), which excluded Dr. Cowan's expert opinion in another case at an advanced stage of litigation, by simply claiming (in a footnote) that "the only similarity is that Dr. Cowan submitted an expert report in each case." (Opp. at 5). This is laughable, and represents a complete failure to deal with the fact that Dr. Cowan's submission in that case suffered from many of the same flaws here:

- There, the court found that Dr. Cowan "merely 'present[ed] the tests [he] believe[d] will be helpful,'" rather than actually conduct the tests proposed. 2017 WL 275398 at *5. Dr. Cowan contended that it would not "be possible" to test his methodologies "without information from the defendants." *Id.* Here, he has made the same error, arguing that he has not collected any data, has not done any calculations using his methodology, and could not do so without information from Riddell. (Saylor Decl., Ex. 11, at 84:9-85:4, 82:11-22, 85:21, 106:11-22.)

- There, Dr. Cowan failed to isolate the effect on reimbursement rates due to the defendants' allegedly wrongful conduct because he simplistically "assign[ed] any differential found [in pharmacy reimbursement rates] to be the result of Defendants' alleged conduct". 2017 WL 275398, at *19-20. Here, he failed to isolate, or even propose a methodology for isolating, the effect on pricing due to the allegedly false and misleading marketing claims, as opposed to other factors. (Saylor Decl., Ex. 3, at ¶ 1.8.)

- There, he improperly relied on class wide averages which "cannot demonstrate antitrust impact for individual class members", and, "[b]ecause antitrust impact is an element of the Plaintiffs' causes of action, 'every class member must prove at least some antitrust impact resulting from the alleged violation.'" 2017 WL 275398, at *20. Here, he improperly proposes a single, aggregate damages number for the entire class, which does not provide a method for determining any individual class member's ascertainable loss under the state consumer protection statutes at issue. (Saylor Decl., Ex. 3, at ¶ 1.9.)

- There, Dr. Cowan's proposed methodology was "unreliable because it [found] damages for class members who have suffered no damage." 2017 WL 275398, at *21. Here, he concedes that some purchasers received large enough discounts to have paid no premium at all, and therefore had no ascertainable loss, but proposes

2

      a gross profit margin analysis that would find damages for those purchasers. (Saylor Decl., Ex. 3, at ¶ 1.9.)

Accordingly, Plaintiffs' attempt to gloss over the significant similarities – and common flaws – between Dr. Cowan's proposed methods here and in *Pharmacy Benefits Managers* is a tacit admission that they cannot overcome those flaws.[2]

## II.   DR. COWAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT CANNOT ASSIST THE TRIER OF FACT

Plaintiffs do not dispute that Dr. Cowan's testimony "must be relevant for the purposes of the case" and have a "valid scientific connection to the pertinent inquiry" in order to pass muster. (Opp. at 3). *See Daubert*, 509 US at 591. Plaintiffs' Opposition proves that the Cowan Report is not consistent with their theory of liability and therefore should be excluded.

Plaintiffs allege that the phrase "concussion reduction technology" or "CRT" "necessarily intends or implies the ability to reduce concussions, and that *such phrase mislead or deceived consumers* regarding the ability of Riddell helmets with CRT to reduce the incidence of concussion better than *any other football helmet on the market*." (Opp. at 6) (emphasis added). As the Court previously noted, Plaintiffs' claim "there is no material difference in terms of concussion prevention between Riddell's helmets and other football helmets… yet [Riddell charges] price premiums of $50 per helmet as compared to other comparable helmets available on the market." (Dkt. 65 at 9).[3]

In their Opposition, Plaintiffs wrongly contend that they can prove a "premium" price

---

[2]    Proposed Class Counsel here, Dennis G. Pantazis of Wiggins Childs, is also counsel for the plaintiffs in Pharmacy Benefit Managers. *See, e.g.,* No. 2:06-md-07182, Dkt. No. 275. Plaintiffs also rely on several antitrust cases in their Opposition while complaining about Riddell's reliance on *Pharmacy Benefits Managers*. *In Re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D. D.C. 2002); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001).

[3]    Plaintiffs cannot dispute that Dr. Cowan does not actually use the $50 premium in his proposed GPM methodology, which is in fact "inconsistent with his assertion of a $50 premium for helmets sold at MSRP." (Saylor Decl., Ex. 3 at ¶ 3.40).

