Joseph A. Boyle
Michael C. Lynch
Melissa E. Byroade
James B. Saylor
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, New Jersey 07054
(Tel.) (973) 503-5900
(Fax) (973) 503-5950

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF MOTION TO EXCLUDE THE
<u>EXPERT REPORT AND TESTIMONY OF DR. BARRY JORDAN</u>**

*Confidential*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

I.  PLAINTIFFS CONFIRM THE MERIT OF DEFENDANTS' MOTION TO EXCLUDE THROUGH THEIR ABANDONMENT OF DR. JORDAN'S SURVEY.......................................................................................................................... 3

II. PLAINTIFFS' OPPOSITION DISCARDS LAW OF THE CASE AND LACKS ANY RELEVANCE OR FIT TO PLAINTIFFS' CLAIMS............................................... 5

III. PLAINTIFFS CONCEDE THAT DR. JORDAN'S METHODOLOGY IS UNRELIABLE AND IDIOSYNCRATIC ......................................................................... 8

CONCLUSION............................................................................................................................ 11

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Calhoun v. Yamaha Motors, Inc.*,
  350 F.3d 316 (3d Cir. 2003)..................................................................................................8

*James v. Harrah's Resort Altantic City*,
  No. CV 14-5434 (JBS/JS), 2016 WL 7408845 (D.N.J. Dec. 22, 2016)
  (Simandle, J.) .......................................................................................................................11

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994).............................................................................................5, 8, 9

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000) ..................................8, 9

*United States v. Schiff*,
  538 F.Supp.2d 818 (D.N.J.2008), aff'd, 602 F.3d 152 (3d Cir.2010) ........................................9

Defendants Riddell, Inc., Riddell Sports Group, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. (collectively, the "Defendants") respectfully submit this reply memorandum in further support of their motion to exclude the Expert Report of Dr. Barry Jordan (Cecchi Decl., Dkt. No. 189, Ex. 30) (the "Report") and the deposition testimony of Dr. Jordan dated January 12, 2017 (Declaration of James B. Saylor, Dkt. 215 ("Saylor Decl."), Ex. 12).

## PRELIMINARY STATEMENT

Plaintiffs, much like they did with their opposition to the exclusion of Dr. Cantu's report, make no effort to rebut the arguments made by Riddell to exclude Dr. Jordan's report and testimony. Plaintiffs did not take the deposition of Defendants' rebuttal expert, Dr. Thomas Gennarelli. Plaintiffs did not submit any supplemental/rebuttal material from Dr. Jordan. Plaintiffs did not defend the evidence relied on by Dr. Jordan or submit any supplemental evidence to try to further explain and support Dr. Jordan's actual report and opinion. Plaintiffs' opposition to Defendants' motion to exclude the report and testimony of Dr. Jordan only demonstrates that they cannot overcome the scientific authority that supports Riddell's claims, that they refuse to follow the law of the case when it does not suit their purposes, and that they cannot even reach consensus between the two experts they offer for the same purpose.

Plaintiffs' employ the same tactic of retreat in defense of Dr. Jordan's report that they did in defense of Dr. Cantu's – they transmogrify Dr. Jordan's opinion from one that involved a purported survey of scientific literature to one based entirely on his personal opinion. Opp. at 7. The introduction and top-line conclusion of Dr. Jordan's Report states that he "surveyed the present state of medical literature" and "can affirmatively state that the claim by Riddell that the Revolution series football helmets reduce the risk of concussion *is not supported by the scientific literature*." Cecchi Ex. 30, at 2. As borne out in his deposition, Dr. Jordan's survey involved the application of an idiosyncratic, untestable methodology he used to subjectively rank

scientific evidence which supports his conclusion that "[t]here is no high level of evidence supporting the efficacy of one helmet compared to another in reducing concussion risk." *See* Saylor Decl., Ex. 12, at 71-76.  Despite all this, Plaintiffs argue that Defendants were incorrect to read his Report as a survey – "***That is not what Dr. Jordan did***." Opp. Br., at 7.[1]  Dr. Jordan's actual report and methodology demonstrate that Plaintiffs once again engage in a bait-and-switch in violation of their obligations under Rule 26.

