UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS)<br><br>***CONFIDENTIAL – FILED UNDER SEAL*** |

### PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO EXCLUDE THE REPORT AND OPINION TESTIMONY OF ROBERT KLEIN

James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
Zachary S. Bower
CARELLA, BYRNE, CECCHI,
 OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Dennis G. Pantazis
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500

*Interim Lead Counsel and Proposed Class Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................1

LEGAL STANDARD ........................................................................................................2

ARGUMENT......................................................................................................................4

   I.   MR. KLEIN IS A QUALIFIED EXPERT WITNESS ........................................4

   II.   MR. KLEIN'S TESTIMONY IS RELIABLE......................................................5

   III.   MR. KLEIN'S TESTIMONY FITS WITH THE THEORY OF THE CASE AND IS HELPFUL TO THE TRIER OF FACT.......................................................9

   IV.   MR. KLEIN SURVEYED THE MOST APPROPRIATE UNIVERSE ............10

CONCLUSION.................................................................................................................13

## TABLE OF AUTHORITIES

**Cases**                                       **Page(s)**

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   350 F.3d 316 (3d Cir. 2003) .................................................................................. 5

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................2, 3, 4, 5

*Diaz v. Johnson Matthey, Inc.*,
   893 F. Supp. 358 (D.N.J. 1995) ............................................................................. 3

*Dyson v. Bissell Homecare Inc.*,
   951 F. Supp. 2d 1009 (N.D. Ill. 2013) ................................................................. 6

*Koninkijke Philips Elec. N.V. v. Hunt Control Sys., Inc.*,
   2016 WL 3545529 (D.N.J. June 29, 2016) ....................................................... 3, 7

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................ 3

*Luppino v. Mercedes-Benz USA, LLC*,
   2015 WL 12819051 (D.N.J. 2015) ....................................................................... 2

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) ..............................................................................2, 3, 4, 5

*United States v. Ford*,
   481 F.3d 215 (3d Cir. 2007) ................................................................................ 2

*Wehman v. State Farm Fire & Cas. Co.*,
   2015 U.S. Dist. LEXIS 117445 (D.N.J. Sep. 3, 2015) ...................................... 3

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ................................................................................ 3

**Other Authorities**

Fed. R. Evid. 401 ........................................................................................................ 2

Fed. R. Evid. 702 ..........................................................................................2, 3, 4, 5

Federal Judicial Center, *Reference Manual on Scientific Evidence* (2d ed. 2000) ........ 6, 7

*Manual for Complex Litigation (Fourth)* § 11.493 (2004) ........................................ 5

## PRELIMINARY STATEMENT

Plaintiffs' market research expert, Robert Klein ("Mr. Klein"), designed and conducted a very straight forward survey to understand what the phrase "Concussion Reduction Technology" means to consumers who are in a position to purchase football helmets and whether a football helmet having "Concussion Reduction Technology" has a material impact on their purchase decision. Based on the results of the survey, Mr. Klein concluded that the phrase "Concussion Reduction Technology" used in marketing Riddell football helmets overwhelmingly communicates that these helmets are safer and offer better protection than other football helmets, and the "Concussion Reduction Technology" feature is material to the purchase decisions of both parents and coaches.

The scientific methodology that supports Mr. Klein's findings, and ultimately his conclusions, is routinely relied upon by market researchers within Mr. Klein's area of expertise. Mr. Klein performed a rigorous qualification procedure for survey participants and he surveyed representative and statistically significant sample populations of both parents of children who play football and football coaches. His opinions are helpful to the trier of fact because they demonstrate, scientifically, that Riddell's claim of "Concussion Reduction Technology" is material to consumers and a helmet claimed to have such technology would positively impact their purchasing decisions.

Defendants make speculative, irrelevant, and, in some cases, nonsensical arguments that, if anything, go to the weight of Mr. Klein's testimony. Only by making up facts and wholly unsupported arguments can Defendants attempt, though unsuccessfully, to find fault with Mr. Klein's expertise and his thoroughly well-supported, scientific opinions. For the reasons set forth below, Defendants' motion should be denied.

