James E. Cecchi
Caroline F. Bartlett
Zachary S. Bower
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
5 Beccker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Interim Class Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS-JS)<br><br>**DECLARATION OF JAMES E. CECCHI** |

James E. Cecchi, of full age, declares under penalty of perjury:

1. I am an attorney-at-law admitted to practice and in good standing in the State of New Jersey and a member of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne"), Interim Class Counsel for Plaintiffs in the above matter.

2. I submit this declaration in opposition to Defendant's Motion to Exclude the Report and Opinion Testimony of Robert Klein.

3. Attached hereto as Exhibit 1 are true and accurate copies of relevant portions of the January 20, 2017 deposition transcript of Robert Klein.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 10, 2017

/s/ *James E. Cecchi*
JAMES E. CECCHI

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Civil Action No. 13-7585 (JBS/JS)

----------------------------------)

IN RE RIDDELL CONCUSSION

REDUCTION LITIGATION

----------------------------------)

DEPOSITION OF ROBERT KLEIN

New York, New York

January 20, 2017

Reported by:

Linda Salzman, RPR

Job No. 117672

1                R. Klein
2      Q.    Talking about the interviews
3  with coaches, how did that happen?  Where
4  did you find the coaches?
5      A.    We found them from looking at
6  websites that listed Pop Warner and other
7  leagues, as well as contacting coaches who
8  were high school or middle school coaches
9  that we could reach by phone from our
10 offices in Boston.
11     Q.    Where did you get the names and
12 phone numbers of these people?
13     A.    Just off websites.
14     Q.    So you just looked at the
15 websites for the teams, for example?
16     A.    Or the high school to see who
17 the football coach was and that sort of
18 thing.
19     Q.    Why did you focus on coaches as
20 opposed to other staff or administrators
21 for these interviews?
22     A.    From the interviews that we
23 conducted, it was clear that the coaches
24 had a, at the middle school and high
25 school level, where the team really

1                    R. Klein
2       provides the equipment as opposed to
3       Pee Wee or Pop Warner, where, in many
4       cases, the parent provides the equipment.
5                 The coaches have a major role in
6       the decision as to what equipment will be
7       bought for their team.  There may be an
8       administrator or athletic director who is
9       going to worry about the budgets and
10      actually sign the check, but the coach is
11      the one whose decision is most relevant in
12      this sort of a situation.
13           Q.   So you just mentioned a
14      difference between middle and high school
15      teams versus younger Pop Warner and
16      Pee Wee-type football.
17                What's your basis for the
18      understanding that the teams don't provide
19      the helmets in younger football leagues?
20           A.   Well, they will sometimes
21      provide the helmets, or tell the parents
22      what helmet to buy, or send them to Dick's
23      Sporting Goods and say buy this particular
24      helmet.
25                From the discussions with both

1        R. Klein
2   the screeners were completed as
3   transmitted to Telepoll so they could
4   conduct the telephone interview at that
5   time identified by the respondents as
6   being a good time to contact them.
7       Q.   Did you also create a question
8   there to send to Telepoll?
9       A.   Yes.
10      Q.   In developing the questionnaire,
11  did you do any qualitative questioning of
12  respondents to develop the questions?
13      A.   We did pilot tests of the
14  questionnaire. And again, that was done
15  internally by Julie and Amanda.
16      Q.   So they, themselves, telephoned
17  people, and were these actual respondents
18  or other employees, or how did they find
19  these people?
20      A.   Same way that they found people
21  for the exploratory interviews. It was
22  for parents, friends and family recruited,
23  again, to test, it was a pretty simple
24  questionnaire, just to test how we would
25  go about, you know, asking it in such a

1           R. Klein
2    reason to question the veracity or the
3    accuracy of the recording of what the
4    respondent said.
5           But no, we don't have any tapes
6    to do that.
7      Q.   And you said you reviewed the
8    responses each day?
9      A.   Our staff did, yes.
10     Q.   How did that work?  What were
11   you provided with by Telepoll?
12     A.   A data file not unlike what --
13   we had a data file, not unlike the data
14   file that you see here, so we were sort of
15   constantly monitoring to make sure that
16   the interviews were following the
17   instructions and appropriately recording
18   responses.
19     Q.   Well, how could you tell whether
20   the interviewers were following
21   instructions?
22     A.   Well, they were given
23   instructions on how to follow-up certain
24   questions and to make sure that if the
25   respondent didn't understand the question,

1   R. Klein
2   they identified a new theme that they
3   hadn't previously seen, they would add
4   that to the coding list.
5           Then, when it was all finished,
6   they compared their codes, and you know,
7   from discussion with themselves and me, on
8   some occasions, arrived at a final coding
9   list for each response for each
10  respondent.
11      Q.   So I want to break that down a
12  little business.  First of all, I think
13  you answered this already.  But Amanda and
14  Julie were acquainted with the issues in
15  the litigation and knew who the client
16  was, correct?
17      A.   Correct.
18      Q.   They were not blind coders in
19  the sense of being naive to the way the
20  client would like the research to come
21  out?
22      A.   They weren't blind coders
23  because they were coding for content.  Not
24  for effect.  If you were coding for
25  effect, it would be important to have

1          R. Klein
2    people involved in the coding who weren't
3    aware of the, you know, who the client
4    was.
5          When you're coding for content,
6    knowing what the issues are is actually
7    beneficial. And we can look at any of the
8    codes, and I'm sure you may have some that
9    you would quibble with and we could
10   discuss that.
11         Basically I've reviewed the
12   codes and I'm satisfied that they've
13   captured the content of the responses.
14      Q.   Just to go through the way the
15   process worked, you said they each, I'm
16   not quite sure I understood, each of them,
17   Amanda and Julie, independently developed
18   codes based on the first 20 or 30
19   questionnaires they coded?
20      A.   And then they compared those
21   codes to create a comprehensive code book.
22      Q.   Before we go there, so the
23   answer is yes, right?
24      A.   Yes.
25      Q.   This is while the responses were