# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) <br><br> *CONFIDENTIAL – FILED UNDER SEAL* |

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO MOTION TO EXCLUDE THE EXPERT REPORT
## AND OPINION TESTIMONY OF CHARLES D. COWAN, PH.D.

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Dennis G. Pantazis
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500

*Interim Lead Counsel and Proposed Class Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

LEGAL STANDARD ........................................................................................................... 1

ARGUMENT ......................................................................................................................... 4

    I.   DR. COWAN IS A QUALIFIED EXPERT WITNESS ............................................. 4

    II.  DR. COWAN'S TESTIMONY FITS WITH THE THEORY OF THE CASE AND IS HELPFUL TO THE TRIER OF FACT ........................................................................ 5

    III. DR. COWAN'S TESTIMONY IS RELIABLE ......................................................... 8

CONCLUSION ..................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*Calhoun v. Yamaha Motors, Inc.*,
   350 F. 3d 321 (3d Cir. 2003) .................................................................................. 3

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 297, 307 (E.D. Mich. 2001) ............................................................... 14

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ..................................................................................... 2, 3, 8, 10

*Diaz v. Johnson Matthey, Inc.*,
   893 F. Supp. 358, 373 (D.N.J. 1995) .................................................................... 2

*Goldenberg v. Indel, Inc.*,
   2012 WL 3780555 (D.N.J. Aug. 30, 2012) ........................................................... 9

*In re Jacoby Airplane Crash Litig.*,
   2007 WL 2746833 (D.N.J. Sept. 19, 2007) ......................................................... 10

*Kohen v. Pac. Inv. Mgmt. Co.*,
   571 F. 3d 672, 677 (7th Cir. 2009) ...................................................................... 14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 156 (1999) ....................................................................................... 2

*Luppino v. Mercedes-Benz USA, LLC*,
   2015 WL 12819051, at *3 ................................................................................... 1, 2

*McGarrigle v. Mercury Marine*,
   838 F. Supp. 2d 282, 293 (D.N.J. 2011) ............................................................... 3

*Massachusetts Mutual Life Ins. Co. v. Residential Funding Co. LLC*,
   989 F. Supp. 2d 165, 171 (D. Mass. 2013) ........................................................... 4

*MSKP Oak Gove, LLC v. Venuto*,
   2016 WL 3566720, at *7 (D.N.J. June 29, 2016) ................................................. 4

*In re Nifedipine Antitrust Litig.*,
   246 F.R.D. 365, 371 (D.D.C. 2007) ...................................................................... 9

*In re Paoli R.R. Yard PCB Litig.*,
   35 F. 3d 717, 741 (3d Cir. 1994) ....................................................................... 2, 3

*In re Pharmacy Benefit Managers Litig.*,
   2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ........................................................... 5

*Schwartz v. Avis Rent A Car, LLC*,
   2014 WL 4272018, *5 (D.N.J. Aug. 28, 2014) ................................................... 10

*In re TMI Litigation,*
    193 F. 3d 670 (1999) ........................................................................................................ 3

*United States v. Ford,*
    481 F. 3d 215, 219 (3d Cir. 2007) .................................................................................... 2

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251, 268 (D.D.C. Feb. 25, 2002) ............................................................ 7, 14

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F. 3d 254, 294 (3d Cir. 2012) .................................................................................... 2

**Other Authorities**

Fed. R. Civ. P. 401 .................................................................................................................... 1

Fed. R. Evid. 702 ............................................................................................................*Passim*

## PRELIMINARY STATEMENT

Plaintiffs' expert, Dr. Cowan, has presented a sound and reliable damages model establishing methods for calculation of class-wide damages in this case. First, it employs a premium based damage calculation that accounts for Defendants' admission that it imposes a $50 premium upon the price of every helmet with "Concussion Reduction Technology" ("CRT"). Then, it offers a more conservative alternative approach that provides a mathematical formula for determining premium by comparing gross profit margins incurred during particular time periods. Defendants have moved to exclude Dr. Cowan's Report and testimony. However, Defendants have not shown or even argued that damages resulting from the premium charged for CRT helmets cannot be calculated on a class-wide basis. Instead, they merely disagree with Dr. Cowan's sound and reliable methods for calculating such damages in this case.

