# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| IN RE RIDDELL CONCUSSION REDUCTION LITIGATION | Civil Action No. 13-7585 (JBS)(JS) |
|---|---|
| | CONFIDENTIAL-FILED UNDER SEAL |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Dennis G. Pantazis
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500

*Interim Lead Counsel and Proposed Class Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... i

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL ARGUMENT ....................................................................................................... 2

1.    Plaintiffs' Theories of Liability are Clearly Stated ........................................... 2

2.    Riddell's Marketing Presented Consumers a Consistent, Uniform and Common Message Regarding Concussion Reduction Technology ........................... 3

3.    Riddell's Advertising Use of the Term CRT Continued B*eyond* 2012 ....................... 8

4.    Named Plaintiffs' Individual Claims are not Rendered Deficient by Alleged "Contradictory" Testimony ...................................................... 9

5.    Plaintiffs have Satisfied all Rule 23(a) Requirements ................................. 16

6.    Plaintiffs are Adequate Representatives for Each Proposed Class ............................ 20

7.    Riddell's Alleged "Change in the Market" Does not Affect Typicality .................... 21

8.    There are no "Unique Defenses" Sufficient to Preclude Certification ....................... 23

9.    Rule 23(b)(3) Certification is Proper .............................................. 26

10.    Plaintiffs are Entitled to Presumptions of Common Proof ......................... 29

11.    Plaintiffs can Prove Damages on a Class-wide Basis .................................. 31

      a.    Plaintiffs' damages model fits their theory of liability ................................... 31

      b.    Plaintiffs' damages model recognizes any necessary variables ...................... 33

      c.    Alleged individual damage issues do not predominate .................................. 35

12.    Plaintiffs have Established Ascertainability ............................................. 37

13.     Rule 23(b)(2) Certification is Proper ..........................................................40

14.     Issue Certification is Appropriate under Rule 23(c)(4) ..............................40

CONCLUSION...............................................................................................................44

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allapattach Servs., Inc. v. Exxon Corp.,*
    157 F. Supp. 2d 1291, 1324-26 (S.D. Fla. 2001) .................................................. 43

*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538, 550 ........................................................................................ 25, 26

*Beck v. Maximus, Inc.,*
    457 F. 3d 291, 296 (3d Cir. 2006) ....................................................................... 19

*Bright v. Asset Acceptance, LLC,*
    292 F.R.D. 190, 200 (D.N.J. 2013) ...................................................................... 23

*Butler v. Sears Roebuck and Co.,*
    727 F. 3d 796, 801 (7th Cir. 2013) ...................................................................... 43

*Byrd v. Aarons, Inc.,*
    784 F. 3d 154, 163 (3d Cir. 2015) ....................................................................... 38

*Calhoun v. Yamaha Motor Co., U.S.A.,*
    350 F. 3d 316, 321 (3d Cir. 2003) ....................................................................... 32

*Cannon v. Cherry Hill Toyota,*
    184 F.R.D. 540 (D.N.J. 1999) ............................................................................. 25

*In re Cardizem,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000) ............................................................. 35

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297, 307 (E.D. Mich. 2001) ............................................................. 36

*Cheatham v. ADT Corp.,*
    161 F. Supp. 3d 815, 826 (D. Ariz. 2016) .......................................................... 25

*Chiang v. Veneman,*
    385 F. 3d 256, 273 (3d Cir. 2004) ....................................................................... 37

*Flores v. Anjost Corp.,*
    284 F.R.D. 112, 123 (S.D.N.Y. 2012) ................................................................ 38

*Gates v. Rohm and Haas Co.,*
    655 F.3d 255 (3d Cir. 2011) .................................................................... 40, 41, 42

*In re General Motors,*
    55 F. 3d 768, 817 (3d Cir. 1995) ......................................................................... 37

*Goldenberg v. Indel, Inc.,*
    2012 WL 3780555 (D.N.J. Aug. 30, 2012) ........................................................ 34

*Grandalaski v. Quest Diagnostics, Inc.*,
    767 F. 3d 175, 184-85 (3d Cir. 2014) ...................................................... 38

*In re Jack Faucett Assoc. v. American Tel. & Tel.*,
    1983 WL 4601, *3 (D.D.C. Mar. 18, 1983) ............................................ 37

*Jerry Enters. of Glocester County, Inc. v. Beverage Group, LLC*,
    178 F.R.D. 437, 445 (D.N.J. 1998) ....................................................... 42

*Kohen v. Pac. Inv. Mgmt. Co.*,
    571 F. 3d 672, 677 (7th Cir. 2009) ....................................................... 36

*Korrow v. Aaron's Inc.*,
    2013 WL 5811496, at * 7, 12 (D.N.J. July 31, 2013) ...................... 20, 38

*Legard v. EQT production Co.*,
    2012 WL 933192, at *1-2 (W.D. Va. Mar. 20, 2012) ........................... 21

*Marcus v. BMW of N. Amer.*,
    687 F. 3d 583, 599 (3d Cir. 2012) .................................................. 23, 24

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
    295 F. 3d 380, 385 (3d Cir. 2002) ....................................................... 26

*In re Nifedipine Antitrust Litig.*,
    246 F.R.D. 365, 371 (D.D.C. 2007) ...................................................... 35

*O'Brien v. Brain Research Labs, LLC*,
    2012 WL 3242365, at *6-7 (D.N.J. Aug. 9, 2012) ................................ 20

*Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*,
    187 So. 3d 868, 870 (Fla. App. 2016) ................................................... 40

*In re Pharmacy Benefit Managers Litig.*,
    2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ..................................... 32, 33

*Schellenbach v. GoDaddy.com*,
    2017 WL 192920 (D. Ariz. Jan. 18, 2017) ........................................... 25

*Schlesinger v. Reservists Committee to Stop the War*,
    418 U.S. 208, 216 (1974) ..................................................................... 21

*Schwartz v. Avis Rent A Car, LLC*,
    2014 WL 4272018, *5 (D.N.J. Aug. 28, 2014) ............................... 33, 34

*Senna v. Kansas City Royals Baseball Corp.*,
    315 F.R.D. 523, 571 (N.D. Cal. 2016) ........................................... 10, 15

*Siemer v. Associates First Capital Corp.*,
    2001 WL 35948712, at *4 (D. Ariz. March 30, 2001) .......................... 29

*Stephenson v. Bell Atlantic Corp.*,
    177 F.R.D. 279, 291 (D.N.J. 1997) ...................................................... 19

iv

*Suchanek v. Sturm Foods, Inc.*,
    311 F.R.D. 239, 245 (S.D. Ill. 2015) ............................................................... 19, 22

*In re Visa Check/Master Money Antitrust Litig.*,
    280 F.3d 124, 141 (2d Cir. 2001) ............................................................... 43

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251, 268 (D.D.C. Feb. 25, 2002) ............................................................... 37

*Wal-Mart Stores v. Dukes*,
    131 S. Ct. 2541, 2551 (2011) ............................................................... 42

*Wallace v. Powell*,
    2013 WL 2042369, at *21 (M.D. Pa. May 14, 2013) ............................................................... 42

## Other Authorities

Arizona Consumer Fraud Act ............................................................... 29

Fed. R. Civ. P. 23 ............................................................... *passim*

## PRELIMINARY STATEMENT

Defendants brief is not a typical response brief.  When carefully reviewed, it becomes apparent that almost all of the legal and factual points raised by Riddell are either without a coherent citation or, if a citation exists, it is wholly misrepresentative.  In many circumstances, Defendants completely misrepresent the underlying facts.  As such, and as has been a consistent problem in this case, it is clear that Defendants remain afraid to have a jury determine the one question that will decide this case – whether Riddell helmets with CRT are better at preventing concussions than other helmets on the market.  All of Plaintiffs' claims depend on the answer to this question.  For purposes of this motion, Plaintiffs have established, by a preponderance of the evidence, each necessary element of Rule 23(a) and (b)(3), and alternatively (c)(4), to support entry of an order granting class certification.  Riddell,[1] however, contests every applicable Rule 23 element, except for numerosity, adequacy of class counsel and superiority.

Riddell's grounds for opposing certification derive primarily from alleged (1) "contradictions" in Plaintiffs' pleadings, discovery responses and deposition testimony, and (2) "unique defenses" arising from each named Plaintiff's purchase of Riddell helmets. Riddell also contests Plaintiffs' class-wide damages analysis.

These alleged contradictions and unique defenses are created from misleadingly selective deposition excerpts or parsed from pleadings and discovery responses.  In many cases, Riddell's arguments have no support in the record evidence before the Court or in any case law.  In most instances, Defendants seek to substitute the arguments of its counsel for factual evidence and legal authority.  At best, Riddell's arguments against certification point to factual disputes inherent in every case which do not cause Plaintiffs' claims to be atypical or destroy

---

[1] Defendants in this matter are referred to herein collectively as "Riddell" unless noted otherwise.

predominance.   At worst, they are based on conjecture, misrepresentation, and speculation. Further, as Plaintiffs have presented an adequate and "viable method" for proving damages on a class-wide basis based largely on Defendants' admissions of charging a price premium, Plaintiffs' Motion for Class Certification should be granted.

## LEGAL ARGUMENT

1.      **Plaintiffs' Theories of Liability are Clearly Stated**.

Riddell initiates its resistance to class certification by misstating the issues at hand and alleging Plaintiffs are seeking to certify an issue that has been abandoned and is "not in this case."   Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification, DE. 214 at 1 (hereinafter "DE. 241").   For response, Plaintiffs refer to the Court's August 3, 2015 Order, DE. 66, and Opinion, DE. 65, which clearly identify the claims allowed to proceed in this case.   Therein, the Court determined, *inter alia*, that,

> [T]he phrase "concussion reduction technology" necessarily implies the ability to  reduce concussions. At the very least, based on the allegations in the SAC, such a phrase may have mislead or deceived consumers regarding the ability of Defendants' helmets to reduce the incidence of concussions.   Consequently, to the extent Defendants' helmets cannot in fact reduce concussions, Plaintiffs have provided a plausible basis that these marketing statements are false, misleading, or deceptive.

DE. 65 at 33-34.  Thus, the Court Ordered that:

> Plaintiffs' consumer fraud claims under New Jersey, Florida, Arizona, and California law may proceed based on allegedly false or misleading marketing statements regarding "concussion reduction technology," as well as such statements which referenced a 31% reduction in concussions in relation to helmets not included in the UPMC study, particularly youth helmets.

DE. 66 at 1-2.

2

Thereafter, Plaintiffs structured their discovery and arguments to conform to the Court's identification of viable claims. Most recently, Plaintiffs succinctly summarized their claims in their Brief in Support of Motion for Class Certification ("Class Cert Brief") by stating, in part,

> Plaintiffs allege that Riddell falsely marketed certain football helmets as containing "Concussion Reduction Technology" and charged Plaintiffs and other Class members a premium for those helmets. In fact, these helmets did not and could not offer better protection to reduce concussions than any other helmets.
>
> Specifically, Plaintiffs assert violations of various state consumer fraud statutes based on false and/or misleading marketing statements regarding "concussion reduction technology," "CRT," and a 31% reduction in concussions for helmets not included in the UPMC study, including youth helmets.