3

comparison using no relevant comparators at all. This is fatal. A "premium" necessarily implies an increased charge as compared to *something else*. Plaintiffs cannot turn their back on their own allegations that: they seek to recover for an allegedly unjustified "premium" charged by Riddell *as compared to* "other football helmet[s] on the market." However, when challenged on the basis that their damages analysis is devoid of any data regarding comparable helmets on the market, Plaintiffs did just that by abandoning their essential theory (as identified by this Court, *see* Dkts. 41 and 65), to argue that the "focus" in a damages analysis is that Riddell "charged consumers extra for [CRT], and failed to deliver." (Opp. at 6). There is nothing in the record to support this argument, and Plaintiffs cannot prove how, according to them, Riddell's CRT helmets "failed to deliver" in any way. Moreover, Plaintiffs cannot change to this theory now, because they relied on a comparison to other helmets on the market to survive Riddell's two motions to dismiss.[4] Plaintiffs cannot possibly demonstrate that Riddell "charged consumers extra" for anything unless some comparison is made to other, non-CRT helmets, and they specifically identified those "other" helmets as helmets made by Riddell's competitors in the SAC. *See* Dkt. No. 45, ¶11, n.1. They simply cannot measure that alleged "premium" without looking at such other helmets.

Again, Plaintiffs allege that Riddell's CRT marketing "mislead or deceived consumers regarding the ability of Riddell helmets with CRT to reduce the incidence of concussion better

---

[4] Of course, had Plaintiffs based their claims on the "inability of any helmets to reduce concussions," Riddell would have attacked and destroyed that theory just as it destroyed the $50 price premium case they actually plead. For example, Plaintiffs cannot explain why comparing sales of non-Revolution helmets from 1998-2002 to post-2006 Revolution sales provides reliable evidence of the value of the Revolution helmets without the CRT claim during the class period. *See* Saylor Decl., Ex. 3, at 3.30, 3.31. Indeed, the Revolution series of helmets were sold at a higher price from 2002-2006 (prior to the results of the UPMC Study and the making of the CRT claims). Plaintiffs have no answer for this and thus no proof for their alternate damage theory.

4

than any other football helmet on the market." (Opp. at 6). This claim is not consistent with what Dr. Cowan *actually proposes*. He proposes a comparison of Riddell's profit margins on the Revolution series of helmets after CRT claims to Riddell's helmets sold five years before Riddell even made CRT marketing claims (which goes to the theory of liability that Plaintiffs abandoned), and which sales do not include the sales of the Riddell Revolution series of helmets that were made before the UPMC Study results were publicized and before the CRT claims made in advertisements.[5]

In fact, Plaintiffs concede that the alleged "'premium' has been in effect since 2002, but CRT marketing was not instituted until 2007." (Opp. at 11). Only a premium generated in, or after, 2007 could be attributed to CRT advertisements. But Plaintiffs explicitly rely on a $50 premium from sales in 2002 or 2003 (obviously before the introduction of the CRT claims in 2007).[6] Plaintiffs then confusingly claim (incorrectly and without citing any evidence) that the "premium charged for CRT helmets was attributable to the CRT claims and nothing else." (Opp. at 10-11). A premium generated by sales in 2002-2003 cannot be attributable to advertising claims first made in 2007. Plaintiffs simply refuse to recognize this fatal flaw, and instead directly contradict themselves in the Opposition.

Dr. Cowan proposes a comparison that avoids isolating the effect of the CRT marketing claims. Dr. Cowan ignores the time period of 2002 through 2006, when the Revolution series of helmets were on the market but prior to the CRT marketing claims, first made in 2007. Instead,

---

[5] Dr. Cowan proposes to measure the alleged unlawful premium as a function of "Excess GPM" – difference in Riddell's GPM associated with CRT helmets as compared to Riddell's traditional helmets. But that comparison mirrors the testing done by the UPMC, which showed that CRT helmets are more effective at reducing concussions than traditional helmets. Thus, a liability finding, to support Dr. Cowan' Excess GPM model, is foreclosed by the Court's dismissal of consumer fraud claims based on advertising that accurately represents the results of the UPMC study. *See* Dkt. No. 65, at 3.

[6] Saylor Decl., Exs. 42, 46, 50, 57, 61 (responses to Interrogatory No. 10).

he compares Riddell's profit margins on a totally different set of non-Revolution series helmets from five years before the CRT marketing claims were ever made. Using sales of non-Revolution helmets and ignoring five years of sales of Revolution helmets means that Dr. Cowan's analysis does not "fit" this case.

Plaintiffs also misunderstand Riddell's argument regarding ascertainable loss. Riddell is not arguing that Plaintiffs must, at this stage, provide "proof of individual damages on the class member level." (Opp. at 7). But Plaintiffs must propose a methodology for calculating damages that will confirm that each class member has suffered ascertainable loss. Just as antitrust impact on each class member was required to be shown at the class certification stage in *Pharmacy Benefit Managers*, so too must an ascertainable loss be shown by each proposed class member here and now as ascertainable loss is an element of Plaintiffs' claims. *See* Dkt. No. 65, at 37. Dr. Cowan's proposed methodology, based solely on Riddell's internal data, would indiscriminately apply to class members who actually paid a "$50 premium," those who paid no premium, and any purchaser in-between.