Plaintiffs' Opposition further demonstrates the lack of relevance and fit of Dr. Jordan's report and testimony (and Plaintiffs' entire motion for class certification) to Plaintiffs' claims and the law of the case.  Dr. Jordan's Report is based on the bold conclusion that "[h]elmets have not been proven to reduce the incidence of [concussions]." Cecchi Decl., Ex. 30, at 4; Saylor Decl., Ex. 12, at 50.  The Court was clear that Plaintiffs had to choose between two "unclear and inconsistent" theories, Dkt. No. 41, 2-3, and Plaintiffs' Opposition acknowledges this choice: "if Plaintiffs claims were not based on comparative effectiveness, they should clearly allege that their claims were that no football helmet can reduce concussions." Opp., at 10, n.5 (citing Dkt. No. 41, 30-31).  Plaintiffs then say that they "***chose to focus their claims that Riddell helmets were not comparatively better than other helmets***," Opp. at 10, in direct contradiction to their defense of Dr. Cantu's report, which stated that their "claims ***do not involve a comparison between Riddell CRT helmets and those of its competitors***." Pltfs. Opp. to Mot. to Exclude the Report of Dr. Cantu, at 8.  Putting aside this stark contradiction, Plaintiffs' Opposition to the instant motion argues that they can ignore the law of the case because "evidence that *no* helmet can reduce concussions would be relevant to the more specific proposition that Riddell's are not

---

[1] There can be no question that Dr. Jordan's report and disclosure was that of a survey of the state of scientific literature that supports or supposedly refutes Riddell's claims.  Indeed, Dr. Jordan testified that his job was to say that Riddell's claims of concussion reduction technology are not supported by level 1 evidence." *Id.* at 156.

comparatively better than other helmets." Opp., at 10.  This Court has already found this proposition to be so unclear and inconsistent to merit dismissal.  Therefore, if Plaintiffs continue back down this path, the Court should dismiss the case in its entirety.

Last, Dr. Jordan's report is unreliable, and Plaintiffs' opposition does not even try to save it.  Dr. Jordan's "Level 1, 2, 3" methodology is not outlined in his report.  Dr. Jordan testified hat he "didn't outline [his methodology] specifically" in his report, *See* Saylor Decl., Ex. 12, at 76, but that "[s]cientific studies are usually classified by level of evidence" which is set forth "[i]n the medical literature" and "well known" but that he cannot provide "the exact article right now." *Id.*, at 70-71.  Plaintiffs do not provide this unidentified article to support his methodology in opposition to this motion to exclude either.  In truth, Dr. Jordan's methodology is based on his own subjective conclusions, and the Court should reject it as wholly unreliable.

## I.  PLAINTIFFS CONFIRM THE MERIT OF DEFENDANTS' MOTION TO EXCLUDE THROUGH THEIR ABANDONMENT OF DR. JORDAN'S SURVEY

Like the expert report of Dr. Cantu, Dr. Jordan's expert report and disclosure and the conclusions therein are contain a survey of "the present state of medical literature," and find that "the claim by Riddell that the Revolution series football helmets reduce the risk of concussion is not supported by the scientific literature." Cecchi Decl., Ex. 30, at 2.  Dr. Jordan's report discusses the supposed "lack of high level evidence" in laboratory and epidemiological studies that he examined and cited; that there is supposedly "no high level of evidence" supporting the efficacy of helmets with respect to concussion risk; and, that "[t]here is no existing strong evidence that a helmet can . . . significantly reduce the incidence of SRC [sports-related concussions]." *Id*. at 3-4.  Dr. Jordan testified that he relied upon a "well known" methodology borne out "in the medical literature": "Scientific studies are usually classified by level of evidence.  Level 1 being the highest level, level 2 and level 3, and level 3 being the lowest level

3

of evidence." Saylor Decl., Ex. 12, at 70-71. Dr. Jordan testified that he applied these "levels" to the various studies that he considered, and based upon his conclusion on his belief that none rose to "Level 1" evidence. *Id.* at 72-74. While he "didn't refer to that" methodology in his report, it was implied by his use of the term "high level" evidence or "strong evidence." *Id.*, at 71, 76. The failure to define Dr. Jordan's alleged methodology in his Rule 26 report, his deposition, or in Plaintiffs' Opposition proves that his opinion is unreliable and subjective.