## LEGAL STANDARD

In general, evidence is admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 702 "allows a witness qualified to be an expert to give testimony if the expert's scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue if: (i) the testimony is based upon sufficient facts and data, (ii) the testimony is the product of reliable principles and methods; and (iii) the expert witness has applied the principles and methods reliably to the facts of the case." *Luppino v. Mercedes-Benz USA, LLC*, 2015 WL 12819051, at *3 (D.N.J. 2015). Rule 702 is applied consistent with "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("Rule 702 mandates a policy of liberal admissibility.").[1] "A court's rejection of expert testimony should be the exception rather than the rule. *Luppino*, 2015 WL 12819051, at *3 (citing Fed. R. Evid. 702 Advisory Committee Note).

The "ultimate touchstone" for the admissibility of expert testimony "is helpfulness to the trier of fact," and such testimony "is sufficiently grounded for the purposes of litigation only if it will help the trier of fact to reach accurate results." *Paoli*, 35 F.3d at 744 and n.12; *see also United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007) (approving of the New Jersey District Court's process in evaluating "whether [the expert's testimony] provides in a reliable way some probative piece of evidence that would be helpful to a lay jury in understanding the case and reaching a reliable conclusion."). An expert's testimony need only assist the trier of fact and

---

[1] All internal citations and quotations omitted and emphasis in original unless otherwise noted.

2

relate to, or "fit," the underlying facts of the case. *Daubert*, 509 U.S. at 591. The district court must determine whether the "particular expert ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).

Once a court finds that the proposed witness qualifies as an expert, it "must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 149). Thus, the test under *Daubert* is "not what the experts say, but what basis they have for saying it." *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)); *see also Wehman v. State Farm Fire & Cas. Co.*, 2015 U.S. Dist. LEXIS 117445, at *8 (D.N.J. Sep. 3, 2015) ("The reliability inquiry under Rule 702 focuses on the soundness of the expert's methodology and technique rather than on the expert's conclusions.") (citing *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247 (3d Cir. 2008)). In the context of survey evidence, "[a]s long as [it is] conducted according to accepted principles . . . survey evidence should ordinarily be found sufficiently reliable under *Daubert*." *Koninkijke Philips Elec. N.V. v. Hunt Control Sys., Inc.*, 2016 WL 3545529, at *4 (D.N.J. June 29, 2016). Indeed, technical deficiencies or shortcomings, if any, go to the weight accorded the survey evidence, not its admissibility. *Id.* at *5.

"[Plaintiffs] do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Paoli*, 35 F.3d at 744.

> The evidentiary requirement of reliability is lower than the merits standard of correctness. *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on "good grounds," *i.e.,* if it is based on the methods and procedures of science. A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect. As *Daubert* indicates, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

*Id.* (internal citations omitted). An expert's opinion is not unreliable because he or she comes to a different conclusion than another expert. *Id.* at 746, n.15.

## ARGUMENT

### I.  MR. KLEIN IS A QUALIFIED EXPERT WITNESS

Defendants do not challenge Mr. Klein's qualifications as a survey research expert. Plaintiffs nonetheless respectfully direct the Court's attention to Mr. Klein's qualifications. Mr. Klein's qualifications cannot be glossed over, as Defendants do, because the qualifications of the proposed expert is among the factors to be considered in determining the reliability of his opinions, in addition to the threshold question of whether the person is actually an expert. Mr. Klein, a graduate of Massachusetts Institute of Technology's Sloan School of Management, has worked in the field of market research for over forty-five years. Co-Founder of Applied Marketing Science, Mr. Klein has conducted countless surveys during the course of his career for litigation and non-litigation purposes, and has testified as an expert on more than thirty occasions in the past four years alone.

## II. MR. KLEIN'S TESTIMONY IS RELIABLE

"An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). "The evidentiary requirement of reliability is lower than the merits standard of correctness. *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on 'good grounds,' *i.e.*, if it is based on the methods and procedures of science." *Paoli*, 35 F.3d at 744. Subjective belief or unsupported speculation renders an expert's opinion unreliable. *Calhoun*, 350 F.3d at 321.