As further established herein, Dr. Cowan is a qualified expert; his testimony is reliable and will assist the trier of fact. Defendants' motion to exclude Dr. Cowan's testimony and Report should be denied.

## LEGAL STANDARD

In general, evidence is admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 702 "allows a witness qualified to be an expert to give testimony if the expert's scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue if: (i) the testimony is based upon sufficient facts and data, (ii) the testimony is the product of reliable principles and methods; and (iii) the expert witness has applied the principles and methods reliably to the facts of the case." *Luppino v. Mercedes-Benz USA, LLC*, 2015 WL 12819051, at *3 (D.N.J. 2015).

1

Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their 'general approach' of relaxing the traditional barriers to 'opinion testimony.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993); *In re Paoli R.R. Yard PCB Litig.*, 35 F. 3d 717, 741 (3d Cir. 1994) ("Rule 702 mandates a policy of liberal admissibility."). "A court's rejection of expert testimony should be the exception rather than the rule. *Luppino*, 2015 WL 12819051, at *3.

The "ultimate touchstone" for the admissibility of expert testimony "is helpfulness to the trier of fact," and such testimony "is sufficiently grounded for the purposes of litigation only if it will help the trier of fact to reach accurate results." *Paoli*, 35 F. 3d at 744 and n. 12; *see also United States v. Ford*, 481 F. 3d 215, 219 (3d Cir. 2007) (approving of the New Jersey District Court's process in evaluating "whether [the expert's testimony] provides in a reliable way some probative piece of evidence that would be helpful to a lay jury in understanding the case and reaching a reliable conclusion."). An expert's testimony need only assist the trier of fact and relate to, or "fit," the underlying facts of the case. *Daubert*, 509 U.S. at 591. The district court must determine whether the "particular expert ha[s] sufficient specialized knowledge to assist the jurors "in deciding the particular issues in the case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).

Once a court finds that the proposed witness qualifies as an expert, it "must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F. 3d 254, 294 (3d Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 149). Thus, the test under *Daubert* is "not what the experts say, but what basis they have for saying it." *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995).

2

"[Plaintiffs] do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Paoli*, 35 F.3d at 744.

> The evidentiary requirement of reliability is lower than the merits standard of correctness. *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on "good grounds," *i.e.*, if it is based on the methods and procedures of science. A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect. As *Daubert* indicates, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

*Id.* (internal citations omitted). An expert's opinion is not unreliable because he or she comes to a different conclusion than another expert. *Id.* at 746, n.15.

In addition, there must also be "fit" between the expert's testimony and the issues in the case, *i.e.*, that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun*, 350 F. 3d at 321. The testimony must have a valid scientific connection to the relevant facts and issues. *McGarrigle v. Mercury Marine*, 838 F. Supp. 2d 282, 293 (D.N.J. 2011) (quoting *In re TMI Litigation*, 193 F. 3d at 670)). The issue fit is directly related to the "particular disputed issues in the case." *Paoli*, 35 F. 3d at 743. The opinions "fit" depends upon whether it is "helpful"; *i.e.*, "whether the expert's technique or principle [is] sufficiently reliable that it will aid the jury in reaching accurate results." *Id.* at 744. "The fit requirement 'goes primarily to relevance' by 'requir[ing] a valid scientific connection to the pertinent inquiry as a precondition to admissibility.' 'In other words, the expert's testimony must be relevant for the purposes of the case

and must assist the trier of fact.' However, reliability does not require correctness. Rather, the party need only demonstrate 'by a preponderance of the evidence' that the expert's opinion bears adequate indicia of reliability, not that it is objectively 'true.'" *MSKP Oak Grove, LLC v. Venuto*, 2016 WL 3566720, at *7 (D.N.J. June 29, 2016) (citations omitted).