DE. 188 at 1.

Accordingly, Plaintiffs have not waived or abandoned any viable claim, issue or theory in this case.

**2.    Riddell's Marketing Presented Consumers a Consistent, Uniform and Common Message Regarding Concussion Reduction Technology.**

The evidence in this case establishes that *all* Riddell marketing regarding helmets with Concussion Reduction Technology ("CRT") was uniform, highly orchestrated, concentrated, and focused on its intended audience. Riddell does not, however, deny that CRT was a common theme of its helmet marketing. Rather, it attempts to craft a sharper distinction by alleging it,

> [N]ever disseminated a 'common message that Riddell helmets with concussion reduction technology were better at reducing concussions than all other helmets on the market,' that the "representative samples" of advertisements cited by Plaintiffs "make no such claim, and that CRT was consistently presented with accurate reporting of the UPMC study."

DE. 214 at 9.

To be clear, Riddell is arguing it never issued an advertisement that included these exact words – "that Riddell helmets were better at reducing concussions than all other helmets on the market." It also claims CRT was "consistently presented" in conjunction with the UPMC study.[2] Thus, Riddell is not denying that CRT was a primary focus of its helmet marketing; just that it did not use the exact statement that its "CRT helmets were better at reducing concussions than all other helmets." And, even if those exact words did not appear in any Riddell advertisement or pass from the lips of a Riddell salesperson, it should be clear from the mere term itself – Concussion Reduction Technology – that it conveys a material message to consumers that a helmet with CRT reduces the incidence of concussions better than all other helmets on the market. The Court recognized this intended meaning, and so did Riddell. Moreover, the consumers surveyed by Plaintiffs' expert Robert Klein understand that CRT means that the helmets are safer and offer better protection. See Cecchi Dec., DE. 189, Ex. 28 at 2. It is clear that the term CRT conveys what Riddell intended and always expected it to convey – a belief that the helmet would reduce the incidence of concussions better than all other helmets on the market.[3]

---

[2] This directly contrasts with Riddell's own expert in the Schutt patent litigation ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Cecchi Suppl. Dec., Ex. 72 at RIDDELL-FTC-002474.

[3] At no point does Riddell deny that the term CRT leads a reasonable consumer to believe the CRT helmets would reduce the incidence of concussion better than all other helmets on the market. Nor has Riddell submitted any evidence in rebuttal of the Klein Report, DE. 214.

As for the allegation that CRT "was consistently presented with accurate reporting of the UPMC study," DE. 214 at 9-12, even if this were true, and it is not,[4] the UPMC study does not detract from the perception created by CRT that it would reduce the incidence of concussions.[5] In fact, it probably enhances the misperception.[6]  Moreover, there is no evidence that Riddell, whether in writing or verbally through its salespeople, ever attempted to explain away the intended misperception Riddell created with CRT.

After attempting to distinguish its CRT message to consumers, Riddell next addresses each of its primary marketing methods that utilized the term CRT – catalogs, mailers, print ads,

---

[4]  This allegation is repeated throughout the Riddell Opposition.  However, it is inaccurate and intentionally misleading.  Each time it is stated it should be greeted with skepticism.  Contrary to the allegation, Riddell routinely utilized various advertisements that touted CRT but failed to mention the UPMC or any study.  For example, and without limitation (there are too many examples to list here), *see* (1) Press Release stating "industry leading concussion-reducing helmets" with no mention of any study (Cecchi Suppl. Dec., Ex. 53 at RIDDELL00000207); (2) Riddell 2011 point of sale hangtags using CRT that stated – "Riddell® helmet technology stands alone as the pinnacle of protection" – without explanation or reference to anything else (DE. 189, Cecchi Dec., Ex. 22 at RIDDELL00000960); (3) 2008 Football Catalog references the UPMC study on two pages with no association to CRT (Cecchi Dec., DE. 189 (hereinafter "DE. 189"), Ex 9 at RIDDELL00090582 and 90584).   Additionally, on two separate pages, the catalog advertises Concussion Reduction Technology four times without any reference to the UPMC (DE. 189, Ex 9 at RIDDELL00090583 and 90585); (4) the 2012 catalog list CRT and Concussion Reduction Technology twenty times and has zero citations to the UPMC Neuro article (DE. 189, Ex 15 at RIDDELL00091550-91769); (5) the 2008 and 2009 football catalogs specifically cite the Neurosurgery study a total of three times in obscure locations, and not near the term CRT (DE. 189, Ex 9 at RIDDELL00090582; DE. 189, Ex 11 at RIDDELL00090915 and RIDDELL00090923); and (6) a 2010 Riddell helmet exterior product package which advertises CRT, but fails to mention the UPMC study (DE. 189, Ex 24).

[5] Further, Defendants' suggestion that the UPMC study should be accepted as true is wrong. While the Court did conclude that Plaintiffs could not proceed on advertising claims that accurately portrayed the UPMC study, once Defendants use the study to defend their CRT advertising, Plaintiffs are certainly able to argue to the finder of fact that the study was unreliable.

[6]  An alleged impact of the UPMC study on consumer perception of CRT, if any, is a fact issue that should be decided by the jury, and not in a motion for class certification.

retail point of sale, and website.[7]  With regard to catalogs, Riddell argues they were "only distributed to Riddell sales representatives to give to institutional customers," (of course, this is the customer segment that makes up the vast majority of sales of helmets with CRT).  DE. 214 at 9.  Riddell goes on to contradict itself by saying these catalogs "for institutional customers . . . do not contain Plaintiffs' alleged 'common message,'" but then states, "the 2008 and 2009 Catalogs use 'CRT', . . . only in connection with certain helmet models  . . . . "  *Id.* (Yes, those with CRT at issue here).  The catalogs were actually replete with references to CRT.[8]  *See* DE. 188 at 4-5.

As for mailers and print advertisements, Riddell again does not deny that CRT was referenced therein.  Instead, it merely attempts to create a distinction by contending, again, that "the phrase Concussion Reduction Technology" was presented therein with "details about the UPMC Study, references to CRT design features, and/or links to additional information."  DE. 214 at 11.  For certain, as noted above, none of this alleged explanatory information (if in fact it was even provided) actually explained the truth about CRT, nor could it have placed consumers on notice of the truth.  Moreover, this factual subterfuge attempted by Riddell is again just that, a factual matter that should be determined by the jury and not at class certification.  In other words, the alleged contradictions do not preclude Plaintiffs' establishment of the Rule 23 factors by a preponderance of the evidence, they may serve merely as questions for the jury at trial.

_____

[7] Riddell also utilized product placement with the NFL, ESPN, NBC, and FOX, and others to disseminate its CRT message. Cecchi Suppl. Dec., Ex. 54 at 99.

[8] Riddell's catalogs from 2008-2012 mention CRT *97 times*.  *See* DE. 189, Exs. 9-15.  The 31% reduction claim/UPMC is mentioned only 15 times.  2008-2012 Football and All Sports Catalogs; *see also* the Riddell 2012 All Sports Catalog that defines CRT as "Concussion Reduction Technology, [which] provides the industry's preeminent protective foundation".  *See* DE. 189, Ex. 15 at RIDDELL00091655.

As for retail point of sale materials, Riddell again admits that point of sale material, such as packaging and product hang-tags, referenced CRT.  However, it argues these point-of-sale materials also contained an "accurate description of the UPMC study."[9]  DE. 214 at 11.  Again, whether the materials reference the UPMC does not extinguish the fact that CRT was prominently referenced at the point of retail sales.  Nor did any reference to the UPMC study explain away the misperception intended by "Concussion Reduction Technology."

As for the Riddell website, it also contained prominent references to concussion reduction technology.  Riddell does not deny the website referenced CRT.  It only attempts to diminish this fact or contrive factual distinctions by again arguing that the website provided "explanations" of CRT's elements,[10] reference to the UPMC study, and links to a medical study.  DE. 214 at 12.  Once again, none of this information negates the ultimate message conveyed by CRT, in that the helmets reduce the incidence of concussion better than other helmets on the market.  Accordingly, the Riddell website, where consumers purchased helmets directly from Riddell, admittedly exposed all those purchasers to the term CRT and represented that those helmets contained such "technology."

---

[9]  For clarification, it is important to note that the *only* Riddell helmet tested in the UPMC study was the Riddell Adult Revolution model.  However, Riddell routinely used the study to improperly advertise in all forms for youth helmets and multiple other Riddell helmet models, which were not included in the study. 2009 Football Catalog (DE. 189, Ex. 11 at RIDDELL00090923-90924); 2010 Football Catalog (DE. 189, Ex. 11 at RIDDELL00091166); 2011 All-Sports Catalog (DE. 189, Ex. 13 at RIDDELL00091312); Riddell's Website (DE. 189, Ex. 26 at RIDDELL-FTC-000893-000896); Product Packaging (DE. 189, Ex. 25 at RIDDELL-FTC-052763); 2010 Product Hangtags (DE. 189, Ex. 23 at RIDDELL-FTC-001223); Print Advertisements in USA Magazine (DE. 189, Ex. 18, 19).  *See also* Order, DE. 66 (31% reduction claims relating to youth helmets may proceed).

[10]  One would think that a "description of CRT's elements" itself would actually cause, or at least assist, a reasonable consumer to believe the helmet provided better protection against the incidence of concussion than other helmets.

Despite Riddell's denial of a common message and its argument regarding accurate reporting of CRT, there is no evidence to dispel the fact that CRT was the prominent focus of Riddell helmet marketing.   CRT consistently appeared in such marketing, and it was not truthfully explained.  Plaintiffs have established a "common message."