Plaintiffs also wrongly claim that Defendants are "incorrect" to assert the "fabricated" argument that "if the discount [off MSRP] is equal to or exceeds $50, then there is no damage." (Opp. at 14). But Riddell is merely taking Dr. Cowan at his words:

> In the methodology proposed below, it is assumed that if a CRT helmet is sold for anything up to $50 below MSRP, only the premium amount paid is impacted. Further, if it is sold for more than $50 below MSRP, the actual premium paid is accepted as zero. … The issue of quantifying the full impact of premiums paid is that actual premium paid will vary from $0 to $50 for individual helmet sales, depending on the actual price paid relative to the respective MSRP.

6

Cowan Report at 4. Plaintiffs cannot save Dr. Cowan by disregarding his Report.[7]

In addition, Dr. Cowan's proposed methodology, which "focuses on the estimation of premium paid" using Riddell's gross profit margins, necessarily will result in a single damages estimate for all class members. Under Dr. Cowan's gross profit margin methodology, all class members will participate in a fund. That fund is calculated by using an average of all sales prices. Plaintiffs completely ignore that this method creates an interclass conflict, as it will dilute the claims of class members who obtained smaller discounts or paid MSRP, and inflate the claims of class members who obtained larger discounts or paid more than $50 off MSRP (and should therefore have no damages under Dr. Cowan's analysis).[8] Dr. Cowan therefore fails to propose a theory of calculating damages that fits the Plaintiffs' claims in this case.

### III. DR. COWAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS NOT RELIABLE

Plaintiffs agree that Dr. Cowan must have "good grounds" for his belief. (Opp., at 4.) *In re Pharmacy Ben. Mgrs.*, 2017 WL 275398, at *17. Dr. Cowan does not meet this standard, and Plaintiffs' Opposition highlights their purposeful refusal to stand behind their own expert.

---

[7] Plaintiffs' reliance on *In re Cardizem* and *In re Vitamins* for the argument that they need not show that injury exists for each putative class member is misplaced. In *In re Cardizem,* the plaintiffs were only permitted to proceed without proof of injury for each class member because the fact of antitrust impact (*i.e.*, injury) was susceptible to proof on a class-wide basis. 200 F.R.D. at 307-08. Similarly, in *In re Vitamins*, the court merely observed the common refrain that individualized inquiries into the "amount of damages" does not normally preclude class certification, and that class members' damages could be analyzed if plaintiffs were successful in proving the alleged antitrust conspiracy and impact. 209 F.R.D. at 268. Neither case involves the situation presented here – where the *fact of injury* is in dispute and the fact that certain class members have not been injured at all has been acknowledged by Plaintiffs' expert.

[8] For example, Plaintiff Gustavo Galvan apparently paid 100 percent over MSRP to someone for a Riddell helmet (he has no receipt). Saylor Decl., Ex. 54, at 19, 30; *id.*, Ex. 58. Under Dr. Cowan's analysis, not only will Mr. Galvan not be able to recover the full amount of his supersized "premium," but his claim would be further diluted by those class members that paid less than MSRP (such as Plaintiff Alliance Youth Sports Association) and those who paid less than $50 below MSRP. Clearly, Mr. Galvan would fare better pursuing his claim individually. The same is true for those who paid MSRP or close to it, such as Plaintiffs Douglas and Denise Aronson and Norma Theil. The present case much more closely tracks the issues presented in *Pharmacy Benefits Managers.*

7

First, Plaintiffs claim that the Cowan Report "provides mathematical formulae that can be easily applied and tested" and that "Riddell merely needs to produce the withheld financial data to input into the formula in order to establish a final class-wide damage number." (Opp., at 8-9). This is not true. Plaintiffs do not dispute that Dr. Cowan testified that he would consider changing his methodology to suit any data he may get from Riddell in the future.[9] So, while Dr. Cowan may reproduce a formula on one page of his Report, he has no idea whether that formula would even work, or what data may be available to "plug in" to the formula.[10]