Defendants engaged Dr. Thomas Gennarelli to evaluate Dr. Jordan's conclusions and methodology. *See* Saylor Decl., Ex. 4, at 1.[2] Dr. Gennarelli found both Dr. Jordan and Dr. Cantu's survey of the scientific and medical literature to be "considerably neglectful of the entirety of biomechanical works regarding concussion biomechanics and helmet performance testing." Saylor Decl., Ex. 4, at 4. Dr. Gennarelli further concluded that "[f]ootball helmets also reduce the incidence of concussion resulting from blows to the head that occur during football games and practices" and that those "who contend otherwise, such as Dr. Jordan, are making a contention, that is well outside the mainstream of contemporary medical, engineering and scientific thinking and literature." *Id.* at 5. Indeed, Dr. Gennarelli observed that Plaintiffs' other expert, Dr. Cantu, did not even agree with Dr. Jordan's conclusion. *Id.* at 5-6.

Defendants' motion to exclude Dr. Jordan's testimony focused on the unreliability of his opinion, given the evidence available to him and his inability to demonstrate that his methodology was accepted by the scientific community. Like their retreat with Dr. Cantu, Plaintiffs refuse to meet the challenges raised by Defendants' motion and Dr. Gennarelli's report, and claim that Dr. Jordan only "testified from his knowledge, training and experience as a

---

[2] Dr. Gennarelli's qualifications are briefly described in Defendants' Reply in further support of the Motion to Exclude the Expert Report of Dr. Robert Cantu (and Dr. Gennarelli's rebuttal report, Saylor Decl., Ex. 4).

neurologist." Opp. at 6.  They disavow any notion that Dr. Jordan's opinions were based on "some amorphous set of medical literature" and refuse to address Defendants' arguments.  *Id.*  Unlike their response to Dr. Cantu, they do not claim that the factors outlined by the Third Circuit in *Paoli* do not apply at all, but effectively dismiss them by saying that his opinion was "scientific" and "reliable" because his "methodology was to draw upon his learning and experience as a neurologist" and that the "review of the medical literature" was only to determine whether there existed anything that would change his preconceived opinion.  *Id.* at 3-4, 6-7.  Again, like Defendants' motion to exclude the expert report of Dr. Cantu, had Dr. Jordan disclosed that he was offering a personal opinion and not a survey of scientific literature, the focus of Defendants' motion and Dr. Gennarelli's report would have attacked this separately unsupportable conclusion, and Dr. Jordan's qualification as a medical doctor to express an opinion about the scientific literature at issue in this case.

Plaintiffs cannot convert Dr. Jordan's flawed survey of scientific support into an unassailable personal opinion that they instruct the Court to accept because Dr. Jordan is purportedly qualified.  This offends Plaintiffs duties under Rule 26, and should be rejected.

## II.  PLAINTIFFS' OPPOSITION DISCARDS LAW OF THE CASE AND LACKS ANY RELEVANCE OR FIT TO PLAINTIFFS' CLAIMS

This Court, in ruling on Plaintiffs' First Amended Complaint, found their "essential theory of the case . . . so unclear and inconsistent that it fails to satisfy the plausibility standard under Rule 12(b)(6). . . . ***If Plaintiffs do not rely on comparative effectiveness, and instead base their claims on the inability of any football helmets to reduce concussions, than their pleading should make that clear.***" Dkt. No. 41, at 2-3, 30-31.  Plaintiffs' chose a comparative theory, based on a study from the University of Wisconsin that compared brands of modern football

5

helmets, and thereby survived Defendants' motion to dismiss Plaintiffs' Second Amended Complaint. Dkt. No. 65, at 33, n.17, 36-37.