Mr. Klein's market research survey meets the standard for survey reliability. It was designed in accordance with relevant factors outlined in the Manual for Complex Litigation published by the Federal Judicial Center in 2004. Exhibit 28 to Cecchi Decl. in Support of Class Certification ("Class Cert. Decl."), Klein Report at 3; *see also Manual for Complex Litigation (Fourth)* § 11.493 (2004). After engaging in a rigorous qualification process to obtain relevant, representative, and statistically significant samples for both the parent and coach populations, Class Cert. Decl., Exh. 28, Klein Report at 4-8, 10-14, Mr. Klein employed non-leading, open-ended questions to elicit responses regarding the meaning of "Concussion Reduction Technology." Surveys utilizing open-ended questions to gather data are commonplace in the field of market research and are routinely used in non-judicial settings. In addition to the care taken to identify the relevant sample populations, Mr. Klein pilot tested the questionnaire to ensure that the questions were clear and unambiguous. Declaration of James E. Cecchi ("Cecchi Decl."), Exh. 1, Klein Tr. at 46:10-15. Finally, the interviewers were constantly monitored for quality control "to make sure that the interviews were following the instructions and

appropriately recording responses." *Id.* at 57:10-18. Following these proper survey procedures ensures that the survey is scientifically valid and reliable.

Defendants seek to exclude Mr. Klein's opinion testimony by attacking its reliability in a series of arguments based on nothing but conjecture and sleight of hand. For example, Defendants speculate about context – that is, what parents "might imagine seeing" and how parents "likely process the claim" (Defs' Br. at 4-5) – when they were asked to articulate what the phrase "Concussion Reduction Technology" communicated to them, but Defendants' rank speculation does not undermine the reliability or validity of the survey. In responding to the question, parents and coaches had to internalize and process the phrase and reach an understanding of what it meant to them regardless whether the CRT claim existed in Riddell marketing materials or had been repeated by an "authority figure." Each respondent was qualified to participate in the survey as someone who had experience with football (either because a child played the sport or because he/she coached football), Class Cert. Decl., Exh. 28, Klein Report at 4-8, 10-13, thus whether they saw the claim in marketing material or learned of the claim from an authority figure is irrelevant to their understandings of what "Concussion Reduction Technology" in connection with football helmets meant to them personally.

Defendants improperly recast Mr. Klein's study as a consumer perception study, which it is not, and fault Mr. Klein for not using a control group or questions. A control group is necessary when the study seeks to test a causal proposition, such as consumer confusion between two trademarks where infringement is alleged. *See* Reference Manual on Scientific Evidence, § IV.F. The purpose of a control group in this circumstance would be to isolate the effect of one specific element on a particular outcome. *See, e.g., Dyson v. Bissell Homecare Inc.*, 951 F. Supp. 2d 1009, 1017 (N.D. Ill. 2013) (survey was "used to examine the effect of certain

6

advertising claims"). Mr. Klein's study was not designed to test causal connections. Instead, Mr. Klein's study determined what is communicated by the phrase "Concussion Reduction Technology" and the material impact of that phrase on purchase decisions. Class Cert. Decl., Exh. 28, Klein Report at 2. Mr. Klein found that the majority of parents and coaches believe the phrase "Concussion Reduction Technology" communicates a safer and more protective helmet, and that respondents would be more likely to choose a football helmet with "Concussion Reduction Technology" over helmets without "Concussion Reduction Technology." *Id.* There is no role for a control group in this type of survey because consumer confusion is not an issue. *Koninkijke Philips Elecs.*, 2016 WL 3545529, at *8 (controls not needed for a survey where survey population is restricted to people with experience in the field). Moreover, the respondents' pre-existing beliefs about concussions or helmets are irrelevant because the purpose of the survey is to gauge what the phrase communicates, not whether there is consumer confusion in the marketplace.

Finally, Defendants challenge the coding of the responses, but again their criticisms fall flat. In order to tabulate open-ended responses, it is necessary to group them into thematic groupings or "buckets" that have similar meaning.[2] Because no two respondents give identical answers, without such coding, the survey would merely be a list of responses. Coding open-ended questions in this manner is a well-recognized method of data analysis. Federal Judicial Center, *Reference Manual on Scientific Evidence*, 268 (2d ed. 2000). While Defendants claim that the coding was biased since it was performed by non-blinded coders, Mr. Klein explained at

---

[2] As Mr. Klein explained at his deposition, two trained coders independently scored the same responses to check for the level of consistency in classifying responses. They then compared their work and resolved any disagreements. If they still were uncertain, they brought the matter to Mr. Klein, and he made the final decision. And when the task was completed, Mr. Klein reviewed all the codes.

7

his deposition that, "They weren't [required to be] blind coders because they were coding for content. Not for effect. If you were coding for effect, it would be important to have people involved in the coding who weren't aware of . . . who the client was. When you're coding for content, knowing what the issues are is actually beneficial." Cecchi Decl., Exh. 1, Klein Tr. at 69:22-70:7. This is because the expert, in this case Mr. Klein, is the ultimate arbiter of any conclusions reached by such coding and will have to defend (as he did in his deposition) the codes assigned to each response.