We must, however, "keep in mind the Supreme Court's admonition that '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts.' 'So long as the expert's testimony rests upon 'good grounds', it should be tested by the adversary process ... rather than excluded from juror's scrutiny for fear that they will not ... satisfactorily weigh its inadequacies." *Massachusetts Mutual Life Ins. Co. v. Residential Funding Co. LLC*, 989 F. Supp. 2d 165, 171 (D. Mass. 2013) (citations omitted).

## ARGUMENT

### I.   DR. COWAN IS A QUALIFIED EXPERT WITNESS

Defendants concede Dr. Cowan's qualifications as an expert witness. Nonetheless, because an expert's qualification is one of the elements impacting the *Daubert* analysis, Plaintiffs respectfully request the Court consider Dr. Cowan's qualifications. He holds a Bachelors of Arts degree in Economics from the University of Michigan, a Master of Arts degree in Economics from the University of Michigan, and a doctorate in Mathematical Statistics from George Washington University. He is currently the Managing Partner of Analytic Focus, LLC, a firm that provides expert witness and consulting services in litigation, as well as statistical and econometric advice to government agencies and private financial institutions. Prior to joining

Analytic Focus, Dr. Cowan served, at various points, as a director of financial research at PricewaterhouseCoopers, LLP; Chief Statistician for the Federal Deposit Insurance Corporation and the Resolution Trust Corporation; Chief Statistician for the National Center for Education Statistics, an agency within the Department of Education; and Chief of the Survey Design Branch of the U.S. Bureau of the Census. Dr. Cowan is an adjunct professor in the Department of Biostatistics in the School of Public Health at the University of Alabama in Birmingham. He is the author or co-author of two books and numerous articles on statistical methods and sampling. Dr. Cowan is a member of several professional societies and has held leadership positions in both the American Statistical Association and the American Association for Public Opinion Research.

## II.   DR. COWAN'S TESTIMONY FITS WITH THE THEORY OF THE CASE AND IS HELPFUL TO THE TRIER OF FACT

Defendants argue Dr. Cowan's testimony is not helpful to the trier of fact and should be excluded.[1] First, they contend there is a lack of "fit" because Plaintiffs' damages model does not match the Plaintiffs' theory of liability. (Defs' Br. at 10.) Defendants insist that in order to fit Plaintiffs' theory of liability, Dr. Cowan *must* compare competitor pricing, rather than address Defendants' admitted extraction of a $50 premium from their customers. (*Id.*) Plaintiffs' theory of liability is that Riddell marketed and sold football helmets with the phrase "concussion reduction technology" or "CRT," which necessarily intends or implies the ability to reduce

---

[1] Riddell relies heavily upon *In re Pharmacy Benefit Managers Litig.*, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ("*PBM*") in its effort to discredit Dr. Cowan, as if to imply that when an expert's opinion is rejected in one case, all of his opinions in subsequent unrelated cases must be rejected, regardless of differing facts, law, and claims. The *PBM* case involves MDL claims of complex antitrust price fixing conspiracies that resulted in alleged reductions in amounts reimbursed to pharmacies for prescriptions filled. Dr. Cowan submitted several reports regarding plaintiffs' claims and damages theories in that case. Although Dr. Cowan was deemed qualified, the PBM court as Riddell exclaims, excluded his reports and opinions. However, there is no similarity in the facts, issues or law between the *PBM* case and this case. The only similarity is that Dr. Cowan submitted an expert report in each case.

5

concussions, and that such phrase mislead or deceived consumers regarding the ability of Riddell helmets with CRT to reduce the incidence of concussion better than any other football helmet on the market. Plaintiffs seek damages in the amount of the "premium" extracted by Riddell from CRT helmet purchasers. Thus, Plaintiffs' damage theory "fits" precisely with and is relevant to their theory of liability. Plaintiffs' theories are further supported by, of course, the fact that Riddell acknowledges adding a premium to its pricing in order to capitalize on the perceived CRT safety benefit. Accordingly, Plaintiffs' damages model acknowledges Riddell's misconduct and offers valid methods to calculate class-wide damages caused by that misconduct.