### 3.      Riddell's Advertising Use of the Term CRT Continued *Beyond* 2012.

The heading to section II.C. of the Riddell Opposition states "Riddell Ceases Use of the Phrase Concussion Reduction Technology in 2012."  DE. 214 at 12.  This statement is not true.  At best, Riddell may have made a *decision* in 2012 to cease using the term CRT after questioning by the FTC, ███████████████████████████████████[11]  However, this decision was merely the beginning of a "phase out" of the term CRT that continued well into 2014.[12]  Riddell was providing interviews leading with CRT to news organizations in the fall of 2012, which they

---

[11] Riddell also alleges misleadingly "the FTC did not take any issue with Riddell's use of the phrase "Concussion Reduction Technology."  DE. 214 at 7.  In reality, the FTC launched a full investigation based on concerns from Senator Udall regarding Riddell's advertising of helmets with the term "concussion reduction technology."  More importantly, Senator Udall's request to the FTC describes the advertising as "misleading safety claims and deceptive practices related to the sale of new helmets."  *See* Cecchi Suppl. Dec., Ex. 55.  The FTC chose not to move forward with the enforcement of their action against Riddell *because* Riddell "discontinued use of the 31% claim."  *See* April 24, 2013 letter from FTC, cited as Ex. 31 in Defendants' Opposition Brief.   *See also*  https://www.ftc.gov/system/files/documents/public_statements/205241/140313sportssafetyhouse.pdf.  Additionally, the FTC stated it "disagree[d] only with Riddell's decision to use the results reported in [Neurosurgery] - given the authors' express acknowledgments of the research's limitations – as the basis for unqualified claims for Revolution helmets."  *Id.*  The Commission reserved the right to take further action.  *Id.*  The FTC also stated on March 13, 2014, "Commission staff also investigated concussion reduction claims made by three major manufacturers of football helmets: Riddell Sports Group, Inc., Schutt Sports, Inc., and Xenith LLC.  In these matters, the staff determined to close the investigation without taking formal action, by which time all three companies discontinued potentially deceptive claims from their advertising, or had agreed to do so."  *Id.*

[12] Riddell acknowledges in its Opposition that the company "*phased out* use of the phrase Concussion Reduction Technology."  DE. 214 at 12 (emphasis added).  This contradicts any suggestion that use of the term CRT ceased immediately at the time the decision to drop the claim was allegedly made "at some point" in 2012.

were aware would be printed in magazines in 2013.  *See* Cecchi Suppl. Dec., Ex. 56 at RIDDELL00008659.  Popular Science Magazine even published an article titled, "New Football Helmet Could Save the Sport" with CRT claims in January, 2013.  *See* http://www.popsci.com/science/article/2013-08/helmet-wars-and-new-helmet-could-protect-us-all.

The fact that Riddell, internally, may have decided to stop using the CRT message in 2012, does not erase a multifaceted nationwide marketing strategy, employed since 2008, in which Riddell consistently and prominently promoted the use of the phrase CRT, or Concussion Reduction Technology, to sell its helmets.  Just as one may, at some point, stop spraying graffiti on a building, that does not mean they ever covered up the paint.  Similarly, Riddell never made a single effort to retract any of its materials or statements made in regard to the CRT claims.  In fact, on the date this lawsuit was filed, CRT statements were present on Defendants' social media pages on Facebook, and Twitter.  *See* DE. 189, Ex. 8 at RIDDELL00003342.  Even as of the date of this filing, Defendants' Facebook page and Twitter still contain statements about CRT.  *See* Cecchi Suppl. Dec., Exs. 57, 58, 59.  Further, many of Defendants' retail and institutional partners were provided this message, but not told to remove it until much later than 2012.  *See* Cecchi Suppl. Dec., Ex. 60 at RIDDELL00014302 (VP Michael Oller asking Sports Authority on January 14, 2014 to change language on Sports Authority's website from "CRT" to "Patented Side Impact Protection").

The reason Riddell repeats this lie throughout its Opposition is to try to support its arguments against a finding of adequacy and typicality.  Thus, each time Riddell regurgitates the "we quit in 2012" refrain, the argument it purports to support should be regarded with severe suspicion.

4.    **Named Plaintiffs' Individual Claims are not Rendered Deficient by Alleged "Contradictory" Testimony**.

Riddell next picks and chooses certain statements and allegations from each named Plaintiff's pleadings, interrogatory responses and/or deposition testimony to conclude there are "contradictions" therein which render each Plaintiff's claims "deficient" for purposes of class certification.  DE. 214 at 13-18.  At most, these alleged "contradictions" create credibility issues to be determined by the jury.  *See, e.g.*, *Senna v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 571 (N.D. Cal. 2016) (inconsistencies between declaration and deposition testimony were not of the magnitude that renders class representative inadequate.  "Rather, such inconsistencies are appropriate issues for the jury to consider in determining whether plaintiffs can prove their claims.").  Thus, for purposes of class certification, each Plaintiff has established, by a preponderance of the evidence, that he, she or it has valid claims plus standing to proceed in this matter, individually and as a class representative.  With that said Plaintiffs address each of the alleged "contradictions" in the order presented by Riddell.

Riddell begins by arguing the Aronsons' deposition testimony contradicts their Motion, pleadings, and interrogatory responses because (1) they purchased a Xenith helmet at one time, (2) they were not present for any Riddell sales presentation, (3) their son played football for a year before he asked for a Riddell Speed helmet, (4) Mr. Aronson never heard the term Concussion Reduction Technology, and (5) they did not investigate other helmets before purchasing Riddell.  DE. 214 at 13-14.  Despite Riddell's efforts to "poke holes" in the Aronsons' pleadings, discovery responses and deposition testimony, the undisputed facts in this case include the following:  on September 6, 2011, the Aronsons purchased a Revolution Speed helmet, which contained CRT, directly through Riddell's website.  Cecchi Suppl. Dec., Ex. 62 at RIDDELL00103300; Cecchi Suppl. Dec., Ex. 63 at 79:4-13; 81:2-8.  They were exposed to the

CRT representations prior to purchase.  Cecchi Suppl. Dec., Ex. 61 at 58:19-59:25; Cecchi

Suppl. Dec., Ex. 63 at 81:2-8.  They believed based upon the CRT that the helmet was safer than

others in preventing the incidence of concussion.  Cecchi Suppl. Dec., Ex. 63 at 124:1-25.  None

of these facts are disputed.  Thus, there is no defense to the Aronsons' claim that is any different

than that of the other class members and the Aronsons' claim will rise or fall with that of the

class.[13]

Accordingly, their claims are not "deficient" as alleged by Riddell.  The Aronsons have

standing to pursue this matter individually and they are adequate class representatives.[14]

Next, Riddell argues Plaintiff Norma Thiel's "motion and pleadings" are "contradicted by

[her] interrogatory answers and testimony."  DE. 214 at 14-15.  More specifically, Riddell

---

[13] The Aronsons' deposition testimony reflects: Mr. Aronson heard presentations from manufacturers; hearing at least one from the "Riddell guy" and maybe one from Xenith.  Cecchi Suppl. Dec., Ex. 61 at 46:5-22.  Mr. Aronson was present at a presentation performed by Riddell at DePaul in 2009 or 2010, but missed the beginning.  Mr. Aronson attended presentations by helmet manufacturers including Riddell.  *Id.* at 46:6-47:22.  As a result of the meeting with Riddell, the Aronsons purchased the Revolution helmet in 2009 or 2010.  *Id.* at 57:11-58:8.  The helmet was actually purchased on September 6, 2011.  *See* Cecchi Suppl. Dec., Ex. 62 at RIDDELL00103300.  Mr. Aronson was convinced that they needed the Revolution because it could "reduce the chances of getting a concussion."  So, the family purchased it and his son used it his freshman year of high school.  *See* Cecchi Suppl. Dec., Ex. 61 at 58:19-59:25.  Ms. Aronson and her son reviewed the Riddell website together and she reminded him to "click the one that doesn't give you concussions," because they were paying more money and she wanted to be sure they were purchasing the one that reduces concussions.  Cecchi Suppl. Dec., Ex. 63 at 79:4-13; 81:2-8.  Ms. Aronson had a variety of reasons for purchasing the helmet: (1) she felt it was safer, (2) it reduced the incidences that he could possibly get a concussion, (3) she wanted her son to be safe, and (4) it would protect his brain.  *Id.* at124:1-25.  Mr. Aronson attended presentations by helmet manufacturers including Riddell and Xenith.  Cecchi Suppl. Dec., Ex. 61 at 46:6-47:22.  The day of purchase, Ms. Aronson and her son reviewed Riddell's website to be sure they got the helmet that "reduces concussions."  Cecchi Suppl. Dec., Ex. 63 at 81: 2-8.

[14] Alleged "contradictions" for each Plaintiff are a common theme throughout the Opposition and provide the only support for various arguments.  For example, later in its Opposition, Riddell extrapolates from this groundless contradictions argument that the Aronsons cannot meet the adequacy and typicality requirements of Rule 23(a).  DE. 214 at 29-30.  *See* section 5 below.

argues, in part, that because it "ceased *all use* of the phrase 'Concussion Reduction Technology' in the fall of 2012, more than six (6) months before Ms. Thiel's April 24, 2013 purchase," her allegations cannot be true.   DE. 214 at 14 (emphasis added).   This argument is not even consistent with what Riddell told the Court earlier in its Opposition, where it said it "phased out use of the phrase Concussion Reduction Technology" and that it "discontinued selling traditional helmets" . . . "as of 2012."  It did not say *all* ads with CRT *ceased* in 2012, and indeed they did not.  But for now, with regard to Ms. Thiel's claim, Riddell says it "ceased all use of the phrase [CRT] in Fall of 2012."  DE. 214 at 14.  Of course, to the contrary, other evidence in this case indicates that this phase out period continued at least through January 2014, (and some ads for CRT remain to this day on the Web)[15] which would explain why Ms. Thiel was able to view Riddell's *YouTube* advertisement in April of 2013.[16]  Once more, as with the Aronsons, these alleged "contradictions" are contrived factual disputes that should not affect a finding of adequacy and typicality for Ms. Thiel.  *See* DE. 189, Ex. 8.

Riddell also argues Plaintiff Farrell's "Motion claims" are "contradicted by [his] interrogatory answers and testimony."  DE. 214 at 15.  For Farrell, Riddell attempts to lay all the blame on Farrell's high school football coach.  Riddell alleges it was a coach who told Farrell about the benefits of CRT, accepted Farrell's mother's money and, as suggested by Riddell, that

---

[15]  *See, e.g.*, Twitter picture.  Cecchi Suppl. Dec., Exs. 57-59.

[16]  Riddell also alleges that "the sole piece of Riddell marketing [Ms. Thiel] relied upon a *YouTube* video...was published on March 19, 2013, and not once mentions the phrase 'Concussion Reduction Technology,' 'CRT,' or any iteration thereof."  DE. 214 at 15.  In reality, Ms. Thiel stated in deposition, "I believe so, yes" that the March 19, 2013 video is the one she saw.  Cecchi Suppl. Dec., Ex. 64 at p. 104: 2-3.  However, this less than definitive response is not further addressed and it is unclear whether she could have seen another video with the same content that included CRT or Concussion reduction.  Riddell admits that CRT was advertised in a 360 video on *YouTube* issued in February 2012, which likely remained active for an indefinite period thereafter.  *See* DE. 189, Ex. 8 at RIDDELL00003342.

the coach was selling helmets he got for free, and that he sold Farrell a used helmet rather than a new Riddell helmet.  DE. 214 at 15-16.  Riddell also says Farrell never saw a Riddell catalog, some of the "things" he saw about the helmets were not Riddell ads, and he only went to the Riddell website once.  *Id*.[17]  These allegations are intentionally misleading in light of Mr. Farrell's deposition testimony and written discovery responses.  Nevertheless, as with the other Plaintiffs, these alleged contradictory facts do not preclude a finding of adequacy and typicality for Mr. Farrell because his discovery responses and deposition testimony are to the contrary.