Second, Plaintiffs offer no legitimate explanation for Dr. Cowan's failure to consider the multitude of factors that should be accounted for in order to isolate the effect on pricing of the CRT marketing claims at issue. *See* Saylor Decl., Ex. 3 at 1.8, pp. 20-30. Plaintiffs merely state that "[t]here is nothing in the Cowan Report to indicate that most if not all of these alleged factors would not be considered." (Opp. at 9). Yet the Cowan Report in fact *does* demonstrate that these factors are not considered, as they are missing from his proposed methodology. For example, according to Plaintiffs, manufacturing costs "includes many if not all of the alleged factors and differences that Riddell complained about" so Dr. Cowan need only account for those costs. (Opp. at 9-10). This is simply not true, and is in fact contradicted by Dr. Cowan's

---

[9] *See* Saylor Decl., Ex. 11 at 84:9-85:4 (stating he would collect data from Riddell to calculate damages if the proposed class is certified); 82:11-22; 85:21 (stating he hasn't "collected data from anybody"); 106:11-22. Plaintiffs' implication that Defendants somehow prevented the discovery of information Plaintiffs needed to present a viable damages model is simply false. (Opp. at 9, n.3). Plaintiffs were not precluded from obtaining any information that would be relevant to their motion for class certification. Plaintiffs concede that they "did not seek to compel production of all necessary Riddell financial records" (Opp. at 9); they cannot now rely on speculation about data that may or may not exist in order to save the Cowan Report from exclusion.

[10] Plaintiffs' reliance on *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365 (D.D.C. 2007) is misplaced. In that case, the expert relied on government and academic studies, internal projections, and empirical sales data – none of which Dr. Cowan uses here. Likewise, in *Goldenberg v. Indel, Inc.,* No. 09-5202 (JBS/AMD), 2012 WL 3780555 (D.N.J. Aug. 2012), the court allowed an expert to use a generally accepted method of asset allocation to determine damages in an ERISA case.

8

testimony. When asked if he knew "which soft costs [he] would apply to the … cost of goods manufactured in this case," Dr. Cowan responded: "No, I'd have to see Riddell's books to see what they did."[11] Thus, Dr. Cowan does not even know whether applying these unexplored additional manufacturing, sales and administrative costs might result in no increase in gross profit margin during the class period (and no damages under his methodology).

Third, Plaintiffs provide no legitimate explanation for the fact that Dr. Cowan's methodology fails to account for the effect on pricing due to marketing claims this Court has found to be permissible, as they represent the results of the UPMC Study. Plaintiffs merely state that the "undisputed evidence in this case is that the premium charged for CRT helmets was attributable to the CRT claims and nothing else." (Opp. at 10-11). Plaintiffs do not point to any evidence at all, and cannot even cite the Cowan Report for this proposition. It is also plainly not true as the "premium" began five years before the CRT claims.[12] Indeed, as explained in the Stamm Report, "controlling for all other differences in the helmets being compared is critical" to isolating a premium "associated with only the alleged false and misleading claims."[13]

Fourth, Plaintiffs' attempt to defend Dr. Cowan's faulty choice of time period, which would compare Riddell profit margins for sales prior to 2002 with sales from 2008 to the present,

---

[11] Saylor Decl., Ex. 11 at 134:16-19.

[12] In their reply brief, Plaintiffs similarly argue that "all post-CRT sales are attributable to the falsity of CRT." (Reply at 32). This statement is overbroad, as Plaintiffs have no evidence that every purchaser of a CRT helmet purchased solely based on CRT. It is also unhelpful because, while *sales* may be attributable to CRT claims (an unproven contention), Plaintiffs have no evidence of a *premium* attributable to CRT claims.

[13] Saylor Decl., Ex. 3 at 3.2. Plaintiffs' attempt to characterize the major failings of the Cowan Report as a mere "disagreement" among experts that only go to weight, and not admissibility is a red herring, and the cases Plaintiffs' cite are inapposite. *See Schwartz v. Avis Rent a Car Sys.*, No. 11-4052 (JLL), 2014 WL 4272018 (D. N.J. Aug. 28, 2014) (where the court merely found that the lack of a consumer survey would go to weight, where the expert report was otherwise reliable because it was based on academic literature and an analysis of competitor data); *In Re Jacoby Airplane Crash Litig.*, No. 99-6073 (HAA), 2007 WL 2746833 (D. N.J. Sept. 19, 2007) (in which the court was discussing whether a factual report came within a hearsay exception, and the case did not involve a *Daubert* motion).