Plaintiffs' opposition to the instant motion acknowledges the choice they faced when filing and defending their Second Amended Complaint, but then completely disregard this Court's decisions and the law of the case. Faced with the above-described choice, Plaintiffs argue that they "***chose to focus their claims that Riddell helmets were not comparatively better than other helmets.***" Opp. at 10, n.5. This is diametrically opposite to their statement in defense of Dr. Cantu's report and testimony, where Plaintiffs argued that their "claims ***do not involve a comparison between Riddell CRT helmets and those of its competitors.***" *See* Dkt. No. 231, at 8. This tactical contradiction rejects the law of the case. Plaintiffs cynically argue that despite choosing a comparative claim over one based on "the inability of any football helmets to reduce concussions," that they may offer evidence "that *no* helmet can reduce concussions" because it is "relevant to the more specific proposition that Riddell's are not comparatively better than other helmets." Opp. at 10, n.5. This argument is not supported by the Wisconsin study, upon which Plaintiffs' SAC relied, but on the Cleveland Clinic study (modern helmets are no better than old leather helmets), which Plaintiffs abandoned to survive dismissal: "having omitted, among other things, any reference to the Cleveland Clinic study, Plaintiffs have more precisely articulated the basis of their claims." Dkt. No. 65, at 22. Plaintiffs attempt to free themselves from the standards of false advertising law by abandoning the scientific support that they argued supported their allegations regarding Riddell's CRT marketing.

This Court reject this tactic. Indeed, it is remarkable that Plaintiffs would present the Court with the same "essentially theory of the case" that this Court found to be "so unclear and inconsistent that it fails to satisfy the plausibility standard under Rule 12(b)(6)." Dkt. No. 41, at

2-3. Should Plaintiffs continue to insist that they may ignore the law of the case, the Court should find not only that they are seeking to certify a class on claims that have been dismissed, but that their continued reliance on the claims this Court found mandated dismissal requires dismissal of their claims with prejudice at this stage of the proceedings.

Nor can Dr. Jordan plausibly argue in this case that helmets have *no ability* to reduce concussions where the UPMC Study found a 31% reduction in the risk of concussion in players wearing helmets incorporating CRT as compared to players wearing traditional helmets. Dr. Jordan's report and Plaintiffs' defense thereof fly directly in the face of the Court's ruling with respect to the UPMC Study. The Court conclusively found that "Plaintiffs may not base their consumer fraud claims on marketing statements which accurately reflected the results of the UPMC study, regardless of the study's purported flaws." Dkt. No. 65, at 29. Nevertheless, Plaintiffs contend that Dr. Jordan is free to explain to a jury that he "identified flaws in the [UPMC] Study that, in his opinion, made the results of the Study suspect." Opp. at 8, n.3. Plaintiffs then go on to recount the flaws that Dr. Jordan identified and will supposedly present to a jury – purported bias, age of the players, the age of the helmets, etc. – all of which Plaintiffs' alleged in the SAC and this Court *considered and rejected. Compare id.*, *with* Dkt. No. 65, at 27-29. These issues are simply not in this case, and Plaintiffs' inability to support a comparative theory of liability does not resurrect them.[3]

---

[3] Plaintiffs' Opposition suggests that "whether the 31% concussion reduction claim could be transferred to helmets that were not part of the UPMC Study and to Riddell's concussion-reduction technology generally is an entirely different issue." Opp., at n.2. Plaintiffs' passing attention to this notion of alleged differences between the models of Riddell helmets at issue in this case is not supported by any evidence that there is any difference with respect to these helmets or the efficacy of CRT therein. *See* Def's. Opp to Class Certification, Dkt. No. 214, at 2 n.5, 5-6. This Court has also already found that Plaintiffs cannot "establish that 'the technology in place in [all the helmets at issue in this case] is not the same technology 'shown' to reduce concussions." Dkt. No. 65, at 32. And, Plaintiffs did not attempt to pursue any claims or certify