Defendants also take issue with Mr. Klein's conclusion that respondents believed the phrase "Concussion Reduction Technology" meant that the helmets would be "safer" and "offer better protection," even though their responses may not have compared other football helmets expressly. This argument is a red herring and has no bearing on the reliability of the study.[3] Mr. Klein used by the ordinary meaning of the words when analyzing the responses. "Safer" is by definition a comparative word. Safer than what (a competitor's helmet, an older model helmet, or no helmet) is irrelevant to the analysis and the purpose of the survey. The same holds true for "reducing" concussions or "preventing" injury, because this survey did not seek to compare models of helmets or the incidence of concussions. Rather, the survey simply elicited from respondents their understanding of the meaning of the words "Concussion Reduction Technology" and the materiality of those words to their purchasing decisions.

Finally, Defendants fault the instructions to interviewers to keep responses describing what a concussion is to a minimum, but defining a concussion was not pertinent to the survey. In

---

[3] Defendants' discussion of the purpose of a consumer perception survey in false advertising litigation at section I.C is garbled, unsupported by any source, and irrelevant, as it again, miscasts Mr. Klein's survey as a "consumer perception survey," which it is not. Moreover, the survey did not attempt to identify class members so Defendants' discussion of the purported limitations of the proposed classes is totally irrelevant and should be disregarded by the Court.

8

conducting surveys, it is critical that the respondent understand the question—here, what does "Concussion Reduction Technology" communicate. Where a respondent answers by giving his or her definition of a concussion, it is clear that the respondent did not understand the question. Accordingly, it is entirely appropriate that the interviewer steer the respondent back to the question.

### III. MR. KLEIN'S TESTIMONY FITS WITH THE THEORY OF THE CASE AND IS HELPFUL TO THE TRIER OF FACT

Mr. Klein concluded that, based upon their answers, 85.1% of coaches and 94% of parents surveyed would be more likely to choose a helmet with CRT for their players or children when making purchase decisions, overwhelmingly demonstrating that Riddell's "Concussion Reduction Technology" claim is material to consumers. Mr. Klein's data accords with and supports Plaintiffs' testimony that Riddell's "Concussion Reduction Technology" claim was material to them in making their purchases and with Riddell's own documents showing a significant $50 price premium charged for helmets with CRT.

Defendants argue that the "materiality question"[4] was biased and unbalanced in favor of a finding that the CRT claim was material to respondents, but, if anything, the opposite is true. Out of the four possible response options, only one indicated that CRT was material. "Less likely to choose" and "No effect" responses both affirmatively demonstrate the lack of materiality of the CRT claim to purchasing decisions. Moreover, by claiming that this is a

---

[4] If you were choosing a helmet for your football players [or for your child in the parent survey] and you were told it featured QUOTE concussion reduction technology UNQUOTE how likely would you be to choose that helmet as compared to other football helmets without QUOTE concussion reduction technology UNQUOTE? All other things being equal would you say that

- You would be more likely to choose the helmet with concussion reduction technology
- It would have no effect on your choice of that helmet
- You would be less likely to choose the helmet with concussion reduction technology
- Or you don't know or have no opinion

9

"something for nothing" question, Defendants *admit* that CRT means something to respondents and has value, and clearly it must, considering the $50 price premium Riddell charged. But, again, their "something for nothing" argument is a red herring, because Mr. Klein was not tasked (as in a conjoint study) with determining the value that consumers would pay to obtain CRT, and indeed, Plaintiffs' damages expert has not relied upon Mr. Klein's study to determine damages.

## IV. MR. KLEIN SURVEYED THE MOST APPROPRIATE UNIVERSE

At the outset of the project, Mr. Klein conducted exploratory interviews with coaches and parents of football players to determine who has decision-making input when it comes to purchasing football helmets, so he could direct his survey to the most relevant sample populations. Class Cert. Decl., Klein Report at 4. Based on the information he obtained in those interviews, Mr. Klein determined the appropriate universe for measuring what is communicated by Riddell's CRT claim to be parents of youth football players and coaches of middle school and high school players. *Id.* Indeed, Mr. Klein testified:

> From the interviews that we conducted, it was clear that the coaches . . . at the middle school and high school level where the team really provides the equipment as opposed to Pee Wee or Pop Warner, where, in many cases, the parent provides the equipment. The coaches have a major role in the decision as to what equipment will be bought for their team. There may be an administrator or athletic director who is going to worry about budgets and actually sign the check, but the coach is the one whose decision is most relevant in this sort of situation.