Riddell further argues that Dr. Cowan's testimony is "unfit" because it fails to "consider data from Riddell's competitors." (Defs' Br. at 11.) For example, Defendants argue that Dr. Cowan should have considered competitors' helmets in determining the price premium to be applied in his damages analysis, *id.*, because, according to them, Plaintiffs' theory of liability is that "Riddell's marketing is false and misleading because CRT helmets are less effective at reducing concussions *than other helmets on the market.*" (*Id.*) (emphasis added). But that conflates the issues with what Plaintiffs are required to show under a damages analysis, where the focus is properly on the fact that Riddell promised consumers "Concussion Reduction Technology," charged consumers extra for it, and failed to deliver. Thus, it was entirely appropriate for Dr. Cowan to consider Riddell's financial information when determining the price premium damages methodology because the proper consideration is how much consumers paid for the misleading claims compared to how much the same helmet would have cost absent those claims. Defendants' argument on this point is unfounded and goes back to Riddell's attempt to recast the claims and issues in this case. It also blatantly ignores the fact that Riddell admits to adding a $50 price premium to take advantage of the consumer perception created by

CRT. Moreover, sales data from another company cannot provide better information about what pricing *would have been* for the CRT helmets if the premium had not been added. Thus, the damage premium is properly calculated internally, and not by comparing competitor pricing.

Next, Defendants claim a lack of fit because Dr. Cowan has not calculated class member damages on an individual basis. (Defs' Br. at 12.) More specifically, Defendants argue that "Plaintiffs and absent class members must prove ascertainable loss or injury" and therefore they "must set forth a method for 'calculating the premium they paid for the helmets at issue.'" (*Id.*) Defendants then conclude that Dr. Cowan should not have utilized "averages or formulas" to calculate class-wide damages, but should have calculated damages on an *individual* class member basis. (*Id.*) At this juncture, the Court need only assess whether "methods are available to prove damages on a class-wide basis." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. Feb. 25, 2002). There is no requirement for proof of individual damages on the class member level. Thus, Dr. Cowan's Report is not "unfit" for failing to perform such calculations.

Defendants also argue that Dr. Cowan's "methodology is 'inconsistent with his assertion of a $50 premium for helmets sold at MSRP,'" because his formula could result in damages that are actually less than $50 per helmet. (*Id.* at 13.) Defendants ignore that Dr. Cowan offers alternative theories. The first method is a simple calculation wherein the number of CRT helmets sold is multiplied by $50. This method, of course, is based upon Defendants' admission that they added a $50 premium to the price of each CRT helmet. The next theory provides a more detailed scientific formula for comparing MSRP and other factors for helmets sold before and after the CRT marketing plan was implemented. This conservative method, as noted by Dr. Cowan, could result in damages of less than $50 per helmet sold. This is a fair and reasonable analysis and certainly fits with the claims in this case and the damages suffered by class

members. Therefore, Dr. Cowan's opinion that class-wide damages can be calculated by applying a consistent methodology for all class members is, thus, helpful to the trier of fact, and meets this prong of Rule 702 and *Daubert*.

### III. DR. COWAN'S TESTIMONY IS RELIABLE

Defendants claim generally that Dr. Cowan's testimony is not reliable because "it is not based upon sufficient facts or data." (Defs' Br. at 13.) Defendants go on to allege this unreliability arises from Dr. Cowan's failure to perform "any calculations," his data is "incomplete and inappropriate," and he "ignores the multitude of factors that go into price and/or profit margin increases and therefore 'does not isolate the effect on pricing of the allegedly false and misleading claims at issue.'" (*Id.* at 14.) Defendants also allege Dr. Cowan does not account for "differences' in 'products, competition, economic conditions, and costs, other than manufacturing costs . . . .'" (*Id.* at 15.)