As for Plaintiff Galvan, Riddell argues his interrogatory answers and deposition testimony contradict his "Motion and pleadings."  DE. 214 at 16-17.  For example, Mr. Galvan purchased two Riddell youth helmets from Dick's in 2011.  Riddell claims it did not sell helmets to Dick's until 2012, so Mr. Galvan could not have relied on Riddell's retail packaging.  *Id*. at 17.  This claim, like Riddell's claim that it ceased all use of the term CRT in 2012, is less than truthful.  Allison Boersma, a former Chief Operating Officer and Rule 30(b)(6) witness for Riddell, testified that Dick's came to Riddell in *2010* requesting to sell Riddell helmets and they began selling to Dick's from then on.  *See* DE. 189, Ex. 27 at p. 48.

Riddell also questions the fact that Mr. Galvan said he paid $200 for each helmet he purchased at Dick's when, according to Riddell, the same helmets could have been purchased from Riddell online for $108.99 each.  DE. 214 at 17, fn. 78.  Whether he paid more than he should have or his recollection of the price paid is inaccurate; that does not affect his adequacy

---

[17] Actually, Mr. Farrell testified that before purchasing he reviewed Riddell's website, catalogs, and magazines which contained information regarding Riddell helmets.  *See* Cecchi Suppl. Dec., Ex. 65 at 23, 24, 46.  He also stated the coach presented the team a model helmet with a catalog; Farrell then researched the helmet and got money from his mother to buy it.  *Id*. at 28-29.  The evidence also indicates that Farrell's high school purchased helmets from Riddell and paid a significant amount of money to Riddell during the period in question.  Cecchi Suppl. Dec., Ex. 66 at RIDDELL00103303-103325.  There is no evidence that Mr. Farrell purchased a "used" helmet or that his coach, rather than Riddell, was selling helmets to students.

or the typicality of his claims.  It just creates another factual distinction Riddell can address at

trial.

Riddell also contends Mr. Galvan testified he relied on the 31% reduction claim in the

UPMC study, rather than on any claims on Riddell's website.  DE. 214 at 17.[18]  His actual

testimony on this point is quite clear:

> Is that where you saw the reference for concussion reduction
> technology in the packaging? – No, it was on the internet website.
> It was on the paper in the helmet but I didn't read the whole thing.
> Once I seen the CRT to verify that, it was it then. – So you saw a
> section of the Riddell news site that referenced the 31% and
> concussion reduction technology? – Yes.

DE. 189, Ex. 46 at p. 114, Line 2-11.

> I remember they said that it would reduce it (concussions) a
> significant amount. To me it was any reduction of concussion
> could be significant. And that was the reason why I ended up
> purchasing them. – So was it the 31% that was the reduction? – To
> me that's a big number, yeah. – That was an important number to
> your purchase? – Yes.

*Id*. at 119.

Riddell also attempts to make hay from misstating Mr. Galvan's testimony as to when he

first contacted attorneys about this case.  Mr. Galvan initially stated during his deposition he did

not learn of the case until after it was filed.  However, he later corrected himself to say he was

mistaken and that it was in late 2013.  Riddell misleadingly does not acknowledge the corrected

testimony but relies upon the initial statement to insinuate that Mr. Galvan is an inadequate

representative.  DE. 214 at 17.  Furthermore, regardless of when he actually learned of his claim,

it does not affect his adequacy in this matter.  *See Jerry Enters. of Glocester County, Inc. v.*

---

[18] This actually supports Mr. Galvan's allegations, particularly since he purchased youth helmets;
thus, the 31% reduction claim remains viable for Mr. Galvan.  *See* Order, DE. 66 (31% reduction
claims relating to youth helmets may proceed).

*Beverage Group, LLC*, 178 F.R.D. 437, 445 (D.N.J. 1998) (discussing at length and rejecting the argument that class representative was inadequate because he was not aware of his claim prior to being contacted by counsel).

In sum, these alleged inconsistencies or "contradictions" in testimony do not render Mr. Galvan an inadequate representative nor do they destroy the typicality of his claims.

As to Plaintiff Alliance Youth Sports Association ("AYSA"), Riddell argues that AYSA's "Motion" is contradicted by AYSA's interrogatory and deposition testimony.  DE. 214 at 18.  Riddell points out that AYSA, in addition to purchasing helmets with CRT, also purchased "a large number of traditional 'Riddell Attack' helmets."  Riddell also argues that Mr. King, the AYSA representative, identified a full-page ad for the "Attack helmet" "which references the helmet as "traditional football helmet technology."  DE. 214 at 18.  Finally, Riddell alleges there are differences in AYSA's discovery responses regarding prices paid and what Riddell claims were actually paid for helmets with CRT.  DE. 214 at 18.  Again, these alleged contradictions go to the weight of all the AYSA testimony, including Riddell's version of the facts, for the jury to resolve.

As repeatedly expressed, this sort of inconsistency and contradiction in testimony alleged by Riddell is not of the magnitude that renders class representatives inadequate.  Rather, such inconsistencies are appropriate issues for the jury to consider in determining whether Plaintiffs can prove their claims.  Moreover, the alleged "contradictions" within Plaintiffs' pleadings, discovery responses, and depositions do not rise to a level that would cast doubt on the adequacy of Plaintiffs to represent the class.  At best, this may create a question of credibility going to the weight of the evidence.  *Senna*, 315 F.R.D. at 571.

**5.      Plaintiffs have Satisfied all Rule 23(a) Requirements.**

Riddell next argues the Plaintiffs cannot satisfy Rule 23(a).  Riddell offers a generalized conclusion that "Plaintiffs' proposed subclasses are overbroad, some absent class members possess higher levels of sophistication than others, some were not exposed to the claims at issue at all, and some were exposed to different messages by different means."  DE. 214 at 25-26. Riddell also argues certain Plaintiffs are not part of the class they seek to certify.  *Id*. at 26.

As support for the argument that the class definitions are "overbroad," Riddell states that because the definitions include "all persons who purchased 'Riddell Football helmets *with* concussion reduction technology,'" the classes are "not limited to helmets that were marketed as containing CRT," and therefore must "include purchasers who were *never* exposed to CRT marketing, or mislead by an omission, or saw "accurate information about the UPMC study."  *Id*. (emphasis in original).  Riddell also includes the now familiar refrain that it *ceased* the use of CRT "by the fall of 2012,"[19] and there can be no valid claims after that date.  DE. 214 at 26.[20] This argument is an intentional misinterpretation of the classes as defined.

The proposed classes *are specifically defined and limited* to helmets that were marketed as containing CRT.  Plaintiffs direct Riddell's attention to the proposed class definitions at pages 16-17, and fn. 18 of Plaintiffs' Memorandum, DE. 188.  There, the class definitions specifically

---

[19] To this point in its Opposition, Riddell has now alleged that it: (1) "phased out use of the phrase [CRT]," (presumably beginning in 2012), DE. 214 at 12; (2) "ceased all use of the phrase [CRT] *in the Fall of 2012*", *id*. at 14; and (3) "ceased its use of 'CRT' *by the fall* of 2012."  *Id*. at 26 (emphasis added).  Of course, as noted above, Riddell helmet advertisements containing the term Concussion Reduction Technology persist to this day.

[20] Riddell also argues that the retail classes "will include people like [Galvan], who never saw Riddell's product packaging because he allegedly purchased from Dick's before Riddell sold Dick's any helmets.  DE. 214 at 26.  Of course, as noted above, Galvan saw Riddell ads regarding CRT before purchase, and whether Dick's obtained Riddell helmets from another source is uncertain.

include and identify every Riddell helmet model identified by Riddell in discovery that was *marketed and sold with CRT*. Thus, the class is indeed "limited to helmets that were marketed as containing CRT." It contains no others. If a class member did not purchase one of the listed helmets, then he, she or it did not purchase a helmet marketed with CRT and is not a class member.

Riddell next questions typicality by arguing the proposed classes "would contain members who were exposed to different marketing claims, with varied levels of detail, through different mediums." DE. 214 at 26. More specifically, Riddell argues Plaintiffs Thiel and the Aronsons "were not exposed to the same oral representations and catalogs as teams, leagues, and other Direct Purchasers, . . . nor would they have been exposed to the product packaging that the proposed New Jersey Retail Purchasers saw." *Id*. at 27. Riddell also argues (again) that Plaintiff Farrell "gave his mother's cash to his coach in exchange for a helmet," he was not "exposed to the same representations as other direct purchasers in Florida, he would not have seen product packaging, and his "purchase was not coupled with any common message about CRT." DE. 214 at 27. Once again, everyone was exposed to the same term -- CRT. The method of delivery may have differed but the message was always "Concussion Reduction Technology." If someone heard it from a salesperson and another read it online, it makes no factual or legal difference. CRT was the common and consistent message throughout all Riddell marketing of helmets with CRT. Thus, there was no difference in the CRT marketing message, just differences in the method of delivery.

As for Plaintiff Galvan, Riddell restates its *argument* that he purchased *before* Riddell sold helmets to the store he purchased from, and that he was not "exposed to the same catalogs and oral representations to which institutional Direct Purchasers in California would have

received."  DE. 214 at 27.  Again, the actual evidence shows that Dick's was selling Riddell helmets before Riddell now claims it was, and Mr. Galvan viewed CRT ads before purchasing. As for the alleged varying CRT messages between retail purchasers and institutional purchasers, there were none.

For AYSA, Riddell argues that "unlike individual purchasers in the Direct Purchaser class in Arizona, [AYSA] negotiated directly with a Riddell Sales Representative over the price of the helmets and additional equipment..., received oral representations about their features, . . . obtained special . . . discount pricing, resold or rented helmets,[21] and never received product packaging."  Riddell also contends that because AYSA's representative testified as to what a Riddell salesperson told him, "the Court 'would have to conduct thousands of individualized inquiries into the content of each sales presentation' to determine if every other pitch was the same."  DE. 214 at 27-28.[22]  Again, AYSA received the same CRT message as everyone else. Furthermore, there is no evidence that any Riddell salesperson varied the CRT message to AYSA or revealed the truth about CRT.  Thus, there is no evidence that the message to AYSA varied from that given to any other purchaser.

Riddell also asserts, again without any evidentiary support, that institutional purchasers have a "higher level of sophistication than parents," thereby creating some impermissible distinction or conflict among class members.  DE. 214 at 28.  Presumably, this statement is intended to mean that Riddell believes institutional purchasers are intelligent enough to know

---

[21] Riddell argues that AYSA "has an atypical experience because it resold and rented helmets for which it is claiming damages."  DE. 214 at 28.  This is a matter of individual damage calculation for AYSA and does not impact typicality.  *See* section 13 below.