9

likewise fails. It is undisputed that Riddell was able to increase its prices at the time the Revolution helmet was launched in 2002.[14] As Plaintiffs put it, "the 'premium' has been in effect since 2002, but CRT marketing was not instituted until 2007." (Opp. at 11). Accordingly, any "premium" that existed before 2007 cannot be due to the marketing claims that allegedly misled Plaintiffs. Plaintiffs spin their wheels trying to explain this. Plaintiffs claim at the top of page 11 that the premium is "attributable to the CRT claims and nothing else." Further down the same page, Plaintiffs contend (without citation) that the "[t]he critical distinction here is *when* the premium price was originally instituted and not necessarily when CRT claims were being made." (Opp. at 11).[15] Together, these statements lead to the nonsensical argument that the premium charged by Riddell *in 2002* can only be attributable to marketing claims first made *in 2007*.

Plaintiffs also wrongly contend that Dr. Cowan's use of 2008 to the present as the damages period is appropriate. Plaintiffs do not dispute that, as Dr. Cowan conceded, there would be no damages after Riddell stopped making the marketing claims.[16] In fact, Defendants "phase out" of CRT was complete by the fall of 2012. Indeed, the 2013 Football Catalog was released in late 2012 and contains no reference to CRT.[17] Plaintiffs cite nothing to the contrary:

- Plaintiffs claim that "Riddell was providing interviews leading with CRT to news organizations in the fall of 2012, which they were aware would be printed in

---

[14] While Plaintiffs accuse Riddell of "fail[ing] to reveal to the Court that they began adding the price premium in 2002", the Stamm Report specifically notes that Riddell increased its prices upon the introduction of CRT helmets in 2002. Saylor Decl., Ex. 2 at 3.15.

[15] On the next page, Plaintiffs respond to the fact that Dr. Cowan fails to account for price increases due to CRT design elements by claiming that "[t]he premium at issue related solely to the CRT helmet and was not divided among any other fanciful product 'elements'". (Opp. at 12). Yet Plaintiffs provide no evidentiary support for this argument. And, in fact, Riddell's Senior Vice President of Research and Product Development, Thad Ide, testified that the reason Riddell was able to achieve the higher price point was due to the new technology included in the CRT helmets. Saylor Decl., Ex. 7 at 233.

[16] Saylor Decl., Ex. 11 at 161:5-22.

[17] *See* Opp. to Mot. for Class Certification, Dkt. No. 214, at 10, n.35, 12.

      magazines in 2013."[18] However, the cited excerpts relate only to rotational acceleration and "the urgency of changing NOCSAE standards" to incorporate rotational acceleration. See Dkt. No. 230-1, Ex. 1, at RIDDELL0008660.

- Plaintiffs next cite to a spreadsheet, created in April 2012 during Riddell's phase out of CRT, to suggest that "on the date this lawsuit was filed, CRT statements were present on Defendants' social media pages on Facebook, and Twitter."[19] Plaintiffs purposefully presented this chart without the April 17, 2012 cover e-mail (Saylor Decl., Ex. 10). Plainly, a document created in April 2012 indicates nothing about what was on Defendants' social media pages over a year and a half later, when this case was filed. See Dkt. No. 1 (Complaint, December 16, 2013).

- Plaintiffs also point to three social media postings – two dated December 7, 2011, and one dated July 30, 2010. Opp. at 13, citing Cecchi Decl., Dkt. No. 230-1, Exs. 2, 3, 4; see also Pltfs. Reply in Support of Class Certification, Dkt. 232, citing Cecchi Decl., Exs. 57, 58, 59. Though Plaintiffs may have been able to hunt these down by digging deep in social media archives, each posting was disseminated before the fall of 2012.[20]

Even if these sources suggested that CRT claims existed in the marketplace after the fall of 2012, they fall far short of Plaintiffs' burden to demonstrate that Riddell disseminated any CRT claims after the fall of 2012 or that they were disseminated on a broad, common basis to support a damages analysis that extends past 2012, let alone to the present.

## CONCLUSION

      For all of the reasons set forth above, Riddell respectfully requests that the Court grant this Motion, and grant such other and further relief as the Court deems just and proper.

---

[18]    Opp. at 13 (citing Cecchi Decl., Dkt. No. 230-1, Ex. 1); see also Dkt. 232, at 8-9.

[19]    Opp. at 13 (citing Cecchi Decl., Ex. 8); see also Dkt. 232, at 9.

[20]    The only evidence that Plaintiffs present to suggest that a CRT claim was made after the fall of 2012 is a request by Riddell to a single retailer – Dick's Sporting Goods – to remove CRT from their website in January 2014. Opp. at 13 (citing Cecchi Decl., Dkt. No. 230-1, Ex. 5); see also Dkt. No. 232, at 9. This single instance of the use of CRT on a single retailer's website was caught by Riddell and directed to be taken down.

Dated: Parsippany, New Jersey
        March 20, 2017

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: */s/ Joseph A. Boyle*
    Joseph A. Boyle

Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950
*Attorneys for Defendants*