7

As Plaintiffs' explain in their brief, Rule 702 and *Daubert* require that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motors, Inc.*, 350 F.3d 316, 321 (3d Cir. 2003). The requirement of "fit" is "one of relevance and expert evidence which does not relate to an issue in the case is not helpful. The expert's testimony must 'fit,' and admissibility depends, in part, on a connection between the expert opinion offered and the particular disputed factual issues in the case. Fit is not always obvious, and scientific validity for one purpose is not necessarily validity for other unrelated purposes." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000) (citations and quotations omitted). The expert's testimony must be "sufficiently reliable so that it will aid the jury in reaching accurate results." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). Dr. Jordan's report and testimony do just the opposite. To allow Dr. Jordan to present his conclusions about the purported flaws in the UPMC Study would contradict this Court's previous rulings. Dr. Jordan's belief that no helmet can reduce concussions was abandoned in the SAC and is "well outside the mainstream of contemporary medical, engineering and scientific thinking and literature." Saylor Decl., Ex. 4, at 5. Such an opinion, contradicted even by Plaintiffs' other expert offered for the same purpose, will not aid the jury in reaching an accurate result.

### III. PLAINTIFFS CONCEDE THAT DR. JORDAN'S METHODOLOGY IS UNRELIABLE AND IDIOSYNCRATIC

Defendants, at length, addressed why the methodology employed by Dr. Jordan in his evaluation of the scientific and medical literature – a system of "levels" that he didn't "specifically" include in his report, but testified at length to and is supposedly implied in his

---

a class based on the 31% claim or any alleged difference between any of the alleged helmet models in this case.

report – was unreliable. *See* Mot., at 13-22. Defendants' addressed each one of the factors outlined in the Third Circuit's decision in *In re Paoli R.R. Yard PCB Litig.*. 35 F.3d at 742, n.8. Unlike their defense of Dr. Cantu's report, Plaintiffs do not dispute that these factors apply (at least to some degree) to Dr. Jordan's report. Opp. at 3-4. Nevertheless, Plaintiffs refuse to address any of them. Rather, Plaintiffs baldly claim that Dr. Jordan did not review an undefined pool of medical literature, and that the Court may assume the reliability of his opinion because his supposed "methodology was to draw upon his learning and experience as a neurologist." This does not carry Plaintiffs' burden to establish, by a preponderance of the evidence, that the Rule 702 requirements are met. *See In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir.1999); *United States v. Schiff*, 538 F.Supp.2d 818, 834 (D.N.J.2008), aff'd, 602 F.3d 152 (3d Cir.2010).

Plaintiffs' failure to meet their burden is evidenced by their retreat from Dr. Jordan's extensive testimony about the methodology that he employed, and assurance that he could produce scientific and/or medical sources to support his methodology. Dr. Jordan concluded in his report that "[t]here is no high level of evidence supporting the efficacy of one helmet compared to another in reducing concussion risk. . . [T]he evidence that helmets reduce the risk of concussion is inconclusive." Cecchi Decl., Ex. 30, at 4. Dr. Jordan testified that this reference to "high level" evidence and other references to "high level" support in his report is based on a methodology that he used to evaluate the scientific studies that he reviewed:

> Q: When you say "high level support," how do you define high level support?
> A: Okay. Scientific studies are usually classified by level of evidence. Level 1 being the highest level, level 2 and level 3, and level 3 being the lowest level of evidence.
> . . .
> Q: Where did you come up with that ranking system?
> A: I didn't come up with it.
> Q: Where is it set forth?
> A: In the medical literature.

9

>Q: Where is that ranking system set forth?
>A: I can't give you the exact article right now. But it's well known.