Cecchi Decl., Exh.1, Klein Tr. 19:22-20:12. Thus, using sources such as directories, including, among others, Clell Wade's coachesdirectory.com, a national list of 19,344 high school and middle school coaches, Mr. Klein emailed targeted survey invitations to relevant potential participants. *Id.* The process employed by Mr. Klein to identify and include proper population samples is textbook scientific sampling.

Grasping at straws in a desperate attempt to discredit the reliability of Mr. Klein's survey, Defendants speculate wildly that *"an unknown percentage"* of parents and coaches *"may have had* flag football in mind" when they participated in the survey. (Defs' Br. at 13-14.) With no evidence—only conjecture from counsel and Defendants' rebuttal survey expert, who has no expertise in the area of flag football—the Court should completely disregard this argument. Even if Defendants' unfounded speculation were true, at most the inclusion of respondents who had flag football "in mind" goes to the weight of the survey. That being said, there is no evidence (and Defendants point to nothing other than Carlson's unsupported assumptions) that suggests that (1) a statistically significant portion of the football-playing universe plays or coaches flag football exclusively, and, importantly, (2) that respondents who may have flag football "in mind" would react to and interpret the phrase "Concussion Reduction Technology" any differently than those with tackle football experience. *See* Declaration of Robert Klein ("Klein Decl."), ¶¶ 3-5 (noting that there is no difference in what is communicated by the phrase "concussion reduction technology" and only direct purchasers of football helmets for their child were asked the question that established the materiality of the claim).

Continuing their cascade of meritless, hypothetical sampling arguments, Defendants also claim (again with no support) that non-coach institutional decision-makers should have been surveyed because they may regard concussions as less important than budgetary concerns in selecting football helmets. (Defs' Br. at 14.) Understandably, Riddell would like the survey to include people who purportedly don't care about concussions in the hopes that the results will skew to reflect a lack of materiality of the CRT claim to purchasing decisions. But, Riddell offers no evidence that non-coach institutional decision-makers care more about bean-counting than the health and welfare of their football playing students. Nor is there any evidence that the

phrase "Concussion Reduction Technology" means something substantially different to non-coach institutional decision-makers than it does the rest of the population. And, as noted above, through extensive exploratory interviews, Mr. Klein was able to identify and focus his survey on the most appropriate universe, and although there are various parties who take part in the decision about which helmet to purchase, based on his careful exploration of the issue, coaches drive the final decision. Mr. Klein's sampling methodology passes muster.

Likewise, Defendants' complaints about surveying parents of elementary school-aged children simply don't add up. (Defs' Br. at 15-16.) In fact, there are no significant differences between the net calculation, or codes 1, 2, and 3 individually for the 71 respondents who indicated they were a direct purchaser (purchased football helmet for their child) compared to the 130 respondents who were non-direct purchasers (their child's football helmet was provided by their team or they were unsure). Klein Decl., Exh. 1. Thus, there is no reason to "scrap" the results from the parent portion of the survey, and, as with all of Defendants' other arguments, this one fails to undermine the reliability and the helpfulness of Mr. Klein's testimony.

Defendants also argue that coaches from "non-school, private football programs and college and adult players should have been included in the study, (Defs' Br. at 17), despite the fact that Riddell targeted its CRT marketing to youth football leagues and high school teams

(Am. Compl. ¶ 44 and ¶ 53) – populations that were included in the survey. Riddell's desperate arguments that the Klein survey is under-representative are contradicted by its own marketing material and are, thus, unavailing.

Finally, there is no reason to believe that the words "concussion reduction technology" mean anything different today than they did during the period of time between 2007-2012 when Riddell used the phrase in its marketing and advertising. What the survey results show is that an overwhelming majority of survey respondents believe that this phrase means that the helmet is safer. Exactly what Riddell's marketing was intended to convey.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert report and testimony of Robert Klein should be denied.

Dated: March 10, 2017

/s/ James E. Cecchi
James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
Zachary S. Bower
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Dennis G. Pantazis
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500

*Interim Lead Counsel
and Proposed Class Counsel*

13