With regard to the allegation of "failure to perform any calculations," Dr. Cowan submitted valid verifiable methodologies for calculating class-wide damages for this case. Indeed, he provides mathematical formulae that can be easily applied and tested. All that is required of Plaintiffs at this point in the litigation is to establish there is a *method* available to calculate damages on a class-wide basis. *In re Vitamins*, 209 F.R.D. at 268. They are not required at this juncture to perform those calculations. In addition to the straightforward $50 multiplied by number of helmets sold, Dr. Cowan provided an acceptable alternative methodology, in fact a mathematical formula, for determining class-wide damages. Class Cert. Decl., Exh. 36, Cowan Report, at 3, 5, 7. However, the formula requires "plugging-in" specific

8

and identifiable financial data held by Riddell.[2] Stated differently, a valid formula exists; Riddell merely needs to produce the withheld financial data to input into the formula in order to establish a final class-wide damage number.[3] The fact that Riddell holds the financial data to be used in Plaintiffs' damages formula does not preclude the use of Plaintiffs' class-wide damage theory and analysis. *See Goldenberg v. Indel, Inc.*, 2012 WL 3780555 (D.N.J. Aug. 30, 2012) ("Plaintiffs need only demonstrate that they are capable of proving classwide damages…"). In sum, Plaintiffs have offered a viable and sufficient colorable method of proving class-wide impact with common evidence as to issue of causation. *See In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 371 (D.D.C. 2007) ("plaintiffs need only demonstrate that a viable methodology is available, not that their methodology is the best or most accurate").

Next, the "multitude of factors" and "differences" in products argument is simply inaccurate and misleading. There is nothing in the Cowan Report to indicate that most if not all of these alleged factors and differences would not be considered. Indeed, Dr. Cowan's methodology considers manufacturer's cost, which includes many if not all of the alleged factors

---

[2] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ In sum, Riddell readily maintains the pricing information to be plugged-in to Dr. Cowan's formula. It merely has not been produced to this point in the litigation. *See* Footnote 4, *infra*.

[3] Plaintiffs did not seek to compel production of all necessary Riddell financial records during class discovery and Plaintiffs should not be prejudiced by that decision. Defendants vigorously resisted Plaintiffs' discovery requests for such comprehensive production at the class stage and the Court deferred such discovery. *See* Letter Order, Oct. 26, 2015, DE. 90 ("If a discrete and severable issue exists that is only relevant if the class is certified (*e.g.*, class wide damages), the Court may defer discovery on the issue"). Later, the Court ruled, "Plaintiffs should only take the merits discovery they reasonably need to file their class certification motion." Letter Order, June 8, 2016, DE. 157. Riddell's actual financial records were unnecessary to create a damage formula for this case. They are, however, necessary upon certification to "plug-in" to the formula. Riddell should not be allowed to withhold production of financial information and now claim that Plaintiffs lack sufficient financial information to support their damages formula.

and differences that Riddell complained about. Moreover, Dr. Cowan's Report clearly acknowledges differences in "cost of production" and "product line categories." Class Cert. Decl., Exh. 36, Cowan Report at 6. "Cost" is also an element of his GPM formula. *Id*. at 5, ¶ 17. *See also id.* at ¶ 19 ("The benefits of considering GPM and its trends across time include that it accounts for varying costs of goods, and it easily allows for entry and exit of specific product lines throughout the timeline.").

Furthermore, even if any of the alleged factors or differences were omitted from Dr. Cowan's methodology, it would go only to the weight of his opinion and not to its admissibility. *See, e.g.*, *Schwartz v. Avis Rent A Car, LLC*, 2014 WL 4272018, *5 (D.N.J. Aug. 28, 2014) (finding defendant's various allegations of unreliability in expert's report goes to weight and not admissibility). In sum, the "factors and differences" argument is merely a disagreement fabricated by Defendants' expert to question Dr. Cowan's analysis. Such disagreement, no matter how unfounded, goes to the weight of the testimony and not to its admissibility. It does not serve as a basis for excluding Dr. Cowan's testimony or Report. *See Daubert*, 509 U.S. at 595 (stating that the "presentation of contrary evidence ... [is a] traditional and appropriate means of attacking shaky but admissible evidence"); *In re Jacoby Airplane Crash Litig.*, 2007 WL 2746833 (D.N.J. Sept. 19, 2007) ("As Plaintiffs persuasively argue ... [d]isagreement of another expert does not render a report untrustworthy").