[22] Riddell fails to offer any evidentiary support that the message for CRT ever deviated based upon its method of delivery.  Stated differently, there is no evidence that the oral and written messages regarding CRT *ever* differed in any material respect, whether conveyed orally or in writing.

that Riddell is misleading them.  Of course, there is no evidence to that effect, and this off hand and unsupported allegation should be rejected.

Based upon the foregoing allegations, it appears Riddell would have us believe the typicality element of Rule 23(a) requires Plaintiffs to establish that each named Plaintiff and class member must be exposed to not only a common message, but must be exposed to each and every method Riddell utilized to disseminate its false common message of CRT and must have the same undefined level of sophistication.  That is not the law.  The clear weight of the evidence in this case is that each Plaintiff was exposed to Riddell's CRT marketing message.  The same core of written and verbal misrepresentations concerning CRT made to the named Plaintiffs, were made to all or most, of the class members.  *See Stephenson v. Bell Atlantic Corp.*, 177 F.R.D. 279, 291 (D.N.J. 1997) ("To demonstrate the requisite predominance of common issues of fact and law in a case such as this, plaintiffs must identify a small core of misrepresentations and omissions made to all, or most, of the class members.").

Again, the message presented by "Concussion Reduction Technology" was the same regardless of the advertising medium.  The delivery method may have varied but the message of CRT was always the same.  Thus, Riddell's unsupported allegations of varying marketing claims are insufficient to defeat typicality for these Plaintiffs.  *See, e.g.*, *Beck v. Maximus, Inc.*, 457 F. 3d 291, 296 (3d Cir. 2006) ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory"); *Suchaneck v. Sturm Foods, Inc.*, 311 F.R.D. 239, 255 (S.D. Ill. 2015) (the court rejected defendants' argument that typicality is not satisfied because purchasers bought subject product for different reasons and formed their belief about it for different reasons.  The court found "when it comes to consumer fraud class actions,

19

individual differences are to be expected"); *Korrow v. Aaron's Inc.*, 2013 WL 5811496, at *12 (D.N.J. July 31, 2013) ("In fact, '[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct'"); *O'Brien v. Brain Research Labs, LLC*, 2012 WL 3242365, at *6 (D.N.J. Aug. 9, 2012) ("the typicality requirement is met, regardless of factual differences, as long as the same unlawful conduct was directed at or affected both the named plaintiff and the absent class members").

In summary, the named Plaintiffs' claims arise from the same conduct that gives rise to the claims of other class members and are based on the same legal theory. Like the other class members, the named Plaintiffs purchased helmets with CRT that Riddell misrepresented would reduce the incidence of concussions better than other helmets on the market. There is no evidence that there are any factual differences between the named Plaintiffs' claims and those of other members of the classes, other than perhaps the class members who purchased different quantities or different models of helmets with CRT, or they paid differing amounts for the helmets. *See O'Brien*, 2012 WL 3242365, at *7. Typicality is satisfied.

### 6. Plaintiffs are Adequate Representatives for Each Proposed Class.

Those who purchased helmets with CRT directly from Riddell account for approximately ▉ of all purchasers in this case. Every purchaser was exposed to the same CRT message. There were no variations in the CRT message among direct purchasers ▉▉▉▉▉ ▉▉▉▉▉▉ And, the damages incurred per purchased helmet will be measured by the same method for all purchasers. Thus, there is no actual conflict among the interests of the proposed direct and retail class members. That is to say, each named Plaintiff is adequate to serve *both* classes proposed in his/her/its respective state - retail and direct purchasers - in that

they possess the same interests and suffered the same injury shared by all members of the class they seek to represent. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974) (noting that a class representative "must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents").

The only significant distinction between the two classes – retail and direct – is that records exist to identify the direct purchasers but additional effort will need to be made to identify retail purchasers, either from non-parties or by other means.   Therefore, Plaintiffs believe that each named Plaintiff can adequately represent *both* the direct and retail classes for their respective statewide classes.[23]

### 7.    Riddell's Alleged "Change in the Market" does not Affect Typicality.

Riddell takes another swing at typicality by arguing, "[t]ypicality is lacking because of the continued release of new products into the marketplace during the class period, which altered the landscape of available alternatives and affected the perceptions of consumers."   Riddell believes these unidentified new products "affected the perceptions of consumers," and thereby precludes any chance of establishing typicality.   DE. 214 at 29.   However, Riddell does not actually explain how this would affect typicality, nor does it offer any proof to support this conclusion; it merely claims that by 2012 "fewer and fewer traditional models were on the market."   *Id*.

---

[23] Should the Court determine there is no adequate representative presently named for a particular class, Plaintiffs request the Court to allow Plaintiffs an opportunity to move to add or substitute an appropriate representative plaintiff.  *See Legard v. EQT Production Co.*, 2012 WL 933192, at *1-2 (W.D. Va. Mar. 20, 2012) (motion to substitute class representative granted over defendant's objection that no class had yet been certified).

Riddell attempts to support this contrived argument against typicality by arguing, "Plaintiffs' survey expert fails to take into account any variables relevant to available alternatives, and disregards the evolution of consumer opinion on concussions that continues through the present day." DE. 214 at 29. Of course, Riddell fails to offer any evidence of the existence of such "variables" or "evolution of consumer opinion," just a bald assertion that "variables" exist and Plaintiffs' expert did not consider them. Stated differently, Riddell fabricated an argument and attacks Plaintiffs' expert because he did not consider it.

In truth, Plaintiffs' marketing expert, Robert Klein, did not in fact perform a survey or offer an opinion on "the evolution of consumer opinion on concussions," but he did survey consumers and reach a conclusion about how they perceived the term "Concussion Reduction Technology." Klein Report, DE. 189, Ex. 28. (CRT term communicates that the helmets are safer and offer better protection than other helmets and the CRT claim has a material and positive impact on customer purchase decisions). The claims in this case are clearly defined to relate only to those helmet models containing CRT. The fact that nebulous "new products" may have been offered during the class period does not impact typicality (or have any relevance whatsoever) where the named Plaintiffs and class members purchased specific models of Riddell helmets with CRT. Riddell's unsupported allegations are not enough to preclude a finding of typicality. *See, e.g.*, *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 245 (S.D. IL 2015) (court denied motion to exclude marketing expert opinion stating "[t]o the extent that Defendants want to quibble with [the expert's] understanding of the facts or the materials that he reviewed, those are matters for cross-examination because they go to the weight and credibility of his opinions, rather than their admissibility"). Accordingly, Riddell's alleged "variables in the helmet market" do not affect typicality.

22

8.      **There are no "Unique Defenses" Sufficient to Preclude Certification**.

For its next attack upon typicality and adequacy, Riddell alleges it has "unique defenses" that "render Plaintiffs' interests antagonistic to those of the class" and lists its "defenses" against each Plaintiff.  DE. 214 at 30-33.  "It is well established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'"  *Marcus v. BMW of N. Amer.*, 687 F. 3d 583, 599 (3d Cir. 2012) (citations omitted).  A unique defense might result in the representative "devot[ing] time and effort to the defense at the expense of issues that are common and controlling for the class."  *Id.* (citations omitted).  *See also Bright v. Asset Acceptance, LLC*, 292 F.R.D. 190, 200 (D.N.J. 2013) (finding no evidence that a defense would become a major focus of the litigation or that the Plaintiff would devote a large amount of time and effort to the defense at the expense of issues that are common and controlling for the class).  All of the alleged "unique defenses" argued by Riddell are just a retread of the alleged factual "contradictions" discussed in section 4 above.  As noted above, these are mere factual issues that Riddell may raise in cross-examination at trial.

With regard to the Aronsons' claims, Riddell alleges its unique defenses are that the Aronsons (1) purchased a Xenith brand helmet at one time,[24] (2) never met with a Riddell representative, (3) never compared helmets from other manufacturers, (4) did not know Riddell had less expensive helmets than the one they purchased, (5) purchased the helmet because their son requested it, and the son "controlled the computer" when they visited the Riddell website to make their purchase.  DE. 214 at 30.  A comparison of these allegations with the Aronsons'

_____

[24] Like many of Riddell's "unique defenses," they simply have no relevance to the issues in the litigation whatsoever, and would not be admissible at trial – and thus, certainly not a "unique defense."

discovery responses and deposition testimony reveals, at best, that Riddell may have some questions for the Aronsons upon cross-examination at trial.  These allegations are the same "contradictions" addressed in section 4 above, and they certainly do not rise to the level of a "unique defense" that is likely to become a major focus of this litigation.  *Marcus*, 687 F. 3d at 599.

For its "unique defenses" to Plaintiff Thiel's claims, Riddell argues that (1) she purchased a helmet six months after Riddell ceased using the term CRT, (2) she purchased a Riddell CRT helmet because her son told her that he wanted one, (3) her son showed her a *YouTube* video which Riddell contends does not mention CRT, and (4) a Riddell helmet with CRT was available to her son at school for free but she chose to purchase a Riddell 360.  DE. 214 at 30.  As in the Aronsons' case, these defenses are merely a re-argument of the alleged "contradictions" in testimony discussed above.  Nonetheless, these allegations do not rise to the level of a defense that is likely to become a major focus of the litigation.  They are at most questions for cross-examination that the jury can weigh accordingly.

For Plaintiff Farrell, Riddell argues (again) that (1) Mr. Farrell's mother gave him cash to give to his high school football coach for a helmet, (2) the coach encouraged the team to buy Riddell helmets, (3) Farrell could not testify to any statement by Riddell he was exposed to, and (4) Riddell even suggests that Farrell's coach did not purchase the helmet sold to Farrell and that the helmet may have been "used" rather than new.  DE. 214 at 31.  Of course, the facts of the case belie these alleged "unique defenses."  *See* section 4 above.  Nonetheless, they do not rise to the level of a defense that is likely to become a major focus of the litigation.

Riddell claims it has "unique defenses" against Plaintiff Galvan because Mr. Galvan's "allegations suffer from a unique question of credibility" because he said he did not know he

24

filed this lawsuit, or its details until early 2016, after it was filed.[25]  DE. 214 at 31.  This is the

same intentional mischaracterization of Mr. Galvan's testimony as discussed in section 4 above.

Riddell also contends Mr. Galvan is not a "consumer" for purposes of California law because he

purchased two helmets and allowed two players on a youth team he coached to use them.  The

applicable California Code section states a consumer is one who purchased goods for "*personal*,

family, or household purposes."  *Id*. (emphasis added).  In effect, Mr. Galvan bought two

helmets for personal use and he let two children on his team use them.  This was a consumer

purchase as contemplated by the California statute cited by Riddell.  In addition, Riddell again

argues that Mr. Galvan paid more than list price for the helmets and that he bought them before

Riddell ever sold to Dick's, that his purchase could not have had a Riddell hang tag, and that he

refused to consider more expensive helmets.  *Id*. at 31-32.  These allegations were all previously

discredited in section 4 above.  But even if these allegations could not be discredited, they

certainly do not present unique defenses that would become a major focus of the litigation.