Saylor Decl., Ex. 12, at 70-71. Dr. Jordan then applied his own subjective "level" to the studies that the Court has to evaluate. Dr. Jordan says that the Wisconsin Study "says so on the paper" that it is a "level of evidence 2." Then, he contends that the Virginia Tech Study, "I think it's 3." As for UPMC he "would say, yeah, yes" that it is a level 2. And the 2016 Collins Study, he said "the type of, the level of evidence, this would be probably level 2." Dr. Jordan flippantly dismisses as unreliable anything other than his subjective interpretation of what rises to the level of "level 1" evidence. Saylor Decl., Ex. 12, 70-75. However, Dr. Jordan cannot say that anything other than his subjective interpretation of "level 1" evidence could support a marketing claim or be useful to a consumer. *See id.*, at 154-156.

Plaintiffs' completely fail to defend this methodology, and cannot suggest that the reliability of Dr. Jordan's report does not rely on it. Defendants questioned why Dr. Jordan didn't set forth this "level" methodology in his report. Dr. Jordan testified that "actually I did, but I didn't outline it specifically." Saylor Decl., Ex. 12, at 76. Dr. Jordan flatly testified that his opinion is "simply to say that Riddell's claims of concussion reduction technology are not supported by level 1 evidence." *Id.* at 156. Thus, it is preposterous for Plaintiffs to suggest that this methodology is not relevant to the Court's evaluation of the reliability of his testimony. Yet, Plaintiffs' fail to identify the unidentified "medical literature" where this methodology is supposedly set forth for the Court to review. Plaintiffs do not even address some of the admissions in Dr. Jordan's untestable methodology: (1) that Riddell has "Level 2" support for its claim, the UPMC Study is more reliable than other studies, and that if researchers had corrected one alleged "flaw" in the UPMC Study (which Plaintiffs are not permitted to raise), Dr. Jordan

10

would consider the UPMC Study Level 1 evidence, *id*. at 137-138, 23-24, 153; and that (2) what Dr. Jordan's supposed methodology would consider "Level 1" evidence – NOCSAE standards that the organization's website claim show the ability to reduce the incidence of concussion – directly contradicts his finding that there is no high level support for the fact that helmets can reduce the incidence of concussions. *Id.* at 230, 255; *id.* Ex. 16. In sum, Dr. Jordan "has not followed any methodology that would render his opinion reliable, and rather produces an opinion that is 'subjective belief or unsupported speculation.'" *James v. Harrah's Resort Altantic City*, No. CV 14-5434 (JBS/JS), 2016 WL 7408845, at *5 (D.N.J. Dec. 22, 2016) (Simandle, J.).

Plaintiffs' miserably fail to meet their burden to support Dr. Jordan's reliability. The Court has no evidence to evaluate the propriety of Dr. Jordan's application of "levels" to the scientific evidence he reviewed to reach his conclusion that Riddell did not possess support for its claims. In fact, Dr. Gennarelli found that "Riddell did exactly what Dr. Jordan, and most others, would agree is best practice. Riddell conducted laboratory testing or analyzed that of others, then perused results of predicted concussion incidence in their own helmets and those of other manufacturers and finally, took the results to field testing. These studies (UPMC and Virginia Tech) confirmed that the new series of Riddell helmets, not only performed better in laboratory tests but also in the real world on the football field." Saylor Decl., Ex. 4, at 6.

Dr. Jordan's report and testimony, divorced from any evidence to support its methodology despite Plaintiffs' opportunity to present it, should be excluded.

## CONCLUSION

For all of the reasons set forth above, Riddell respectfully requests that the Court grant the Motion to exclude Dr. Jordan's report and testimony in its entirety, and grant such other and further relief as the Court deems just and proper.

| | | |
|---|---|---|
| Dated: | Parsippany, New Jersey<br>March 20, 2017 | Respectfully submitted,<br><br>KELLEY DRYE & WARREN LLP<br><br>By: */s/ Joseph A. Boyle*<br>    Joseph A. Boyle<br><br>Michael C. Lynch<br>Melissa E. Byroade<br>James B. Saylor<br>KELLEY DRYE & WARREN LLP<br>One Jefferson Road<br>Parsippany, New Jersey 07054<br>(Tel.) (973) 503-5900<br>(Fax) (973) 503-5950<br>*Attorneys for Defendants* |