Defendants also allege Dr. Cowan's proposed methodology does not "have any way to account for the effect on pricing of those marketing claims that the court has found to be permissible," *i.e.*, the UPMC study. (Defs' Br. at 15.) This argument is an attempt at misdirection. The undisputed evidence in this case is that the premium charged for CRT helmets

10

was attributable to the CRT claims and nothing else. So, there is no reason to speculate as to what effect other alleged marketing claims may have had on pricing.

Defendants further allege that Dr. Cowan's testimony is unreliable because his "choice of time period is also problematic." (*Id.* at 15.) Defendants offer two arguments in this regard. First, Defendants suggest that there should be no comparison between "modern helmets" sold after 2006 and "traditional helmets" sold prior to 2002. (*Id.*) This argument is wrong because it overlooks the pertinent fact that the alleged "traditional helmets" sold *prior* to 2002 did *not* contain any purported concussion safety benefits and thus did *not* include the $50 price premium. Therefore, Dr. Cowan correctly compares Riddell helmets where the premium was not added to the price with those helmets where the premium was added to the price.

The second argument offered by Defendants on this point is that Dr. Cowan "should have looked to the sales and margins associated with [the] Revolution series from the time period where Riddell was selling CRT helmets but was not making the challenged marketing claims (2002 through 2007) and the time period during which Riddell was making the claims (2007 through 2012)." (*Id.* at 16.) The critical distinction here is *when* the premium price was originally instituted and not necessarily when the CRT claims were being made. The Defendants fail to reveal to the Court that they began adding the price premium in 2002 when they first determined promises of increased concussion protection would allow them to extract a premium from consumers. Defendants introduced the Revolution line of helmets in 2002 and began representing they "provide better protection against concussions" and are "designed with the intent of reducing concussions." It was not until 2007 that the Defendants took it a step further with the advent of the "Concussion Reduction Technology" marketing campaign. In sum, the "premium" has been in effect since 2002, but CRT marketing was not instituted until 2007.

Thus, it would be illogical, as Defendants suggest, to compare time periods where the premium was charged with other periods where the same premium was also being charged. Dr. Cowan compared the correct time periods.

Riddell also argues that Dr. Cowan "inappropriately includes as Excess GPM any changes in GPM due to price increases associated with the introduction of Riddell's new design elements, including both CRT Design Elements and Non-CRT Design Elements, into Riddell's helmets, even though that price increase could not have been caused by the allegedly false and misleading marketing that did not begin until 2007." (Defs' Br. at 16.) This argument is entirely hypothetical and lacks factual support. There are no facts regarding "CRT Design Elements or Non-CRT Design Elements." These appear to be terms created by Defendants' expert rather than existing facts previously adduced in this case. Defendants' arguments and their expert's "conclusions" based upon these contrived "elements" should be rejected. Moreover, Defendants have never disputed that it added $50 as a premium to its CRT helmets. The premium at issue related solely to the CRT helmet and was not divided among any other fanciful product "elements." Moreover, as noted above, Dr. Cowan's formulae accurately accounts for necessary factors and costs.

Next, Defendants argue Dr. Cowan's Report is unreliable because he measures damages from 2008 to *present.* The Defendants say they "stopped making the CRT marketing claims in 2012," so there can be no damages after that point. (Defs' Br. at 16-17.) The statement that Defendants "stopped making the CRT marketing claims in 2012" is not truthful. At best, Riddell may have made a *decision* in 2012 to cease using the term CRT after questioning by the FTC. However, this decision was merely the beginning of a "phase out" of the term CRT that

12

continued well into 2014.[4] Riddell was providing interviews leading with CRT to news organizations in the fall of 2012, which they were aware would be printed in magazines in 2013. *See* Declaration of James E. Cecchi ("Cecchi Decl."), Exh. 1 at RIDDELL00008659. Popular Science Magazine published an article titled, "New Football Helmet Could Save the Sport" with CRT claims in January, 2013. *See* http://www.popsci.com/science/article/2013-08/helmet-wars-and-new-helmet-could-protect-us-all.