Riddell argues it has unique defenses against AYSA because: (1) AYSA has not issued a

written resolution authorizing this lawsuit,[26] (2) its claims are barred by the Arizona one-year

statute of limitations,[27] (3) it purchased helmets with and without CRT and that creates

---

[25] Even if this allegation were true, Mr. Galvan has responded to Riddell's written discovery and appeared for deposition.  He has at all times cooperated with counsel to pursue his claims in this Court and is an adequate representative of the proposed California classes.

[26]  The President of AYSA, Oliver Ross, authorized AYSA to pursue this lawsuit.  Cecchi Suppl. Dec., Ex. 67 at 97.

[27] All the evidence in this case indicates AYSA timely filed its lawsuit. Furthermore, the Arizona Consumer Protection Act utilizes the discovery method to determine when the one-year statute of limitations begins to run.  *Cheatham v. ADT Corp*., 161 F. Supp. 3d 815, 826 (D. Ariz. 2016) Therefore, the question of *when* the consumer knew or should have known is a question of fact. *Schellenbach v. GoDaddy.com*, 2017 WL 192920 (D. Ariz. Jan. 18, 2017).  Also, the filing of the original suit alleging a nationwide class tolled the running of all applicable statutes of limitation nationwide as to all Class members, including AYSA, under the *Am. Pipe & Constr. Co. v. Utah*,

"problems with causation," and (4) Mr. King's "continuously changing position on how much alternative Schutt helmets would have cost him." DE. 214 at 33. Riddell concludes that all these "defenses" render AYSA "an atypical and inadequate representative." *Id*. These allegations, like those against the other named Plaintiffs (and particularly in light of AYSA's contradictory evidence), do not rise to the level of a defense that is likely to become a major focus of the litigation.

In sum, there is no evidence that any alleged "unique defense" will become a major focus of the litigation or that any named Plaintiff will devote a large amount of time and effort to a particular defense at the expense of issues that are common and controlling for the class. Accordingly, these alleged "unique defenses" do not prevent the Plaintiffs from satisfying the typicality requirement of Rule 23(a).

### 9.    **Rule 23(b)(3) Certification is Proper**.

Riddell argues a 23(b)(3) certification is improper because the vast majority of its sales are to institutional customers, and because salespeople make those sales, then these sales must necessarily involve "individualized oral representations" which would defeat predominance. DE. 214 at 35. Riddell, however, fails to offer any evidence to support this argument beyond the mere suggestion that salespeople communicate, in part, through oral communications with Riddell's institutional customers.[28] More importantly, there is no evidence that these salespeople made any varying material representations regarding CRT.

---

414 U.S. 538, 550 doctrine. *McKowan Lowe & Co. v. Jasmine, Ltd*., 295 F.3d 380, 385 (3d Cir. 2002) (discussing and confirming the tolling of unnamed class members claims once class action is filed, due to Supreme Court's ruling in *American Pipe*).

[28] Institutional customers are primarily coaches, schools, and football leagues.

Riddell further argues that Plaintiffs offer no evidence that Riddell's sales representatives themselves made uniform representations to potential purchasers.  DE. 214 at 36.  It strains credulity to believe Riddell's salespeople, trained as they were to tout CRT, would not present Riddell's CRT marketing message to institutional consumers.[29] *See* DE. 189, Ex. 16 at RIDDELL00011434-00011442.  Indeed, the actual evidence – Riddell's own sales training materials – refute this argument.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *See* Cecchi Suppl. Dec., Ex. 68 at RIDDELL-FTC-000381-426.

Furthermore, Riddell's Marketing Director developed a consistent marketing message via catalogs, brochures, sales flyers, and "anything that a sales rep would use to put in front of their customer," which were all disseminated to sales representatives at Riddell's National Sales Meetings.  *See* Cecchi Suppl. Dec., Ex. 54 at 20, 27-28.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

█████████████████████ *See* Cecchi Suppl. Dec., Ex. 68 at RIDDELL-FTC-000420.  ████████████

████████████████████████████████████████████████████

---

[29] Riddell also says its "executives encouraged representatives to present accurate information about CRT," DE. 214 at 37, by instructing them to "[b]e sure not to use 'safer' when talking about [the Revolution] helmets."  DE. 214 at 37-38, fn 138.  Clearly, this is not a disclosure or even an explanation, but an intentional concealment; they let the phrase CRT speak for itself. If they intentionally avoid using the word "safer," then they just let the phrase "concussion reduction technology" hang in the air for the purchaser to deduce what it means to them.  And, as Klein concluded, consumers understood overwhelmingly that the phrase "Concussion Reduction Technology" meant a safer, more protective helmet.  DE. 189, Ex. 28 at 2.

███████████████████████████████████████████████████

██████████████████████████████████████████████████ *See*

Cecchi Suppl. Dec., Ex. 69 at RIDDELL00018446-00018452.  ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████  *See* Cecchi Suppl. Dec., Ex. 70 at RIDDELL00075023.  The Riddell Football and All

Sports Catalogs were provided to the sales representatives during or immediately after the

National Sales Meeting.  *See* Cecchi Suppl. Dec., Ex. 71, at 56-57.  Riddell sales representative,

Dominick Violi, testified at deposition in this case that hundreds of the annual catalogues were

delivered to his house, which he would then provide to customers.  Cecchi Suppl. Dec., Ex. 71,

at 63.  Riddell's sales message was consistent and common from the top down.

In addition, all written marketing materials were intended by Riddell to be provided, and

undisputedly were provided, to their direct "institutional" purchasers.  Definitely, the direct

mailers referencing CRT were routinely sent to *all* high school and youth organizations, as well

as leagues, which encompassed the vast majority, if not all, of the institutional customers.  *See*

DE. 189, Ex. 16.  Accordingly, it is ludicrous for Riddell to contend that institutional purchasers

were not exposed to CRT, whether through contact with a salesperson or through mailers and

catalogs.

Riddell also argues that Plaintiffs cannot establish Rule 23(b)(3) "predominance" for

those class members who purchased "off the Riddell website" and for those who purchased from

retailers, because they were exposed to "differing representations and materials."  DE. 214 at 39.

Riddell again attempts to support this argument by suggesting that because "these materials

contain information about research that went into the development of CRT, the UPMC Study's

■

results and its comparison to traditional helmets, there can be no common message." *Id*.  Again, the references to CRT were consistent and uniform throughout *every* method utilized to market helmets with CRT.  Each purchaser, whether at retail or direct from Riddell, was exposed to CRT without any material variations in the message.

**10.      Plaintiffs are Entitled to Presumptions of Common Proof**.

Riddell next argues that individualized issues will predominate under the four state consumer protection statutes relied upon by Plaintiffs – Arizona, California, Florida and New Jersey.  DE. 214 at 39.  Plaintiffs have established that for each state consumer law involved here, any reliance component can be established class-wide.  *See* DE. 188 at 28-37.

Riddell begins by alleging the Arizona Consumer Fraud Act will not allow a class action in a case alleging misrepresentation, rather than fraudulent concealment.  *Id*. at 40.  This is incorrect.  *See Siemer v. Associates First Capital Corp*., 2001 WL 35948712, at *4 (D. Ariz. March 30, 2001) (Court granted class certification on ACFA claim finding "Plaintiffs have sufficiently demonstrated reliance by their purchase of [the product].  This alone is sufficient to show reliance to the degree necessary under the ACFA.  In addition, the Court need not evaluate the reasonableness of the Plaintiffs' reliance under the statute, reliance does not have to be reasonable.").

Riddell also argues AYSA, the Arizona representative, has "individualized inquiries" destroying predominance because (as we have addressed before) AYSA "orally negotiated," received lower pricing, purchased some helmets without CRT, continued to purchase helmets after this lawsuit, and they were "sophisticated and exposed to information to put them on notice here."   Plaintiffs note once again that this litany of "contradictions" does not destroy predominance in this case.

Riddell also argues there is no presumption of reliance under the California, Florida and New Jersey consumer laws at issue. DE. 214 at 41-45. This issue was fully addressed for each state in Plaintiffs' Memorandum In Support of Motion for Class Certification. DE.188 at 30-37. The cases cited by Riddell on this point are inapposite and inapplicable, so there is no need to burden the Court with further explanation of the case law from these states. Furthermore, Riddell alleges predominance is also destroyed because of those various "contradictions" we now know so well for each named Plaintiff. They do not destroy predominance of common issues in this case.

For California, Riddell claims Mr. Galvan's "own experience (*i.e.*, price paid, purchased before Dick's sold Riddell helmets and not in Riddell packaging) is illustrative of some of the individualized issues the Court will face," and improperly projects those same "issues" upon every other California class member. DE. 214 at 43. These alleged contradictions in testimony, now being described as "individual issues" by Riddell, do not destroy predominance because Galvan was exposed to CRT claims and bought a Riddell helmet due to Defendants' misrepresentations.

For Florida, Riddell argues there are many "individualized factual and legal issues" such as the "reselling and renting of helmets by institutional purchasers," that Mr. Farrell was not "exposed to any claims by Riddell, and his mother gave him money to buy the helmet. DE. 214 at 44-45. Again, these arguments have been addressed before. These alleged contradictions in testimony, now being described as "individual issues" by Riddell, do not destroy predominance because Farrell was exposed to CRT claims and bought a Riddell helmet due to Defendants' misrepresentations.

As for New Jersey, it is more of the same – Riddell says Ms. Thiel relied on a video that did not contain the phrase CRT, the Aronsons did not see a presentation by a Riddell salesperson, and the "parties cannot prove that any CRT representations caused them ascertainable loss." DE. 214 at 46. The New Jersey Plaintiffs have established predominance.

**11.     Plaintiffs Can Prove Damages on a Class-wide Basis**.

Riddell contends Plaintiffs cannot prove class-wide damages and offers three arguments: Plaintiffs' damages model (1) does not fit their theory of liability, (2) does not account for "other variables," and (3) will require individual damages inquiries. DE. 214 at 47-54.

**(a).     Plaintiffs' damage model fits their theory of liability**.

Riddell argues Plaintiffs' damages model does not "fit" because it is not consistent with their theory of liability. DE. 214 at 47. Once again, Plaintiffs' theory of liability is that Riddell marketed and sold football helmets with the phrase "Concussion Reduction Technology" or "CRT," which necessarily intends or implies the ability to reduce concussions, and that such phrase mislead or deceived consumers regarding the ability of Riddell helmets with CRT to reduce the incidence of concussion better than any other football helmet on the market. Plaintiffs' also seek damages in the amount of the "premium" extracted by Riddell from CRT helmet purchasers. Thus, Plaintiffs' damages theory fits precisely with and is relevant to their theory of liability. Evidence of price premium is supported by, of course, the fact that Riddell acknowledges adding a premium to its pricing in order to capitalize on the perceived CRT safety benefit. On this topic, Riddell's own expert in the Schutt patent litigation had the following to say: ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████Cecchi Suppl. Dec., Ex 72 at

31

RIDDELL-FTC-002474.   Therefore, Plaintiffs' damages model acknowledges Riddell's misconduct and offers valid methods to calculate class-wide damages caused by that misconduct.