Moreover, the fact that Riddell, internally, may have decided to stop using the CRT message in 2012, did not erase a multifaceted nationwide marketing strategy, employed since 2008, in which Riddell consistently and prominently promoted the use of the phrase CRT, or Concussion Reduction Technology, to sell its helmets. Just as one may, at some point, stop spraying graffiti on a building that does not mean they ever covered up the paint. Similarly, Riddell never made a single effort to retract any of its materials or statements made in regard to the CRT claims. In fact, on the date this lawsuit was filed, CRT statements were present on Defendants' social media pages on Facebook, and Twitter. *See* Class Cert. Decl., Exh. 8 at RIDDELL00003342. *Even as of the date of this filing*, Defendants' Facebook page and Twitter still contain statements about CRT. *See* Cecchi Decl., Exs. 2, 3, 4. Further, many of Defendants' retail and institutional partners were provided this message, but not told to remove it until much later. *See* Cecchi Decl., Ex. 5 at RIDDELL00014302 (VP Michael Oller asking Sports Authority on January 14, 2014 to change language on Sports Authority's website from "CRT" to "Patented Side Impact Protection").

---

[4] Riddell acknowledges in its Opposition to Plaintiffs' Motion for Class Certification that the company "*phased out* use of the phrase Concussion Reduction Technology." DE. 214 at 12 (emphasis added). This (along with the other evidence noted herein) contradicts any suggestion that use of the term CRT ceased immediately in 2012 at the time the decision to drop the claim was allegedly made.

13

Accordingly, Dr. Cowan's use of a damages period of 2008 *to present* is supported by fact and entirely appropriate.

Finally, Defendants claim Dr. Cowan's methodology is unreliable because "it finds damages for class members who have suffered no damages," and that he "provides no method for excluding purchasers who paid no damages at all." (Defs' Br. at 17.) Riddell apparently fabricated this no damage argument by taking out of context Dr. Cowan's statement at page 4 of his Report that a discount of more than $50 could make the premium zero. Riddell jumps from this statement to the conclusion that Dr. Cowan should have provided a method for excluding all of these class members they speculate "paid no premium at all." (*Id.*) In truth, Dr. Cowan's Report specifically recognizes that even when a helmet is "sold at a discount, there still is an impact from the premium," and that variance in the premium paid will depend "on the actual price paid relative to the respective MSRP." Class Cert. Decl., Exh. 36, Cowan Report at 4. Thus, Riddell's contention that if the discount is equal to or exceeds $50, then there is no damage is incorrect. Furthermore, "Plaintiffs are not required to show that fact of injury actually exists for each class member." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001). *See also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F. 3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct. . . . Such a possibility or indeed inevitability does not preclude class certification.) As a result, Plaintiffs do not need to completely eliminate individual variations in damages, even if some class members may hypothetically have no damages at all. *In re Vitamins*, 209 F.R.D. at 268.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert report and testimony of Dr. Charles D. Cowan should be denied.

Dated: March 10, 2017

                                    Respectfully submitted,

                                    CARELLA, BYRNE, CECCHI,
                                  OLSTEIN, BRODY & AGNELLO, P.C.
                                  Interim Class Counsel

                                  By:    */s/ James E. Cecchi*
                                              JAMES E. CECCHI

                                  Dennis G. Pantazis
                                  D. G. Pantazis, Jr.
                                  WIGGINS CHILDS PANTAZIS
                                  FISHER & GOLDFARB, LLC
                                  The Kress Building
                                  301 Nineteenth Street North
                                  Birmingham, Alabama 35203
                                  (205) 314-0500

                                  *Interim Class Counsel*

Additional counsel for Plaintiffs:
E. Clayton Lowe, Jr.
THE LOWE LAW FIRM, LLC
301 19th Street North, Ste. 525
Birmingham, Alabama 35203
(205) 314-0607

15