Riddell further argues that to be valid and "fit", Plaintiffs' damage analysis "must be" based upon a comparison against Schutt and Xenith pricing.  DE. 214 at 49.  This argument is unfounded.  It relates to Riddell's attempt to recast the claims and issues in this case and it blatantly ignores the fact that Riddell admits to adding a $50 price premium to take advantage of the consumer perception created by CRT.  DE. 189, Exs. 32, 33.  Thus, the damage premium is properly calculated internally, not by comparing competitor pricing.

Riddell continues its lack of "fit" argument by complaining Plaintiffs' damages model is flawed in that it compares pre-CRT sales with post-CRT sales.  *Id*.  Riddell says this is wrong because it "assumes all post-CRT sales are attributable to false or misleading marketing, and that any purchaser therefore suffered damages.  *Id*.  This is precisely the point all post-CRT sales are attributable to the falsity of CRT.  As established, Riddell's marketing of CRT was common and uniform.  Every purchaser post implementation of the CRT marketing program was exposed to CRT and was damaged by the premium Riddell *admits* was directly attributable to this claim.  Thus, the before and after (pre- and post-) CRT comparison is appropriate.

Accordingly, the damages model, as set forth in the Cowan Report, DE. 189, Ex. 36, "fits" here in that it is relevant for the purposes of the case and will assist the trier of fact.  *Calhoun v. Yamaha Motor Co., U.S.A.*, 350 F. 3d 316, 321 (3d Cir. 2003).[30]

---

[30] Riddell relies heavily upon *In re Pharmacy Benefit Managers Litig*., 2017 WL 275398 (E.D. Pa. Jan. 18, 2017)("*PBM*") in its effort to discredit Dr. Cowan, as if to imply that when an expert's opinion is rejected in one case, all of his opinions in subsequent unrelated cases must be rejected, regardless of differing facts, law, and claims.  The *PBM* case involves MDL claims of complex antitrust price fixing conspiracies that resulted in alleged reductions in amounts reimbursed to pharmacies for prescriptions filled.   Dr. Cowan submitted several reports regarding plaintiffs' claims and damage theories in that case.  Although Dr. Cowan was deemed

**(b).   Plaintiffs' damages model recognizes any necessary "variables."**

Riddell next argues that Plaintiffs' damage model is deficient in that it does not "account for other alleged variables" affecting pricing and profit margins such as, "███████████ ████████████████████████████████████████████████████ DE. 214 at 51-52.  These alleged "variables" are not dispositive to Plaintiffs' assessment because Riddell itself added the premium *after* all of these alleged variables are accounted for.  That is, Riddell set its price utilizing these "variables" before it added the $50 premium.

In addition, there is nothing in the Cowan Report to indicate that most if not all of these alleged variables would not be considered by his alternative methodology.  Indeed, Dr. Cowan's conservative methodology considers manufacturer's cost, which includes many if not all of the alleged variables.  Moreover, Dr. Cowan's Report clearly acknowledges differences in "cost of production" and "product line categories."  DE. 189, Ex. 36 at 6.  "Cost" is also an element of his GPM formula.  *Id.* at 5, ¶ 17.  *See also* Cowan Report, DE. 189, Ex. 36 at 5, ¶ 19 ("The benefits of considering GPM and its trends across time include that it accounts for varying costs of goods, and it easily allows for entry and exit of specific product lines throughout the timeline.").  Furthermore, even if the Court gives credence to the argument that the alleged variables were omitted from Dr. Cowan's methodology, it would go only to the weight of his opinion and not to its admissibility.  *See, e.g*., *Schwartz v. Avis Rent A Car, LLC*, 2014 WL 4272018, *5 (D.N.J. Aug. 28, 2014) (finding defendant's various allegations of unreliability in expert's report goes to weight and not admissibility).

---

qualified, his reports and opinions were, as Riddell exclaims, excluded by the *PBM* court.  However, there is no similarity in the facts, issues or law between the *PBM* case and this case.  The only similarity is that Dr. Cowan submitted an expert report in each case.

Riddell further argues that Dr. Cowan offered only a "[m]ere assurance that a methodology could be applied" and that he did not test his proposed methodologies because "it would not be possible to do so without information from Defendants."  DE. 214 at 51.  Dr. Cowan actually provided more than an assurance.  In addition to the straight-forward $50 multiplied by number of helmets sold methodology, he provided an acceptable alternative and conservative methodology, in fact a mathematical formula, for determining class-wide damages. Cowan Report, DE. 189, Ex. 36 at 3, 5, 7.  However, the formula requires "plugging-in" specific and identifiable financial data held by Riddell.[31]  Stated differently, a valid formula exists; Riddell merely needs to produce the withheld financial data to input into the formula in order to establish a final class-wide damage number.[32]  The fact that Riddell holds the financial data to be used in Plaintiffs' damages formula does not preclude the use of Plaintiffs' class-wide damage theory and analysis.  *See Goldenberg v. Indel, Inc*., 2012 WL 3780555 (D.N.J. Aug. 30, 2012) ("Plaintiffs need only demonstrate that they are capable of proving classwide damages…").  In sum, Plaintiffs have offered two viable methods of proving class-wide impact with common

---

[31] ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████  DE. 189, Ex. 27, at 30-31, 79, 83.  In sum, Riddell readily maintains the pricing information to be plugged-in to Dr. Cowan's formula. It merely has not been produced at this point in the litigation.  *See* Footnote 32, *infra*.

[32] Plaintiffs did not seek to compel production of all necessary Riddell financial records during class discovery and Plaintiffs should not be prejudiced by that decision.  Defendants vigorously resisted Plaintiffs' discovery requests for such comprehensive production at the class stage and the Court deferred such discovery.  *See* Letter Order, Oct. 26, 2015, DE. 90 ("If a discrete and severable issue exists that is only relevant if the class is certified (*e.g*., class wide damages), the Court may defer discovery on the issue").  Later, the Court ruled, "Plaintiffs should only take the merits discovery they reasonably need to file their class certification motion."  Letter Order, June 8, 2016, DE. 157. Riddell's actual financial records were unnecessary to create a damage formula for this case.  They are, however, necessary upon certification to "plug-in" to the formula.  Riddell should not be allowed to withhold production of financial information and now claim that Plaintiffs lack sufficient financial information to support their damages formula.

evidence as to issue of causation. *See In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 371 (D.D.C. 2007) ("plaintiffs need only demonstrate that a viable methodology is available, not that their methodology is the best or most accurate").[33]

**(c). Alleged individual damage issues do not predominate**.

For its final attack upon Plaintiffs' damages model Riddell argues in speculative fashion that, "class certification should be denied because there are individual issues relating to whether class members suffered any injury at all, either because they did not in fact pay a premium, or because they would have purchased the helmet regardless of Riddell's CRT marketing claim." DE. 214 at 53. Once again, these allegations were discredited above. And, moreover, these alleged individual damage issues cannot preclude a finding of predominance. *See In re Cardizem*, 105 F. Supp. 2d 618 (E.D. Mich. 2000).

Next, Riddell contends Plaintiffs cannot show an ascertainable loss because, in essence, Riddell disagrees with its own price premium admissions and the damages model prepared by Plaintiffs' expert, Dr. Cowan. DE. 214 at 54. More specifically, Riddell disagrees with Dr. Cowan's comparison of Riddell gross profit margins for particular years and then misconstrues Dr. Cowan's report to say "a purchaser who purchased a Revolution helmet series helmet for more than $50 below MSRP, has no ascertainable loss." *Id*. Thus, Riddell concludes the "proposed classes *could include* numerous class members who have suffered no injury at all," and this presumably creates some impermissible issue of damages. DE. 214 at 54 (emphasis

---

[33] Riddell also argues that Dr. Cowan's "choice of time period ignores the changing market and results in comparison of helmets that are not comparable and were on the market at different times." DE. 214 at 52. This is wrong because Riddell imposed the premium on all helmets with CRT during the period they were sold; so comparing different "models" of helmets with CRT would be improper. Riddell also argues that the time period utilized to measure damages – from 2008 to present – is wrong because (as we have heard) Riddell "stopped making the CRT claims in 2012." *Id*. at 52. This argument has been proved wrong.

added).  Riddell apparently fabricated this argument by taking out of context Dr. Cowan's statement at page 4 of his Report that a discount of more than $50 could make the premium zero. Riddell jumps from this statement to the conclusion there "could be" "no ascertainable loss" for numerous class members.  *Id.*[34]  In truth, Dr. Cowan's Report specifically recognizes that even when a helmet is "sold at a discount, there still is an impact from the premium," and that variance in the premium paid will depend "on the actual price paid relative to the respective MSRP."  Cowan Report, DE. 189, Ex. 36 at 4.  Thus, Riddell's contention that if the discount is equal to or exceeds $50, then there is no ascertainable loss is incorrect.  Furthermore, for purposes of class certification, even if there are some unnamed class members who suffered no damages, that alone cannot preclude certification.  *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001) (Plaintiffs are not required to show that fact of injury actually exists for each class member").  *See also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F. 3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct…. Such a possibility or indeed inevitability does not preclude class certification.").

These alleged individual damage issues do not create a barrier to class certification. Indeed, variations in damages among class members are common and expected and do not preclude certification.  The Court need only assess whether "methods are available to prove damages on a class-wide basis."  *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. Feb. 25, 2002).  As a result, Plaintiffs do not need to provide a precise damage formula, nor do they need to take into account or eliminate individual variations in damages.  *Id.*; *see also In re*

---

[34] As an example to support this leap of speculation, Riddell offers its repeatedly discredited allegations against Ms. Thiel and AYSA.  For Ms. Thiel, Riddell again says she cannot prove, in this instance, damages, because her son could have used a school provided Riddell helmet with CRT for free.  DE. 214 at 54.  For AYSA, Riddell again argues that AYSA resold or rented Riddell helmets they purchased, and any amounts they received would have to be accounted for." *Id.*  These examples do not establish that individual damages issues will predominate.

*Jack Faucett Assoc. v. American Tel. & Tel.*, 1983 WL 4601, *3 (D.D.C. Mar.18, 1983) ("[w]hile the quantum of damages for each plaintiff may be different, that fact alone is insufficient to introduce a predominant noncommon question.").

Further, to the extent individual damages issues *may* need to be accounted for as Riddell alleges, it is well-established that such individualized issues with respect to damages calculations do not defeat Rule 23(b)(3) certification if the predominance requirement is otherwise met. *See In re General Motors,* 55 F. 3d 768, 817 (3d Cir. 1995) ("because separate proceedings can, if necessary be held on individualized issues such as damages . . . such individual questions do not ordinarily preclude the use of the class action device"); *Chiang v. Veneman*, 385 F. 3d 256, 273 (3d Cir. 2004) (same).

Accordingly, the individual damages issues alleged by Riddell do not predominate in this matter.  Moreover, Plaintiffs have offered a valid and reasonable approach to calculating damages and the Court should find that Plaintiffs have established that common issue of damages predominates.

### 12.    Plaintiffs have Established Ascertainability.

Riddell maintains detailed sales records for all persons and entities who purchased CRT helmets *from* Riddell (█████████████████████████████████████.  The sales records admittedly retained by Riddell █████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████  *See* DE. 188 at 43-44.

████████████████████████████████████████████████████████████████

████████████████████████████████████  *Id*. at 20.  This information should easily establish there is "a reliable and administratively feasible mechanism for determining

whether putative class members fall within the class definition."  *Byrd v. Aarons, Inc.*, 784 F. 3d 154, 163 (3d Cir. 2015).  The "ascertainability inquiry is narrow," and it "only requires the plaintiff to show that class members can be identified."  *Id*. at 165.  Furthermore, the ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.'"  *Id*. at 163.  *See also Grandalski v. Quest Diagnostics Inc.*, 767 F. 3d 175, 184-85 (3d Cir. 2014) ("Our cases that have addressed ascertainability have focused on whether objective records could readily identify class members.");  *Flores v. Anjost Corp.*, 284 F.R.D. 112, 123 (S.D.N.Y. 2012) ("The class can clearly be ascertained by objective documentation, such as Defendants' employee payroll records and wage statements; no subjective criteria is required to determine the class'[s] contours.  The fact that an analysis of Defendants' data is necessary does not render a class unascertainable.") (internal citation omitted).[35]  Furthermore, the classes are appropriately limited to those who purchased from Riddell in New Jersey, Arizona, California and Florida.  *See Korrow v. Aaron's Inc.*, 2013 WL 5811496, at *7 (D.N.J. July 31, 2013).

Accordingly, ascertainability is clearly established through the detailed records Riddell maintains for approximately ■■■ of the purchases at issue in this case.  Indeed, ascertainability rarely gets better than that.

Instead of conceding ascertainability in light of the detailed customer records it maintains, Riddell belligerently argues Plaintiffs have "failed to provide any evidence in support

---

[35] Furthermore, whether a proposed class includes individuals who were not exposed to Riddell's CRT message or even those who were not harmed is irrelevant for ascertainability.  *See Byrd*, 784 F. 3d at 167-68.  And, "[t]o the extent [Riddell] meant to challenge any potential differences between the proposed class representatives and unnamed class members, such differences should be considered within the rubric of the relevant Rule 23 requirements such as adequacy, typicality, commonality, or predominance."  *Id.* at 169.

of an administratively feasible method of identifying class members...," and offers two arguments in support of this conclusion.  DE. 214 at 55.  First, Riddell says the classes are not ascertainable because Plaintiffs seek to include individuals *like* Mr. Farrell who Riddell alleges did not purchase from Riddell and Riddell has no record of his purchase" (but they do have sales records for his school they sold to), and Plaintiffs offer "no method to objectively identify individuals *like* Mr. Farrell."  DE. 214 at 55 (emphasis added).  Riddell's second argument is that the "resale issues . . . frustrate class treatment of Riddell's institutional purchasers," because "many institutional purchasers resell or rent the helmets they buy from Riddell, which makes their assertions of injury and class membership individualized."  *Id*. at 55-56.  That's it – allegations that there *may* be individuals "*like* Mr. Farrell," and some purchasers who *may* have resold or rented their helmets.  These are both speculative arguments and Riddell has not offered any evidence to support these allegations.  Moreover, these two arguments, in light of the substantial (if not complete) amount of customer records Riddell maintains, cannot overcome a finding of ascertainability in this case.

　　　Riddell also contests the ascertainability of the proposed retail purchaser class in each state.  DE. 214 at 56.  ██████████████████████████████ ████████████████████████████████████ Plaintiffs referenced in their Memorandum in Support of Class Certification the methods for ascertaining the retail purchasers.  Plaintiffs restate those steps here.  *See* DE. 188, at 44-45.

### 13.    **Rule 23(b)(2) Certification is Proper**.

Certification is appropriate under Rule 23(b)(2) in this case because Riddell is a continuous threat to reinstitute its claims of CRT or similar misrepresentations to maintain or gain a marketing and financial advantage.   The fact that they say they have ceased use of the term CRT is of no avail.[36]  Based upon its proclivity to misrepresent the efficacy of its products for profit, Riddell is likely to violate the various consumer laws again in the future.  For example, Riddell promised the FTC it would drop its 31% reduction claims, but immediately shifted to CRT to promote a perception of increased safety.  *See* fn. 9, above.  Without injunctive and or declaratory relief directing Riddell to forever cease such misleading conduct, then the threat remains.   Furthermore, for purposes of the Florida classes, the Florida Deceptive and Unfair Trade Practices Act allows a claimant to seek an injunction even if the complained of conduct has ceased.  *See Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc*., 187 So. 3d 868, 870 (Fla. App. 2016) ("The mere voluntary cessation of conduct alleged to be in violation of FDUTPA does not necessarily foreclose [plaintiff] from pursuing an action for injunctive relief").

### 14.    **Issue Certification is Appropriate under Rule 23(c)(4)**

In the event the Court determines that Plaintiffs' classes cannot be certified under Rule 23(b)(3), it would be proper in this case to certify specific core liability questions respecting those claims under Rule 23 (c)(4)(A).  *In Gates v. Rohm and Haas Co*., 655 F.3d 255 (3d Cir. 2011), the Third Circuit, adopting an analysis from the American Law Institute's Proposed Final Draft of the Principles of the Law of Aggregate Litigation, explained that the criteria to be considered in whether or not to certify specific issues are:

---

[36] Again, the marketing is still present on their social media as of March 10, 2017.  *See* Cecchi Suppl. Dec., Exs. 57-59.

> [T]he type of claim(s) and issue(s) in question; the overall
> complexity of the case; the efficiencies to be gained by granting
> partial certification in light of realistic procedural alternatives; the
> substantive law underlying the claim(s), including any choice-of-
> law questions it may present and whether the substantive law
> separates the issue(s) from   other issues concerning liability or
> remedy; the impact partial certification will have on the
> constitutional and statutory rights of both the class members and
> the defendant(s); the potential preclusive effect or lack thereof that
> resolution of the proposed issue class will have; the repercussions
> certification of an issue(s) class will have on the effectiveness and
> fairness of resolution of remaining issues; the impact individual
> proceedings may have upon one another, including whether
> remedies are indivisible such that granting or not   granting relief
> to any claimant as a practical matter determines the claims of
> others; and the kind of evidence presented on the issue(s) certified
> and potentially presented on the remaining issues, including the
> risk subsequent triers of fact will need to reexamine evidence and
> findings from resolution of the common issue(s).

*Id*. at 273.  The Third Circuit characterized this as a "non-exclusive list of factors [that] should

guide courts as they apply Fed. R. Civ. P. 23(c)(4) to treat common things in common and to

distinguish the distinguishable."  *Id*. (citations and internal quotation marks omitted).

Application of the *Gates* Rule 23(c)(4) factors here indicates that certification of the issue

of Riddell's liability under the four state consumer fraud laws at issue is particularly appropriate.

Certification is consistent with a number of the ALI Principles of Aggregate Litigation:  the

substantive law in this case does not require a person-by-person inquiry to determine class-wide

liability; for each class, a single body of law applies to the claims; certification will provide an

effective method to resolve these proceedings; certification of a liability class will be

significantly more efficient than resolving each of these cases individually; individual

proceedings will have no impact on the class proceeding; and the evidence presented in support

of liability will be different than that needed to establish individualized damage claims.  These

factors weigh heavily in favor of certification with respect to liability in this case as common

proof can resolve that issue "in one stroke" for all Class members.  *See Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

The determination of a defendant's liability is appropriate for treatment on a class-wide basis where, as here, the misrepresentations were uniform.  Certifying a liability class will thus materially advance this litigation by resolving, for all Class members, the disputed issue of whether Riddell violated the consumer fraud laws at issue. Consideration of the remaining *Gates* Rule 23(c)(4) factors — *i.e.*, whether individual proceedings will have any impact on the class proceeding, whether the evidence presented in support of liability will be different than that needed to establish individualized damage claims, and whether issue certification will fairly and efficiently advance the litigation — therefore militate in favor of granting a Rule 23(c)(4) certification here.  Notably, the central problem that prompted the *Gates* Court to affirm the district court's denial of class certification — namely, because the issue of liability was inseverable from other individual issues that would be left for follow-up proceedings, 655 F.3d at 272, 273-74 — is not present here.  And, unlike in *Gates*, Plaintiffs have not failed to "define the scope of the liability-only trial" or to "propose what common proof would be presented."  *Id*. at 274.

Courts in this Circuit and elsewhere have recognized that:

> Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. . . .  These solutions include bifurcating liability and damage trials with different juries or decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages. . . .  Thus, once the question of liability is answered concerning Defendants' conduct, the Court may consider whether to decertify the Classes or take other appropriate measures.

*Wallace v. Powell*, 2013 WL 2042369, at *21 (M.D. Pa. May 14, 2013) (citations omitted).

42

By way of example only, if a fact finder determines that CRT is false or misleading, issues as to an appropriate remedy can be resolved either by settlement, or by way of a special master process, or as directed by the Court. *Butler v. Sears Roebuck and Co*., 727 F. 3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification"); *Allapattah Servs., Inc. v. Exxon Corp*., 157 F. Supp. 2d 1291, 1324-26 (S.D. Fla. 2001) (appointing special master to administer $1 billion damages award); *In re Visa Check/Master Money Antitrust Litig*., 280 F.3d 124, 141 (2d Cir. 2001) (listing a number of ways to proceed following a finding of liability in favor of a 23(c)(4) liability class, including appointing a magistrate judge or special master to preside over individual damages proceedings).

Because individualized damages proceedings would only take place following a finding of liability in the Plaintiffs' favor, it would be unnecessary to develop (or consider) a class-wide damages theory under *Comcast*. *See Butler*, 727 F.3d at 799-802.

## CONCLUSION

Plaintiffs respectfully request this Court grant their Motion for Class Certification and certify the classes (or alternative subclasses), appoint Plaintiffs as Class Representatives, and appoint Interim Class Counsel as Class Counsel.

Dated: March 10, 2017

Respectfully submitted,

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Interim Class Counsel

By:      */s/ James E. Cecchi*
          JAMES E. CECCHI

Dennis G. Pantazis
D. G. Pantazis, Jr.
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500

*Interim Class Counsel*

Additional counsel for Plaintiffs:
E. Clayton Lowe, Jr.
THE LOWE LAW FIRM, LLC
301 19th Street North, Ste. 525
Birmingham, Alabama 35203
 (205) 314-0607

44